```
1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF FLORIDA

3                   JACKSONVILLE DIVISION

4   AMBER MILLS, an individual  )
                                )
5           Plaintiff,          )
                                ) CIVIL ACTION NO.
6   -VS-                        )
                                ) 3:33-CV-00477-TJC-LLL
7   STATE FARM MUTUAL           )
    AUTOMOBILE INSURANCE        )
8   COMPANY,                    )
                                )
9           Defendant.          )

10
              **************************************
11             ORAL AND VIDEOTAPED DEPOSITION OF THE
                30(b)(6) CORPORATE REPRESENTATIVE
12                      RUSSELL HORNE
                     DECEMBER 8, 2023
13                       VOLUME 1
              **************************************
14

15          ORAL AND VIDEOTAPED DEPOSITION of RUSSELL

16   HORNE, produced as a witness at the instance of the

17   Plaintiff, and duly sworn, was taken in the above-styled

18   and numbered cause on the 8th day of December, 2023,

19   from approximately 9:25 a.m. to 3:58 p.m., before

20   Melissa J. Carson, CSR, in and for the State of Texas,

21   reported by machine shorthand, at the TOWNE PLACE

22   SUITES, 545 K Avenue, located in the City of Plano,

23   County of Dallas, State of Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.
```

EXHIBIT A

Russell Horne    12/8/2023

```
 1                   A P P E A R A N C E S

 2    FOR THE PLAINTIFF:

 3            MR. HOWARD G. BUTLER
              MR. DREW BASKIN (VIA ZOOM)
 4            BUTLER LAW GROUP
              1506 Prudential Drive
 5            Jacksonville, Florida 32207
              PHONE:  904.398.2308
 6            EMAIL:  hgb@butlerlawgroup.net

 7    FOR THE DEFENDANT:

 8            MS. AMANDA L. KIDD
              BOYD & JENERETTE, P.A.
 9            201 North Hogan Street
              Suite 400
10            Jacksonville, Florida 32202
              PHONE:  904.353.6241
11            EMAIL:  akidd@boydjen.com

12
      ALSO PRESENT:
13
              Mr. Tony McGough, Videographer
14

15

16

17

18

19

20

21

22

23

24

25
```

Russell Horne    12/8/2023

```
 1                          INDEX
                                              PAGE
 2
     Appearances.......................................  2
 3

 4   RUSSELL HORNE

 5   Examination by Mr. Butler.........................  5

 6   Signature and Changes.............................143

 7   Reporter's Certificate............................145

 8

 9                         EXHIBITS

10   NO.                DESCRIPTION              PAGE

11   1    Composite of Plaintiff's Notice Of
          Taking 30(b)(6) Corporate
12        Representative Video Deposition Duces
          Tecum Of State Farm Mutual Automobile
13        Insurance Company's Corporate
          Representative............................  6
14
     1A   Thumb drive (attached to original only).......  24
15
     2    Copy of Mr. Horne's driver's license..........  6
16
     3    Copy of insurance definition..................  14
17
     4    Copy of Florida Law Nonjoinder Statute........  16
18
     5    Photocopy picture of State Farm at
19        CityLine......................................  52

20   6    Mr. Horne's resume............................  52

21   7    Copy of Our Commitment to Our
          Policyholders from State Farm's auto
22        claims manual.................................  61

23   8    Copy of Liability Coverage for Bodily
          Injury from State Farm's auto claims
24        manual........................................  63

25
```

Russell Horne    12/8/2023

Page 4

1                    EXHIBITS (CONTINUED)

2    NO.                    DESCRIPTION                    PAGE

3    9    Copy of excerpt from State Farm's claims
          manual in effect 9/18/19..................... 64
4
     10   Copy of Claim Activity and Processing,
5         Reserves from State Farm's claims manual..... 73

6    11   Composite copy of State Farm Claims File,
          Mary Laseter's injuries...................... 84
7
     12   No exhibit marked
8
     13   Copy of State Farm Claims Handling Activity
9         Context Timeline............................. 89

10   14   Composite copy of Amber Mills' demand
          dated 2/18/22................................ 92
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Russell Horne    12/8/2023

```
 1                    P R O C E E D I N G S
 2               (Exhibit No. 1 marked.)
 3               THE VIDEOGRAPHER:   We're now on the
 4    record.   Today's date is December the 8th, 2023 and the
 5    time is 9:25 a.m.
 6               This is the video deposition of Russell
 7    Horne as corporate representative of State Farm Mutual
 8    Automobile Insurance Company.   If the attorneys could
 9    please state their appearances for the record, after
10    which the court reporter will please swear in the
11    witness.
12               MR. BUTLER:   Howard Butler on behalf of
13    Amber Mills.
14               MS. KIDD:   Amanda Kidd on behalf of State
15    Farm and the witness.
16               (Witness sworn.)
17                    RUSSELL HORNE,
18    The witness hereinbefore named, being first duly
19    cautioned and sworn to testify the truth, the whole
20    truth, and nothing but the truth, testified on his oath
21    as follows:
22                    EXAMINATION
23    BY MR. BUTLER:
24        Q.   Please state your full name for the record.
25        A.   Russell Eric Horne.
```

Russell Horne    12/8/2023

1    Q.  Mr. Horne, do you have a company business card

2  associated with your work at State Farm?

3    A.  I do not.

4    Q.  You don't carry a business card in any settings

5  at all?

6    A.  No, we do -- we do not.

7    Q.  Do you have a copy of your driver's license

8  here with you today?

9    A.  I do.

10    Q.  I'm going to ask that you give the court

11  reporter your driver's license so that she can make a

12  copy of it --

13    A.  Sure.

14    Q.  -- for the record.  That will be Exhibit No. 2

15  to the deposition.  Exhibit No. 1 is the composite of

16  the Deposition Notices from the beginning up until

17  currently.

18         Is it your understanding that we're here to

19  ask State Farm questions under oath about State Farm,

20  its insured, Mary Laseter, a collision occurring on July

21  29th, 2021, in Jacksonville, Florida, and State Farm's

22  related claims handling up through March 30th, 2023?

23    A.  That's my understanding.

24    Q.  In accordance with the Federal Rules of Civil

25  Procedure, we're here in Dallas, Texas, to take the

Russell Horne    12/8/2023

```
 1    deposition of State Farm regarding its institutional
 2    knowledge and related documents regarding certain
 3    designated areas of inquiry in the case of Amber Mills
 4    versus State Farm.  Is that your understanding as well?
 5         A.  Yes, it is.
 6         Q.  Have you been chosen, designated, and fully
 7    prepared by State Farm to serve as its designated
 8    corporate representative in this case and to give
 9    complete, knowledgeable, and binding testimony under
10    oath regarding one or more of the designated areas set
11    forth in Exhibit No. 1, the Notice of Depositions?
12         A.  Yes.
13         Q.  Corporations like State Farm speak only through
14    its people, correct?
15              MS. KIDD:  Object to form.  You can answer.
16         Q.  (BY MR. BUTLER)  A corporation can only speak
17    through its people?
18         A.  Yes.
19         Q.  And perhaps in some cases via its own internal
20    documents?
21              MS. KIDD:  Object to form.  You can answer.
22              THE WITNESS:  Okay.
23         A.  Yes.
24         Q.  (BY MR. BUTLER)  You're aware that State Farm
25    is allowed to designate and prepare multiple people as
```

R, 403

Russell Horne    12/8/2023

Page 8

R, 403

1  desired to cover particular areas of inquiry as they see
2  fit?
3            MS. KIDD:   Object to form.
4       A.  Yes.
5       Q.  (BY MR. BUTLER)   Has State Farm designated
6  anyone besides yourself for any of the noticed areas of
7  inquiry in this case?
8       A.  No.
9       Q.  Just you?
10      A.  Correct.
11      Q.  In addition to being State Farm's designated
12 corporate representative in this case, you were actually
13 involved at a supervisory management level in the claims
14 handling process of the Mills versus Laseter case from
15 the outset to the trial and up through entry of the
16 final judgment, true?
17      A.  Yes.
18      Q.  Is it State Farm's understanding that Amber
19 Mills has a valid assignment of all rights and claims
20 from State Farm's insured, Mary Laseter?
21      A.  Yes.
22      Q.  Let's go over some basics.  What is auto
23 liability insurance generally?   What is it that State
24 Farm is selling to its customers?
25            MS. KIDD:  Object to form.

Russell Horne    12/8/2023

Page 9

1        A.  Can you repeat?  I'm sorry.

2        Q.  (BY MR. BUTLER)  What is auto liability

3    insurance generally?

4              MS. KIDD:  Object to form.

5        A.  Generally it's the third-party coverage where

6    we're finding for the insured in case they are at fault

7    for any liabilities.

8        Q.  (BY MR. BUTLER)  I'm going to show you an item

9    that has a general definition of insurance.  Take a

10   moment to look at that.

11       A.  Okay.

12       Q.  Does State Farm agree with this general

13   definition of insurance?

14             MS. KIDD:  Object to form.

15       A.  Yes.

16       Q.  (BY MR. BUTLER)  And if you would, show that to

17   the camera just briefly so we know what it is that

18   you're looking at.

19       A.  (The witness complies.)

20       Q.  And what is that basic definition of insurance?

21       A.  Seems like a very general insurance practice

22   definition.

23       Q.  And what is that definition that we just looked

24   at?

25       A.  It's a definition of a contract for insurance

R, 403, HS

Russell Horne    12/8/2023

Page 10

R, 403, MIL

1    coverage.

2        Q.   Does State Farm agree that auto liability

3    insurance is a type of insurance where an individual

4    pays an insurance company in exchange for financial

5    protection or reimbursement of losses resulting from a

6    covered event?

7              MS. KIDD:  Object to form.

8        A.   Yes.

9        Q.  (BY MR. BUTLER)  In general, how do insurance

10   companies make money?

11             MS. KIDD:  Object to form.

12       Q.  (BY MR. BUTLER)  And I'm going to just show you

13   again.

14             MS. KIDD:  Hey, I'm going to give some

15   leeway here, but this is outside the scope of the areas

16   of inquiry.  So it's not noticed and not part of this

17   deposition.

18       Q.  (BY MR. BUTLER)  Take a look at what you have

19   there in front of you and I'm going to ask you a

20   question when you're done.  Does State Farm generally

21   agree with this explanation of how insurance carriers

22   make money?

23             MS. KIDD:  Object to form.

24       A.   I'm not an expert in that area.  I can't answer

25   that question.

Russell Horne    12/8/2023

Page 11

```
 1        Q.  (BY MR. BUTLER)  And I'm not asking you to be
 2   an expert in that area, but it's my understanding that
 3   you have been working at State Farm for about a decade
 4   at this point?
 5        A.  Correct.
 6        Q.  Do you have a general sense, given your
 7   background and as their corporate representative in this
 8   case, as to whether or not insurance companies make
 9   their money by charging for any premiums in exchange for
10   insurance coverage, then reinvesting those premiums into
11   other interest-generating assets?
12             MS. KIDD:  I'm going to object to form.
13   I'm going to instruct you not to answer.  It's outside
14   the scope of the deposition.
15        Q.  (BY MR. BUTLER)  State Farm is the largest auto
16   liability insurance company in the U.S.?
17             MS. KIDD:  Object to form.
18        A.  Yes.
19        Q.  (BY MR. BUTLER)  Does State Farm consider
20   itself to be a leader in that industry?
21             MS. KIDD:  Object to form.
22        A.  I believe so, yes.
23        Q.  (BY MR. BUTLER)  Is Florida a significant and
24   important market for State Farm?
25             MS. KIDD:  Object to form.
```

R, 403, MIL

Russell Horne    12/8/2023

1      A.  I don't know and I can't answer that.  It's

2   outside of my scope.

3      Q.  (BY MR. BUTLER)  You yourself adjust cases in

4   Florida?

5      A.  Correct.

6      Q.  Other people here in the Dallas office of State

7   Farm -- strike that.

8              Other individuals here in the Dallas

9   corporate offices of State Farm adjust Florida claims as

10  well?

11     A.  Correct.

12     Q.  What percentage of your claims come from

13  Florida?

14     A.  Personally?

15     Q.  Yes, sir.

16     A.  A hundred percent.

17     Q.  And what percentage of claims for which Angela

18  Butler serves as a claims specialist would be from the

19  state of Florida?

20     A.  100 percent.

21     Q.  Does State Farm's premium rates take into

22  account the relative risk of its policyholder drivers?

23              MS. KIDD:  Object to form and I'm going to

24  instruct you not to answer.

25     Q.  (BY MR. BUTLER)  State Farm had insured Mary

Russell Horne    12/8/2023

Page 13

 1    Laseter for many years prior to this wreck?

 2                    MS. KIDD:  Object to form.

 3          A.  I'm unaware.

 4          Q.  (BY MR. BUTLER)  Would that information be

 5    reflected in State Farm's claims file?

 6          A.  No, it would not.

 7          Q.  Where would that information be held?

 8          A.  Typically that's with our agency office.

 9          Q.  And your agency office is where?

10          A.  I'm not sure who Mary Laseter's agent is, so I

11    cannot answer that.

12          Q.  Is it your understanding that nowhere in the

13    State Farm records that pertain to this matter is any

14    information on how long Mary Laseter had been a State

15    Farm insured?

16          A.  My understanding, what's in the State Farm file

17    is it would show the policy inception date that's

18    applicable to this loss in question.

19          Q.  So regardless, you don't know the answer to

20    that question?

21          A.  Correct.

22          Q.  Would it be true that State Farm had

23    accumulated for its insured, Mary Laseter, the types of

24    data that auto insurance carriers typically obtain on

25    their customers for relative risk assessment purposes?

Russell Horne    12/8/2023

Page 14

```
 1              MS. KIDD:  Object to the form and I'm going
 2   to instruct you not to answer.
 3       Q.  (BY MR. BUTLER)  If you would, I'm going to
 4   just --
 5       A.  (The witness hands a document to Mr. Butler.)
 6   Oh, this one?
 7       Q.  Yes, sir.  I'm going to put the Exhibit 2
 8   sticker on the --
 9              THE REPORTER:   I thought you wanted his
10   driver's license as 2.
11              MR. BUTLER:  You know, I think you're
12   absolutely right.  Thank you for keeping us straight on
13   that.  So this is number 3, the definition of insurance.
14              (Exhibit No. 3 marked.)
15              MS. KIDD:  And we'll just object to that
16   exhibit.
17              MR. BUTLER:  Madam court reporter, I'm
18   going to get these to you for holding.
19       Q.  (BY MR. BUTLER)   In accordance with State
20   Farm's policy with its insured, Mary Laseter, did State
21   Farm have exclusive control over claims-handling
22   decisions?
23       A.  Yes.
24       Q.  Exclusive control over negotiations and
25   settlement?
```

Russell Horne    12/8/2023

Page 15

1        A.   Yes.

2        Q.   Exclusive control over which litigation

3   attorneys, if any, defend the case?

4        A.   The firm, yes, but the individual attorneys,

5   no.

6        Q.   Exclusive control over litigation-related

7   decisions?

8        A.   Sometimes.

9        Q.   And does State Farm have the exclusive ability

10  to hire and fire the attorneys defending the case?

11       A.   Yes.

12       Q.   Each of those things are spelled out in State

13  Farm's policy, State Farm's claims manual, and State

14  Farm's manual for defense attorneys it chooses --

15            MS. KIDD:  Object to the form.

16       Q.   (BY MR. BUTLER)  -- correct?

17            MS. KIDD:  You can answer.

18       A.   Correct.

19       Q.   (BY MR. BUTLER)  State Farm -- strike that.

20            In your Florida claims, would you and other

21  State Farm claims-handling personnel work closely with

22  the defense attorneys chosen by State Farm in any given

23  case?

24       A.   Yes.

25       Q.   Is State Farm and its claims-handling personnel

R,
403

R, 403,
LC

Russell Horne    12/8/2023

Page 16

R, 403, LC

1    familiar with Florida's nonjoinder statute?

2        A.  Yes.

3        Q.  And please explain a little bit about what the

4    nonjoinder statute is, how it works in a Florida auto

5    liability case like this.

6                MS. KIDD:  Object to the form.

7        A.  I -- I'm so sorry, I have to apologize that

8    it's not ringing a bell at the moment.

9        Q.  (BY MR. BUTLER)  And I'll -- I'll try to help a

10   little bit.  Let me start by showing you this.

11               (Exhibit No. 4 marked.)

12       A.  Yes, I am familiar with that.

13       Q.  If you would, show that to the camera just so

14   we know what you're looking at there.

15       A.  (The witness complies.)

16       Q.  Thank you.  The nonjoinder statute in the state

17   of Florida does what?

18               MS. KIDD:  Object to the form.  You can

19   answer.

20       A.  So I can read this verbatim?

21       Q.  (BY MR. BUTLER)  No, I'm more interested in

22   your knowledge about how it works from --

23       A.  Sure.

24       Q.  -- State Farm's perspective.

25       A.  Sure.  From State Farm's perspective, again, if

Russell Horne    12/8/2023

Page 17

1    there -- I'm -- I'm honestly just by letter, I'm going

2    to read this.  Nonjoinder statute prohibits injured

3    third parties from filing a direct action against a

4    liability insurer unless that third party has satisfied

5    one of the following conditions obtaining a settlement

6    against the insured; or two, obtaining a verdict against

7    the insured.

8        Q.  In a situation like the Amber Mills versus Mary

9    Laseter case, how does that nonjoinder statute come into

10   play?

11           MS. KIDD:  Object to form.  You can answer.

12       A.  It would come into play in the sense that you

13   prevailed in litigation.

14       Q.  (BY MR. BUTLER)  Is State Farm itself a party

15   to the lawsuit between Amber Mills and Mary Laseter

16   prior to the entry of a verdict in the case?

17       A.  I'm sorry, can you rephrase that?

18       Q.  Was this case -- strike that.

19           Was the Amber Mills versus Mary Laseter

20   case, was State Farm a named party in the --

21       A.  No, they were --

22       Q.  -- prior case?

23       A.  -- not.

24       Q.  And that's because of the nonjoinder statute?

25       A.  Correct.

R,
403,
LC

Russell Horne    12/8/2023

Page 18

1          Q.  What is the purpose behind that statute from
2     State Farm's perspective?
3          A.  Sure.
4               MS. KIDD:  Object to the form.  Go ahead.
5          A.  From State Farm's perspective, that means that
6     Laseter was -- would have the right to sign over her
7     rights to file a suit against State Farm to the
8     Plaintiff in the underlying case.
9          Q.  (BY MR. BUTLER)  She would not be able to do
10    that without State Farm's permission prior to an excess
11    verdict in the case --
12         A.  That's --
13         Q.  -- correct?
14         A.  -- that's correct.
15         Q.  So am I correct that in -- am I correct that in
16    the litigation between Amber Mills and Mary Laseter,
17    even though State Farm has the exclusive rights and
18    control over that claim, State Farm is not a named party
19    in that case?
20         A.  That's correct.
21         Q.  And in exchange for that exclusive authority
22    and control, does State Farm agree that Florida law
23    imposes a duty of good faith on them with respect to the
24    claims handling of Mary Laseter's case?
25         A.  Yes.

R,
403,
LC

Russell Horne    12/8/2023

Page 19

R,
403

1          Q.  Was the Mills versus Laseter case handled by
2   State Farm using the same or different claims-handling
3   approach as State Farm utilized in its other Florida
4   auto liability cases during the 2020 to early 2023 time
5   frame?
6                MS. KIDD:  Object to the form.  You can
7   answer.

R,
403

8          A.  Yes, it was the same.
9          Q.  (BY MR. BUTLER)  As a result of the Mills
10  versus Laseter case, were any changes made to any State
11  Farm claims-handling practices, policies, or related
12  guidelines?
13               MS. KIDD:  Object to the form.
14         A.  To my knowledge, no.
15         Q.  (BY MR. BUTLER)  As a result of the Mills
16  versus Laseter case, were any of the State Farm
17  personnel involved in the claims-handling process
18  disciplined or reprimanded in any way?
19               MS. KIDD:  Object to form.
20         A.  No.
21         Q.  (BY MR. BUTLER)  As a result of the Mills
22  versus Laseter case, were any of the State Farm
23  personnel involved in the claims-handling process
24  required to undergo any additional training of any kind?
25               MS. KIDD:  Object to form.

Russell Horne    12/8/2023

Page 20

R, 403

R, 403

1    A.  No.

2    Q.  (BY MR. BUTLER)  Can we assume by that that

3    State Farm determined that the Mills versus Laseter

4    claim was handled in accordance with State Farm's then

5    existing policies and directives from the outset through

6    final judgment?

7         MS. KIDD:  Object to the form.

8    A.  Yes.

9    Q.  (BY MR. BUTLER)  State Farm through you and its

10   other claims-handling personnel monitored the trial of

11   Mills versus Laseter during February 2023?

12   A.  Correct.

13   Q.  Did any significant new or surprising evidence

14   come up at the trial of the Mills versus Laseter case?

15        MS. KIDD:  Object to the form.

16   A.  Not at the trial.

17   Q.  (BY MR. BUTLER)  Did any new or surprising

18   evidence come up in the 90 days before the trial of this

19   case?

20        MS. KIDD:  Object to form.

21   A.  I believe yes.

22   Q.  (BY MR. BUTLER)  And precisely what new or

23   surprising evidence came up from State Farm's

24   perspective?

25   A.  Sure.  It may be just outside of that 90 day

Russell Horne    12/8/2023

Page 21

1    mark, but the opinion from Dr. Grabel (sic) I believe

2    was November 4th of '22 wherein he had mentioned that

3    there was a permanent aggravation to a preexisting

4    condition.

5        Q.   And that opinion was via State Farm's chosen

6    defense medical expert?

7        A.   Correct.

8        Q.   And his name was what again?

9        A.   Dr. Grabel.

10       Q.   Would it be Dr. Gabriel?

11       A.   I'm pretty sure it was Dr. Grabel.

12       Q.   What kind of --

13       A.   He's a --

14       Q.   -- physician was he?

15       A.   -- neurosurgeon.

16       Q.   Do you recall the spelling of the last name of

17   that particular doctor?

18       A.   I believe it's G-R-A-B, as in bravo, E-L.

19       Q.   Was there any reason why State Farm could not

20   have had Dr. Gabriel do his evaluation much earlier in

21   the case or even pre-suit?

22              MS. KIDD:  Object to form.

23       A.   We had requested the CME once suit initiated

24   and that was the soonest we could get there.  As far as

25   Dr. Gabriel, I can't answer that.

R,
403

Russell Horne    12/8/2023

Page 22

1      Q.  (BY MR. BUTLER)  When did State Farm first

2  request a CME or a compulsory medical examination by a

3  doctor of its choosing?

4      A.  I don't recall the exact date, but that may

5  have been in our initial litigation plan to Counsel.

6      Q.  I don't want to guess as to when it may have

7  been, do you know as you're sitting here when State Farm

8  first requested a CME being done in this case?

9      A.  Not an exact date.

10      Q.  Are you sure what month and year that request

11  was first made?

12      A.  Not an exact month, no.

13      Q.  Were there any other new or surprising evidence

14  in this case other than Dr. Grabel's (sic) opinion that

15  you spoke about?

16           MS. KIDD:  Object to the form.

17      A.  No, there's not.

18      Q.  (BY MR. BUTLER)  Does State Farm have the

19  ability and wherewithal, if they choose, to have an

20  evaluation of the medical records, films, and so forth

21  done prior to a lawsuit?

22      A.  Potentially.

23      Q.  Is that, in fact, done in cases?

24      A.  It is.

25      Q.  Was that done in this case?

Russell Horne    12/8/2023

1        A.  It was not.

2        Q.  Why not?

3        A.  It was not done because when we initiated

4   negotiations with your firm, we were given an ultimatum

5   and less than four days to respond or you would file

6   suit.  Before we could request any information, we

7   inquired about the subsequent loss that Mills had, you

8   had advised us again of the ultimatum and then

9   subsequently filed suit before we could get any

10  additional information, perform any film reads.

11       Q.  And that information comes from where?

12       A.  The film?  We would get that from you or

13  through an authorization for release of information from

14  their -- I think it was Precision Diagnostics.

15       Q.  No, my question is, is what is your source of

16  information that tells you that you were given some sort

17  of ultimatum within four days?

18       A.  Sure.  A documented conversation on, I believe

19  it was, going off of memory, May 2nd between Angela

20  Butler and yourself.

21       Q.  Of what year?

22       A.  2022.

23       Q.  Anything else?

24       A.  No.

25       Q.  Referring you now to Schedule A of Exhibit No.

Russell Horne    12/8/2023

Page 24

1  1, and that's a composite exhibit of the Notices of

2  Deposition in this case, Schedule A refers to all

3  documents to be produced by you at this deposition

4  organized by corresponding number, correct?

5      A.  Uh-huh.  Yes, correct.

6      Q.  And you're aware that we sent an email to

7  defense counsel that those documents could be produced

8  electronically via a drum -- a thumb drive here today?

9      A.  That's correct.

10     Q.  And I see your defense counsel holding up in

11 front of her an item that appears to be a thumb drive;

12 is that --

13     A.  That's correct.

14     Q.  -- the thumb drive?

15     A.  That is the thumb drive.

16         MR. BUTLER:  For the record, that thumb

17 drive will be marked and identified as 1A.

18         (Exhibit No. 1A marked.)

19         MS. KIDD:  I'm -- if this is a good time, I

20 need to take a comfort break.  Sorry, the coffee.

21         MR. BUTLER:  Sure, let's --

22         THE VIDEOGRAPHER:   We're off the record at

23 9:58 a.m.

24         (Break from 9:58 to 10:06 a.m.)

25         THE VIDEOGRAPHER:   We're back on the

Russell Horne    12/8/2023

Page 25

1    record at 10:06 a.m.

2        Q.  (BY MR. BUTLER)  Referring you to the thumb

3    drive, Exhibit 1A, that you produced here today, have

4    you reviewed the items that are on the thumb drive?

5        A.  Yes, I have.

6        Q.  Are they organized by numbers corresponding to

7    each request in the Deposition Notice, Schedule A?

8                MS. KIDD:  Object to form.

9        A.  Yes.

10       Q.  (BY MR. BUTLER)  Are they all Bate stamped?

11       A.  I'm sorry?

12       Q.  Are they all Bate stamped?  Do they have a

13   particular identification number at the lower right-hand

14   corner, typically?

15       A.  I believe so.

16       Q.  Who assisted you in looking for any responsive

17   documents?

18       A.  Counsel.

19       Q.  And when and where did that search for

20   responsive documents take place?

21       A.  I don't recall the date.

22       Q.  Where was it done?

23       A.  Electronically.

24       Q.  And you would have been where?

25       A.  Via Zoom or via phone.

Russell Horne    12/8/2023

Page 26

```
 1        Q.  And where physically would you have been
 2   located?
 3        A.  Texas.
 4        Q.  Would you have been at the State Farm corporate
 5   offices or somewhere else?
 6        A.  No, I would have been at my home office.
 7        Q.  And Counsel would have been where?
 8        A.  Florida.
 9        Q.  Other than the two of you, did anyone else
10   assist you in looking for any responsive documents?
11        A.  Not to my knowledge, no.
12        Q.  Where did you look for them?
13        A.  Within the claims file that are within our
14   State Farm intranet.
15        Q.  And what does the State Farm intranet include,
16   aside from the claims file in this case?
17        A.  So it would have contained our HR documents
18   within a certain area.  It also would have compiled all
19   of our training documents as well.
20        Q.  How about your claims manuals?
21        A.  That would be considered one of our claims
22   training documents, but yes, it would be there as well.
23        Q.  Are there any other files or places that State
24   Farm keeps information in that is not part of the State
25   Farm intranet that you researched?
```

Russell Horne    12/8/2023

Page 27

```
 1       A.  Not to my knowledge.

 2       Q.  Does Exhibit 1A represent all of the responsive

 3  documents in the possession, control, or available on

 4  demand by State Farm?

 5            MS. KIDD:  Object to form.

 6       A.  Yes.

 7       Q.  (BY MR. BUTLER)  You have personal knowledge

 8  regarding the claims files in the matters related to

 9  Mills versus Laseter because of your participation in

10  that claim, true?

11       A.  True.

12       Q.  Are all of State Farm's claims-related files up

13  through March 30th, 2023 among those items on the thumb

14  drive which we previously marked as Exhibit 1A?

15       A.  Yes.

16       Q.  We have up on the screen here before you that

17  thumb drive in terms of its organization.  Take us

18  through that, please.

19       A.  Sure.  So a little small on the screen there,

20  but it looks like there's claims training materials.

21  Looks like there's production materials, which should be

22  the claim file.  There's HR shared documents.  I cannot

23  read the fourth and the fifth item from where I'm

24  sitting.

25            MR. BUTLER:  Are you able to enlarge that
```

Russell Horne    12/8/2023

Page 28

 1  for us, please, sir?

 2                THE VIDEOGRAPHER:  I don't know if it'll...

 3  No, just --

 4      A.  Looks like I can see item number four, unless

 5  my vision's incorrect, but it's the PIP production

 6  documents.  And then number five would be the subpoena

 7  responses.

 8      Q.  (BY MR. BUTLER)  Beginning with that last one,

 9  which subpoena responses?

10      A.  I'm sorry, you've got something else on -- up

11  on the screen there.  But it would be the duces tecum.

12      Q.  To who?

13      A.  To me.

14      Q.  Anything else?

15      A.  Not to my knowledge.

16      Q.  All right.  Going up to the next item from the

17  bottom, what is that?

18      A.  That would be the PIP production documents, so

19  anything PIP related that's in the claim related to our

20  insured.

21      Q.  And those would be PIP related documents that

22  were contained within the claims file?

23      A.  Correct.

24      Q.  Anything else?

25      A.  Not in that one.

Russell Horne    12/8/2023

Page 29

```
 1       Q.  Moving up to the next one?
 2       A.  Would be any of our HR documentation.
 3       Q.  That would be essentially the personnel file
 4  type of information for yourself and the other
 5  individuals that were participating in the claims
 6  handling of this matter?
 7       A.  Correct.
 8       Q.  And what is the item above that?
 9       A.  That should be the contents of the claim file.
10       Q.  So take me in that claims file to this May 2nd,
11  2022, Angela Butler note that you were telling us about
12  a few minutes ago.
13       A.  Sure.  If you go into the file production.  And
14  I don't recall exactly what page it is, but there
15  should --
16            MS. KIDD:  Is there a way he can scroll to
17  get through this?
18            THE VIDEOGRAPHER:  If a mouse will --
19            MS. KIDD:  I don't -- will it pick up from
20  down there?
21            THE VIDEOGRAPHER:  Will it go that far, if
22  you want to try that.
23            MR. BUTLER:  Not just yet.  You can scroll
24  for him in a minute.
25       Q.  (BY MR. BUTLER)  Mr. Horne, you have a State
```

Russell Horne    12/8/2023

Page 30

```
 1   Farm laptop yourself, do you not?
 2       A.  Correct.
 3       Q.  And your laptop has on it all of this
 4   information pertaining to the Mills versus Laseter case,
 5   correct?
 6       A.  Correct.
 7       Q.  And in addition to that, it would have a lot of
 8   other stuff presumably as well?
 9       A.  Correct.
10       Q.  You didn't bring that --
11       A.  I did not.
12       Q.  -- with you?
13       A.  I did not.
14       Q.  Why not?
15       A.  I didn't think that would be necessary since we
16   had produced documents on a flash drive.
17       Q.  It would have saved you a lot of time in trying
18   to identify a document that you didn't have a Bates
19   number for or an exact date for or something like that,
20   wouldn't it?
21              MS. KIDD:  Object to --
22       A.  You're --
23              MS. KIDD:  -- form.
24       A.  -- you're correct.
25       Q.  (BY MR. BUTLER)  So if you would guide us to
```

Russell Horne    12/8/2023

```
 1   the place in this file where we would find that
 2   particular item you referenced --
 3        A.  Okay.
 4        Q.  -- before.
 5                 THE WITNESS:  Keep going down.  You're
 6   going to have a lot of clicks, I'm sorry.  We're looking
 7   for the file notes, which would be the adjuster's actual
 8   notes within the claim file, dated May 2nd, 2022.
 9        Q.  (BY MR. BUTLER)  When we get to the file note
10   section, I'm going to want you to tell us --
11        A.  Sure.
12        Q.  -- when those start and stop in terms of --
13        A.  Absolutely.
14        Q.  -- the Bates numbers and --
15                 THE WITNESS:  All right.  We're in the file
16   note section.  Keep going.
17        Q.  (BY MR. BUTLER)  The beginning of the file note
18   section --
19        A.  There was --
20        Q.  -- would start with?
21        A.  Started just a couple of pages up.  I want to
22   say it was maybe 65.
23                 THE WITNESS:  Keep going.
24        A.  Yes.  So right there, file history, that's page
25   59.
```

Russell Horne    12/8/2023

Page 32

```
 1        Q.  (BY MR. BUTLER)  So the file notes start at
 2   page 59?
 3        A.  Correct.
 4        Q.  And they go on before that.  And do you see
 5   some black portions of the screen on some of those pages
 6   within this --
 7        A.  Yes.
 8        Q.  -- file note section?
 9        A.  Uh-huh.  Yes.
10        Q.  Where are those notes?
11        A.  Those notes happened after March 30th.
12        Q.  Okay.  All right.
13             MR. BUTLER:  Keep going down and take us to
14   the --
15        Q.  (BY MR. BUTLER)  So at least the way these are
16   ordered, do I understand that they go from the most
17   recent to the furthest back?
18        A.  That's correct.
19        Q.  All right.
20             THE WITNESS:  Keep going.  We're looking
21   for May of 2022.  Let's see that.  Is that -- is that
22   May?  Okay.  Here we go.  All right.  Go down a little
23   bit further, looking for -- keep going.  We're looking
24   for May 2nd, I believe.  Yep, I think you may have
25   passed that.
```

Russell Horne    12/8/2023

Page 33

```
 1                THE VIDEOGRAPHER:   May 2nd there.
 2                THE WITNESS:   Yeah.  Bear with me.  Go up
 3    one page for me and scroll down.  All right.  Keep going
 4    up.  Right there, that note.
 5          A.   That's the one I was referring to is actually
 6    May 3rd, 2:04 p.m. and that is on page 91.
 7          Q.   (BY MR. BUTLER)  Are there any other particular
 8    notes or dates that you have committed to recollection
 9    because of their importance other than this one, May the
10    3rd, 2022 at 2:04 p.m., which is on page 91?
11          A.   Not off the top of my head, no.
12                MR. BUTLER:  Are you able to print that out
13    for me?  Never mind, I think we can probably get that,
14    so...
15                THE VIDEOGRAPHER:  I mean, I can probably
16    print it to a PDF, not on paper.
17                MR. BUTLER:  Yeah, it's a --
18          Q.   (BY MR. BUTLER)  Any other particular notes of
19    Angela Butler that you want to refer us to?
20                MS. KIDD:  Object to the form.
21          A.   While we're in here, yes, I do.  I believe it
22    is November 14th and November 29th.
23                THE WITNESS:  So we want to go up in pages.
24          Q.   (BY MR. BUTLER)  What year?
25          A.   2022.
```

Carson Reporting & Associates    214.346.3434

Russell Horne    12/8/2023

Page 34

1      Q.  So that would be about --

2      A.  Right there.

3      Q.  -- six-and-a-half months later --

4      A.  Correct.

5      Q.  -- correct?

6      A.  Correct.  And you -- I was mistaken earlier, I

7  thought it was Grabel.  It is Dr. Gabriel.

8            But right there in that file note, I -- we

9  had mentioned that there was a surprise finding

10  regarding the CME.  That's Angela's notification to me.

11      Q.  And what page is this on, first of all?

12      A.  74.

13      Q.  And what is the date and time of this?

14      A.  November 14th, 2022.

15      Q.  Time?

16      A.  Time, 12:04 p.m. Central Standard Time.

17      Q.  And then you mentioned something about November

18  29th?

19      A.  Yes.  And I believe that -- that note on the

20  29th, 11/29/2022, 12:18 p.m. Central Standard Time --

21      Q.  What --

22      A.  -- actually goes --

23      Q.  -- page is this?

24      A.  -- to page 71 and 72.  It's split between the

25  two.

Russell Horne    12/8/2023

Page 35

1          Q.  And what is it of importance?  Let's start with

2     page 74, which was November 14th, 2022 --

3          A.  So --

4          Q.  -- at 12:04 p.m.  What importance did you

5     attribute to that?

6          A.  This is when our position on the case changed.

7     Now, we received a copy of the CME that did indicate

8     that there was a permanent aggravation, permanent being

9     the key word.  So I instructed Angela to set a call with

10    Counsel to discuss that and discuss the results of the

11    CME and to review next actions.

12         Q.  Anything else about that?

13         A.  The date on this was 11/14.  This is right

14    before the Thanksgiving holiday.  The next available

15    date I could get with Counsel was November 29th, 2022.

16         Q.  All right.  November 29th, 2022, this is 71 and

17    72.  What of importance do you attribute to this?

18         A.  Sure.  So this was our call with Counsel who

19    had gone over the report with Dr. Gabriel with us and

20    had advised that we were going to have an issue because

21    he did opine that there was a permanency and thus our

22    position on the case changed from a defensive posture to

23    a resolution posture.  I made the recommendation to file

24    a proposal for settlement for the $25,000 policy limit

25    at that time, given the new information from the CME.

Russell Horne    12/8/2023

Page 36

1     Q.  And in summary, that CME finding agreed with
2  that of the treating physicians in that regard, that
3  State Farm had going all the way back to before a
4  lawsuit was ever filed in this case, correct?
5              MS. KIDD:  Object to form.
6     A.  No.  No.  And the reason I say that is because
7  Gabriel opined that it was a permanent aggravation not a
8  new injury.
9     Q.  (BY MR. BUTLER)  Do you understand under
10  Florida law that a permanent injury can be established
11  by either a permanent injury or a permanent aggravation
12  of a preexisting condition?
13              MS. KIDD:  Object to form.
14     A.  I do, which is why this was significant.
15     Q.  (BY MR. BUTLER)  Does State Farm dispute that
16  in the initial demand package that was provided to them
17  that it contained evidence that that cervical injury was
18  permanent?
19     A.  Yes, we do dispute that.
20     Q.  Are there any other particular items that you
21  have committed to memory in terms of the date or the
22  Bates number or whatever because of their importance?
23     A.  No.
24     Q.  Has any item that once was contained in the
25  claims file on or before March 30th, 2023 been removed

Russell Horne    12/8/2023

Page 37

```
 1   by anyone for any reason?
 2        A.   Yes.
 3        Q.   What?
 4        A.   I believe the HIPAA information for Laseter was
 5   removed.
 6        Q.   When was that removed?
 7        A.   Upon production.
 8        Q.   And when would that production have been,
 9   approximately?
10        A.   I cannot recall the date.
11        Q.   By who -- by whom was it removed?
12        A.   Counsel.
13        Q.   Anything else?
14        A.   Not to my knowledge, no.
15        Q.   Is State Farm's entire litigation files among
16   those items on the thumb drive which has been marked as
17   Exhibit 1A?
18             MS. KIDD:  Object to the form.
19        A.   Yes.
20        Q.   (BY MR. BUTLER)  Where are they located within
21   this --
22        A.   They would be --
23        Q.   -- exhibit?
24        A.   -- in the final production.
25        Q.   That would be the...
```

Russell Horne    12/8/2023

Page 38

```
 1      A.  Yes, and they're going to be down towards the
 2  bottom.
 3      Q.  If you would take us to that section so we can
 4  note the --
 5      A.  Sure.
 6      Q.  -- Bates numbers.
 7          THE WITNESS:  You're going to scroll for
 8  quite some time, but keep going.
 9          THE VIDEOGRAPHER:  What --
10      A.  So all of these right now are all of our
11  documents.  It does contain all of our litigation emails
12  between defense Counsel.
13          THE WITNESS:  Can you please go higher in
14  the page number and I'll give you the start on that.
15  I'm sorry, opposite way.  I believe -- go down a little
16  bit for me.  I think we just passed it.  A little bit
17  more, a couple more.  I believe that -- go up two pages.
18      A.  I believe page number 822 is the beginning of
19  all of our documents contained within the claim file.
20      Q.  (BY MR. BUTLER)  I thought we were talking
21  about litigation files.  What are you now saying?
22      A.  So the litigation file is within the claim
23  itself, so the notes are intermixed.  Everything is
24  within the same claim number.  The file notes between
25  Angela and myself are in there.  They do talk about the
```

Russell Horne    12/8/2023

 1  litigation.  There's not a separate claim number or

 2  claim file for the litigation.  Everything's combined.

 3      Q.  So what section do we look in to find all of

 4  your correspondence to and from Cole, Scott & Kissane?

 5      A.  Starting at 822 that I'm -- it is all of our

 6  documents for the claim file and it's intermixed.

 7      Q.  And where does that section end?

 8      A.  I want to say it's around 1200.

 9      Q.  Well, scroll through.

10          THE WITNESS:  Go down to 1300.  All right.

11  Do you mind scrolling up for me just a hair?  Okay.

12  It's still in the emails.  All right.  Keep going down.

13  All right.  Up just a couple of pages.

14      A.  I believe that the email correspondence stops

15  at 1264.

16      Q.  (BY MR. BUTLER)  I'm sorry?

17      A.  I believe the email correspondence and

18  documents stop at 12 -- 1265, it looks like, is that

19  last page number there.

20      Q.  So are you telling me that your litigation

21  files between page numbers 822 and 1265 also contain

22  your correspondence between you and Angela Butler and

23  other State Farm teammates?

24      A.  Any document that comes in the claim file is

25  imaged and housed, so it should be between those pages.

Russell Horne    12/8/2023

Page 40

1   That does include emails.

2       Q.  Do you or your claims-handling colleagues at

3   State Farm utilize any communication apps or other

4   channels of communication outside of the claims file?

5       A.  Yes.

6       Q.  What are the names of those apps and channels?

7       A.  Microsoft Teams.

8       Q.  Any others?

9       A.  Our Outlook for email.

10      Q.  Any others?

11      A.  That's all.

12      Q.  So as I understand your sworn testimony today,

13  neither you nor your claims-handling colleagues at State

14  Farm utilize any communication apps or other channels of

15  communication outside of the claims file, Microsoft

16  Teams, and Outlook email?

17      A.  We have our hard phone as well, which we would

18  make outbound calls to, and that would be through Cisco

19  Jabber.

20      Q.  And is there any type of recording or records

21  keeping associated with Cisco Jabber?

22      A.  Only inbound calls that the adjusters receive

23  on a loop, so mostly calls that are not their own.

24      Q.  So calls that the adjuster receives are in some

25  way recorded, but the calls that they make are not?

Russell Horne    12/8/2023

Page 41

```
 1        A.   That's correct.
 2        Q.   Do we have the Cisco Jabber recorded calls
 3   related to the Amber Mills versus Mary Laseter case?
 4        A.   There wouldn't be any because they would have
 5   been direct calls to Angela.  Most of those calls are
 6   usually recorded.  If you were to call Angela and zero
 7   out speak with another adjuster.  They're recorded for
 8   performance and evaluation purposes.
 9        Q.   Regardless of for what purpose they're
10   recorded, they are, in fact, recorded, true?
11        A.   True.
12        Q.   So my question is:  Are there any recordings of
13   calls related to the Amber Mills versus Mary Laseter
14   claim --
15        A.   No.
16        Q.   -- at State Farm?
17        A.   No, not to my knowledge.
18        Q.   Have you checked?
19        A.   I have not checked, but not to my knowledge.  I
20   don't believe that there are any calls that would be
21   recorded for this one.
22        Q.   The call that you referenced in Angela Butler's
23   notes on May the 3rd, 2022 at 2:04 p.m., would that call
24   have been recorded?
25        A.   No.
```

R,
403

R,
403

1        Q.  Why not?

2        A.  Because you called Angela directly, was my

3    understanding, per the note.

4        Q.  Does Angela Butler have any recordings of any

5    of the calls that she alleges to have made in connection

6    with the Amber Mills versus Mary Laseter case?

7        A.  No, there are no recordings.

8        Q.  There were some recordings but those recordings

9    no longer exist?

10               MS. KIDD:  Object to the form.

11        A.  Can you repeat or rephrase?

12        Q.  (BY MR. BUTLER)  Do I understand you correctly

13    that there were initially recordings of any such calls

14    that she made, but to your knowledge they no longer

15    exist?

16               MS. KIDD:  Object to the form.

17        A.  No, there were no recorded calls.

18        Q.  (BY MR. BUTLER)  Does Angela Butler have any

19    recorded calls for the calls that she received in

20    connection with the Amber Mills versus Mary Laseter

21    case?

22        A.  To my knowledge, no.

23        Q.  Were any of those initially recorded but not

24    kept for some reason?

25        A.  It would be retained if they were, but to my

Russell Horne     12/8/2023

Page 43

1  knowledge none were recorded.

2      Q.  Who's the most knowledgeable person that you

3  know of regarding that Cisco Jabber system and how it

4  works?

5              MS. KIDD:  Object to the form.

6      A.  Me.

7      Q.  (BY MR. BUTLER)  So tell us how it works.

8      A.  Sure.  So Cisco is a soft phone, so it's an

9  Internet based phone.  They use an Internet connection

10  to make outbound or inbound calls.  If the adjuster

11  receives a call that is on a loop, meaning that is a

12  call that they would have received that is not their

13  claim number, I'll provide an example, let's say you

14  were to call Angela and you hit zero, there's an option

15  to zero out.  When you zero out, you'll get another

16  adjuster.  Typically that call is recorded specifically

17  for management review.

18              You would have received -- if the call was

19  recorded, you would have received a greeting from the

20  adjuster saying this call may be recorded or monitored

21  for informational and evaluation purposes.  If you did

22  not receive that, the call was not recorded or

23  monitored.

24      Q.  To your knowledge, does State Farm have access

25  to any recordings of any calls pertaining to the Amber

Russell Horne    12/8/2023

Page 44

```
 1 │ Mills versus Mary Laseter claim?
 2 │      A.  Not to my knowledge.
 3 │      Q.  Have you previously testified as a corporate
 4 │ representative on behalf of State Farm prior to today?
 5 │      A.  No.
 6 │      Q.  Have you ever testified in any cases involving
 7 │ State Farm directly or indirectly in any other capacity
 8 │ other than as a corporate representative?
 9 │      A.  No.
10 │      Q.  Have you ever given a deposition of any kind in
11 │ any matter?
12 │      A.  No.
13 │      Q.  Have you ever done any kind of appearances or
14 │ speaking engagements on any matters relating to State
15 │ Farm or auto liability insurance in any way?
16 │      A.  Within the company, yes, I have.
17 │      Q.  Tell me about that.
18 │      A.  Sure.  So I lead different classes instructing
19 │ adjusters on basic principles and practices of best
20 │ handling.
21 │      Q.  And would that have been true prior to July
22 │ 29th, 2021?
23 │      A.  Yes.
24 │      Q.  And does that pertain to Florida cases or cases
25 │ in other jurisdictions as well?
```

Russell Horne    12/8/2023

Page 45

```
 1      A.  Specifically Florida.  Seldomly North Carolina
 2  and West Virginia.
 3      Q.  And why those two states?
 4      A.  State Farm is paired up with demand pools.  The
 5  specific demand pool that I'm a part of is A-1, which is
 6  Florida, North Carolina, and West Virginia.  My team
 7  specifically is only Florida.
 8      Q.  For all claims that emanate in the state of
 9  Florida, where are they handled from a claims handling
10  perspective in the State Farm scheme?
11              MS. KIDD:  Object to the form.
12      A.  Can I ask as far as location?
13      Q.  (BY MR. BUTLER)  Yeah, let me try to reask that
14  a little bit.  In the March 2020 to 2023 time frame,
15  where and out of which offices does State Farm adjust
16  Florida claims from a claims-handling perspective?
17      A.  Sure.  The date that you reference, we have
18  remote employees all throughout Florida and we also had
19  employees here in Texas as well.
20      Q.  Anywhere else?
21      A.  We have employees across all 50 states.  I
22  can't be exact on if we had someone working in a remote
23  state.
24      Q.  Do you have -- strike that.
25              Are some aspects of Florida claims handled
```

Russell Horne    12/8/2023

Page 46

```
 1   out of State Farm's Atlanta offices?

 2       A.  As of the date of loss?

 3       Q.  In that time frame that I just mentioned?

 4       A.  Not to my knowledge.

 5       Q.  Has Atlanta State Farm -- strike that.

 6           Has State Farm's Atlanta offices been

 7   involved in any capacity in the receipt of information

 8   regarding Florida claims in the last five years?

 9           MS. KIDD:  Object to form.

10       A.  When you say receipt of claims, can you

11   clarify?

12       Q.  (BY MR. BUTLER)  We have an Atlanta address for

13   State Farm to send information through to.

14       A.  Correct.  Yes.  We -- we have an Atlanta area

15   that handles the receipt of documents.

16       Q.  Well, that was my question from before, so --

17       A.  State --

18       Q.  -- so let me go back and -- and answer (sic)

19   the question.  Do I understand that for Florida claims,

20   State Farm's Atlanta offices are involved in the

21   information receipt process?

22       A.  Yes, that's correct.

23       Q.  And the claims handling of those cases takes

24   place out of which of State Farm's corporate offices?

25       A.  It would be all Florida with remote adjusters
```

Russell Horne    12/8/2023

Page 47

```
 1  in Texas.
 2       Q.  Is that divided up in any geographical or other
 3  way between Florida handling versus handling of folks in
 4  Texas or wherever?
 5       A.  No.
 6       Q.  The claims handling for the Amber Mills versus
 7  Mary Laseter claim took place out of which State Farm
 8  corporate office?
 9       A.  Florida and Texas.
10       Q.  And where is that Florida office?
11       A.  It would have been Winter Haven.  Winter Haven
12  was shuttered due to COVID as a result of everyone
13  working from home and the adjusters are spread
14  throughout Florida, working in remote capabilities.
15       Q.  After the Winter Haven State Farm corporate
16  office was shuttered, where were those people, which
17  corporate office were they then connected with?
18       A.  None.
19       Q.  Was -- strike that.
20           So take me through the State Farm personnel
21  who were most involved from the outset through the final
22  judgment in this case and where they're located?
23       A.  Sure.  Tocorra Verneiul, she was the initial
24  handling injury adjuster; she's based out of the Winter
25  Haven office.  I believe she handled the case up until
```

Russell Horne    12/8/2023

Page 48

1    January 31st, 2022, at which point it came over to

2    Jennifer Miller for a brief period of, I believe, two or

3    three days.  The file was then transferred over to

4    Angela Butler, who was operating under Neoshi Williams

5    up until I took the case over with Angela being my

6    employee, and I believe that was in June 2022.  Angela

7    and I remained on the case to this day.

8         Q.  Angela Butler was located out of which State

9    Farm office?

10        A.  Richardson, Texas.

11        Q.  That's the Dallas corporate offices here, just

12   a mile or two from where we sit today?

13        A.  Correct.

14        Q.  And likewise you work out of that same

15   Richardson, Texas, that -- that is the Dallas corporate

16   offices that are again just a mile or two away from us?

17        A.  That's correct.

18        Q.  Have you yourself ever been involved in any

19   other cases involving allegations of bad faith handling

20   practices?

21        A.  No.

22        Q.  What is your current position with State Farm?

23        A.  Injury claim team manager.

24        Q.  And how long have you served in that particular

25   capacity?

Russell Horne    12/8/2023

Page 49

1        A.   Since February 2022.

2        Q.   And before that?

3        A.   Injury claims adjuster.

4        Q.   And what time frame did you serve in that

5   capacity?

6        A.   September 2014 through February 2022.

7        Q.   And before that?

8        A.   Before that I was not employed by State Farm.

9        Q.   What year did you first begin working for State

10   Farm?

11        A.   2014.

12        Q.   Tell me about any and all groups or committees

13   that you have been involved in within State Farm,

14   starting with the most recent and going back in time.

15             MS. KIDD:   Object to the form.

16        A.   Can you explain groups or committees, expand on

17   that for me?

18        Q.   (BY MR. BUTLER)   Within State Farm, are there

19   various groups or committees?

20        A.   No.

21        Q.   You told us earlier that, for example, you do

22   some training of other adjusters --

23        A.   Uh-huh.

24        Q.   -- in this case, that would be the type of

25   thing that I'm interested in.   Does -- how -- does State

Russell Horne    12/8/2023

Page 50

1   Farm have a particular group or committee of trainers

2   for claims handling purposes?

3       A.   There is a department for claims handling or

4   claims training.  I was not part of that department.  I

5   use my knowledge and expertise in Florida cases and

6   provided information and guidance direction to other

7   Florida adjusters.

8       Q.   And when would that have been done?

9       A.   Between 2017 to current.

10      Q.   Would there be any training materials or

11  presentation materials that you used when doing that

12  between 2017 and March of 2023?

13      A.   No, there would not.  All presentations were

14  based on my knowledge and experience.

15      Q.   You didn't put anything down in any kind of

16  outline or show any visual presentation aids or anything

17  of that type?

18      A.   No, I did not.

19      Q.   Have you worked out of any of the other State

20  Farm corporate offices?

21      A.   No.

22      Q.   Ever visited them or been there?

23      A.   Yes.

24      Q.   Which offices would that have been?

25      A.   Other than the Richardson office and Winter

Russell Horne    12/8/2023

Page 51

R,
403,
MIL

1    Haven, Bloomington, Illinois.

2                    MS. KIDD:  Do you need a break or anything?

3                    THE WITNESS:  I'm good.

4        Q.  (BY MR. BUTLER)  Is that the State Farm

5    corporate offices that both you and Angela Butler work

6    out of here at State Farm?

7        A.  Yes.

8        Q.  And in particular, building two, there's a

9    group of three buildings as I understand it, can you

10   show us which building number two is?

11       A.  You're incorrect.  There's actually four

12   buildings.

13       Q.  I apologize.

14       A.  Building number two would be the tallest one.

15       Q.  Can you just hold that up, show us where that

16   would be?

17       A.  Sure.

18       Q.  And have you and Angela Butler been at that

19   location during the entire period of the claims handling

20   process of the Amber Mills versus Mary Laseter claim up

21   through the date of final judgment?

22       A.  Regarding my involvement, no.  Angela, yes.

23       Q.  And what's different about yours?

24       A.  I relocated to the Dallas area in March of

25   2022.

Russell Horne    12/8/2023

Page 52

1        Q.  From Winter Haven, Florida?

2        A.  Correct.

3        Q.  Take a look at that.  Is that a copy of your

4   LinkedIn profile?

5        A.  Yes, it is.

6        Q.  Does it fairly and accurately depict your

7   employment both before and -- and after joining State

8   Farm?

9        A.  Yes.

10       Q.  All right.  Thank you.

11            MR. BUTLER:  This will be 5, the picture,

12   and 6, the LinkedIn.

13            (Exhibit Nos. 5 & 6 marked.)

14       Q.  (BY MR. BUTLER)  Can we assume that State

15   Farm's claims files are computerized and accessible by

16   all State Farm personnel involved regardless of their

17   location?

18            MS. KIDD:  Object to the form.

19       A.  Yes.

20       Q.  (BY MR. BUTLER)  And that was true in the case

21   of State Farm's insured, Mary Laseter's wreck dated July

22   29th, 2021?

23       A.  Yes.

24       Q.  Who is your direct supervisor on this case?

25       A.  As of current?

Russell Horne    12/8/2023

Page 53

1      Q.  Back during the July 29th, 2021 up through
2  March 30th, 2023 time frame.
3      A.  My involvement didn't begin until June 2022.
4  At the time of my involvement, it was Arielle Brodsky
5  followed by Jennifer Dorris followed by Martin Cantu
6  followed by Erin Hailey.
7      Q.  What's the reason why your direct supervisor
8  has changed?
9      A.  Sure.  Arielle went out for maternity leave.
10  During her absence Jennifer Dorris was to replace her.
11  Jennifer Dorris had an unfortunate cancer diagnosis and
12  had to leave early.  Martin Cantu came in.  Martin
13  handled until Arielle's return; however, Arielle was
14  sent to a different segment and Erin Hailey took over
15  that segment for Martin.
16      Q.  So as of March 2022 when you first became
17  involved in this claim, who was your immediate
18  supervisor?
19      A.  June 2022.
20      Q.  Let me correct that, then.  As of June 2022
21  when you first became involved in this claim, who was
22  your direct supervisor?
23      A.  Arielle Brodsky.
24      Q.  And Arielle was out of which State Farm
25  corporate office?

Russell Horne    12/8/2023

Page 54

1          A.   Dallas.

2          Q.   And at some point she had to go on leave and

3    your immediate supervisor became Martin Cantu?

4          A.   Incorrect.  Jennifer Dorris.

5          Q.   Jennifer Dorris.  And for how long was Jennifer

6    Dorris your --

7          A.   Approximately --

8          Q.   -- immediate supervisor?

9          A.   -- I'm sorry.  Approximately two-and-a-half

10   months.

11         Q.   Do you recall the timeframe?

12         A.   Up until December 1st, 2022.

13         Q.   And out of what State Farm corporate office was

14   Jennifer?

15         A.   Winter Haven.

16         Q.   So do I understand that the Winter Haven office

17   from a physical perspective is shut down but all of its

18   people are still involved in a remote capacity?

19         A.   That's correct.

20         Q.   Who did they report to personnel wise?

21              MS. KIDD:  Object to form.

22         A.   Can you rephrase?

23         Q.   (BY MR. BUTLER)  What office are they

24   affiliated with there at State Farm now that the Winter

25   Haven office itself is shuttered?

Russell Horne    12/8/2023

Page 55

```
 1        A.  None.  Not affiliated with any office.

 2        Q.  And when did Martin Cantu come into play as

 3   your immediate supervisor?

 4        A.  December 2022.

 5        Q.  Who was Angela Butler's direct supervisor prior

 6   to May 2022?

 7        A.  Neoshi Williams.

 8        Q.  And which State Farm corporate office is Neoshi

 9   Williams out of?

10        A.  Dallas.

11        Q.  And is she still there?

12        A.  She is.

13        Q.  Building two, just like you and Angela Butler?

14        A.  That's correct.

15        Q.  Did you attend any Florida meetings via home --

16   strike that.

17             Are you a part of any -- strike that, I'm

18   sorry.

19             Are you a part of any liability insurance

20   industry groups?

21        A.  Not to my knowledge, no, I'm not.

22        Q.  Do you know if Angela Butler is?

23        A.  No, I do not.

24        Q.  Do you know if Neoshi Williams is?

25        A.  I do not.
```

R,
403,
MIL

Russell Horne    12/8/2023

Page 56

```
 1        Q.  Do you know if Martin Cantu is?
 2        A.  I do not.
 3        Q.  Do you know if Jennifer, and remind me of
 4   Jennifer's last name?
 5        A.  Dorris, and no, I'm not.
 6        Q.  I'll just ask the question again.  Do you know
 7   if Jennifer Dorris is a member of any insurance industry
 8   groups?
 9        A.  No, I do not.
10        Q.  Did you ever attend any Florida industry group
11   meetings via phone or computer between 2020 and the
12   first quarter of 2023?
13             MS. KIDD:  Object to the form.
14        A.  Define Florida injury groups.
15        Q.  (BY MR. BUTLER)  I'm referring to Florida
16   insurance industry groups and their related activities.
17   So with that in mind, did you ever attend any Florida
18   meetings via phone or computer at any time between March
19   of 2020 and the first quarter of 2023?
20             MS. KIDD:  Object to form.
21        A.  No, I have not attended any insurance industry
22   group meetings.
23        Q.  (BY MR. BUTLER)  State Farm and its
24   claims-handling personnel work closely with their chosen
25   defense counsel when it litigates claims, right?
```

Russell Horne    12/8/2023

Page 57

R,
403,
MIL

```
 1              MS. KIDD:  Object to form.
 2       A.  Correct.
 3       Q.  (BY MR. BUTLER)  Was State Farm and its
 4  claims-handling personnel aware of the Florida
 5  courthouse closures related to the COVID-19 pandemic?
 6              MS. KIDD:  Object to form.
 7       A.  Yes.
 8       Q.  (BY MR. BUTLER)  Florida courthouses were
 9  completely closed beginning in March of 2020 for a
10  period of about 17 months and partially reopened in
11  October of 2021, true?
12              MS. KIDD:  Object to form.
13       A.  I don't have direct knowledge of that.
14       Q.  (BY MR. BUTLER)  Do you have indirect knowledge
15  of that?
16       A.  Approximate dates sound correct, yes, based on
17  news articles.
```

R,
403,
MIL

```
18       Q.  And do you recall that after the partial
19  reopening in October of 2021, there were nearly one
20  million cases backlogged?
21       A.  Sounds correct.
22       Q.  And was it State Farm's understanding that
23  after that partial reopening in October of 2021, that
24  criminal case trials would be given priority because of
25  the constitutional rights of speedy trial --
```

Russell Horne    12/8/2023

Page 58

R,
403,
MIL

```
1              MS. KIDD:  Object to form.
2       Q.   (BY MR. BUTLER) -- in those cases?
3       A.   That's correct.
4       Q.   Do I understand correctly that you obtained a
5  degree in legal studies before going to work at State
6  Farm approximately 10 years ago?
7       A.   That's correct.
8       Q.   As of January 1st, 2020, were you familiar with
9  Florida's laws requiring good faith handling and
10  penalizing bad faith claims-handling practices?
11       A.   Yes.
12       Q.   You would be aware of the elements that are set
13  forth in Florida statute 624.155 that deals with some of
14  those things?
15              MS. KIDD:  Object to form.
16       A.   I don't have the elements memorized, but I'm
17  familiar with them.
18       Q.   (BY MR. BUTLER)  I don't expect you to, but
19  you're familiar with that statute and its elements,
20  generally speaking?
21       A.   In a general sense, yes.
22       Q.   And the same as far as Florida statute 627.727,
23  subsection 10, also deals with that area, generally
24  speaking?
25              MS. KIDD:  Object to form.
```

Russell Horne    12/8/2023

Page 59

```
 1        A.  I believe you're correct, yes.

 2        Q.  (BY MR. BUTLER)  Does a -- strike that.

 3              Doesn't State Farm's training materials

 4    actually refer to some of those statutory provisions?

 5        A.  They do.

 6        Q.  And State Farm understood that under Florida

 7    law if, in fact, they don't handle a claim in good

 8    faith, they can and will be responsible for extra

 9    contractual damages as a penalty, true?

10              MS. KIDD:  Object to form.

11        A.  True.

12        Q.  (BY MR. BUTLER)  As of January 1st, 2020 --

13    strike that.

14              Were you familiar with the laws regarding

15    claims-handling practices in any other states that you

16    supervised or participated in other than Florida?

17        A.  West Virginia and North Carolina.

18        Q.  Do those states have similarly robust bad faith

19    claims-handling laws in the 2020 to February 2023 time

20    frame or are they different?

21        A.  They're --

22              MS. KIDD:  Object to form.

23        A.  -- they're different.

24        Q.  (BY MR. BUTLER)  Are you aware of any states

25    that have similarly robust bad faith laws as of February
```

Russell Horne    12/8/2023

Page 60

1    2023 to Florida?

2                MS. KIDD:  Object to form.

3        A.  No.

4        Q.  (BY MR. BUTLER)  You are aware that some

5    significant changes in Florida's bad faith laws took

6    place as of March 24th, 2023?

7                MS. KIDD:  Object to form.

8        A.  Yes.

9        Q.  (BY MR. BUTLER)  Is it State Farm's position

10   that that new law as it pertains to bad faith does not

11   apply to the Amber Mills versus Mary Laseter claim

12   because of the date that it occurred and it was filed

13   and so forth?

14               MS. KIDD:  Object form.

15       A.  Yes, that's my understanding.

16               MS. KIDD:  We've been going over an hour,

17   let's take another --

18               MR. BUTLER:  Yeah.

19               MS. KIDD:  -- comfort break.

20               MR. BUTLER:  I tell you what, let's -- it's

21   12:15, so let's first go off the record.

22               THE VIDEOGRAPHER:  We're off the record at

23   11:16 a.m.

24               (Break from 11:17 to 12:12 p.m.)

25               THE VIDEOGRAPHER:  We're back on the record

Russell Horne    12/8/2023

Page 61

1    at 12:12 p.m.

2        Q.   (BY MR. BUTLER)   Does State Farm have a

3    claims-handling manual setting forth its policies and

4    procedures that must be utilized for auto liability

5    claims?

6        A.   Yes.

7        Q.   Does that manual apply to Florida auto

8    liability claims?

9        A.   Yes.

10       Q.   Including the Mills versus Laseter claim?

11       A.   Yes.

12       Q.   Are all State Farm personnel required to be

13   familiar with and to follow those policies and

14   procedures?

15       A.   Yes.

16       Q.   Does that go for claims specialists and

17   management as well?

18       A.   Correct.

19       Q.   Is it mandatory or discretionary?

20       A.   Mandatory.

21            (Exhibit No. 7 marked.)

MIL

22       Q.   (BY MR. BUTLER)   I'm going to show you what's

23   been marked as Plaintiff's 7 or Exhibit 7; do you

24   recognize that item?

25       A.   Yes, I do.

Russell Horne    12/8/2023

Page 62

MIL

1        Q.   And where does that come from?

2        A.   This would come from our auto claim manual.

3        Q.   And it's entitled our commitment to our

4    policyholders?

5        A.   Correct.

6        Q.   And in this particular case, State Farm's

7    policyholder would be Mary Laseter, correct?

8        A.   That's correct.

9        Q.   And State Farm's commitment to Mary Laseter

10   was, among other things, to treat her like a good

11   neighbor?

12              MS. KIDD:  Object to form.

13       A.   Correct.

14       Q.   (BY MR. BUTLER)  I mean, that's not just an

15   advertising slogan, that's actually in your commitment

16   to your policyholders in the claims manual, correct?

17       A.   That's correct.

18       Q.   And among those commitments to treat your

19   policyholders like a good neighbor, State Farm agrees

20   that they must listen, be fair, be open, and carry out

21   our part of the bargain under the contract in good

22   faith?

23       A.   Correct.

24       Q.   Be familiar and in compliance with those laws

25   and regulations that impact claims in the appropriate

Russell Horne     12/8/2023

1   state and treat policyholders consistent with the

2   requirements of the law?

3       A.   Correct.

4       Q.   To diligently investigate the facts to

5   determine if a claim is valid, reasonably evaluate the

6   claim, and act promptly in resolving the claim.  If it

7   is necessary to deny a claim for coverage or damages, it

8   should be done promptly and courteously with an

9   explanation for the decision?

10             MS. KIDD:  Object to form.

11      A.   That's correct.

12      Q.   (BY MR. BUTLER)   State Farm's claims-handling

13  manual refers to what is called a, quote, current value,

14  unquote, correct?

15      A.   That's correct.

16             (Exhibit No. 8 marked.)

17      Q.   (BY MR. BUTLER)  Going to show you what I've

18  marked as Plaintiff's Exhibit No. 8, is that the -- is

19  Plaintiff's Exhibit 8 a copy of the State Farm

20  claims-handling manual?

21      A.   Yes, it's part of the auto claims manual.

22      Q.   And it's highlighted up at the top, liability

23  coverage for bodily injury; that would be the

24  appropriate section that would apply in this case?

25      A.   Correct.

Russell Horne    12/8/2023

Page 64

```
 1         Q.  And that particular one is dated what?
 2         A.  March 31st, 2021.
 3              MR. BUTLER:  I'm looking for a clip here,
 4    excuse me one second.
 5              (Exhibit No. 9 marked.)
 6         Q.  (BY MR. BUTLER)  I'm going to show you what's
 7    been marked as Plaintiff's composite Exhibit 9.  It is
 8    that same manual, but this has a September 18th, 2019
 9    date.  I will tell you that we have gone through and
10    compared it to the earlier version and we do not see any
11    differences at all in the provisions that we're going to
12    look at, but take a look at that and satisfy yourself.
13         A.  Okay.
14         Q.  Does Exhibit No. 9, is that a true and accurate
15    copy of the State Farm claims manual in effect as of
16    September 19th, 2019, and at least with respect to the
17    provisions that we see there, it's the same as the 2021
18    version that is number 8?
19              MS. KIDD:  Object to the form.
20         A.  Yes.
21         Q.  (BY MR. BUTLER)  We're going to put up
22    beginning at slide 47.  So this is the State Farm's
23    claims manual that we're looking at.  This is the
24    liability coverage section for bodily injury.  And the
25    particular section that we're going to look at is
```

Russell Horne   12/8/2023

Page 65

```
 1   current value focused file handling; is that correct?
 2        A.   That's correct.
 3             MR. BUTLER:  Next.
 4             THE VIDEOGRAPHER:  Next slide?  Okay.
 5        Q.   (BY MR. BUTLER)  Is it true that the claims
 6   specialist must constantly evaluate a claim with the
 7   ultimate goal of concluding that claim in a fair and
 8   reasonable manner and that the current value is an
 9   established range of values for a file based upon all
10   relevant information available to date.  It focuses our
11   claim handling on proper resolution of the claim?
12             MS. KIDD:  Object to form.
13        A.   That's correct.
14        Q.   (BY MR. BUTLER)  Is it mandatory under the
15   manual -- strike that.
16             Does the State Farm claims manual state
17   that the current value is an established range of values
18   for a file based on all relevant information available
19   to date?  I think that's the same one we just did, so
20   sorry.
21             Is the next item that we see here a true
22   and accurate portion of that claims-handling manual?
23        A.   Yes.
24        Q.   When is the investigation of a particular
25   claims required to begin, according to State Farm?
```

Russell Horne     12/8/2023

Page 66

1      A.   Upon notice.

2      Q.   Upon notice of the claim in the first place?

3      A.   Correct.

4      Q.   So in this case if State Farm was notified on

5  July 29th, 2021 about the wreck that had occurred, that

6  or soon after that is when the investigation should

7  begin?

8      A.   Typically, yes.

9      Q.   Are the principles of current value focused

10 file handling, does it require a clear investigative

11 plan to assist with the collection of necessary

12 information?

13           MS. KIDD:  Object to the form.

14     A.   It does.

15     Q.   (BY MR. BUTLER)   And the current value, can it

16 increase or decrease over the life of a file as

17 necessary investigation is completed?

18           MS. KIDD:  Object to form.

19     A.   Yes.

20     Q.   (BY MR. BUTLER)  Is it true that a current

21 value can be a range as opposed to a single value and it

22 can be zero under the circumstances?

23     A.   It can.

24     Q.   And the current value if it's not zero, that is

25 the claims specialist's recommended range of settlement

Russell Horne    12/8/2023

```
 1    value when all necessary investigation is completed,
 2    evaluated, and proper authority is extended?
 3         A.  Correct.
 4              MS. KIDD:  Let me see that.
 5              (The witness hands a document to Ms. Kidd.)
 6         Q.  (BY MR. BUTLER)  Do the objectives for
 7    establishing current value require early focus on
 8    developing file strategy and taking affirmative steps
 9    towards valuing claims for settlement?
10              MS. KIDD:  Object to the form.
11         A.  Yes.
12              MS. KIDD:  I'll just go ahead and state on
13    record that I would object to questioning on this
14    particular claims manual, number one, because it was not
15    produced as part of the production in this claim and
16    possibly improperly all together as it does not appear
17    to be --
18              MR. BUTLER:  Let's keep our objections
19    to --
20              MS. KIDD:  -- I'm going to go ahead --
21              MR. BUTLER:  -- legal objections --
22              MS. KIDD:  -- I'm going to go ahead and put
23    it on the record, it does not have any sort of
24    confidentiality Bate stamp on it, so I'm going to give
25    you a little leeway here, given the fact that it appears
```

Russell Horne    12/8/2023

 1    you represented that it is the same as the 2021, but

 2    just go ahead and put that on record.

 3         Q.  (BY MR. BUTLER)  Among the seven key actions

 4    for implementing a current value focus, according to

 5    State Farm's claims-handling manual, what should the

 6    claims specialist, in this case Angela Butler, be doing

 7    each time the file is reviewed?

 8              MS. KIDD:  Object to the form.

 9         A.  Can you rephrase?

10         Q.  (BY MR. BUTLER)  Sure.  Does the State Farm

11    claims manual include key actions for implementing the

12    current value focus with respect to any particular

13    claim?

14         A.  It does.

15         Q.  Does it ask -- strike that.

16              Does it require the claims specialist each

17    time the file is reviewed to determine what is the claim

18    worth based upon the information known and that

19    information could include information not yet

20    documented?

21              MS. KIDD:  Object to the form.

22         Q.  (BY MR. BUTLER)  True?

23         A.  It would be based on documented information or

24    the value would change.  The adjuster's job is to review

25    that information and update the variant range of value

Russell Horne    12/8/2023

1    as that information is reviewed in the claim file.

2         Q.  And likewise, another one of those seven key

3    actions would be to determine each time the file is

4    reviewed what investigation in -- is reasonably

5    necessary to finalize the liability and damage

6    determination and to evaluate for settlement?

7         A.  Correct.

8         Q.  In this particular case there was never any

9    question regarding fault or liability, true?

10        A.  True.

11        Q.  100 percent of the fault was attributable to

12   State Farm's insured, Mary Laseter, and State Farm knew

13   that from the get-go?

14        A.  Correct, and you'll see that evidence multiple

15   times throughout the claims history.

16        Q.  Among those seven key actions, each time the

17   file is reviewed does State Farm require that, quote,

18   settlement should be attempted as soon as current value

19   is established and necessary investigation complete?

20             MS. KIDD:  Object to the form.

21        A.  Can you rephrase?

22        Q.  (BY MR. BUTLER)  Does State Farm's

23   claims-handling manual indicate that settlement should

24   be attempted as soon as current value is established and

25   necessary investigation complete?

Russell Horne    12/8/2023

Page 70

```
 1              MS. KIDD:  Object to the form.
 2         A.  Yes.
 3         Q.  (BY MR. BUTLER)  Is it State Farm's philosophy
 4    that the initial offer of settlement absent the value
 5    singularly being for policy limits should be within the
 6    range of value?
 7              MS. KIDD:  Object to the form.
 8         A.  Yes.
 9         Q.  (BY MR. BUTLER)  And in accordance with the
10    seven key actions set forth in the State Farm
11    claims-handling manual, is it true that, quote, if
12    litigation occurs, the file should have a documented
13    current value, unquote?
14              MS. KIDD:  Object to the form.
15         A.  That's correct.
16         Q.  (BY MR. BUTLER)  Does the State Farm
17    claims-handling manual have a section dealing with time
18    limit and conditional demands?
19         A.  Yes.
20         Q.  Is State Farm and its claims-handling personnel
21    aware of the ramifications regarding a time limited
22    demand?
23         A.  Yes.
24         Q.  And where any type of time limited demand is
25    received, does State Farm's claims-handling policy
```

Russell Horne    12/8/2023

Page 71

 1    require that management be notified immediately?
 2                    MS. KIDD:  Object to the form.
 3        A.   Yes.
 4        Q.   (BY MR. BUTLER)  Does State Farm's policies and
 5    procedures require, quote, that management must be
 6    advised when a demand is received equal to or in excess
 7    of the policy limit or it appears that a claim will not
 8    settle within policy limits, the team manager must
 9    review the file and provide direction to the claims
10    specialist, unquote?
11                    MS. KIDD:  Object --
12        A.   Yes.
13                    MS. KIDD:  -- to the form.
14        Q.   (BY MR. BUTLER)  Where in this case did that
15    first occur?
16        A.   Can you clarify?
17        Q.   According to State Farm's review of the claims
18    file, when was it that State Farm was aware that policy
19    limits would not settle this case such that the team
20    manager reviewed the file and gave direction to the
21    claims specialist?
22        A.   Cannot recall the exact date, but it was after
23    your initial rejection of our $6550 offer.  I believe
24    that would have been sometime in April of 2022.
25        Q.   Don't you have a letter in writing extending

Russell Horne    12/8/2023

1    the time for accepting a settlement that is a release of

2    all liability of Mary Laseter in exchange for payment of

3    State Farm's policy limits that went up through May of

4    2022?

5        A.  I believe the initial demand that we received

6    for our file reflects a received date in April of 2022.

7        Q.  But you have a letter, do you not, where the

8    original date for acceptance was extended into May of

9    2022, true?

10       A.  That is true in response to our counter -- your

11   counter.

12       Q.  Does the State Farm claims-handling manual

13   require the claims specialist, quote, in analyzing a

14   settlement demand, it's important to determine all of

15   the exposures that need to be resolved in order to

16   properly protect the insureds?

17              MS. KIDD:  Object to the form.

18       A.  Yes.

19       Q.  (BY MR. BUTLER)  In this case the only claim

20   that State Farm ever received in connection with this

21   crash was that of Amber Mills --

22       A.  That's --

23       Q.  -- true?

24       A.  -- correct.

25       Q.  There never were any other claims made or

Russell Horne    12/8/2023

Page 73

1    attorneys involved on behalf of anyone else or anyone
2    else getting any indication of any other claims, true?
3        A.  That's correct.
4        Q.  Can I see that exhibit, the one you're looking
5    at now?
6        A.  (The witness hands a document to Mr. Butler.)
7        Q.  Let's look at the next page of -- and this
8    particular page we'll separate this out, this last page
9    of this, the one we're looking at now because it was
10   produced in this case.  I want to keep those things
11   separate.
12              (Exhibit No. 10 marked.)
13       Q.  (BY MR. BUTLER)  So I've marked this as Exhibit
14   No. 10 and it's up on the screen there.
15       A.  Uh-huh.
16       Q.  Is that part of the State Farm claims manual?
17       A.  Yes.
18       Q.  And does it refer to reserves are established
19   and adjusted by the claims specialist as outlined in the
20   auto claim manual reserves article, and then it has see
21   and it has several items there, the top one of which
22   says auto claim manual reserves?
23       A.  Yes.
24       Q.  Is there a section of the State Farm auto
25   claims manual dealing with reserves?

Russell Horne    12/8/2023

Page 74

```
 1        A.  Yes.
 2        Q.  Where is it in the items that you've produced
 3   to us here today, which is Exhibit 1B?
 4        A.  I don't recall the exact page number.  We'd
 5   have to go through the document.
 6        Q.  All right.  Let's do that.  While we're doing
 7   that, you know that to exist in the composite somewhere?
 8        A.  Yes, I do.  It would be in the claims training
 9   manuals up top and we'll have to scroll through there.
10   You should be able to search reserves.
11              THE VIDEOGRAPHER:  It might be a scanned
12   document, so...  I mean, it's just a scanned document,
13   so it won't go search.
14              THE WITNESS:  Okay.  We'll have to scroll
15   then.
16              (Scanning documents from 12:41 to 12:44.)
17              MR. BUTLER:  While we're doing that, does
18   anybody have an iPhone charger that I can plug into for
19   just a few minutes?
20              MS. KIDD:  I don't.
21              THE WITNESS:  Okay.  Android, sorry.
22              MR. BUTLER:  No iPhones?
23              MS. KIDD:  I do, but at my hotel.
24              THE REPORTER:  I have an iPhone, but don't
25   have the charger with me.
```

Russell Horne    12/8/2023

Page 75

```
 1        Q.  (BY MR. BUTLER)  Getting close?
 2        A.  Well, we still have about 3000 pages left.
 3        Q.  Well, Where would you expect --
 4        A.  Typically --
 5        Q.  -- that reserve --
 6        A.  Sure.
 7        Q.  -- portion of the claims manual to be?
 8        A.  To be honest, I used the hyperlink and it
 9   directs me there automatically.
10        Q.  If we had your computer, we could just
11   hyperlink right to it?
12        A.  You're absolutely correct.  Might be getting
13   pretty close.
14               THE WITNESS:  Amanda, if you see it before
15   I do just --
16               MS. KIDD:  Oh, I'm sorry.
17               THE WITNESS:  -- let me know.  No, you're
18   fine.  I'm struggling to read it from this distance.
19               MS. KIDD:  I know.
20               (Scanning document from 12:45 to 12:48.)
21               THE WITNESS:  That link did not work, did
22   it?
23               THE VIDEOGRAPHER:  No, it's just -- yeah,
24   it's just --
25               THE WITNESS:  Okay.
```

Russell Horne    12/8/2023

Page 76

1      Q.   (BY MR. BUTLER)  So that we're clear, the
2   production of documents that we received today, the
3   hyperlinks don't work?
4      A.   That's correct.  It appears that they are
5   scanned documents, yes.
6      Q.   When you thought we were getting close, are
7   these somewhere different than you would have expected
8   them to be?
9      A.   No.  We saw the first hyperlink, which is what
10  I was expecting, but unfortunately that hyperlink did
11  not work.  That link was the same link that's provided
12  in Exhibit 10.
13            MR. BUTLER:  Ms. Kidd, do you know if it's
14  actually in these documents?
15            MS. KIDD:  Don't know.
16            THE WITNESS:  I do believe it is.  This
17  looks like it is an accurate representation of all of
18  our auto claim manual and the standard procedures.
19            (Scanning documents from 12:50 to 12:52.)
20            THE WITNESS:  I've seen two references so
21  far to it, but I have not seen the actual reserve
22  article yet.
23            (Scanning documents from 12:52 to 12:59.)
24            THE WITNESS:  There's another one
25  referencing reserves.

Russell Horne    12/8/2023

Page 77

 1        Q.  (BY MR. BUTLER)  I'm sorry?

 2        A.  There's another hyperlink referencing reserves,

 3   so we should be getting relatively close to it.

 4        Q.  Another hyperlink that we can't link to?

 5        A.  Correct.

 6             THE WITNESS:  Scroll back up to that table

 7   of contents.  Just a couple of pages up above.  Keep

 8   going.  A little bit further.  I have -- I thought I had

 9   saw reserves in that.  This is the jurisdictional

10   reference, so you can skip down probably about two or

11   300 pages.

12             (Scanning documents from 1:02 to 1:07.)

13             MR. BUTLER:  Madam court reporter, do you

14   have any clips?

15             THE REPORTER:  I may.

16             (Scanning documents from 1:02 to 1:07.)

17             MR. BUTLER:  Mrs. Kidd, if you find it

18   before we do, please yell and give us a Bates number.

19             (Scanning documents from 1:07 to 1:20.)

20             THE WITNESS:  I'm sorry, I'm going to have

21   to call for a break; need to use the restroom.

22             MR. BUTLER:  Sure.  Yeah, I mean, look, if

23   you need to go, we can pause the -- I know you've been

24   looking and I appreciate your patience.  You've been

25   looking for over a half hour at this point for that

Russell Horne    12/8/2023

1    item.  If you need to take a quick pause, we can.

2                   THE WITNESS:  Sure.

3                   MR. BUTLER:  Is that what you'd prefer?

4    You can see you -- you're getting down towards the end.

5                   THE WITNESS:  We're getting down towards

6    the end, yeah.  We can continue, I guess, but -- that's

7    fine.  There.  Is that it?  Activity processing

8    reserves?

9                   MS. KIDD:  Go back.  There you go.  All

10   right.  We -- do you want to take a break before you

11   start answering questions?

12                  MR. BUTLER:  Well, I -- wait just a minute.

13   I want to hear him, what he --

14       Q.  (BY MR. BUTLER)  Is this it?

15       A.  This looks to be a piece of it, yes.

16       Q.  Looks to be a piece of it?

17       A.  Yes.  The reserves are --

18       Q.  So what page are we on, for the record?

19       A.  I cannot read that from here.  It looks like

20   it's partially cut off.

21       Q.  Is that 3070?  So there's a single page 3070?

22       A.  Yep.

23       Q.  And it has a hyperlink to the same thing we've

24   been looking for --

25       A.  Uh-huh.

Russell Horne    12/8/2023

Page 79

1      Q.  -- this entire time, the very first one, auto

2   claim manual-reserves.  So can we assume that that is

3   not that actual auto claim manual-reserves that we're

4   looking at?

5      A.  This looks like it is part of the reserves.

6   There's several training documents in here.  I did see

7   the claim -- I'm sorry, the auto claim manual when we

8   were scrolling.  Unfortunately I believe we may have

9   passed that, but this is the --

10      Q.  Wait just a minute.  Did you just say that you

11   think that we passed what we've been looking for for the

12   last half hour?

13      A.  Possibly, because we do have the auto claim

14   manual in that document.  But what we're looking at is

15   the standard claim procedure guide for the reserves,

16   because it's going to be in two spots.  There's going to

17   be a reserve category for the claims -- sorry, the auto

18   claim manual and there's going to be a reserve for the

19   standard claims procedures.  And this is that standard

20   claims procedures portion of it.

21      Q.  So when we see the hyperlinks there, we see

22   one, two, three, four separate hyperlinks?

23      A.  Correct.

24      Q.  Which one is this one-page document we're

25   looking at?

Russell Horne    12/8/2023

Page 80

1      A.  This one is not one of those three.  The three

2  that are referenced there are the auto claim manual and

3  the claims procedure guide and this is the standard

4  claims procedures.

5      Q.  Okay.  Well, we began this by looking for the

6  very first one there --

7      A.  Correct.

8      Q.  -- auto claims manual-reserves?

9      A.  Correct.

10     Q.  We haven't found that yet, have we?

11     A.  I haven't.  I did see where we had the auto

12  claim manual in this file.  Without the search function

13  in going through the three --

14     Q.  That's what we've been looking for?

15     A.  You're correct.  Yes, that is what we've been

16  looking for.

17     Q.  So I want to capture this one page that we have

18  found and we'll make that an exhibit.  So we're still

19  looking for the item that we started looking for --

20     A.  Correct.

21     Q.  -- more than a half hour ago.  We're almost to

22  the end, so which direction is it that you now want to

23  go?

24     A.  I thought that it would be towards the bottom,

25  but it looks like we're in to the SCP now.  Scroll --

Russell Horne    12/8/2023

Page 81

```
 1        Q.  Do you want to continue to the end, since we're
 2   near the end and make sure --
 3        A.  Let's continue --
 4        Q.  -- we're not --
 5        A.  -- to the end --
 6        Q.  -- missing it?
 7        A.  -- yeah.  Yeah, that was the rest of the SCP.
 8        Q.  So we have gone through this entire file and
 9   not found the item that we're looking for, at least at
10   this point, correct?
11        A.  That's correct.
12        Q.  All right.  So did you say that you thought you
13   might have passed it earlier or something like that?
14        A.  Well, I saw the claims procedure guide in there
15   but I didn't see where it said the reserves on it.
16        Q.  So are you comfortable that you have looked
17   through this item and that we have not been able to find
18   the claims manual-reserves item?
19        A.  I believe it is in the document, but I did not
20   see it through the first pass.
21             MR. BUTLER:  Okay.  With that we'll take
22   that comfort break that you needed.
23             THE WITNESS:  Okay.  I appreciate that.
24             THE VIDEOGRAPHER:   We're off the record at
25   1:27 p.m.
```

Russell Horne   12/8/2023

Page 82

```
 1                    (Break from 1:27 to 1:31.)
 2                    THE VIDEOGRAPHER:   We're back on the
 3    record at 1:31 p.m.
 4         Q.  (BY MR. BUTLER)  Mr. Horne, would you hold up
 5    Exhibit No. 10 so we can see that?
 6         A.  (The witness complies.)
 7         Q.  And we see those blue hyperlinked items right
 8    underneath the highlighted portion there.  It's that
 9    first item that you just kindly spent about 35 minutes
10    or so going through the record and attempting to find,
11    that's -- item we've not been able to locate in the
12    production here today, correct?
13         A.  That's correct.
14         Q.  So let's go to the second item on there and, in
15    fact, again if you'll hold that up for the camera?
16         A.  Sure.
17         Q.  Any of those other items underneath there,
18    those three other hyperlinked items, did you see any of
19    those items as we went through this file looking for --
20         A.  I did not.
21         Q.  -- reserve related information?
22         A.  I apologize.  I did not.  They would be all
23    grouped together, though, it looks like.
24         Q.  All right.  Let's talk about this July 29th,
25    2021 crash and State Farm's investigation of that crash
```

Russell Horne    12/8/2023

```
 1   beginning after being notified.  State Farm knew about

 2   the crash from July 29th, 2021 or thereabouts?

 3       A.  That's correct.

 4       Q.  They were aware of the magnitude and forces of

 5   this crash?

 6               MS. KIDD:  Object to form.

 7       A.  We were aware that an accident had occurred,

 8   yes.

 9       Q.  (BY MR. BUTLER)  Well, in short order after

10   this crash, you were aware of the actual vehicle damage

11   and, for example, the fact that Mary Laseter's car was

12   totaled in this wreck, true?

13       A.  I don't believe we knew that immediately.

14       Q.  And I don't mean to insinuate immediately.  I'm

15   talking about within the first 30 days of July 29th,

16   2021.  So let's -- let's take it during this period.

17   Within the first 30 days of July 29th, 2021, State Farm

18   was aware of the magnitude and forces of this crash?

19       A.  With respect to our insured's vehicle, yes.

20       Q.  You were aware that the wreck was 100 percent

21   responsibility of your insured, Mary Laseter?

22       A.  That's correct.

23       Q.  You were aware that there was no fault or

24   responsibility on the part of Amber Mills?

25       A.  That's correct.
```

Russell Horne    12/8/2023

Page 84

 1        Q.  You were aware that there was airbag deployment
 2    in both of these vehicles related to this wreck?
 3        A.  Initially at least with respect to Laseter's
 4    vehicle, yes.
 5        Q.  Well, State Farm in its capabilities checks out
 6    the vehicles that are involved in the wreck aside from
 7    just its own insureds, don't they?
 8        A.  I don't believe that was the case in this.
 9        Q.  They certainly had the wherewithal to do that
10    if they choose to do so, true?
11                MS. KIDD:  Object to the form.
12        A.  Potentially.  Unless in this case Mills would
13    have had to release the vehicle for us to inspect it.
14    To my knowledge, that did not happen.
15                (Exhibit No. 11 marked.)
16        Q.  (BY MR. BUTLER)  You were aware, and I'm going
17    to show you what's marked as Plaintiff's composite 11,
18    slide 24.  I'm going to show you some items from State
19    Farm's claims file.
20        A.  Uh-huh.
21        Q.  And while we're on that subject, did State Farm
22    ever request to inspect Amber Mills' vehicle in the
23    first 30 or 60 days after this crash?
24        A.  I don't recall.  And my understanding is that
25    she was going through her carrier.

Russell Horne    12/8/2023

Page 85

1          Q.   My question to you was:  Did State Farm ever

2     request to anyone to inspect Amber Mills' vehicle after

3     this crash for the first six months?

4               MS. KIDD:  Object to form.

5          A.   Not to my knowledge.

6          Q.   (BY MR. BUTLER)   The items that we're looking

7     at in front of you are items related to your insured,

8     Mary Laseter, that were a part of the State Farm claims

9     file, correct?

10         A.   That appears to be correct.

11         Q.   And State Farm was aware very early on that

12    Mary Laseter had suffered a fracture of her ribs, a

13    fracture of her pelvis, and a fracture of her hip as a

14    result of this wreck?

15         A.   That appears to be correct.

16         Q.   What is the second page of that item and what

17    does it tell State Farm?

18         A.   It is a note from our PIP department regarding

19    the condition of Ms. Laseter.

20         Q.   And did it note that Mary Laseter as of October

21    27th, 2021 was dependent on a wheelchair as a result of

22    her wreck related injuries?

23         A.   According to what's in front of me, yes, that's

24    correct.

25         Q.   I'm not asking you to give any medical opinions

R, 403, MIL

Russell Horne    12/8/2023

Page 86

1    here, but would State Farm claims personnel and

2    management be familiar with fractured ribs in terms of,

3    you know, their general affect on an insured?

4              MS. KIDD:  Object to form.

5         A.  Can you rephrase that?

6         Q.  (BY MR. BUTLER)  In your work as a supervising

7    management level claims specialist, would you and Angela

8    Butler, for example, have some information regarding

9    fractured ribs as --

10        A.  Yes, we would.

11        Q.  And the same in terms of a fracture of the

12   sacrum?

13        A.  Yes, we would.

14        Q.  Where is the sacrum located, just generally

15   speaking?

16        A.  Sure.  Below the lumbar spine.

17             MR. BUTLER:  Go to the -- go to the next.

18        Q.  (BY MR. BUTLER)  Is this a fair and accurate

19   representation of what you understand the general

20   location of the sacrum to be?

21             MS. KIDD:  Object to form.

22        A.  Yes.

23        Q.  (BY MR. BUTLER)  And a fractured acetabulum, is

24   that accurately depicted on this diagram in accordance

25   with your knowledge as a claims adjuster and a

R, 403, MIL

Russell Horne    12/8/2023

Page 87

R, 403, MIL

1    supervisory level one at that?

2        A.  Yes.

3        Q.  And was State Farm also aware of the fact that

4    as a result of these injuries, Mary Laseter's physician

5    had restricted her weight bearing ability as a result of

6    one or more of those fractures?

7        A.  State Farm as a whole, yes.  State Farm as a

8    whole, yes.

9        Q.  Well, State Farm claims from their own claims

10   file in this case?

11       A.  Define State Farm claims.

12       Q.  This information was contained in the State

13   Farm claims file that was produced --

14       A.  That's correct.

15       Q.  -- in this case?   And we've already talked

16   about the fact that all of State Farm's personnel would

17   have this information available to them as part of being

18   able to look at that file in the claims-handling

19   process?

20       A.  I disagree.

21       Q.  And what is your disagreement with that

22   proposition?

23       A.  Sure.  So this is a first party PIP coverage

24   being placed in front of me.  This is PIP's file.  Our

25   adjusters regarding Mills' claims look at third-party

Russell Horne    12/8/2023

Page 88

```
 1   information, typically we have no need or access to our
 2   PIP claim file.
 3        Q.  My question was was that State Farm's
 4   claims-handling folks in the Mills versus Laseter case
 5   had access to that information in the claims file that
 6   we see here in front of you?
 7        A.  They do.
 8        Q.  And in dealing with your insured or her
 9   representative, that information might be important?
10        A.  Potentially.
11        Q.  And likewise, State Farm in its claims file in
12   this case was aware that its insured, Mary Laseter,
13   required some ongoing home care assistance over a period
14   of months after this crash?
15        A.  By way of what you put in front of me, yes,
16   that's correct.
17        Q.  So about six-and-a-half months later after this
18   crash, State Farm received a demand package on behalf of
19   Amber Mills, true?
20        A.  Define the six-and-a-half months.
21        Q.  Well, we've all seen the demand package in this
22   case.  It was dated February 18th, 2022.  There was some
23   indications or questions from State Farm regarding
24   receiving it at that time, so a hundred and something
25   pages was faxed that has that information to them a
```

Russell Horne    12/8/2023

Page 89

1  short time later.

2      A.  That is correct.  I believe we received that in

3  March.

4      Q.  Early March?

5      A.  I can't recall the date.

6              (Exhibit No. 13 marked.)

7      Q.  (BY MR. BUTLER)  I'm going to show you what's

8  been marked Plaintiff's Exhibit No. 13.  It's three

9  pages here, number 63.  Take a look at that for a moment

10 and when you've had a chance to look at that, let me

11 know.

12     A.  Okay.

13     Q.  So this crash happened on July 29th, 2021 and

14 one week later, approximately one week later, State Farm

15 wrote their insured and said, quote, State Farm will

16 investigate and pursue settlement if appropriate,

17 unquote?

18             MS. KIDD:  Object to form.

19     A.  That's what I see in front of me, yes.

20     Q.  (BY MR. BUTLER)  Look and see if I gave you the

21 letter behind that that -- keep going.

22     A.  Yes, that looks like a claims acknowledgment

23 letter.

24     Q.  Let me see what we're looking at there.  Yeah,

25 so let's go to the -- let's go back, I guess, for a

Russell Horne    12/8/2023

Page 90

R, 403, HS

```
 1    minute.  All right.  So hold up the second page of that
 2    so --
 3         A.  (The witness complies.)
 4         Q.  Does that fairly and accurately depict that on
 5    August the 5th, 2021, State Farm wrote its insured, Mary
 6    Laseter, a letter that said in part, quote, State Farm
 7    will investigate and pursue settlement if appropriate,
 8    unquote, as of August 5th, 2021?
 9         A.  That's correct.
10         Q.  If you look on the time line, there's a
11    reference to a letter dated August 26th, 2021, from
12    State Farm to its insured, this is about a month after
13    the wreck, and it said in part, quote, we will attempt
14    to conclude this claim as reasonably as possible with
15    the attorney's cooperation, unquote.
16         A.  That's correct.
17         Q.  And do you need to go back and look at the
18    letters to confirm from State Farm's perspective that
19    they wrote such a letter on August 26th?
20         A.  No, I'm fine with that.
21         Q.  All right.  So if we were to go out to February
22    18th of 2022, would it be true that as of that date it
23    had been more than six-and-a-half months since State
24    Farm had been given notice regarding this wreck?
25         A.  That would be correct.
```

Russell Horne    12/8/2023

Page 91

1        Q.   And it would be months and months after the

2   information that we just went through that State Farm

3   knew within the first 30 days of this claim regarding

4   the vehicles, the nature and extent of the forces

5   involved and the airbag deployment and the injuries at

6   least sustained by their insured?

7             MS. KIDD:  Object to form.

8        A.   I believe that's correct.

9        Q.   (BY MR. BUTLER)  So if State Farm didn't get

10  that hundred and some-odd page fax containing that

11  demand and all of those materials until a few weeks

12  after February 18th, 2022, that would mean that it was

13  seven months after this crash?

14       A.   Seems like a correct time line.

15       Q.   So they had seven months to investigate this

16  claim, be setting their reserves, be gathering the

17  necessary information, lining up anything and everything

18  they felt was appropriate, true?

19       A.   That's --

20            MS. KIDD:  Object to --

21       A.   -- true.

22            MS. KIDD:  -- form.

23       Q.   (BY MR. BUTLER)  Are you familiar with the

24  demand package that was received by State Farm in this

25  case?

Russell Horne    12/8/2023

Page 92

1          A.  Yes.

2                    (Exhibit No. 14 marked.)

3          Q.  (BY MR. BUTLER)  I'm going to show you what

4    we've marked as Plaintiff's composite number 14 and this

5    will be slide 6.  Let's put up slide 8 for the moment.

6    So do you recall from this image we're looking at here

7    on the screen the basic demand letter dated February

8    18th, 2022 and the accompanying items, is that a true

9    and accurate depiction of at least a portion of the

10   first page of that?

11         A.  Yes.

12         Q.  So that information included a recent

13   photograph of Amber Mills and her family on an outing

14   prior to the collision and it described her as an

15   extremely active, healthy, mother of two children who

16   enjoyed exercising, teaching Pilates, and otherwise

17   being active with her two children?

18         A.  That's correct.

19         Q.  Go to number six.  In that demand, included

20   references to and records from Dr. Huber?

21         A.  Yes.

22         Q.  It referenced an MRI that had been done on

23   Amber Mills' cervical spine along with records from that

24   study?

25         A.  Correct.

Russell Horne    12/8/2023

Page 93

1        Q.  It included the fact that she had been seen at

2    Neurology Associates of North Florida and those records?

3        A.  I recall the statement for August 11th in the

4    demand, but I don't recall the record.  Strike that.  I

5    do recall the record.

6        Q.  You do recall the record.  Okay.  So let's go

7    to the next slide there.  And does this fairly and

8    accurately depict some of the information that was

9    included in that February 18th, 2022 demand that is --

10   that on August the 6th, 2021, Amber Mills had underwent

11   an MRI to her cervical spine and at the C6-7 level there

12   was a disk herniation with an associated annular tear or

13   a fissure as they're sometimes referred to?

14       A.  I believe that's an accurate depiction of your

15   summary, yes.

16       Q.  And did the records back up that summary?

17       A.  You left out the fact that the reading

18   radiologist was unable to determine the age of the

19   herniation.

20       Q.  We can look at that in a few minutes.  He

21   indicated that it was possibly or likely traumatic in

22   nature, did he not?

23       A.  He mentioned that it was age indeterminate.

24       Q.  You don't remember the part about trauma?

25       A.  I believe it could be possible related to the

Russell Horne    12/8/2023

Page 94

1    acute trauma, but it was age indeterminate.

2        Q.  And isn't that true of all MRIs; that is, they

3    don't come with a born on date on them?

4            MS. KIDD:  Object to form.

5        A.  Rephrase for me.

6        Q.  (BY MR. BUTLER)  MRI images don't come with a

7    born on date indicating exactly the date that a

8    particular finding occurred; is that --

9        A.  No --

10       Q.  -- fair?

11       A.  -- but they will usually indicate the

12   approximate age.  I have seen that.

13       Q.  Well, let me ask you this:    At any time before

14   May of 2022 when this case was filed --

15       A.  Uh-huh.

16       Q.  -- that is a lawsuit instituted, did State Farm

17   have any information from any physician refuting any of

18   the findings of the treating physicians that we see here

19   on our screen?

20       A.  At that time?    No.  However, we did question

21   it.

22       Q.  But you had no medical evidence whatsoever to

23   back up that, quote, questioning, unquote, true?

24       A.  Aside from what your reading radiologist had

25   put in his own notes, no.

Russell Horne    12/8/2023

Page 95

1          Q.   Did that initial demand likewise include the

2    fact that Mrs. Mills had been seen by Neurology

3    Associates of North Florida because of headaches,

4    nausea, memory deficits, dizziness, and some radiating

5    cervical spine pain and that she had been diagnosed with

6    cervical spine radiculopathy and posttraumatic

7    headaches?

8          A.   He did, along with a negative EMG and EEG

9    study.

10         Q.   And again, did State Farm have any medical

11   evidence refuting any of the findings set forth by the

12   treating physicians or the reading radiologist or anyone

13   else as contained in that demand?

14         A.   Only the records that you submitted.

15         Q.   And in that demand dated February 18th, 2022,

16   did it indicate that Dr. Huber had noted that as of

17   January 28th, 2022, six months or so after this wreck,

18   that Mrs. Mills' crash related neck injury is chronic

19   and permanent?

20         A.   It did.

21         Q.   And it contained records documenting that?

22         A.   The opinion of Dr. Huber, yes.

23         Q.   And again, State Farm as of May of 2022 had no

24   medical evidence whatsoever refuting the fact that her

25   neck injury was chronic and permanent from this wreck?

Russell Horne    12/8/2023

Page 96

1        A.   We requested additional documents from you.

2   May 2nd, 2022, your conversation with Angela, she made

3   you aware and you advised that you were aware of the

4   subsequent loss in October that Ms. Mills had.  You

5   advised that she was treating, but there were no records

6   provided.  You had -- you had advised that it was not

7   subject to this claim, which brought into question

8   whether or not the chronic and permanent nature of her

9   injury was related to this loss or the subsequent loss.

10        Q.   You know that that incident you're referring

11   to, which we characterized it as a sideswipe, occurred

12   after all of this diagnostic testing that had confirmed

13   a herniated disk with associated annular tear after the

14   posttraumatic headaches, after the indications of

15   radiculopathy had occurred, true?

16        A.   The questionable herniation, yes, I'm aware.

17        Q.   And in fact, later your attorneys indicated

18   that that later sideswipe collision didn't have any

19   significant bearing in this case and in fact they

20   dropped that as a -- as an argument in the case, true?

21            THE REPORTER:  As a what?  I'm sorry.  As a

22   what case?  And in fact your attorneys indicated that

23   that later sideswipe collision doesn't have any

24   significant bearing on this case and in fact they

25   dropped that as the --

Russell Horne    12/8/2023

Page 97

1          MR. BUTLER:  They dropped that argument

2    prior to trial.

3          MS. KIDD:  Object to the form.

4      A.  I'm aware that they dropped that after suit was

5    filed, but what you stated to us indicated that there

6    was some issue there pre-suit.

7      Q.  (BY MR. BUTLER)  You -- strike that.  State

8    Farm could have had a CME or an evaluation or a records

9    review done by a doctor of their own choosing any time

10   during the eight-plus months after this wreck and before

11   this lawsuit was filed, true?

12     A.  I disagree.

13         MS. KIDD:  Object to form.

14     A.  I disagree because records were not provided to

15   us until March.  We had until April to evaluate.  By the

16   time we began to negotiate with us (sic) you did provide

17   us that ultimatum, again referenced on May 2nd, 2022.

18   Therefore, we didn't have adequate time to secure any

19   sort of experts.

20     Q.  (BY MR. BUTLER)  You didn't secure any experts

21   until much later in the process than that, correct?

22     A.  You're correct.  We have to request those

23   first.  They're not immediate.

24     Q.  In that same demand and demand package, there

25   were discussions about Mrs. Mills, the limitations on

Russell Horne    12/8/2023

Page 98

1    her ability to exercise and be active and otherwise

2    engage in activities and hobbies of her own choosing and

3    the negative impact that that's having on her quality of

4    life and the fact that those losses greatly exceeded the

5    $25,000 of liability coverage under your insured's

6    policy?

7        A.  Can you repeat that question?

8        Q.  Did the settlement demand indicate that the

9    losses related to this collision gravely exceeded the

10   $25,000 of limited liability coverage under your

11   insured's policy?

12       A.  The settlement demand contained your opinion

13   which did state that, yes.

14       Q.  Go to the next.  And it contained more than

15   just an opinion, didn't it?  It contained information

16   regarding the wreck, the fact that both vehicles had

17   been totaled in this crash, that airbags had deployed in

18   both of those vehicles, true?

19       A.  True.

20       Q.  So did State Farm have any medical information

21   at all that the injuries being reported weren't

22   reasonable in light of the crash, the mechanism of

23   injury, that type of thing?

24       A.  We relied on the adjuster's background and

25   handling for the claims to make a depend -- I'm sorry,

Russell Horne     12/8/2023

Page 99

1     an independent decision based on the totality of the
2     circumstances and the supplied documentation.
3          Q.   Okay.   And again, as part of that demand
4     package, State Farm knew that Amber Mills' head was
5     involved, her neck, her right shoulder, her right hand,
6     and her lower back, and it included medical records that
7     documented that?
8          A.   That's correct.
9          Q.   That demand package included a disability
10    certificate from August the 9th, 2021, which would be 11
11    days or so after this wreck, indicating that as of that
12    point she was still completely incapacitated from the
13    July 29th, 2021 collision?
14         A.   From her chiropractor, I believe that's
15    correct.
16         Q.   Did State Farm have any medical or physician
17    evidence at all refuting that?
18         A.   We rely on our adjusters making informed
19    independent decisions based on the medical information
20    provided.
21         Q.   And your adjuster in this case whose
22    opinions -- strike that.
23              So whose opinions or judgments were being
24    relied upon by State Farm in terms of assessing this
25    information?

Russell Horne     12/8/2023

Page 100

1        A.   The adjuster.

2        Q.   Who was?

3        A.   Angela Butler.

4        Q.   Anyone else?

5        A.   No.

6        Q.   And Angela Butler, her background is what in

7    terms of any kind of medical, physical therapy or

8    related healthcare background?

9        A.   She's not a doctor, but she has been with State

10   Farm for 25 years.

11       Q.   She's not a doctor.   Has she ever been a nurse?

12       A.   No.

13       Q.   A nurse practitioner?

14       A.   No.

15       Q.   A physical therapist?

16       A.   No.

17       Q.   Ever been involved in the healthcare field at

18   all in terms of hands on dealing with patients?

19       A.   I can't answer that.

20       Q.   As far as you know?

21       A.   As far as I know, no.

22       Q.   The initial demand package included information

23   from a neurologist and his impression regarding cervical

24   radiculopathy and posttraumatic headaches?

25       A.   Yes, that's what I'm seeing.

Russell Horne    12/8/2023

Page 101

1          Q.   And that documentation was included in this

2    demand package as well, true?

3          A.   That's true.

4          Q.   And as of January 28th, 2022, relatively close

5    in time to that February 18th, 2022 demand package, it

6    included medical records that indicated that Amber Mills

7    continued to have pain down her right arm, which is a

8    numbness and tingling and the numbness and tingling goes

9    into the middle, ring, and pinky fingers on the right

10   hand which happens daily?

11         A.   That's what the record states.

12         Q.   Did the records include objective findings of

13   limited range of motion with pain to the cervical and

14   dorsolumbar spine with hypertonicity of the cervical and

15   dorsolumbar spine muscles?

16         A.   Contrary to the initial chiropractic records,

17   yes.

18         Q.   And that record again approximately six months

19   after this crash indicated, quote, she has now chronic

20   pain and a permanent injury to her neck due to the

21   injuries from this motor vehicle accident, unquote.  Did

22   I read that correctly?

23         A.   You did.  Can I note that that's also after the

24   subsequent accident that's in question?

25         Q.   You can note anything you want.  You can also

Russell Horne    12/8/2023

Page 102

1    note that this jived with what Dr. Gabriel, State Farm's

2    own CME, concluded months later after State Farm

3    retained him in this case.

4        A.   Not exactly, because this record does not state

5    that it's a permanent aggravation.   This one states it's

6    an outright permanent injury.

7        Q.   And as we talked about before, either one of

8    those satisfies Florida law in terms of a permanent

9    injury, correct?

10        A.   You're correct, but we still reserve the right

11    to question it.

12        Q.   And your right to question it revealed itself

13    in the fact that State Farm offered $7000 and maintained

14    that $7000 offer up until December 1st of 2022 when you

15    first offered your policy limits in this case?

16            MS. KIDD:   Object to the form.

17        Q.   (BY MR. BUTLER)   Correct?

R,
403

18        A.   As far as offer, yes.   As far as value, no.

19        Q.   So the Plaintiff's witness disclosures at trial

20    were the same doctors whose information was included in

21    that demand package dated February 18th, 2022, correct?

22        A.   That's my understanding.

23        Q.   The injuries that were testified about at trial

24    were the same injuries that were discussed in that

25    February 18th, 2022 demand package, correct?

Russell Horne    12/8/2023

Page 103

1        A.   I don't believe that you brought back the head

2   injury, unless I'm mistaken.

3        Q.   I'll ask my question again.   The injuries

4   claimed at trial were the same injuries that were

5   discussed in the February 18th, 2022 demand package?

6        A.   Yes.

7        Q.   And those are the actual folks that testified

8   at the trial of this case that resulted in an excess

9   verdict?

10        A.   It's my understanding.

11        Q.   And the physician, that neurosurgeon chosen by

12   State Farm, Dr. Gabriel, his opinion was discussed in a

13   January 11th, 2023 pretrial analysis and plan?

14        A.   It was.

15        Q.   And the attorney advised State Farm that her

16   neck injuries likely represent a permanent aggravation

17   of a preexisting condition, according to Dr. Gabriel?

18        A.   That's correct.

19        Q.   That Dr. Gabriel discussed the fact that the

20   neck pain was immediate after the collision and the

21   mechanism of injury with a significant impact supports a

22   cervical sprain/strain and exacerbation of her

23   preexisting degenerative disk disease at C6-7?

24        A.   That's correct.

25        Q.   That she had had persistent neck complaints

R,
403

R,
403

1    since the MVA and her symptomatic complaints on the

2    right side with nerve root symptoms and a right C7

3    distribution correlated with the C6-7 imaging findings?

4         A.   That's correct.

5         Q.   And Dr. Gabriel concluded that the Plaintiff

6    was cooperative and did not exaggerate her symptoms in

7    any way, shape, or form, true?

8         A.   My understanding, yes.

9         Q.   And so is there any reason for you to think

10   that if Dr. Gabriel or another examining physician or

11   evaluating physician chosen by State Farm had looked at

12   this information back in May of 2022, that they would

13   have reached a different conclusion?

14              MS. KIDD:   Object to form.

15        A.   Can you rephrase that?

16        Q.   (BY MR. BUTLER)   Dr. Gabriel has testified that

17   virtually 100 percent of the compulsory medical

18   examinations that he does in litigation cases are on

19   behalf of the defense, true?

20              MS. KIDD:   Object to form.

21        A.   I don't know that answer.

22        Q.   (BY MR. BUTLER)   I'll represent to you that

R,
403,
S

23   that's what he testified to.   My question is:   Is had

24   Dr. Gabriel reviewed the information back in April or

25   May of 2022, is there any reason for you to believe his

Russell Horne    12/8/2023

Page 105

R,
403,
S

1    conclusions would be different than they were when y'all

2    had him evaluate Amber Mills in late 2022, early 2023, I

3    can't recall as I sit here?

4         MS. KIDD:  Object to the form.

5         A.   Provided that you presented Amber Mills to Dr.

6    Gabriel, I believe so, he would have reached the same

7    conclusion and we probably would have had a different

8    opinion on the case.

9         Q.   (BY MR. BUTLER)  And if he -- strike that.

10             State Farm often has physicians like Dr.

11   Gabriel do a records review and render opinions without

12   actually seeing and examining the patient, true?

13        A.   Sometimes.

14        Q.   If you would grab that time line that's in

15   front of you there.

16        A.   Okay.

17        Q.   Did State Farm tell its insured on April the

18   9th, 2022, that is after they received the demand

19   package and supporting materials in this case, that

20   quote, the total amount of damage claimed is currently

21   unknown, unquote?

22        A.   I don't recall.

23        Q.   State Farm did know at that point in time that

24   there was an offer to completely release Mary Laseter of

25   all liability in exchange for the payment of that

Russell Horne    12/8/2023

Page 106

1    $25,000 by State Farm?

2        A.  Yes, and we did notify her about the demand.

3        Q.  And did you indicate in that same letter to Ms.

4    Laseter, quote, if this case settles for an amount less

5    than or equal to your coverage, there will be no

6    personal exposure to you, unquote?

7        A.  That sounds like a form letter that went out,

8    yes.

9        Q.  Well, first of all, that's true, correct?

10       A.  My understanding, yes.

11       Q.  And after that letter and after receiving that

12    demand package, State Farm chose to offer $6550 --

13       A.  That's correct.

14       Q.  -- to settle all claims of Amber Mills?

15       A.  That's correct.

16       Q.  And the only additional item that State Farm

17    requested at that time was the billing related to the

18    MRI?

19       A.  That's correct.

20       Q.  And that was provided to them on the same day

21    or within a day or two, true?

22       A.  True.

23       Q.  And on April the 29th of 2022, Amber Mills

24    extended in writing the time for acceptance, that is a

25    complete release of Mary Laseter in exchange for the

Russell Horne    12/8/2023

Page 107

1    payment of those policy limits to May the 6th of 2022?

2         A.   That's correct.

3         Q.   And after that was done, State Farm's response

4    was to offer $7000?

5         A.   Correct.

6         Q.   What was the amount being reserved on the Amber

7    Mills' case as of May the 2nd, 2022?

8         A.   I don't recall an exact figure.

9         Q.   Where in the materials you provided would we

10   find that information?

11        A.   In the claim file material.

12        Q.   As you sit here today as the State Farm

13   claims -- strike that.

14             As you sit here today as the corporate

15   representative of State Farm, tell me what you recall

16   seeing in the file regarding the setting of reserves in

17   this case beginning as of July 29th, 2021 and moving

18   forward.

19        A.   Sure.  From what I understand, the reserves

20   were set initially as a baseline based on a standard

21   value of claims for that given venue.  After Angela had

22   evaluated the case, the reserves were set to her initial

23   range value.  I don't recall that one.  I do recall that

24   after we received the Precision Imaging bill, the range

25   of value was somewhere in the ballpark of about $9500,

Russell Horne    12/8/2023

Page 108

 1  which would have been reflected in the reserves.

 2      Q.  And did that change at any point after May the

 3  2nd, 2022?

 4      A.  Yes.  As Angela were -- got additional

 5  information, I believe the next time her reevaluation of

 6  the case was right before mediation where we received

 7  the pre-mediation report and discovery update from

 8  defense Counsel.  She updated the claim and I do believe

 9  I gave her authority in the ballpark of $15,000 per

10  mediation.

11      Q.  So does State Farm or any of its

12  claims-handling personnel utilize any type of data

13  analytic software to assist them in a current claims

14  value for their cases?

15      A.  Yes.

16      Q.  And what kind of software was utilized in this

17  case?

18      A.  3 PET was utilized.

19      Q.  I'm sorry?

20      A.  It's called 3 PET.  3 Papa, Echo, Tango.

21      Q.  And who utilized that 3 PET program in the

22  claims handling of this case?

23      A.  Angela Butler.

24      Q.  And I guess I should get out, there's no

25  relationship -- my last name's Butler also, that's just

Russell Horne      12/8/2023

Page 109

1    coincidental, correct?

2          A.    Correct.

3          Q.    Does State Farm agree that it must include

4    complete and accurate data in any claims evaluation so

5    as to arrive at a fair and reasonable evaluation?

6                MS. KIDD:  Object to the form.

7          A.    Can you repeat -- rephrase that question for

8    me?

9          Q.    (BY MR. BUTLER)   Does State Farm agree that it

10   must include complete and accurate data in any claims

11   evaluation so as to arrive at a fair and reasonable

12   evaluation?

13               MS. KIDD:  Object to the form.

14         A.    Anything that we consider to be related, yes.

15         Q.    (BY MR. BUTLER)   What do you mean anything that

16   we consider to be related?

17         A.    When I say we, I mean the actual adjuster who's

18   evaluating the case, it's their duty to investigate,

19   evaluate, negotiate, and settle.   Anything that they

20   believe to be directly causative related to that injury

21   for that particular claimant or Plaintiff that's being

22   alleged, they'll take that into consideration when they

23   evaluate the claim based on the information provided.

24         Q.    So does State Farm agree that its adjuster must

25   include complete and accurate data in any claims

Russell Horne    12/8/2023

Page 110

1    evaluation so as to arrive at a fair and reasonable

2    evaluation?

3        A.  Yes.

4            MS. KIDD:  Object to form.

5        Q.  (BY MR. BUTLER)  Does State Farm agree that in

6    any such software program, any output is directly

7    related to the data input?

8        A.  That's correct.

9        Q.  Does State Farm agree that in any such software

10   program, the notion of garbage in equals garbage out?

11           MS. KIDD:  Object to the form.

12       A.  I don't agree with that statement.

13       Q.  (BY MR. BUTLER)  Does State Farm agree that in

14   any such software program the notion of inaccurate or

15   incomplete information in equals inaccurate or

16   incomplete data out?

17       A.  Yes.

18       Q.  You've heard the term garbage in, garbage out,

19   haven't you?

20       A.  Once upon a time.

21       Q.  In any type of data analytics program does

22   State Farm agree that a complete and accurate data

23   regarding a particular claim must be input in order for

24   the results to be valid?

25           MS. KIDD:  Object to the form.

Russell Horne    12/8/2023

Page 111

1      A.  I disagree.

2      Q.  (BY MR. BUTLER)  How so?

3      A.  Any software used to assist the adjuster is

4  simply a tool.  It is not the basis and the sole basis

5  for the adjuster's evaluation.  The adjuster is supposed

6  to rely on their independent knowledge of that claim

7  file depending on the individual merits presented by you

8  as their representative.

9      Q.  So let's stop for a minute and let's go find

10  the reserves information that you talked about in this

11  case.  So that should be contained in the production of

12  information here, which is the thumb drive that's been

13  identified as Plaintiff's Exhibit 1A?

14      A.  That's correct.

15      Q.  All right.  We're going to pull that up and

16  where do we go to find the reserves?

17      A.  It's going to be in the file history.

18          THE VIDEOGRAPHER:  Is it in the claims?

19          THE WITNESS:  Yeah, if you go to the

20  folder, it should be final production.

21      Q.  (BY MR. BUTLER)  And while we're on this

22  subject generally, have you with and without the aid of

23  State Farm's attorney who's here with us today, have you

24  found any other clues as to where those claims

25  manual-reserves sections --

Russell Horne    12/8/2023

Page 112

```
 1        A.  That would still be --

 2        Q.  -- might be?

 3        A.  -- that would still be related to the -- that

 4   folder that we were in, that file that we accessed with

 5   the 3167 pages, it should be inside of there.

 6        Q.  Well, I know it should be, but we couldn't find

 7   it and that's you who is knowledgeable and brought the

 8   information here with the assistance of Counsel.  So I'm

 9   just saying, we still don't have it --

10        A.  Correct.

11        Q.  -- fair?

12        A.  Fair.

13        Q.  Okay.

14             THE REPORTER:  I'm having a hard time

15   hearing.

16             MS. KIDD:  Yeah, I'll tell them.

17        Q.  (BY MR. BUTLER)  So you're going to take us and

18   show us the reserves history and any related indications

19   of reserves in the Amber Mills versus Mary Laseter case

20   from the outset through the final judgment?

21        A.  Okay.

22             THE WITNESS:  We're going to be scrolling

23   for a while.  I'm apologizing in advance.

24             THE VIDEOGRAPHER:  Okay.  So what's it

25   going to be like?
```

Russell Horne    12/8/2023

Page 113

 1              THE WITNESS:  It's going to be -- the final

 2    history itself, I believe there were 1400 changes, so --

 3    and it's not inclusive of only reserves, it's every note

 4    that's made in that file.  So it's going to be sporadic.

 5    So we're going to have to go slow and look for each

 6    individual reserve note.

 7         Q.  (BY MR. BUTLER)  Is there not a reserves

 8    history document or an ability to print out a reserves

 9    history for a particular claim?

10         A.  No.  It's going to be -- the final history is

11    every change.  So every document that was reviewed, who

12    reviewed it, when it was reviewed.  Every time the

13    reserve was updated.  Essentially any click on the file

14    is going to be documented in the same area the reserves

15    are.  And I want to say it's around 1400 pages.  So I'm

16    more than happy to go through that with you, but I do

17    want to advise that it will take some time.

18         Q.  Are you familiar with the term reserves as it's

19    used in Florida auto liability claims setting?

20         A.  I am.

21         Q.  What are reserves?

22         A.  Money that's set aside to handle the liability

23    aspect of that claim.

24         Q.  What are reserves used for?

25         A.  Money set aside for payment.

Russell Horne    12/8/2023

1      Q.  Anything else?

2              MS. KIDD:  Object to the form.

3      A.  Not that I'm aware of.

4      Q.  (BY MR. BUTLER)  Aren't there legal

5  requirements regarding adequate reserves?

6      A.  There are, regardless of the claim value, yes.

7      Q.  Is the setting and maintaining of appropriate

8  reserves mandatory or discretionary at State Farm in a

9  Florida auto injury claim?

10     A.  Mandatory.

11     Q.  Does State Farm agree that upon learning of a

12  collision with property damage and involving injuries,

13  among the first steps would be assign the claim to an

14  adjuster and the setting of reserves?

15     A.  The reserves are set automatically.  That's

16  outlined in the CPG.

17     Q.  Is the CPG something else that we don't have

18  here today?

19     A.  CPG is in the same spot where the reserves are

20  referenced.  There should be that bulk of pages

21  together.

22     Q.  Which means we've not been able to find it?

23     A.  As of yet, yes.

24     Q.  Can we agree that reserves are established and

25  adjusted by the claims specialist as outlined in the

Russell Horne    12/8/2023

Page 115

R, 403

1    auto claims manual reserves article?

2        A.   That's correct.

3        Q.   Does State Farm agree, quote, it is

4    management's responsibility to maintain the appropriate

5    reserves, unquote?

6        A.   Correct.

7        Q.   And management would mean somebody above Angela

8    Butler at State Farm?

9        A.   Correct.

10       Q.   Does State Farm agree that reserves must be set

11   early at -- strike that.

12           Does State Farm agree that reserves must be

13   set early on at the outset of a claim and adjusted as

14   appropriate based on additional information received?

15       A.   I agree with that.

16       Q.   So other than having you look through a second

17   time this production in order to find relevant

18   information regarding the reserves, is there a better

19   way of doing it, a more efficient way of doing it, as we

20   sit here?

21       A.   If we had a search function, yes, there would

22   be.

23       Q.   So if we had your laptop, for example, we could

24   do that?

25       A.   Yes.

Russell Horne    12/8/2023

Page 116

1      Q.  So where will we look within these documents?

2   And I'll let you give us an example.  So take us through

3   to find the first reserve setting in this case and you

4   can show us what it looks like and who made it and --

5      A.  Sure.

6      Q.  -- at what level.

7      A.  Do you want the first or the most recent?

8      Q.  I want the first.

9      A.  Okay.

10             THE WITNESS:  Go to page 1800 for me.  All

11   right.  And then --

12             MS. KIDD:  That's 800.

13             THE WITNESS:  Is it 8 -- that's 1800.

14             MS. KIDD:  Oh, is it?  Okay.

15             THE WITNESS:  Go up to 1200.  All right.

16   And then -- and then keep going up from there.  We're

17   going to go opposite the way we did earlier.  We're

18   going to go up for a bit.  We're looking for an area

19   that contains file history.

20             (Scanning documents from 2:40 to 2:42.)

21             THE WITNESS:  It's going to be further

22   north than that.  Okay.  Keep going up.

23             (Scanning documents from 2:42 to 2:44.)

24             THE WITNESS:  Let's see here.  Keep going.

25   And keep going.  Keep going.  All right.  Might be in

Russell Horne    12/8/2023

Page 117

 1    this area, we're in performer changes.  All right.  Keep

 2    going.  It'll say reserve.  So --

 3                   MS. KIDD:  Like that?

 4                   THE WITNESS:  Yeah.  There's one of them.

 5    That's April 9th, 2022.  There should be some that

 6    preceded that.

 7         Q.  (BY MR. BUTLER)  Let's -- let's look at what

 8    page number this is and identify it for the record,

 9    please.

10                   THE VIDEOGRAPHER:  312.

11         A.  312.

12         Q.  (BY MR. BUTLER)  Well, it should have a Bates

13    number presumably, so let's look and find the Bates

14    number.  Could you -- I'm not seeing one.  Oh.

15                   MS. KIDD:  312.

16         Q.  (BY MR. BUTLER)  312, okay.  And what is the

17    date of the first indication of any reserve on Bates

18    number 312 in this case?

19         A.  I'll state -- there it is.  April 9th.

20         Q.  April 9th of what year?

21         A.  2022.

22         Q.  Do I understand correctly that the first

23    setting of any -- strike that.

24                   Do I understand correctly from your review

25    of the file that the first indication of any reserves

Russell Horne    12/8/2023

Page 118

```
 1   having been set in this case occurred on April the 9th,

 2   2022?

 3        A.  Manually, yes.

 4        Q.  And how about automatically?

 5        A.  Automatically when the causal loss is open, so

 6   the bodily injury, third-party claim for Mills, we would

 7   have had automatic reserves set.

 8        Q.  In the amount of what?

 9        A.  That depends on the venue.  So this being Duval

10   County, I don't know off the top of my head what exactly

11   that figure was.

12        Q.  Where would we find that information?

13        A.  We would see that under the same file history,

14   but when that cause loss was opened, it should indicate

15   an automatic reserve.  I say should.  It's not something

16   that we typically look for.

17        Q.  Are you telling us here today under oath that

18   no where in the file production that we have is the

19   information related to what, if any, auto reserves were

20   set in this case?

21             MS. KIDD:  Object to the form.

22        Q.  (BY MR. BUTLER)  True?

23        A.  False, because I haven't read through every

24   single one of those file notes, but I presume that if it

25   is captured, it would be there.
```

Russell Horne    12/8/2023

Page 119

1        Q.  Well, that's what we're looking for.

2        A.  Correct.

3        Q.  So I thought you told me this is the first

4    indication you had seen?

5        A.  First manual, yes.

6        Q.  Is there a separate place here somewhere that

7    has the auto reserve figures?

8        A.  Possibly.  We need to scroll down a little bit

9    and see if we can locate that.  That or it's going to be

10   at the very end of the documents.  We can start at 2391

11   and work our way up.  We're going to be looking for a

12   category called file changes, which should indicate when

13   the cause of loss was open.

14       Q.  Based on your review of this production, do you

15   know if that was included?

16       A.  I believe it was included, yes.

17            (Scanning documents from 2:49 to 2:51.)

18       Q.  (BY MR. BUTLER)  While we're looking, does the

19   auto reserve amount, if any, does it change over time

20   automatically?

21       A.  Depending on what the adjuster inputs to the

22   current range value, yes, in their evaluation.

23            THE WITNESS:  Amanda, it might be under

24   claim -- so it's either going to be under file changes

25   or claim events.

Russell Horne    12/8/2023

Page 120

```
 1                (Scanning documents from 2:52 to 2:58.)
 2                THE WITNESS:  Do you mind blowing it up a
 3    little bit for me?  I'm trying to see what -- what
 4    it's -- okay.  Yeah, keep going up a little bit.  I
 5    can't see the dates from back here, Amanda.  Is that --
 6    are we going --
 7                MS. KIDD:  That's April -- I mean August
 8    7th, 2021.
 9                THE WITNESS:  Yeah.
10                MS. KIDD:  August 9th, 2021.
11                THE WITNESS:  So if you want to go down a
12    page for me.  Okay.  Should be a file change initial
13    assignment.  It's not showing -- that's not the claim
14    events, though.  That looks like that's the performer
15    changes.  That's the initial assignment.
16        Q.  (BY MR. BUTLER)  Are these reserve changes that
17    we're looking at here?
18        A.  These are assignments for the initial handling.
19    The file just went through some initial changes as they
20    identified an injury cause loss.  It looks like these
21    were some of the assisting claim associates in the file.
22        Q.  So?
23        A.  We're looking for the cause loss opening.
24    Let's see.  Now it -- it cuts off there.
25                THE WITNESS:  Try jumping up to page 250.
```

Russell Horne    12/8/2023

Page 121

```
 1   Okay.  Let me see.  All right.  These are claim events.
 2   Go down for me.  So we're looking for -- we're looking
 3   for around July 2021.
 4              Might be getting close now.  Go up a little
 5   bit for me.
 6              That's the system, that's the one -- we
 7   received that.  All right.  Keep going up.
 8       A.  Based on what I'm seeing, I don't see an
 9   automatic reserve capture, but off the top of my head,
10   based on this date of loss, it would be approximately
11   $13,800 as our automatic reserve when a cause loss is
12   over for 2021.
13       Q.  (BY MR. BUTLER)  Go to slide number 312.
14   You've indicated that the first manual reserve was done
15   on April the 9th, 2022?
16       A.  That would be accurate.
17       Q.  And what was the reserve changed to, based at
18   that time having received the Plaintiff's demand package
19   that we looked at earlier?
20       A.  Looks like --
21              THE WITNESS:  Can you go up to the next
22   page for me?
23       A.  -- because it changes a couple times as Angela
24   is entering information into the evaluation.
25       Q.  (BY MR. BUTLER)  I want to get it from
```

Russell Horne   12/8/2023

Page 122

1   chronological order.

2        A.  Sure.

3             THE WITNESS:  Then go down for me.  I'm so

4   sorry.  All right.  Right there.

5        A.  Looks like reserves were changed from 12,000 to

6   1423.

7        Q.  (BY MR. BUTLER)  So let me make sure this --

8        A.  Sorry, 1423.

9        Q.  Does that indicate to you that on April the

10  9th, 2022 the automatic reserves were at $12,000?

11       A.  That looks to be the indication, yes.

12       Q.  So they had gone down $1800 or so and now we

13  have the demand information.  What -- what happens next?

14       A.  So as Angela is entering in information into

15  her evaluation, the numbers are going to change until

16  she finalizes her evaluation.

17       Q.  So take me through all of the inputs and

18  changes there.

19       A.  Sure.  So looks like the first change --

20       Q.  And we're looking at page what?

21       A.  312.

22       Q.  312, got it.  Uh-huh.

23       A.  April 9th, 2022, 10:17 a.m. from 12,000 to

24  1423.

25       Q.  So whatever she did then dropped the reserve

Russell Horne    12/8/2023

Page 123

1    level from $12,000 to a bit over $1000?

2        A.  Correct.

3        Q.  What was the number again?

4        A.  1423.

5        Q.  Can you tell what information she put in

6    that --

7        A.  I cannot.

8        Q.  -- did that?

9        A.  I cannot.

10       Q.  All right.  That was at 10:17 --

11       A.  The next line --

12       Q.  -- a.m.?

13       A.  -- next line, April 9th, 2022, 10:23 a.m.

14       Q.  Just a few minutes later?

15       A.  From 1423 to 10,023.

16       Q.  So at this point in time it's down just about

17   $2000 from the automatic reserve that began that day?

18       A.  Correct.

19               THE WITNESS:  Can you go to the next entry,

20   please?

21       A.  Next entry, April 9th, 2022, 10:24 a.m., from

22   $10,023 to $8023.

23       Q.  (BY MR. BUTLER)  So it dropped $2000 --

24       A.  Yeah.

25       Q.  -- in that one minute period of time.  What's

Russell Horne    12/8/2023

Page 124

1   next?

2       A.  Next entry, April 9th, 2022, 10:25 a.m., from

3   $8023 to $9173.

4               Next entry, reserve change April 14th,

5   2022, $9173 to $8943.

6       Q.  8000 --

7       A.  943.  Next entry, April 18th, 2022, 11:39 a.m.,

8   from $8943 to $9257.

9               Next entry, May 2nd, 2022, 10:19 a.m.,

10  $9257 to $9780.

11              Next entry, May 2nd, 2022, 10:20 a.m., from

12  $9780 to $9361.

13              Next entry, May 3rd, 2022, 2:01 p.m., from

14  $9361 to $14,861.

15              Next reserve is dated May 3rd, 2022, 2:02

16  p.m., from $14,861 to $15,000.

17              Next entry, going blind now.  May 3rd, 2022

18  at 2:03 p.m., from 11,443 to $15,000.

19      Q.  I think we just did that one.

20      A.  It's a -- repetitive.

21      Q.  Okay.

22      A.  It's in there twice, yeah.

23              THE WITNESS:  Can you go up for me?

24      A.  And this is May 9th, 2022, nine -- I'm sorry,

25  8:39 a.m., $15,000 to $5804.

Russell Horne   12/8/2023

Page 125

```
 1            May 23rd --
 2       Q.  (BY MR. BUTLER)  Any idea why the nearly
 3   $10,000 drop?
 4       A.  I'm not sure why.
 5       Q.  Any guess?
 6       A.  I can't gander a guess.  May 23rd, 2022, 3:47
 7   p.m., $5804 to $9361.
 8       Q.  $9364?
 9       A.  9361.
10       Q.  61, thank you.  All right.  So let's fast
11   forward.  Let's fast forward to August of 2022 and see
12   where the reserves are.
13       A.  Okay.
14       Q.  And would they continue in this same stretch of
15   pages?
16       A.  They would.
17       Q.  So beginning at page 312 are the pages that
18   have to do with the manual reserve entries and the
19   changes over time?
20       A.  Correct.
21       Q.  All right.
22       A.  August 5th, 2022, 12:12 p.m., 9361 to 10,372.
23       Q.  So were there any changes at all between May
24   the 3rd and August the 5th?  Because the number seemed
25   to be the same, 9361?
```

Russell Horne    12/8/2023

Page 126

```
 1        A.  No, there would not have been.
 2        Q.  There weren't -- there were not any changes to
 3   the manual reserves between May the 3rd, 2022 of $9361
 4   before August the 5th, 2022?
 5        A.  Correct.
 6        Q.  And August 5th it was adjusted to 10,000 what?
 7        A.  372.
 8        Q.  And are there any further adjustments in August
 9   or September?
10        A.  I'm not sure.  We're going to have to scroll.
11   Looks like there was a change August 24th, 2022, 11:51
12   a.m., $10,372 to $15,372.
13             Looks like August 8th -- seems to be a cut
14   off.  August 8th, 2022, 8:57 a.m., change from 15,372 to
15   23,189.
16        Q.  What is the date of that, please, again?
17        A.  August 8th, 2022.
18             MS. KIDD:  I think it's September.
19             THE WITNESS:  Is it -- it is September,
20   you're right.
21             MS. KIDD:  I know it's tiny.
22        Q.  (BY MR. BUTLER)  September the 8th of 20 --
23        A.  Yeah.
24        Q.  -- 22 and the new number is?
25        A.  From 15,372 to 23,189.
```

Russell Horne    12/8/2023

Page 127

1    Q.  And so let me stop you for a minute there.

2  What, if any, relationship is there between the amount

3  of the reserves and the adjuster's assessment of current

4  case value?

5    A.  The relationship would have been reflective of

6  the case value.  I do want to note at that same

7  September 8th, 2022 time stamp, Angela does go back from

8  23,189 to 15,372.

9    Q.  So the reserves are set at the bottom, the top

10  or somewhere in the middle of the claims specialist's

11  current case value?

12    A.  The top.

13    Q.  So whatever the current case value is, that top

14  number is what's represented by the reserve figure?

15    A.  Correct.

16    Q.  Okay.  So on September 8th, 2022, it went up to

17  23,189, but the same day it dropped back down to what?

18    A.  15,372.  And to note, that was at the same

19  timestamp as the increase.

20    Q.  What's going on there, do you think?

21    A.  It could have been an error.

22    Q.  Is there any note that reflects what's going on

23  here?  As the supervising claims specialist in this

24  case, do you see fluctuations of significance on the

25  same day?  Does that trigger any questions or --

Russell Horne    12/8/2023

Page 128

```
 1          A.  No.
 2          Q.  All right.  And skipping forward in to October,
 3   what are we --
 4          A.  Yeah, let's keep --
 5          Q.  -- at?
 6          A.  -- keep going on that one.  There is a reserve
 7   change November 29th.
 8          Q.  How about before November 29th, before we get
 9   there?
10          A.  I didn't see any.
11          Q.  So it stayed at 15,372 from September 8th, 2022
12   up until November 29th, 2022?
13          A.  Correct.
14          Q.  That would be a period of more than
15   two-and-a-half months?
16          A.  Correct.
17          Q.  And on November 29th, 2022, what, if any,
18   change in the reserves is made?
19          A.  15,372 to 19,872.
20          Q.  19,000?
21          A.  872.
22          Q.  All right.  And does it change at all after
23   that?
24          A.  It does.
25                    THE WITNESS:  Can you go up to the next
```

Russell Horne    12/8/2023

Page 129

1    page and stop right there, please.

2        A.  There were two entries, the same timestamp,

3    11/29/2022, 12:53 p.m., first entry from 19,872 to

4    20,872.

5        Q.  20,872?

6        A.  Correct.  Second entry, 20,872 to 25,000.

7        Q.  To put it in proper context, up until September

8    8th, 2022, State Farm was maintaining its $7000 offer in

9    this case?

10       A.  Correct.

11       Q.  What changed at that time?  You didn't have a

12   CME report or anything else --

13       A.  Which --

14       Q.  -- what prompted the change?

15       A.  Which time?

16       Q.  Any time in that September-October time frame?

17       A.  I believe the increase was due to the

18   information that we learned that Mills had an --

19   undergone an injection.  The value was increased to be

20   reflective of that bill in preparation for mediation.

21       Q.  When was the compulsory medical examination

22   performed by Dr. Gabriel, the neurosurgeon chosen by

23   State Farm?

24       A.  November 8th, 2022.

25       Q.  When was that CME report received by State

Russell Horne    12/8/2023

Page 130

```
1   Farm?
2           A.   November 14th, 2022.
3           Q.   Anything else of relevance from State Farm's
4   perspective in terms of the change going on?
5           A.   Yes.   November 29th when the value increased to
6   $25,000 was when we had a conference call with Counsel
7   who went over the CME results with us.   That was after
8   the Thanksgiving break and holiday.   At that time we
9   decided that we needed to change our posture in the
10  case.
11          Q.   Didn't defense Counsel recommend that you
12  extend the policy limits months before that?
13          A.   Yes, but we still had questions that we needed
14  answers to.
15          Q.   And what were those questions?
16          A.   During our initial assignment letter, we asked
17  Counsel to complete surveillance of Mills.   We also
18  asked Counsel to complete the CME.   We asked Counsel to
19  complete a film read as well.   We didn't get the film
20  read, I believe, until a few weeks before Dr. Gabriel's
21  report and the surveillance was completed shortly after
22  -- we had an update shortly after Mills' depo.
23          Q.   So was State Farm rolling the dice hoping that
24  their litigation experts would provide a defense for
25  them to justify their $7000 offer?
```

Russell Horne    12/8/2023

Page 131

1          MS. KIDD:  Object to the form.

2      A.  I don't agree with the way that you phrased
3  that question.  We didn't roll the dice.  We made an
4  informed decision based on the information that you
5  provided about your client.

6      Q.  (BY MR. BUTLER)  All of the information that
7  you had in your possession prior to receiving those
8  litigation reports was that the Plaintiff had a
9  permanent injury as described in that demand package
10  that y'all had had since, if not February of 2022,
11  certainly early March of 2022 --

12      A.  Our --

13      Q.  -- true?

14      A.  False.  Our investigation and evaluation of
15  Mills' claim led us to believe that she had a
16  questionable injury and a soft tissue claim at best.

17      Q.  Did you have any medical evidence to that
18  effect?

19      A.  The evidence that we did have was based on our
20  knowledge and expertise of handling claims.

21      Q.  In other words, you didn't have any medical
22  evidence to support that, only --

23      A.  The medical evidence that we had to support
24  that were the exact notes that made us question whether
25  or not that was related to the loss or by your doctors

Russell Horne    12/8/2023

Page 132

1   that Mills saw.

2            MS. KIDD:  We at a good stopping place for

3   a comfort break -- comfort break?

4            MR. BUTLER:  Sure, if you need to.

5            THE WITNESS:  Yep.

6            THE VIDEOGRAPHER:  We're off the record at

7   3:28 p.m.

8            (Break from 3:28 to 3:37 p.m.)

9            THE VIDEOGRAPHER:  We're back on the record

10  at 3:37 p.m.

11       Q.  (BY MR. BUTLER)  Did you review Angela Butler's

12  3 PET evaluations that were done in the Amber Mills

13  case?

14       A.  Directly I reviewed the one that she sent to me

15  when I was her supervising manager.

16       Q.  Did you have any questions or issues with any

17  of Angela Butler's 3 PET type evaluations that were done

18  in connection with this case?

19       A.  No, I trust her judgment.

20       Q.  Is it State Farm's position that they were set

21  up in any way --

22            MS. KIDD:  Object --

23       Q.  (BY MR. BUTLER)  -- in relationship to this bad

24  faith case?

25       A.  No.

R,
403,
MIL

Carson Reporting & Associates    214.346.3434

Russell Horne    12/8/2023

Page 133

```
 1        Q.  Did you review the deposition of Scott Laseter
 2   taken in this case?
 3        A.  No.
 4        Q.  Do you know who Scott Laseter is?
 5        A.  Mary Laseter's son.
 6        Q.  You and others at State Farm had dealings with
 7   Scott Laseter as Mary Laseter's personal representative?
 8        A.  Not myself.
 9        Q.  Did you receive any communications from Scott
10   Laseter at any time during the Mills versus Laseter
11   claim?
12        A.  Yes.
13        Q.  You do see from the file that others at State
14   Farm had dealings with Scott Laseter as Mary Laseter's
15   personal representative early on in this case?
16        A.  Yes.
17        Q.  Does State Farm dispute any particular aspects
18   of Mr. Laseter's sworn testimony?
19             MS. KIDD:  Object to the form.
20        A.  I can't opine to that because I'm unaware of
21   his testimony.
22        Q.  (BY MR. BUTLER)  You haven't seen any portions
23   of his deposition testimony or the exhibits to his
24   deposition?
25        A.  No, I have not.
```

Russell Horne    12/8/2023

Page 134

1      Q.  Do you know if anyone at State Farm has seen

2  that deposition or those exhibits?

3              MS. KIDD:  Object to the form.  I think

4  it's outside the scope of the deposition.

5      Q.  (BY MR. BUTLER)  You can answer.

6      A.  No.

7      Q.  Are there any other particular items in the

8  claims file that State Farm believes are important in

9  understanding State Farm's claims handling in this case,

10  other than what we have reviewed here today?

11              MS. KIDD:  Object to the form.

12      A.  No.

13      Q.  (BY MR. BUTLER)  Are there any other particular

14  witnesses that State Farm believes supports its defenses

15  of this case?

16              MS. KIDD:  Object to the form.  I'm going

17  to instruct you not to answer.  It's outside of the

18  scope.

19              MR. BUTLER:  I'm going to suggest that you

20  pause for just a minute and rethink that.  He's the

21  corporate representative of State Farm here in this case

22  discussing the claims-handling analysis and I'm asking

23  him if he knows of anybody that has any particular

24  relevant evidence from State Farm's perspective in

25  support of their defenses.

Russell Horne    12/8/2023

Page 135

1          MS. KIDD:  You're asking about litigation

2     strategy.  If you want to ask him about who was in their

3     file, that's one thing.  But if you're asking about

4     who's going to be a witness at the trial, that's -- I'm

5     not letting him answer.

**R, 403**

6          Q.   (BY MR. BUTLER)  From your perspective aside

7     from yourself, who else would be a particularly

8     knowledgeable or important witness in the claims

9     handling of this case?

10         A.   Only myself.

11         Q.   Not Angela Butler?

12         A.   I have more knowledge than she does.

13         Q.   We've been going for a bit longer in the

14    deposition today, so I want to go back and ask you

15    again:  Is there any further indication, based on

16    scrolling through the production of items again for

17    other matters, do you see any indication at all that we

18    have here with us today the claims manual-reserves

19    portion of the claims manual or any of those other

20    hyperlinked items that we were looking for?

21         A.   I didn't see them.

22         Q.   Does State Farm agree that its insured, Mary

23    Laseter, and her personal representative fully

24    cooperated with their claims-handling process from the

25    outset up through verdict?

Russell Horne    12/8/2023

1      A.   Yes.

2      Q.   Does State Farm agree that the verdict in this

3   case fell well within the range of the likely verdicts

4   as determined by its chosen defense attorneys and claims

5   specialists?

6            MS. KIDD:   Object to the form.

7      A.   I disagree in part.

8      Q.   (BY MR. BUTLER)   So let me ask that again.

9   Does State Farm agree that the verdict in this case fell

10  well within the range of likely verdicts as determined

11  by its chosen defense attorneys?

12           MS. KIDD:   Object to the form.

13     A.   Yes.

14     Q.   (BY MR. BUTLER)   Does State Farm agree that

15  they chose not to raise their $7000 offer and not to

16  offer their policy limits for nearly two months after

17  their chosen defense counsel recommended in writing that

18  they extend their policy limits?

19           MS. KIDD:   Object to the form.

20     A.   Yes.   However, as I stated earlier, we still

21  had questions that needed an answer.

22     Q.   (BY MR. BUTLER)   And you got those answers in a

23  form of a verdict that took into account all of the

24  retained experts that State Farm had gathered in this

25  case and after an evaluation of that evidence by six

R, 403

AR

AR

Russell Horne    12/8/2023

Page 137

R,
403,
AR

1    jurors in Duval County, Florida?

2        A.   I disagree.   We got our answer on -- I'm sorry,

3    November 29th, 2022, after we discussed with Counsel

4    about Gabriel's report.

5        Q.   Does State Farm agree that the verdict against

6    State Farm's insured, Mary Laseter in this case,

7    exclusive of any taxable costs was more than 35 times

8    the amount of State Farm's offer of $7000 which they

9    maintained until approximately two months before trial?

10            MS. KIDD:  Object to the form.

11       A.   I agree.

12       Q.   (BY MR. BUTLER)  Does State Farm agree that the

13   verdict against State Farm's insured, Mary Laseter in

14   this case, exclusive of any taxable costs was nearly 10

15   times their policy limits which were never offered until

16   approximately two months before trial?

17            MS. KIDD:  Object to the form.

18       A.   I agree.

19       Q.   (BY MR. BUTLER)  At that point in time did

20   State Farm understand that the Plaintiff's cost in

21   prosecuting this claim likely was in the range, if not

22   exceed, the $25,000 policy limits?

23            MS. KIDD:  Object to the form.

24       A.   Define point in time.

25       Q.   (BY MR. BUTLER)  Two months before trial.  So

Russell Horne    12/8/2023

Page 138

MIL,
R,
403,
S

1    let me ask it again.  Does State Farm agree that the

2    Plaintiff's costs of prosecuting this claim two months

3    before trial likely would have been in the range of

4    their policy limits?

5                    MS. KIDD:  Object to the form.

6         A.   It's possible, yes.

7                    MS. KIDD:  Hold on.

8         Q.   (BY MR. BUTLER)   Did State Farm ever offer any

9    financial consideration for any of the Plaintiff's

10   taxable costs at any time prior to the trial of this

11   case?

12                   MS. KIDD:  Object to the form.

13        A.   No.

14        Q.   (BY MR. BUTLER)   Just give me a minute to...

R,
403,
S

15   Do you know how much State Farm spent in litigating this

16   particular claim after State Farm's chosen defense

17   attorneys recommended that they tender their policy

18   limits?

19                   MS. KIDD:  Object to the form.

20        A.   I don't.

21        Q.   (BY MR. BUTLER)   Do State Farm claims-handling

22   specialists at your level or Angela Butler's level have

23   any performance-based incentives in the way that they

24   are compensated at State Farm?

25                   MS. KIDD:  Object to the form.

Russell Horne    12/8/2023

Page 139

1          A.   Define performance based.

2          Q.   (BY MR. BUTLER)   Is their compensation derived

3    in part based on meeting or exceeding State Farm's

4    financial goals in any way?

5          A.   None --

6               MS. KIDD:  Object --

7          A.   -- whatsoever.

8               MS. KIDD:  -- form.

9          Q.   (BY MR. BUTLER)   Where in the file would we

10   look to find Angela Butler's current case value

11   notations?

12         A.   It's going to be in the same area that we were

13   in in final production.   And case value for this file,

14   correct?

15         Q.   Yes.   And so as an example, take us to one of

16   those and show us what that looks like and is it a

17   figure?   Is it a range?   How did --

18         A.   Sure.

19         Q.   -- she arrive at current case values throughout

20   the course of this case?

21         A.   It's going to be in a range.

22               THE WITNESS:  We're going to go down from

23   here, probably quite a bit.   At least past 384.   Keep

24   going down.

25         A.   So I believe this is going to be the start of

Russell Horne    12/8/2023

Page 140

1    it.  This is the actual -- looks like the bills, yes.

2         Q.  (BY MR. BUTLER)  Let's, for reference sake,

3    let's go to the time frame of August 2022.

4              THE WITNESS:  Go on down.  Keep going.  All

5    right.  All right.  What -- what is the date on this?

6    June 1st.  So this would have been a change that she may

7    have made.  Keep going down.  Keep going.  Keep going.

8    Keep going.

9         A.  You said August?

10        Q.  (BY MR. BUTLER)  Yeah, August 24th or between

11   that date and September 8th.  I'm just looking at some

12   of those prior notations that you had --

13        A.  There's an update August 29th, 2022.  Plaintiff

14   has now completed injections, boardables (phonetic)

15   total 20,438.49.  Defense Counsel advises we file a pay

16   vest (phonetic) for 25 at this time.

17        Q.  What was her current case value?

18        A.  At that time that was the 15,372, I believe.

19        Q.  You said that it would be a range?

20        A.  Yes.

21              THE WITNESS:  We'll keep going down for the

22   range.  Keep going.  Keep going.  Might be about two

23   pages below.

24        A.  Looks like the ranges are not displayed.

25        Q.  (BY MR. BUTLER)  And when you say they're not

Russell Horne    12/8/2023

Page 141

1    displayed, does that mean they don't exist or they're

2    not contained in the information provided here today?

3         A.  They don't exist.  15,372 would have been the

4    peak of her range at that time.  That is evidenced in

5    the claim file history with my file note granting her

6    authority prior to mediation.

7         Q.  Is she not required to give a range of values

8    for the current case value --

9         A.  No.

10         Q.  -- that was discussed in the claims manual?

11         A.  No.  The range value would be evidence in the

12    injury evaluation, but the ranges do change.  It's going

13    to be evidence through the reserves, but you will not

14    see the actual current range of value bottom to top.

15             MR. BUTLER:  Given what we have and we

16    don't have here today, I think that's all I have.

17             MS. KIDD:  Okay.  I don't have any

18    questions.  We'll read.  And just for the record, I

19    objected -- I'm objecting to the exhibits, the paper

20    exhibits.  So far, obviously, I don't have an objection

21    to the Notice of Deposition or the thumb drive.  Other

22    than that.

23             MR. BUTLER:  Thank you.  Thank you for your

24    time.

25             THE WITNESS:  Absolutely.

R,
403

Russell Horne    12/8/2023

1                    THE VIDEOGRAPHER:   We're off the record at

2    3:58 p.m.

3                    (End of Deposition at 3:58 p.m.)

4                    (Exhibit No. 2 marked.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Russell Horne    12/8/2023

Page 143

```
 1                    CHANGES AND CORRECTIONS

 2               WITNESS NAME: RUSSELL HORNE

 3                 DATE:  DECEMBER 8, 2023

 4   Reason Codes:  (1) to clarify the record; (2) to conform
     to the facts; (3) to correct a transcription error; (4)
 5   other (please explain).

 6   PAGE  LINE   CHANGE                        REASON CODE

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25                     SIGNATURE
```

Russell Horne    12/8/2023

Page 144

1        I, RUSSELL HORNE, have read the foregoing

2    deposition or have had it read to me, and hereby affix

3    my signature that same is true and correct, except as

4    noted above.

5

6

7                          _____

                                RUSSELL HORNE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Russell Horne   12/8/2023

Page 145

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                FOR THE MIDDLE DISTRICT OF FLORIDA

 3                       JACKSONVILLE DIVISION

 4    AMBER MILLS, an individual  )
                                  )
 5              Plaintiff,        )
                                  ) CIVIL ACTION NO.
 6    -VS-                        )
                                  ) 3:33-CV-00477-TJC-LLL
 7    STATE FARM MUTUAL           )
      AUTOMOBILE INSURANCE        )
 8    COMPANY,                    )
                                  )
 9              Defendant.        )

10    *********************************************************
                      REPORTER'S CERTIFICATION
11              ORAL AND VIDEOTAPED DEPOSITION OF
                           RUSSELL HORNE
12                       DECEMBER 8, 2023
                            VOLUME 1
13    *********************************************************

14              I, Melissa J. Carson, Certified Shorthand

15    Reporter in and for the State of Texas, hereby certify

16    to the following:

17              That the witness, RUSSELL HORNE, was duly

18    sworn by the officer and that the transcript of the oral

19    deposition is a true record of the testimony given by

20    the witness;

21              I further certify that pursuant to FRCP Rule

22    30 (f)(1) that the signature of the deponent:

23              _____ was requested by the deponent or a

24    party before the completion of the deposition and is to

25    be returned within 30 days from date of receipt of the
```

Russell Horne    12/8/2023

Page 146

1    transcript.  If returned, the attached Changes and

2    Signature Page contains any changes and the reasons

3    therefore;

4        _____ was not requested by the deponent or a

5    party before the completion of the deposition.

6        I further certify that I am neither counsel

7    for, related to, nor employed by any of the parties or

8    attorneys to the action in which this proceeding was

9    taken.  Further, I am not a relative or employee of any

10    attorney of record in the cause, nor am I financially or

11    otherwise interested in the outcome of the action.

12

13        Subscribed and sworn to on the 29th day of

14    December, 2023.

15

16    _____
      MELISSA J. CARSON, Texas CSR No. 1737

17    Expiration Date:  08/31/24
      Firm Registration No. 489

18    Post Office Box 551628
      Dallas, Texas  75355-1628

19    Telephone 214.346.3434

20

21

22

23

24

25