**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORDIA**
**JACKSONVILLE DIVISION**

AMBER MILLS, an individual

     Plaintiff,

vs.                CASE NO: 3:23-CV-00477-MMH-LLL

STATE FARM MUTAL AUTOMOBILE
INSURANCE COMPANY,

     Defendant.
_____



NAEGELI
DEPOSITION & TRIAL

(800) 528 - 3335
NAEGELIUSA.COM

*Nationwide*

COURT REPORTING

LEGAL VIDEOGRAPHY

REMOTE DEPOSITIONS

TRIAL PRESENTATION

LEGAL TRANSCRIPTION

COPYING AND SCANNING

LANGUAGE INTERPRETERS

*Powerful*
LITIGATION SUPPORT

**VIDEOTAPED DEPOSITION OF**

**ANGELA BUTLER**

**TAKEN ON**
**WEDNESDAY, MAY 15, 2024**
**10:49 A.M.**

EXHIBIT
A

**545 K AVENUE**
**BOARDROOM**
**PLANO, TEXAS 75074**

```
 1                          APPEARANCES

 2

 3   Appearing on behalf of the Plaintiff:

 4   HOWARD BUTLER, ESQUIRE

 5   ANDREW BASKIN, ESQUIRE (Via Zoom)

 6   Butler Law Group

 7   1506 Prudential Drive

 8   Jacksonville, Florida  32207

 9   (904) 398-2308

10   (904) 398-3000 (Fax)

11   hgb@butlerlawgroup.net

12   dwb@butlerlawgroup.net

13

14   Appearing on behalf of the Defendant:

15   AMANDA L. KIDD, ESQUIRE

16   Boyd & Jenerette, PA

17   201 North Hogan Street, Suite 400

18   Jacksonville, Florida  32202

19   (904) 353-6241

20   akidd@boydjen.com

21

22   ALSO PRESENT:

23   Jess Bryan, Zoom Technician

24   Tom Hazelhurst, Zoom Technician

25
```

1                          EXAMINATION INDEX

2                                                          Page

3

4    EXAMINATION BY MR. BUTLER                            8

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                            EXHIBITS

2    Exhibit                                       Page

3

4    1      AUTO CLAIM FILE GENERAL                10

5           INFORMATION

6

7    2      CONTACT INFORMATION                    11

8

9    3      INSURANCE                              11

10

11   4      LINKED IN PAGE                         12

12

13   5      POTO OF INSURED AND CLAIM             13

14          SPECIALIST

15

16   6      EVALUATION OF INCURRED MEDICAL        16

17          SPECIAL DAMAGES

18

19   7      APPLICABLE CLAIMS STANDARDS           28

20          UNDER FLA LAW

21

22   8      IMPAIRMENT VERSUS DISABILITY          30

23

24   9      COMMON TYPES OF CRASHES AND           42

25          INJURY MECHANISMS
```



EXHIBITS CONTINUED

Exhibit                                                  Page

10        DIAGRAMS OF TISSUE INJURIES              44

11        DIAGRAM                                  45

12        OBJECTIVE CLINICAL FINDINGS              47

13        DIAGRAM                                  50

14        PRIOR CASES                              65

15        STATE FARM HAS IN HOUSE                  68
          FLORIDA LAWYERS

16        STATE FARM CASES ADMITTING               68
          LIABILITY

17        INTERNET AND SOCIAL MEDIA                77

18        LETTER DATED MARCH 29 2022               79

19        DEMAND PACKAGE TO STATE FARM             79



EXHIBITS CONTINUED

Exhibit                                                          Page

20      3 PET INJURY REPORT                             104

21      REPORTS                                         115

22      STATE FARM PAST MEDICAL                         121
        EXPENSE VALUATION

23      NEVER ANY QUESTION ABOUT                        134
        LIABILITY

24      EMAIL DATED JANUARY 9 2023                      146

25      C6 7 PERMANENCY                                 150

26      CSK RECOMMENDED TENDERING                       151
        POLICY LIMITS

27      EMAIL DATED OCTOBER 24 2022                     152

28      EMAIL DATED FEBRUARY 14 2023                    154



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1                      EXHIBITS CONTINUED

2    Exhibit                                        Page

3

4     29       ATTORNEY CLKIENT PRIVILEGED          166

5              COMMUNICATION

6

7     30       DEFENSE FIRM HIRED BY STATE          170

8              FARM

9

10    31       ATTORNEY CLIENT PRIVILEGED           173

11             COMMUNICATION

12

13     A       AMENDED NOTICE OF TAKING            N/A

14             VIDEO DEPOSITION

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                 VIDEOTAPED DEPOSITION OF

 2                      ANGELA BUTLER

 3                        TAKEN ON

 4              WEDNESDAY, MAY 15, 2024

 5                       10:49 A.M.

 6

 7          THE VIDEOGRAPHER:  We're on the video record.  The

 8  time is 10:49.  Today's date is Wednesday, May 15th, 2024.

 9  Would counsel please state your appearance for the record.

10          MR. BUTLER:  Howard Butler, on behalf of Amber

11  and upon assignment from Mary Laseter.

12          MS. KIDD:  Amanda Kidd, on behalf of State Farm

13  the witness, Ms. Butler.

14          THE VIDEOGRAPHER:  Would the court reporter please

15  swear in the witness.

16          THE REPORTER:  Ms. Butler, will you please raise

17  right hand. Do you affirm under penalty of perjury that the

18  testimony you are about to give will be the truth, the whole

19  truth, and nothing but the truth?

20          THE DEPONENT:  I do.

21          THE REPORTER:  Thank you.

22  ANGELA BUTLER, having been first duly affirmed to tell the

23  truth, was examined, and testified as follows:

24  EXAMINATION

25  BY MR. BUTLER:
</pre>

1    Q.    Tell us your full name, please?

2    A.    Angela Butler.

3    Q.    And where are you employed?

4    A.    State Farm Insurance.

5    Q.    What is your current position at State Farm?

6    A.    Team management.

7    Q.    I'm sorry?

8    A.    A team manager.

9    Q.    How long have you been working for State Farm?

10    A.    November was 25 years.  November of 2023.

11    Q.    And you work out of State Farm's Dallas corporate

12    offices?

13    A.    I do.

14    Q.    Have you been in Texas the entire time that you

15    been with State Farm?

16    A.    I have.

17    Q.    And do I understand correctly that as of 2021 your

18    primary focus is Florida auto injury liability claims?

19    A.    Correct.

20    Q.    And your direct supervisor on Florida auto injury

21    liability claims, Russell Horne, also works out of the same

22    Dallas office?

23    A.    Correct.

24    Q.    As do other adjustors handling Florida auto injury

25    liability claims?

1      A.    They do.

2      Q.    We're here in Dallas, Texas, today to ask you some

3  questions about you and your involvement in the claims

4  of a Duval County, Florida, wreck on July 29th, 2021,

5  State Farm's insured, Mary Laseter.   Is that your

6  as well?

7      A.    It is.

8      Q.    What was your assigned role in connection with

9  Laseter's July 29th, 2021, auto liability claim dealing with

10  Amber Mills' losses?

11      A.    I was the claim specialist handling the file at

12  time.

13      Q.    In that July 29th, 2021, crash State Farm's

14  Mary Laseter, turned left into oncoming traffic and collided

15  with a car occupied by Amber Mills, correct?

16          MS. KIDD:   Object to the form. You can answer.

17          THE DEPONENT:   Yes.

18          (WHEREUPON, Exhibit 1 was marked for

19  BY MR. BUTLER:

20      Q.    And we have marked as ID, as Plaintiff's Exhibit

21  two-page document.

22          MR. BUTLER:   These are Bates Numbers 2 and 3,

23  Counsel.  And I have a copy for you over here.

24          MS. KIDD:   I've got this.

25  BY MR. BUTLER:

1    Q.    Do you recognize that as part of the State Farm's

2    claim file?

3    A.    I do.

4            (WHEREUPON, Exhibit 2 was marked for

5    BY MR. BUTLER:

6    Q.    And I want to show you what has been ID'd and

7    as Plaintiff's Exhibit 2 to the deposition.  This is Bates

8    Number 1265 if I'm reading that correctly, at the bottom

9    Is this particular item an email from you regarding the

10    versus Laseter claim dated June the 13th, 2022?

11    A.    It does have my signature on the bottom.

12    Q.    We -- we know it is because it has your official

13    signature block down there at the bottom?

14    A.    Yes, that's correct.

15    Q.    Your signature block references that you are a

16    specialist?

17    A.    Yes.

18    Q.    For the State Farm Insurance Companies, true?

19    A.    True.

20    Q.    That includes State Farm Mutual Automobile

21    and its subsidiaries?

22    A.    Correct.

23            (WHEREUPON, Exhibit 3 was marked for

24    BY MR. BUTLER:

25    Q.    I'm going to show you what's been marked as

1  Plaintiff's Exhibit 3.  It's two pages there.  And I just

2  you to flip through those and tell me do you agree with the

3  general definition or general statement in Exhibit Number 2

4  (sic)?

5          MS. KIDD:  Object to the form and the question, as

6  well as the exhibit.  And I think you're talking about

7          MR. BUTLER:  I -- okay.

8  BY MR. BUTLER:

9      Q.   As you look through Exhibit 3 --

10     A.   Yes.

11         MR. BUTLER:  Thank you for -- for correcting me

12  there.

13  BY MR. BUTLER:

14     Q.   As you look through Exhibit 3, tell me if you

15  with that general definition and general statement in

16  items as far as --

17     A.   Yes.

18     Q.   -- insurance --

19     A.   I do.

20         MS. KIDD:  Object. Wait 'til he -- wait 'til he

21  finishes before starting.

22         THE DEPONENT:  Sorry.

23         MR. BUTLER:  All right.  That's Exhibit 3.

24         (WHEREUPON, Exhibit 4 was marked for

25  BY MR. BUTLER:

R, 403, S

1    Q.    I'm going to show you what's been marked as

2    Plaintiff's Exhibit 4.  And again, it's two pages.  Do you

3    recognize that as your LinkedIn profile?

4        A.    Yes, I do.

5        Q.    Is the information contained in that profile your

6    information, and it is true and accurate?

7        A.    It is.

8            (WHEREUPON, Exhibit 5 was marked for

9        Q.    All right.  And finally, Exhibit 5 --

10            MS. KIDD:  Sorry.

11   BY MR. BUTLER:

12       Q.    -- is an item, and first on the left is you, the

13   claims specialist in this case, and I think that's the

14   photograph we saw in your LinkedIn profile.  Do you

15   that individual on the right-hand side, at least by the

16   picture?

17       A.    Well, it states it's Mary Laseter.

18       Q.    And I'll tell you that was a screenshot from her

19   deposition that was taken in the Mills versus Laseter case.

20   You're familiar with that deposition generally?

21       A.    Yes.

22       Q.    Does that appear to be Mary Laseter back during

23   timeframe as you recall from your dealings in this case?

24       A.    I mean, I've never seen her in person before, so I

25   would have to assume that you have the correct Mary Laseter.

R,
403,
MIL

1      Q.    Does Exhibit 5 correctly summarize the

2    between you and State Farm and Mary Laseter?

3      A.    Yes.

4      Q.    All right.  Your deposition here today was

5    coordinated some months in advance with you and your

6    representatives?

7            MS. KIDD:  Object to the form.

8            THE DEPONENT:  It was.

9    BY MR. BUTLER:

10     Q.    And have you had an opportunity to speak to

11   Horne following his deposition as State Farm's designated

12   corporate representative in this case?

13     A.    I do have communication with him, yes.

14     Q.    And have you had an opportunity to meet and confer

15   with State Farm's attorneys in this case?

16     A.    Yes.

17     Q.    I think that Ms. Kidd, who's here with us today,

18   introduced herself as not only State Farm's attorney but

19   attorney here.  Is that your understanding?

20     A.    Yes.

21     Q.    When was the last time you spoke to any

22   other folks at State Farm regarding your deposition here

23     A.    On Monday.

24     Q.    And who participated in that?

25     A.    Amanda Kidd and Ed Diffin.

1    **Q.    And who do you understand Ed to be?**

2    A.    He is a State Farm attorney, in-house.

3    **Q.    Have you spoken to anyone else at State Farm**

4    **regarding this case?**

5    A.    No.

R, 403

6    **Q.    You're familiar with the fact that State Farm's**

7    **claims file pertaining to the Mills versus Laseter matter**

8    **been produced to the plaintiff in this case?**

9        MS. KIDD:  Object to the form.

10       THE DEPONENT:  Yes.

11   BY MR. BUTLER:

12       **Q.    Is that your understanding?**

13   A.    Yes.  Yes.

14       **Q.    And based on your review of your work computer,**

15   **records, did you locate any additional items which were**

16   **responsive to the deposition duces tecum document request as**

17   **part of your deposition today?**

18   A.    I'm sorry.  Can you ask that question again?

R, 403

19       **Q.    Did you find any additional items in your**

20   **or control that would constitute a part of the claims file**

21   **this case that weren't previously produced to us?**

22   A.    Not that I'm aware of.

23       **Q.    Can we assume correctly that no such items exist?**

24   A.    Correct.

25       **Q.    As the primary claims' handler in the Mills versus**



1  Laseter case are all of your and your supervisor, Russell

2  Hornes', communications, notes, and records pertaining to

3  matter up to the entry of final judgment included in the

4  Farm claims files produced in this case?

5      A.    To my knowledge, yes.

6      Q.    Is it fair to assume that if any such items are

7  contained in the claims file, then they never existed in

8  case?

9      A.    I would assume, yes.

10     Q.    Now, yesterday we received some additional

11 related records from State Farm in this case that would be

12 response to the duces tecum item Number 3, to your

13 Have you reviewed those items?

14     A.    Not recently.  Are you talking about, like -- I

15 guess, can you rephrase the question.  Maybe I'll understand

16 little better.  Like, I review the items such as the course

17 that's listed on the information you received?

18     Q.    The materials that were produced to us, have you

19 reviewed those --

20     A.    No.  I have not actually personally reviewed it,

21     Q.    All right.

22     A.    Sorry.

23     MR. BUTLER:  We will ID and attach a copy of those

24 items that were produced yesterday as a composite exhibit,

25 whatever number we're on now.  I think Exhibit 6. So I'm

```
 1  to put composite Exhibit 6.  That will be the depo duces
 2  relating to those training materials and the items that were
 3  produced.
 4           (WHEREUPON, Exhibit 6 was marked for
 5           MR. BUTLER:  What should I do with that?  I've
 6  that.
 7           THE REPORTER:  I'll hold onto it for the moment.
 8  BY MR. BUTLER:
 9      Q.   Prior to your deposition today have you ever
10  reviewed any portions of the deposition transcript of State
11  Farm's designated corporate representative, Russell Horne
12  in this case?
13      A.   I've not.
14      Q.   Have you reviewed any of the exhibits to that
15  deposition?
16      A.   I have not.
17      Q.   How about the deposition of Scott Laseter taken in
18  this case?
19      A.   I do not believe so.  I don't recall reading it.
20      Q.   And my question is, is whether you have seen or
21  reviewed any portions of these items.  So I'll ask that
22  regarding the deposition of Scott Laseter?
23      A.   I do not recall.
24      Q.   How about the exhibits to Scott Laseter's
25      A.   Do not recall.
```

```
 1        Q.    The deposition of Mary Laseter taken in this case?

 2        A.    I do not recall.  I'm sure I have reviewed it, but

 3   don't remember what it states.

 4        Q.    Did you review the exhibits to Mary Laseter's

 5   deposition that was taken in this case?

 6        A.    I am not sure.

 7        Q.    How about the deposition of Howard Butler?

 8        A.    No.

 9        Q.    The deposition exhibits to the Howard Butler

10   deposition taken in this case?

11        A.    No.

12        Q.    The deposition of Amber Mills taken in this case?

13        A.    I've reviewed a summary of it, yes.

14        Q.    And who would have supplied you with that summary?

15        A.    Our defense counsel.

16        Q.    And when would have been the last time you

17   any such summary?

18        A.    I would not recall, to be honest.  Not recently.

19             MS. KIDD:  I think there's a little -- can we go

20   the record?

21             THE VIDEOGRAPHER:  We're off the video record.

22   time is 11:05.

23             (WHEREUPON, a recess was taken.)

24             THE VIDEOGRAPHER:  We're on the video record.  The

25   time is 11:06.
```

```
 1  BY MR. BUTLER:

 2       Q.   Ms. Butler, you certainly would have reviewed

 3  depositions taken in the Amber Mills versus Mary Laseter

 4  that you adjusted. I'm asking questions about the

 5  that were taken in this bad faith case.

 6       A.   Okay.

 7       Q.   So let me ask you that last question again.  Which

 8  was, did you review the deposition of Amber Mills taken in

 9  case?  That is the bad faith case?

10       A.   No.

11       Q.   How about any of the exhibits to that deposition?

12       A.   No.

13       Q.   Have you seen or reviewed any portions of the

14  report of George Erickson in this case?

15       A.   No.

16       Q.   Any exhibits or attachments referenced in that

17  report?

18       A.   No.

19       Q.   Have you reviewed a copy of the amended complaint

20  filed in this case?  That is the case of Amber Mills

21  individually and upon assignment of Mary Laseter against

22  Farm?

23       A.   I have not.

24       Q.   What particular items from the State Farm claims

25  did you review in preparation for this deposition?
```

 1       A.    I reviewed the file as far as the claim handling

 2  portion that I had access to when I was handling the claim.

 3       Q.    **Anything else?**

 4       A.    Not that I can recall.

 5       Q.    **What specific portions of the claims file did you**

 6  **review?**

 7       A.    The file history.  Like, our log notes of

 8  that we -- when we have communication or if we're updating a

 9  file, things of that nature.

10       Q.    **State Farm's core business is auto liability**

11  **insurance claims; isn't it?**

12            **MS. KIDD:**  Object to the form.

13            **THE DEPONENT:**  Yes.

14  **BY MR. BUTLER:**

15       **Q.    Your position, and I'm speaking about the 2021,**

16  **timeframe.**

17       A.    Okay.

18       **Q.    Your position involves both the assessment of**

19  **injuries and valuation of related losses from car wrecks,**

20  **right?**

21            **MS. KIDD:**  Object to the form.

22            **THE DEPONENT:**  Correct.

23  BY MR. BUTLER:

24       **Q.    In claims where coverage exists that evaluation**

25  **two basic components, on one hand, liability, or fault,**

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

1    the other, damages or losses flowing from related injuries,

2    correct?

3              MS. KIDD:    Objection to the form.

4              THE DEPONENT:    Correct.

5    BY MR. BUTLER:

L

6         Q.    Evaluation of fault and valuation of damages is

7    you do day in and day out for State Farm?

8              MS. KIDD:    Object to the form.

9              THE DEPONENT:    Correct.

10   BY MR. BUTLER:

11        Q.    And you do that based on your training, education,

12   and experience?

13             MS. KIDD:    Object to the form.

14             THE DEPONENT:    Correct.

15   BY MR. BUTLER:

16        Q.    Do you agree that such evaluations requires

17   of Florida law related to fault and damages?

18        A.    Yes.

19        Q.    It requires knowledge of human anatomy?

20             MS. KIDD:    Object to the form.

21             THE DEPONENT:    Yes.

22   BY MR. BUTLER:

23        Q.    It requires knowledge of the universal laws of

24   physics related to common car crashes?

25             MS. KIDD:    Object to the form.



L

1          THE DEPONENT:  It does.

2   BY MR. BUTLER:

3       Q.    It requires knowledge of injury risk in particular

4   types of crashes?

5          MS. KIDD:  Object to the form.

6          THE DEPONENT:  Yes.

7   BY MR. BUTLER:

8       Q.    It requires knowledge regarding the review and

9   reported findings of medical records?

10      A.    It does.

11         MS. KIDD:  Object to the form.

12  BY MR. BUTLER:

13      Q.    It requires knowledge regarding the review and

14  reported findings of diagnostic testing?

15         MS. KIDD:  Object to the form.

16         THE DEPONENT:  It does.

17  BY MR. BUTLER:

18      Q.    It requires knowledge of impairment and

19         MS. KIDD:  Object to the form.

20         THE DEPONENT:  It could, yes.

R,
403,
MIL

21  BY MR. BUTLER:

22      Q.    You have received training regarding settlement

23  negotiation strategy; haven't you?

24      A.    I have.

25      Q.    You've received training regarding -- strike that.



R, 403, MIL

1    You've received training related to litigation and

2    strategy; haven't you?

3              MS. KIDD:    Object to the form.

4              THE DEPONENT:    Yes.

5    BY MR. BUTLER:

6        Q.    Before going to work at State Farm did you have

7    prior legal training?

8        A.    No prior legal training, no.

9        Q.    Had you ever studied to become a paralegal or have

10   any on-the-job training to be a paralegal prior to going to

11   work at State Farm?

12       A.    No.

13       Q.    Did you have any prior medical training?

14       A.    No.

15       Q.    Did you have any prior nursing training?

16       A.    No.

17       Q.    Had you ever done any work in the healthcare

18       A.    No.

19       Q.    Did you have any prior loss evaluation training

20   before going to work for State Farm?

21       A.    I did not.

22       Q.    Did you have any prior negotiation training?

23       A.    I did not.

24             THE REPORTER:    I'm sorry.  Could you say that one

25   more time?

```
 1              THE DEPONENT:  I did not, no.

 2   BY MR. BUTLER:

 3        Q.    Did you have any prior litigation or litigation

 4   strategy experience?

 5        A.    No.

 6        Q.    Had you ever worked for any other liability

 7   carriers other than State Farm?

 8        A.    No.

 9        Q.    Would it be correct to assume that the source of

10   knowledge and training in all of these areas as of 2021 to

11   came exclusively from State Farm and their approved

12        A.    That would be correct.

13        Q.    As of 2021, 2022, did a State Farm claims

14   like yourself have the authority to settle a Florida auto

15   injury liability case for policy limits without first

16   verbal or written authorization from State Farm's

17        A.    Can you ask that again?  I'm sorry.

18        Q.    Sure.  In the 2021, 2022 timeframe did a State

19   claim specialist like yourself have the authority to

20   Florida auto injury liability case for policy limits without

21   first receiving verbal or written authorization from State

22   Farm's management?

23        A.    No.

24        Q.    Am I correct that at that time, State Farm's

25   required you, the claims adjustor, to first obtain
```

L

1    authorization from State Farm management before offering the

2    policy limits in any Florida injury case?

3        A.    Yes.

4        Q.    And that was State Farm's policy regardless of the

5    particular amount of available bodily injury coverage?

6            MS. KIDD:    Object to the form.

7    BY MR. BUTLER:

8        Q.    True?

9        A.    Yes.

10       Q.    As of 2021, 2022, did you, as the claims

11   have the authority to offer some percentage of the available

12   bodily injury coverage limits to resolve a Florida injury

13   without prior verbal or written authority from State Farm

14   management?

15       A.    Yes.

16       Q.    What was that percentage?

17       A.    It's not so -- so much a percentage.  It's based

18   your authority that you're given as a claim specialist. So

19   based on kind of your experience different CSs have

20   authority levels.

21       Q.    In your particular case in 2021, 2022, what was

22   particular authority?  What percentage of available bodily

23   injury coverage limits could you resolve a case for without

24   prior verbal or written authority from State Farm

25           MS. KIDD:    Object to the form.

```
1              THE REPORTER:  I'm sorry.

2              THE VIDEOGRAPHER:  Let's go off the record real

3    quick. We're off the video record.  The time is 11:16.

4              (WHEREUPON, a recess was taken.)

5              THE VIDEOGRAPHER:  We're on the video record.  The

6    time is 11:18.

7    BY MR. BUTLER:

8         Q.   As of 2021, 2022, what particular authority did

9    have to offer some percentage of the available bodily limits

10   injury coverage in a Florida injury case without prior

11   or written authority from State Farm management?

12        A.   My authority is $7,500.

13        Q.   As a claim specialist you indicated you were

14   with Florida law as it relates to recoverable losses in auto

15   liability claims as of July 29th, 2021?

16        A.   Yes.

17        Q.   Pursuant to Florida law do you agree that the

18   applicable legal standard includes losses for both new

19   as well as an aggravation of any preexisting conditions?

20              MS. KIDD:  Object to the form.

21              THE DEPONENT:  Yes.

22   BY MR. BUTLER:

23        Q.   Do you agree that in the claims handling of a

24   auto injury claim the applicable legal standard applicable

25   both causation and losses is more likely than not?
```

R,
403,
MIL

**NAEGELI**
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

R,
403,
MIL

1          MS. KIDD:  Object to the form.

2          THE DEPONENT:  I'm sorry.  Ask me that again,

3    BY MR. BUTLER:

4          Q.    Do you agree that in the claims handling of a

5    auto liability claim --

6          A.    Mm-hmm.

7          Q.    -- the legal standard appliable to both

8    losses is more likely than not?

9          MS. KIDD:  Object to the form.

10         THE DEPONENT:  Yes.

11   BY MR. BUTLER:

12         Q.    The applicable legal standard relating to

13   and losses is not beyond a reasonable doubt, correct?

14         MS. KIDD:  Object to the form.

15         THE DEPONENT:  Correct.

16   BY MR. BUTLER:

17         Q.    The applicable standard applicable to causation

18   losses is not virtual medical certainty, correct?

19         MS. KIDD:  Object to the form.

20         THE DEPONENT:  I would agree.

21   BY MR. BUTLER:

22         Q.    Do you agree that in a Florida auto liability

23   setting economic losses including past and future medical

24   expenses are recoverable regardless of any permanent injury?

25         MS. KIDD:  Object to the form.



L

```
 1  BY MR. BUTLER:

 2       Q.     Correct?

 3       A.     Correct.

 4       Q.     And if there is more likely than not any permanent

 5  injury or a permanent aggravation one is entitled to recover

 6  losses for related pain, suffering, mental anguish,

 7  inconvenience, and loss of enjoyment of life for the past

 8  in the future, correct?

 9            MS. KIDD:    Object to the form.

10            THE DEPONENT:    Correct.

11            THE VIDEOGRAPHER:    We're off the video record.

12  time is 11:22.

13            (WHEREUPON, a recess was taken.)

14            THE VIDEOGRAPHER:    We're on the video record.    The

15  time is 11:27.

16            (WHEREUPON, Exhibit 7 was marked for

17  BY MR. BUTLER:

18       Q.    I'm going to show you what's been marked Exhibit

19  And if you would pass that to your attorney for a minute

20  can see that. As you answered those last questions, I had

21  out, what I believe is an accurate summary of that, but I

22  to give a minute to take a look at that and tell me if

23  a true and accurate summary of the rules for claims handling

24  you understand them based on your training, education, and

25  experience.
```



NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800) 528-3335
NAEGELIUSA.COM

1       A.    Yes.

2       Q    Do you agree that the claims specialist is

3   to utilize these applicable standards in the valuation of a

4   particular Florida auto injury claim?

5           MS. KIDD:   Object to the form.

6           THE DEPONENT:   It depends on the -- the claim.   I

7   mean, every claim is handled on its own merits.

8   BY MR. BUTLER:

9       Q.   Right.   I'm asking if these are the applicable

10  standards by which you are supposed to judge?

11      A.   Yes.   You -- yes, you can use these.

12      Q.   So let me ask that again.   Do you agree that the

13  claims specialist is required to utilize these applicable

14  standards in the valuation of a particular Florida auto

15  claim?

16          MS. KIDD:   Object to the form.

17          THE DEPONENT:   Yes.

18  BY MR. BUTLER:

19      Q.   Do you agree that the claims specialist is

20  to utilize these applicable standards throughout the claims

21  handling of a particular Florida auto injury claim?

22          MS. KIDD:   Object to the form.

23          THE DEPONENT:   They can, yes.

24  BY MR. BUTLER:

25      Q.   Are they required to apply these standards



```
 1   throughout?

 2        A.    Again, every claim is different.  It just

 3   the claim.  But, yes, you can take these into consideration

 4   when you're evaluating a claim.

 5        Q.    I want to talk to you for a minute about the

 6   of impairment and disability.

 7        A.    Sure.

 8             (WHEREUPON, Exhibit 8 was marked for

 9   BY MR. BUTLER:

10        Q.    Are you familiar with the concept that is

11   in Exhibit 8 in front of you?

12        A.    Yes.

13        Q.    Is it true that the effect of a particular injury

14   depends upon the individual lifestyle and related activities

15   a particular claimant?

16             MS. KIDD:   Object to the form.

17             THE DEPONENT:   I would agree.

18   BY MR. BUTLER:

19        Q.    And in the valuation of a particular claim do you

20   approach it with a one size fits all perspective or do you

21   into account the particular effect that it would have on the

22   particular individual whose claims that you are handling?

23        A.    Yeah.  It would depend on their injury and how it

24   affects them in their daily activities considering, you

25   what their job that they may do for work or enjoyment.  You
```

R,
403



1  know, maybe they enjoy playing tennis or something, so, yes,

2  you would take that into consideration.

3       Q.   You began working for State Farm in the late

4  as I understand it?

5       A.   Correct.

6       Q.   Right out of high school?

7       A.   Yes.

8       Q.   Over the years you have worked on the homeowner

9  commercial property loss claim side of things as well as

10 on in auto injury claims, is that a --

11      A.   No.

12      Q.   -- fair summary?  No?

13      A.   No.  Only auto claims.

14      Q.   Only auto claims?

15      A.   Only auto claims.

16      Q.   Did you see and experience significant changes to

17 State Farm's claims handling policies, processes, and

18 during that timeframe, the early, mid to late 2000s?

19      A.   There's always changes ongoing, yes.

20      Q.   Some of those changes came about in conjunction

21 what State Farm called their ACE, or ACE project?

22           MS. KIDD:  Object to the form.

23           THE DEPONENT:  I'm not sure what you're

24 ACE.  You said, "ACE?"

25 BY MR. BUTLER:

R, 403



Angela Butler   May 15, 2024 - NDT Assgn # 74664

```
 1        Q.    ACE.

 2        A.    I'm not familiar with that currently.

 3        Q.    You're not familiar with what was referred to as

 4   Auto Claims Excellence program that State Farm engaged in in

 5   the early mid-2000s?

 6        A.    Yes.  Yes.  I am familiar with that.

 7        Q.    What acronym did you know it by, or what name?

 8        A.    I mean, we have so many acronyms, so it's --

 9   sometimes it's hard to configure them with like exactly what

10   you're referring to so that's why I didn't recall what you

11   asking.

12        Q.    Does that ring a bell --

13        A.    It does.

14        Q.    -- generally speaking?

15        A.    It does.

16        Q.    How about another significant project that was

17   referred to as the CMSR project?

18        A.    CMSR project.  I can't -- not recall right now.

19   Sorry.

20        Q.    Does the Content Material Spend Review project,

21   does that --

22        A.    It does not --

23        Q.    -- ring a bell?

24        A.    -- ring a bell right at the moment.

25        Q.    All right.  Do you recall State Farm working
```

1  outside consulting company called McKinsey & Company

2  the auto claims excellence and some of these other

3  were familiar with?

4       A.   I cannot say 100 percent, yes.

5       Q.   You're familiar generally with, McKinsey &

6  aren't you?

7            MS. KIDD:   Object to the form.

8            THE DEPONENT:   No.

9  BY MR. BUTLER:

10      Q.   You don't recognize them as a well-known outside

11 consultancy group to State Farm and many of the large

12 carriers --

13           MS. KIDD:   Object to the form.

14 BY MR. BUTLER:

15      Q.   -- around the country?

16      A.   I mean, at the moment it does not ring a bell to

17 I'm not saying I've never heard of it, but I'm not familiar

18 with it right at the moment.  I don't recall.

19      Q.   And I'm just interested in whether -- based on

20 25 years of being at State Farm and working in auto claims

21 during that time period whether you had ever heard of

22 & Company and some of the consultancy-type of work they had

23 done with State Farm over the years?

24      A.   I do not recall.  I mean, like I said, they're

25 changing, so I -- I do not recall.

1          Q.    Whatever those changes were, did you undergo

2    based on those changes in policies and processes, and

3    approaches?

4              MS. KIDD:  Object to the form.

5              THE DEPONENT:  Any time there's changes there's

6    usually some type of training provided to us to review, so I

7    would -- I would have to say, yes, in that matter.

8    BY MR. BUTLER:

**R, 403**

9          Q.    Do you remember one of the significant changes was

10   the State Farm adjustors using software to help in the

11   valuation of claims?

12              MS. KIDD:  Object to the form.

13              THE DEPONENT:  Yes.

14   BY MR. BUTLER:

15         Q.    And that's something that you would have received

16   training on as a claims specialist?

17         A.    Correct.

18         Q.    And do I understand correctly that in later

19   actually would train other State Farm claims specialists in

20   various aspects of their work?

21         A.    That is correct.

22         Q.    And would it be fair to say that you would be

23   training them on the policies, processes, and approaches

24   were coming out of these programs that State Farm was

25   implementing, such as the ACE, Auto Claims Excellence type



R,
403

1  **programs?**

2          **MS. KIDD:**  Object to the form.

3          **THE DEPONENT:**  I mean, I would be -- act as a

4  not so much as a trainer because we do have trainers at

5  Farm, but I would act as a mentor within my section.

6  BY MR. BUTLER:

7      Q.  **Do you recall any public controversy about certain**

8  **aspects of these new claims handling strategies that State**

9  **and McKinsey & Company and other large insurance companies**

10  **developed?**

11      A.  Ask the first -- the first -- the first part of

12  question again.  I'm sorry.

13      Q.  **Do you recall some public controversy about**

14  **aspects of these new claims handling strategies and**

15  **that State Farm developed along with McKinsey & Company as**

16  **as other large auto insurers?**

17      A.  I personally don't recall, but there could be.

18  not sure to be a hundred percent.

19      Q.  **You don't remember hearing reports, reading things**

20  **about --**

21      A.  Internally, you know, people would probably

22  maybe how they liked something, how they don't.  How it's

23  working for them.  How it's not working for them when

24  adjusting claims, but outside, like publicly, no, I'm not

25  familiar with any controversy.

```
 1        Q.    Were you ever familiar with a State Farm vice
 2   president named Susan Hood?  Does that name ring a bell?
 3        A.    I recall, yes.
 4        Q.    Where did you run across Susan Hood from?
 5        A.    I've never personally met her, that I can
 6   but seeing her name through emails and documents that come
 7   communications that come out to State Farm employees.
 8        Q.    Did she work in the Dallas corporate offices as
 9        A.    I -- I don't believe she's ever been in the Dallas
10   like worked from the Dallas office.  I think she is more
11   Illinois office.
12        Q.    Bloomington --
13        A.    Yes.
14        Q.    -- Illinois, the --
15        A.    The headquarters.
16        Q.    -- original --
17        A.    There you go.
18        Q.    -- headquarters?  You don't recall Susan Hood
19   deposed in an Oklahoma case where the discussion surrounded
20   State Farm's relationship and dealings with McKinsey &
21   regarding the ACE and C-M-S-R-type projects?
22             MS. KIDD:  Object to the form.
23             THE DEPONENT:  I'm not familiar with that.
24   BY MR. BUTLER:
25        Q.    Based on your own training, education, and
```



1  **at State Farm relating to adjusting auto injury liability**

2  **insurance claims what percentage of claimants did you**

3  **anticipate would be forced to accept an offer of less than**

4  **their claim was worth because they would need the money**

5  **prompt settlement.  What would be your experience in that**

6  **regard?**

7          **MS. KIDD:**  Object to the form.

8          **THE DEPONENT:**  I mean, the majority of the claims

9  that I've handled are usually attorney rep'd so I usually

10 negotiate to come to an agreement with that attorney.

11 very few that are unrep'd that I feel I would not offer them

12 something unreasonable based on what they presented to

13 their claim.

14 **BY MR. BUTLER:**

R,
403

15      **Q.   In your training, and education, and experience**

16 **in State Farm were you ever told that as many as 90**

17 **claimants would settle their claims for less than it was**

18 **because they'd need the money in a prompt settlement**

19 **loss?**

20          **MS. KIDD:**  Object to the form.

21          **THE DEPONENT:**  I've never been told that.

22 **BY MR. BUTLER:**

23      **Q.   Of your unrepresented claimants based on your own**

24 **training, education, and experience what would you put that**

25 **percentage at?**



**R,
403**

1          MS. KIDD:  Object to the form.

2          THE DEPONENT:  I honestly do not know what

3  I would put that at.

4  BY MR. BUTLER:

5      Q.   Do you agree that Mary Laseter and her

6  were fully cooperative with State Farm throughout their

7  from the beginning all the way up through the time of

8      A.   I would agree that they were.

**R,
403,
MIL**

9      Q.   You were aware that due to COVID-19 conditions

10  the courthouses in the State of Florida were closed for a

11  month period beginning in March 2020 'til October of 2021?

12          MS. KIDD:  Object to the form.

13          THE DEPONENT:  Yes, I was familiar.

14  BY MR. BUTLER:

15      Q.   And you were aware as well that upon that

16  opening in October of 2021, there was reportedly a million

17  backlogged cases that the courts were going to have to be

18  dealing with?

19          MS. KIDD:  Object to the form.

20          THE DEPONENT:  Yes.  I did know that they were

21  behind.

22  BY MR. BUTLER:

23      Q.   And you were aware that criminal cases because

24  right to speedy trial guaranteed by the Constitution would

25  priority, or precedence over civil cases like auto injury

1   claims, true?

2            MS. KIDD:   Object to the form.

3            THE DEPONENT:   I was not aware of that, but it's

4   possible.

5   BY MR. BUTLER:

6        Q.   Do you agree that the same claims handling --

7   that. Do you agree that the same claims handling policy and

8   philosophy was utilized in the Mills versus Laseter case

9   other State Farm Florida cases that arose during and were

10  adjusted during the COVID-19 shutdown and related backlog

11  period?

12           MS. KIDD:   Object to the form.

13           THE DEPONENT:   Can you ask me the question again?

14  BY MR. BUTLER:

15       Q.   Was the Mills versus Laseter case handled by State

16  Farm using the same or different claims handling

17  State Farm utilized in its other Florida auto liability

18  during the 2020 to early 2023 timeframe?

19       A.   I mean, they were still handled the same, yes.

20       Q.   I will tell you that Russell Horne, as State

21  designated corporate representative, testified as

22  a result of the Mills versus Laseter case were any changes

23  to any State Farm claims handling practices, policies, or

24  related guidelines? And his answer was, No. Do you agree

25  that sworn testimony?

1           **MS. KIDD:**  Object to the form.

2           **THE DEPONENT:**  Yes.

3     BY MR. BUTLER:

R, 403

4           Q.    Since there was an objection to the form.  Were

5     any changes made to any State Farm claims handling

6     policies, or related guidelines as a result of the Mills

7     Laseter case, from your perspective?

8           A.    No.

9           Q.    As a result of the Mills versus Laseter case

10    or any of State Farm's personnel that were involved in the

11    claims handling process disciplined or reprimanded in any

12          A.    No.

13          Q.    As a result of the Mills versus Laseter case

14    of the State Farm personnel involved in the claims handling

15    process required to undergo any additional training of any

16    kind?

17          A.    No.

18          Q.    Can we assume by that, that State Farm determined

19    that the Mills versus Laseter claim was handled in

20    with State Farm's then-existing policies and directives from

21    the outset through final judgment?

22          **MS. KIDD:**  Object to the form.

23          **THE DEPONENT:**  Yes.

24    BY MR. BUTLER:

25          Q.    Given that your core job responsibilities are the



1  evaluation of injuries from collisions, is it fair to assume

2  that you're generally familiar with the universal laws of

3  physics imparted on occupants in common types of collisions?

4       A.   Yes.

5       Q.   I missed one.  Do you agree that State Farm was

6  set up in any way in relationship to this bad faith case --

7            MS. KIDD:  Object to the form.

8  BY MR. BUTLER:

9       Q.   -- by anything that the Laseters or Amber Mills or

10  their representatives did?

11            MS. KIDD:  Object to the form.

12            THE DEPONENT:  Not that I'm aware of.

13  BY MR. BUTLER:

14       Q.   Can we assume that you have a working knowledge of

15  common injury mechanisms in collisions?

16       A.   Yes.

17       Q.   Can we assume that given your work you have seen

18  standard vehicle crash test videos or photos conducted by

19  Insurance Institute for Highway Safety or the government?

20       A.   Yes.

21            MS. KIDD:  Object to the form.

22  BY MR. BUTLER:

23       Q.   And many of those tests utilize anthropomorphic

24  dummies to simulate human occupant-type of movements in

25  types of collisions?

MIL, 403

1          MS. KIDD:  Object to the form.

2          THE DEPONENT:  They do.

3  BY MR. BUTLER:

4      Q.   That would include offset frontal collisions?

5          MS. KIDD:  Object to the form.

6          THE DEPONENT:  Yes.

7  BY MR. BUTLER:

8      Q.   And is it fair to assume that you have basic

9  familiarity with airbag deployments and their related speeds

10  and forces?

11     A.   Yes.

12          MR. BUTLER:  Okay.  I'll see what we're on --

13  --

14          (WHEREUPON, Exhibit 9 was marked for

15  BY MR. BUTLER:

R,
403

16     Q.   I'm showing you Plaintiff's composite Exhibit 9.

17  Just ask you to take a -- Do you recognize these items as

18  still photographs and related items to standard crash tests

19  involving a frontal offset-type collision?

20     A.   Yes.

21     Q.   And as a auto liability claims specialist you

22  routinely utilize such knowledge in the assessment of losses

23  claims that you're adjusting?

24     A.   Yes.

25          MS. KIDD:  Object to the form.



1              THE DEPONENT:  I'm sorry.

2    BY MR. BUTLER:

**R, 403**

3        Q.    Are the items in Plaintiff's composite Exhibit 9

4    consistent with your training, education, and experience in

5    terms of the basic occupant movements and airbag

6    a frontal offset collision such as the one shown?

7        A.    Yes.

8        Q.    Now, I want to direct your attention to the item

9    deals with airbags.  Tell me when you see that.

10       A.    This one?

11       Q.    Right.  No.  Keep going.  It's a --

12       A.    Oh.

13       Q    -- a written --

14       A.    Oh.  The -- okay.  Gotcha.

15       Q.    -- item concerning airbags.  What -- strike that.

**R, 403, HS**

16   What does Florida report in terms of airbag deployment

17       A.    It states:  Airbags explode at speeds of 200 miles

18   per hour, or 12 to 18 inches.

19       Q.    And is that consistent with your training,

20   and experience?

21       A.    I would agree, yes.

22       Q.    Given that your core job responsibilities are the

23   evaluation of injuries from collisions is it fair to assume

24   that as of 2021 you have received training related to human

25   anatomy as it relates to the head, spine, and extremities?



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

```
 1        A.    Yes.
 2              MR. BUTLER:  Let me mark a couple of items
 3   need a Exhibit 10.
 4              (WHEREUPON, Exhibit 10 was marked for
 5   identification.)
 6   BY MR. BUTLER:
 7        Q.    The head weighs 10 to 12 pounds, is that your
 8   understanding?
 9        A.    I would agree.
10        Q.    It sits on top of the spine on a joint known as
11   Atlas?
12        A.    Correct.
13        Q.    And inside the skull sits the brain and it's
14   suspended in cerebral spinal fluid?
15        A.    Yes.
16        Q.    The spinal cord itself runs from the brain down
17   the spine through the neck, midback, and low back?
18        A.    Yes.
19        Q.    The spinal cord is housed inside of and
20   the spine and its supporting structures?
21        A.    Correct.
22        Q.    Those supporting structures, that is muscles,
23   ligaments, and tendons serve to support, stabilize, and
24   the spine and the spinal cord inside it?
25        A.    Yes.
```

1    Q.    Each of those supporting tissues have a different

2  physical makeup and level of blood supply; don't they?

3        MS. KIDD:   Object to the form.

4        THE DEPONENT:   Yes, they do.

5  BY MR. BUTLER:

6    Q.    Which is why they heal somewhat differently in

7  of time and degree.   Is that your understanding?

8    A.    Correct.

9    Q.    So the items I've shown you there, I believe it's

10  Plaintiff's composite Exhibit 10, just flip through those

11  then I'll have a couple of questions for you. Have you had a

12  chance to flip through those just generally?

13    A.    There's two, right?

14    Q.    Are there two of them?

15    A.    Yeah. Okay.

16    A.    Okay.  I just want to make sure.

17    Q.    All right.   Are those things you have seen

18  something akin to those?

19    A.    Yes.

20    Q.    Are those true and accurate based on your

21  education, and experience?

22    A.    Yes, I would agree.

23    Q.    All right.

24        (WHEREUPON, Exhibit 11 was marked for

25  identification.)

```
 1   BY MR. BUTLER:
 2        Q.   Okay.  I'm going to show you what's been marked as
 3   Plaintiff's Exhibit 11.
 4            MR. BUTLER:  Somewhere I think I have one for you
 5   here somewhere, Amanda.
 6   BY MR. BUTLER:
 7        Q.   Now, the structure of the spine itself includes
 8   vertebrae separated by intervertebral discs.  Is that right?
 9            MS. KIDD:  Object to the form.
10            THE DEPONENT:  Yes.
11   BY MR. BUTLER:
12        Q.   And I'd like you to flip through Plaintiff's
13   composite Exhibit 11 and then I'm going to have some
14   for you. Do you agree that inside of the disc is a
15   material called nucleus pulposus?
16        A.   Yes.
17        Q.   And it is housed and protected by a tough fibrous
18   outer covering called the annulus fibrosus as shown in those
19   items?
20            MS. KIDD:  Object to --
21            THE DEPONENT:  Yes.
22            MS. KIDD:  -- the form.
23   BY MR. BUTLER:
24        Q.   Do those diagrams truthfully and accurately
25   the basic anatomy of a disc --
```

Exh. 11



NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

1      A.    Yes.

2      Q.    -- as you understand it? And is it your

3  based on your training, education, and experience that the

4  prevalence of herniated discs in asymptomatic people, for

5  someone who's less than 40 years of age that would be

6  between 3 and 10 percent?

7           MS. KIDD:   Object to the form.

8  BY MR. BUTLER:

9      Q.    Is that your understanding?

10     A.    It's -- could be, yes.   Yes.

11     Q.    Do you have any medical literature or training

12 materials that would refute or dispute in any way what's

13 there in --

14     A.    No.

15     Q.    -- that medical paper? Are you familiar with the

16 "objective evidence?"

17     A.    Yes.

18     Q.    Okay.  What is your understanding as to the

19 difference between objective and subjective evidence?

20     A.    Objective would mean that's something that it's --

21 would be related to the accident.  Maybe a doctor is

22 that it is something that's an acute injury to someone's

23 or back.

24          (WHEREUPON, Exhibit 12 was marked for

25 identification.)

R, 403

```
      BY MR. BUTLER:
```

R, 403, HS

1    BY MR. BUTLER:

2         Q.    All right.    I'm going to show you what's been

3    as Plaintiff's Exhibit 12.    And let's start with a couple of

4    terms that are important.    Do you know --

5         A.    Okay.

6         Q.    -- the term "muscle spasm?"

7         A.    Yes, I do.

8         Q.    And do you agree with the definition of muscle

9    shown in the Stedman's Medical Dictionary, that is, quote,

10   "sudden involuntary contraction of one or more muscles?"

11              MS. KIDD:    Object to the form.

12              THE DEPONENT:    Yes.

13   BY MR. BUTLER:

14        Q.    Do you agree that that would be an example of an

15   objective finding?

16        A.    Yes.

17        Q.    And the -- the next item there, is it a list here,

18   like that?  Do you have that?

19        A.    Yes.  This one.

20        Q.    So this list of items, do you agree that the items

21   shown here -- and I'll let you -- you can read them for us

22   we're looking at this.  And I want to ask you some questions

23   about this.  Go ahead and read the list.

24        A.    Out loud?

25        Q     Mm-hmm.

R, 403, HS

1    A.    Oh, bruising.

2    **Q.    Go ahead, again.  I'm sorry.**

3    A.    Diagnostic testing.

4    **Q.    No.  If you'd start at the top.  Read -- what is**

5    **if you would, please read for us this list of objective**

6    **medical-type findings.**

7    A.    Bruising, diagnostic testing, muscle spasms,

8    restricted range of motion, and clinically significant

9    findings.

10    **Q.    Do you agree that those items are types of**

11    **evidence that you would be looking for as a claims**

12    **in evaluating an injury claim?**

13    **MS. KIDD:**  Object to the form.

14    **THE DEPONENT:**  Yes.

15    BY MR. BUTLER:

16    **Q.    If you would go to the last item.  Do you see the**

17    **definition of chronic?**

18    A.    Yes.

19    **Q.    And do you agree from a claims specialist**

20    **that something that is chronic is permanent in nature?  That**

21    **chronic.  Something that is persistent or endlessly**

22    **or troublesome?**

23    A    Yes.

24    **MS. KIDD:**  Object to the form.

25    **THE DEPONENT:**  Yes. I'm sorry.

1  BY MR. BUTLER:

2      Q.   I want to talk about C-H-I or closed head injury.

3  Are you familiar with that term generally?

4      A.   A closed head injury, yes.

5          (WHEREUPON, Exhibit 13 was marked for

6  identification.)

7  BY MR. BUTLER:

R,
403,
HS

8      Q.   And I'm showing you three pages, which are

9  Plaintiff's composite Exhibit 13, that illustrate certain

10 of head injury and ask you to take a look at those. First of

11 all, are you familiar with the coup-contrecoup type of

12 mechanism that can occur to the brain?

13     A.   Yes.

14     Q.   And do you agree, based on your training,

15 and experience, that that can cause certain structural

16 components of the cells within the brain to stretch and

17 and lead to certain types of symptoms?

18          MS. KIDD:   Object to the form.

19          THE DEPONENT:   They could.

20 BY MR. BUTLER:

21     Q.   And based on your training, and education, and

22 experience what would you be looking for in terms of

23 symptoms from a post-concussion syndrome-type of injury?

24     A.   As far as, like they could have memory loss,

25 dizziness.   Do you mean items like that?



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

1    Q.    Yeah.

2    A.    Yeah.

3    Q.    That kind of thing.

4    A.    Yeah.  Dizziness, memory loss, fogginess.

5    Q.    Headaches?

6    A.    Headaches, mm-hmm.

7    Q.    Okay.  I want to ask you some questions generally

8    speaking about 3-P-E-T.  Do know what I --

9    A.    Okay.

10    Q.    -- I'm referring to?

11    A.    Yes.

12    Q.    You call it what?

13    A.    3PET.

14    Q.    3PET.  I want to ask you some questions about 3PET

15    generally.  Do you agree with State Farm's designated

16    representative, Russell Horne, that the only data analytics

17    program that was ever utilized in this case for claim value

18    purposes was using 3PET?

19        MS. KIDD:  Object to the form.

20        THE DEPONENT:  Yes.  We did use it.

21    BY MR. BUTLER:

22    Q.    And I -- I will say that I do understand that you

23    also did a past medical bill analysis using a companion

24    made by the same people.  Is -- is that right?

25    A.    Correct.

**R, 403, HS**

1      Q.    Am I correct that there were three 3PET valuation

2  runs done in this case?

3      A.    I can't recall exactly how many.

4      Q.    Were they all done on one day essentially?

5      A.    Usually they are, yes.  You would enter the

6  information as you receive them in so, yes.

7      Q.    This State Farm analytics program that you call

8  do I understand correctly that it's located out on the West

9  Coast and you log into it remotely from wherever you're at?

10         MS. KIDD:  Object to the form.

11         THE DEPONENT:  Yes.  We have access to it on our

12  computer.

13  BY MR. BUTLER:

14      Q.    And are there certain required fields or sections

15  that you must input the applicable data for any claim that

16  you're analyzing?

17      A.    Yes.

18      Q.    Are there drop -- strike that. Are there dropdown

19  boxes for many of those various input sections?

20      A.    Yes.

21      Q.    Are there any data input fields in the State Farm

22  3PET program related to liability or fault?

23      A.    No, not liability or fault.

24         THE REPORTER:  I'm sorry --

25  BY MR. BUTLER:

R,
403

```
 1        Q.     Are there --
 2               THE REPORTER:  -- could you say that one more
 3               THE DEPONENT:  Not liability or fault.
 4   BY MR. BUTLER:
 5        Q.     Are there any data input fields related to the
 6   particular type of collision involved?  For example,
 7   rear-end, side-impact, offset?
 8        A.     No.
 9        Q.     Are there any data input fields related to the
10   severity of the collision?
11        A.     There is.
12        Q.     And where and what are those various choices?
13        A.     It would be, none, minimal, moderate, and I
14   severe or hard, we have that too.
15        Q.     None, minimal, moderate --
16        A.     And severe, or heavy.  I believe it's heavy impact
17   the option.
18        Q.     Does the 3PET report have any data input fields
19   related to whether or not there was airbag deployment in the
20   subject crash?
21        A.     No.  And regarding your liability -- were you
22   whether dropdown boxes to assess the liability?  Because you
23   you asked about the liability so I wanted to make sure I
24   answered that correctly.
25        Q.     I asked you whether there was any required input
```

1  related to liability or fault.

2      A.    Okay.   No, there's not any required, no.   Okay.

3      Q.    In terms of injury does the 3PET program allow the

4  claims specialist to input just a single area of injury or

5  multiple areas of injury where applicable?

6      A.    I mean, we can enter multiple injuries as far as

7  the relate to the individual.   But are you asking, like if I

8  put in a neck injury, does it give me multiple options as

9  as where those injuries are located?

10     Q.    Okay.   So we'll -- we'll take those separately.

11     A.    Okay.

12     Q.    In terms of injury does the 3PET program allow the

13  claims adjustor to input just a single area of injury or

14  multiple areas of injury where applicable? So let's start

15  head, neck, shoulder, wrist, does it allow you to put in

16  one injury or all of the injuries?

17     A.    All of the injuries.

18     Q.    Now, with respect to, for example, the neck --

19     A.    Mm-hmm.

20     Q.    -- or the spine, if you have multiple areas of the

21  neck that are injured --

22     A.    Mm-hmm.

23     Q.    -- are you able to put in a single injury or

24  injuries?

25     A.    You would put it in as a single, but at the



1  level of the injury.

2      Q.    In evaluating a Florida auto liability claim

3  utilizing the 3PET program does State Farm's protocol call

4  the claims specialist to include all documented areas of

5  from a particular collision?

6      A.    Yes.

7      Q.    Please list for me all of the various available

8  choices regarding the injury and factors data inputs for the

9  claims specialist to choose from related to the head.

10     A.    To the head, there's an option for a head injury

11  then you -- it has the dropdown box -- boxes to choose the

12  injury such as alleged headaches, or objective to them.

13  were they having headaches, or are they just alleging that

14  have headaches, or were they actually having headaches, or

15  were just telling the doctor that they had headaches, or

16  they treated for the headaches, I should say.

17          Does that make sense? So you can choose those

18  dropdown options as far as the severity of that head injury.

19  Is it a minor head injury or is it a significant head

20  There's also an option if the head injury is severe enough

21  we have an out-of-scope.  Say there was a head injury with a

22  brain bleed, right, then you -- that's an out-of-scope

23  that we would place in, within the 3PET to give it a value.

24     Q.    So starting with the head --

25     A.    Mm-hmm.



1    **Q.    -- generally speaking what are the choices?**

2    A.    I would have to look at it, to be honest with you

3    because I don't have it memorized.    But it would -- it lists

4    a minor head injury and then your dropdown options -- I

5    have to look at it, to be honest with you to tell you what

6    -- the options are.

7    **Q.    What are the various available choices related**

8    **neck?**

9    A.    Kind of the same.    I would need to look at it.

10    it does ask you is it something that -- did they treat for

11    Did they stick to the treatment plan, is one of the

12    it's yes or no. Was the -- the impact, like we had stated

13    before, was it minor, moderate, or heavy.    The part of the

14    injury.    Did they get injections.    Did they actively treat?

15    Did they passively -- was it passive treatment? Those are

16    of the questions that it asks you.

17    **Q.    So I'm interested in the nature of the injury.**

18    **are the available choices regarding the nature of the neck**

19    **injury that you are allowed to put in, in the 3PET program?**

20    A.    You could put annular tear, herniation, or

21    sprain/strain, are the options.    I believe you -- there's

22    options if you -- I would have to look at it to be quite

23    with you.    I don't have it memorized because there are a lot

24    options in there as far as when it comes to a neck injury.

25    if you, for example, if you have a herniated disc, you would

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

1    put it was herniated.  It would be a herniation, an annular

2    tear.  And then there's -- there's another option I can't

3    recall without looking at it, but those are the options I'm

4    aware of right now that I can show you.

5        Q.    What are the available choices regarding the

6    shoulder?

7        A.    That would be kind of the same.  I mean, it

8    you all the questions, the severity of the accident, and

9    it would ask you, as far as the shoulder, it would ask you

10   it's a shoulder tear, or if it's like a soft tissue injury.

11       Q.    You mentioned severity earlier, as I understand it

12   there is no input regarding the severity related to the

13   itself, at least?

14       A.    Like, the severity of the impact or the severity

15   the injury?

16       Q.    As I understand it there is not one for the

17   of the impact?

18       A.    No.  There is one for the impact.  That's the one

19   where you can put none, minimal --

20       Q.    Mm-hmm.

21       A.    -- moderate, or heavy.

22       Q.    Gotcha.  Yeah.  So now going to the -- and we were

23   talking about the shoulder.

24       A.    Mm-hmm.

25       Q.    Is there something that differentiates the



1    a particular shoulder injury as far as your inputs are

2    concerned?

3        A.    Yes.   You could put a shoulder sprain/strain, or

4    could put a shoulder tear.   Those are the options.   I

5    there is a third one, but I don't remember the exact name

6    it.

7        Q.    How about related to the wrist or hand?

8        A.    There is one, same.   If it's a tear or a soft

9    injury.

10       Q.    And how about related to the low back?

11       A.    It would be similar to the neck based on is it a

12   herniation, or is it a soft tissue injury or is it an

13   tear.

14       Q.    So it goes soft tissue, herniation, or an annular

15   tear?

16       A.    Yes.   There is another option.   I just -- I can't

17   recall what it is right at the moment.

18       Q.    Is it in any particular order among those you just

19   told us about?   In other words, does it go from minor to

20   severe?

21       A.    Yes.   It's just a dropdown box, so you just choose

22   which one.

23       Q.    And in the dropdown box does it go from minor to

24   severe?

25       A.    I believe so.

1    Q.    So in terms of the neck or the lumbar or low

2    A.    Mm-hmm.

3    Q.    -- the choices are; soft tissue, herniation --

4    A.    Mm-hmm.

5    Q.    -- annular tear?

6    A.    Yes.

7    Q.    Annular tear being the worst?

8    A.    Yes.

9    Q.    Do I understand there's nothing that talks about,

10   like disc bulges or things like that?

11   A.    That's it.    Bulge is the one of the options.    So

12   can be; soft tissue, bulge, herniation, annular tear.

13   Q.    As a claims adjustor do you believe that all

14   disc herniations are alike?

15   A.    No.

16   Q.    A herniation with an associated annular tear is

17   than a herniated disc without?

18   A.    Correct.

19       MS. KIDD:  Object to the form.

20       THE DEPONENT:   Sorry.

21   BY MR. BUTLER:

22   Q.    What part or parts of the body does the, quote,

23   "nerve impingement," unquote, section encompass generally?

24   A.    Say that again.  I'm sorry.

25   Q.    What part or parts of the body does the, quote,

1    "nerve impingement," unquote, section encompass generally?

2         A.    Like a fecal sac.  Is that what you're talking

3    Like the -- the fecal sac?

4         Q.    No.  I'm --

5         A.    Is that -- is that what you're --

6         Q.    -- I'm -- I'm --

7         A.    -- asking, like --

8         Q.    -- talking about, can the nerve impingement be

9    somewhere other than in the spine, for example?

10        A.    I would think so, yes.

R, 403

11        Q.    How do you define nerve impingement in the spine

12   some other joint?

13        A.    How do I define it?

14        Q.    Mm-hmm.  Yes.

15        A.    Like as a -- a -- a pinched nerve within the

16        Q.    You're talking about a mechanically compressed

17        A.    Mm-hmm.  Yes.

18        Q.    Does the 3PET program have a data input for nerve

19   radiculitis or nerve irritation?

20        A.    Not that I recall.

R, 403

21        Q.    Is it your understanding based on your training

22   experience, that spinal nerves can also be interfered with

23   irritated by a disc herniation without a full-on mechanical

24   compression?

25             MS. KIDD:    Object to the form.



R, 403

1        THE DEPONENT:  Can you ask me that again?  I'm

2        MR. BUTLER:  Sure.

3   BY MR. BUTLER:

4        Q.   Is it your understanding based on your training,

5   education, and experience as a claims specialist that spinal

6   nerves can also be interfered with and irritated by a disc

7   herniation without a full-on mechanical compression?

8        MS. KIDD:  Object to the form.

9        THE DEPONENT:  It's possible.

10  BY MR. BUTLER:

11       Q.   Is it your understanding that, for example, spinal

12  nerves and be chemically irritated if there is a tear or

13  fissure in the annulus fibrosus, that tough fibrosis disc

14  cover, which serves as a portal allowing that gelatinous

15  material to seep out into areas occupied by nerves?

16       A.   Yes.

17       Q.   For each area of injury included in a 3PET

18  is there a data input for the claims specialist to indicate

19  whether there is a, quote, "mechanism consistent with

20  unquote?

21       A.   Yes.  I mean, there's a question that asks if you

22  believe it's related to the accident.

23       Q.   What are the various available choices for data

24  for that particular field?

25       A.   Highly unlikely, likely, and probable, or highly



1  unlikely, probable, and likely, I believe, are the options.

2  Let me think about it.  One second.  I'm trying to picture

3  dropdown box.  I haven't used it in -- in a minute, so -- so

4  it's highly unlikely, probable, and questionable.  There you

5  go. So highly unlikely, then you have questionable, can we

6  relate it to the accident or not.  And then you have highly

7  unlikely.  Like we feel that it's highly unlikely that they

8  sustained this injury from this accident.

9       Q.   What is meant by the 3PET section titled, quote,

10  "Injury Factor," unquote?

11       A.   I would have to look at it to recall.  Do you have

12  picture of it or anything?

13       Q.   Well, as you sit here today, do you recall what

14  data input choices are for that particular section?

15       A.   And tell me the name of it again?

16       Q.   Injury factor.

17       A.   I -- I do not.  I mean, it sounds familiar.  I

18  just -- again, I'd have to look at it to --

19       Q.   In reference to, quote, "injury factor," unquote,

20  what does an input level -- an input of, quote, "level,"

21  unquote, mean?

22       A.   That I believe is pertaining to the highly

23  probable, or questionable.  Is that -- ask me that question

24  again.

25       Q.   In reference to, quote, "injury factor," unquote,

1    what does an input of, quote, "level," unquote, mean?

2        A.    Again, I would have to, kind of look at it to give

3    you an honest answer.

4        Q.    Does the State Farm 3PET program have any data

5    sections or some other place for the claims specialist to

6    any data or amounts related to pain?

7        A.    No.

8        Q.    Suffering?

9        A.    No.    I mean, there's -- there's data fields that

10   can enter but that's kind of what you get when you enter

11   information.

12       Q.    Mental anguish?

13       A.    No.

14       Q.    Inconvenience?

15       A.    No.

16       Q.    Loss of enjoyment of life?

17       A.    No.

18       Q.    State Farm injury claims specialists have various

19   investigation tools at their disposal, right?

20           MS. KIDD:    Object to the form.

21           THE DEPONENT:    Yes.

22           MS. KIDD:    Did you want to take a break?

23           THE DEPONENT:    Yeah.    No.

24   BY MR. BUTLER:

25       Q.    Among those tools is the internet, social media,

1    data-based searches?

2            MS. KIDD:  Object to the form.

3            THE DEPONENT:  I mean, those are available options

4    you needed it.

5    BY MR. BUTLER:

6        Q.    Yeah.  So let me -- I'm asking you about the

7    investigation tools --

8        A.    Mm-hmm.

9        Q.    -- that a State Farm claims specialist has at

10   disposal.  You have capabilities of performing internet,

11   media, and data-base searches, true?

12       A.    Yes.  Yes.

13       Q.    State Farm has investigators?

14       A.    Yes.

15       Q.    State Farm has physicians and nurses available for

16   records review, film review, that type of thing?

17       A.    They do.

18       Q.    State Farm has information authorization forms?

19       A.    Yes.

20            MS. KIDD:  Object to the form.

21   BY MR. BUTLER:

22       Q.    They send requests for information, requests for

23   authorization forms, requests for film reviews, and all of

24   those kind of things routinely?

25            MS. KIDD:  Object to the form.

1          **THE DEPONENT:**  They can, yes.

2               (WHEREUPON, Exhibit 14 was marked for

3     identification.)

4               THE DEPONENT:  Thank you.

5     BY MR. BUTLER:

**R, 403**

6          Q.   **I'm showing you Plaintiff's composite Exhibit 14,**

7     **which gives examples of instances involving Florida cases**

8     **during this era where, in fact, requests for information,**

9     **requests for authorization forms, and all of those kind of**

10    **things have been sent?**

11         A.   Yes.

12         Q.   **These are true and accurate examples of those**

13    **of things?**

14              **MS. KIDD:**  Object to the form.

15              **THE DEPONENT:**  Yes.

16    BY MR. BUTLER:

17         Q.   **State Farm has databases where they can track**

18    **attorney-physician relationships if they so choose?**

19              MS. KIDD:  Object to the form.

20    BY MR. BUTLER:

21         Q.   **Right?**

22         A.   I'm sorry.  Ask that again.  Do they have what

23         Q.   **State Farm has databases where they can track**

24    **attorney-physician relationships?**

25              MS. KIDD:  Object to the form.



```
 1              THE DEPONENT:  I'm not sure if they -- if they
 2   the relationships.  I'm not -- I'm not familiar with that.
 3   Like as far as --
 4   BY MR. BUTLER:
 5        Q.   Does State Farm have databases where they track
 6   physician's litigation involvement?
 7        A.   Yes.
 8        Q.   You haven't seen databases or information where a
 9   particular attorney or firm, they've tracked cases where a
10   particular physician was involved in some way, shape, or
11   in the claim?
12              MS. KIDD:  Object to the form.
13              THE DEPONENT:  I guess I'm confused on what --
14   you're asking as far as like whenever, like if State Farm is
15   choosing a physician outside to --
16   BY MR. BUTLER:
17        Q.   No.  I'm -- let me re-ask it.  Does State Farm, to
18   your knowledge, have databases that allow them to track the
19   number of times that a particular attorney involved in
20   claim has been involved with a particular physician who
21   likewise is involved in that claim?
22        A.   I'm -- I'm sure they do.
23        Q.   Okay.
24              MR. BUTLER:  That will be part of that last
25   there.  And it's just that list that we went over.
```

R,
403,
MIL

```
 1  BY MR. BUTLER:

 2       Q.    We went through this list, is that a true and

 3  accurate summary of what you've just told us in terms --

 4       A.    I think so.

 5       Q.    -- of some of the available tools?

 6       A.    Yes.  Yes.

 7            MS. KIDD:  Hey, are we close to -- can we go off

 8  record?

 9            THE VIDEOGRAPHER:  We're off the video record.

10  time is 12:46.

11            (WHEREUPON, a recess was taken.)

12            THE VIDEOGRAPHER:  We're on the video record.  The

13  time is 12:56.

14  BY MR. BUTLER:

15       Q.    State Farm has --

16       A.    Thanks.

17       Q.    -- in-house lawyers in the State of Florida in the

18  event that you have any questions or need anything --

19            MS. KIDD:  Object to the form.

20  BY MR. BUTLER:

21       Q.    -- from them?

22       A.    Yes.

23            MR. BUTLER:  Did -- did you say something?  Did

24  -

25            MS. KIDD:  Yeah.  I objected to the form.
```

R, 403

1          MR. BUTLER:  Okay.

2          (WHEREUPON, Exhibit 15 was marked for

3    identification.)

4    BY MR. BUTLER:

R, 403

5          Q.    Does Plaintiff's Exhibit 15 truly and accurately

6    represent an example of some of the State Farm in-house

7    handling Duval County cases back during this timeframe?

8          A.    Yes.

L

9          Q.    In a case of clear fault where State Farm makes a

10   decision to litigate a claim instead of -- strike that. In a

11   case of clear fault where State Farm makes a decision to

12   litigate a claim rather than settle because they dispute

13   causation or diagnosis, they have the ability to admit

14   liability and dispute just causation and/or damages,

15          MS. KIDD:  Object to the form.

16          THE DEPONENT:  They do.

17          (WHEREUPON, Exhibit 16 was marked for

18   identification.)

19          THE DEPONENT:  Thanks.

20   BY MR. BUTLER:

R, 403

21         Q.    I'm showing you Plaintiff's composite Exhibit 16.

22   Can you confirm for us that those are true and accurate

23   examples in Duval County cases where State Farm's done just

24   that in a case where fault isn't an issue.  They've admitted

25   fault and merely disputed --

R, 403

1    A.    Mm-hmm.

2    Q.    -- or contested causation or damages or whatever?

3         MS. KIDD:  Object to the form.

4         THE DEPONENT:  Yes.

5  BY MR. BUTLER:

6    Q.    Evidence generally falls into two basic

7  subjective and objective, true?

8         MS. KIDD:  Object to the form.

9         THE DEPONENT:  Yes.

10 BY MR. BUTLER:

L

11    Q.    Objective evidence is that which can be observed

12 measured or validated without merely relying upon what

13 says, right?

14    A.    Correct.

15         MS. KIDD:  Object to the form.

16         THE DEPONENT:  Sorry.

17 BY MR. BUTLER:

L

18    Q.    Examples of objective evidence are things like

19 weight, mass?

20    A.    Yes.

21         MS. KIDD:  Object to the form.

22 BY MR. BUTLER:

23    Q.    Speed?

24         MS. KIDD:  Same objection.

25         THE DEPONENT:  Yes.



Angela Butler    May 15, 2024    NDT Assgn # 74664

```
 1   BY MR. BUTLER:

 2        Q.    Direction?

 3              MS. KIDD:   Same objection.

 4              THE DEPONENT:   Yes.

 5   BY MR. BUTLER:

 6        Q.    Forces?

 7              MS. KIDD:   Same objection.

 8              THE DEPONENT:   Yes.

 9   BY MR. BUTLER:

10        Q.    Impact damage?

11              MS. KIDD:   Same objection.

12              THE DEPONENT:   Yes.

13   BY MR. BUTLER:

14        Q.    Airbag deployment?

15              MS. KIDD:   Same objection.

16              THE DEPONENT:   Yes.

17   BY MR. BUTLER:

18        Q.    And the universal laws of physics, correct?

19              MS. KIDD:   Object -- same objection.

20              THE DEPONENT:   Yes.

21   BY MR. BUTLER:

22        Q.    Okay.   Examples of objective medical evidence are

23   physician-documented bruising, for example?

24              MS. KIDD:   Object to the form.

25              THE DEPONENT:   Yes.
```

L



L

```
 1    BY MR. BUTLER:

 2         Q.    Abnormal imaging studies?

 3              MS. KIDD:   Object to the form.

 4              THE DEPONENT:   Yes.

 5    BY MR. BUTLER:

 6         Q.    Electrodiagnostic findings?

 7              MS. KIDD:   Object to the form.

 8              THE DEPONENT:   Yes.

 9    BY MR. BUTLER:

10         Q.    A physician's documented palpation of involuntary

11    muscle spasm on physical exam?

12              MS. KIDD:   Object to the form.

13              THE DEPONENT:   Yes.

14    BY MR. BUTLER:

15         Q.    A physician's documented measured loss of range of

16    motion in areas of injury?

17              MS. KIDD:   Object --

18              THE DEPONENT:   Yes.

19              MS. KIDD:   -- to the form.

20    BY MR. BUTLER:

21         Q.    And based on your training, education, and

22    can objective evidence inform and corroborate certain

23    clinically significant symptoms being reported by the

24    person?

25         A.    Yes.
```



**L** | 1      Q.   For example, radiating symptoms that are

2  with the particular level of abnormality and dermatomes of

3  nerves emanating from a particular disc segment?

4        MS. KIDD:  Object to the form.

5        THE DEPONENT:  Yes.

6  BY MR. BUTLER:

**L** | 7      Q.   Early on you were aware that Mary Laseter was a

8  hundred percent at fault for the subject collision, true?

9        MS. KIDD:  Object to the form.

10       THE DEPONENT:  Yes.

11  BY MR. BUTLER:

12      Q.   You knew that there was a significant frontal

13  collision involving significant damage to both vehicles,

14  correct?

15    A   Yes.

16       MS. KIDD:  Object to the form.

17       THE DEPONENT:  Yes.

18  BY MR. BUTLER:

19      Q.   You were aware that there was airbag deployment?

20      A.   Yes.

21       MS. KIDD:  Object to the form.

22  BY MR. BUTLER:

**MIL, R, 403** | 23      Q.   Were you aware of Ms. Laseter's collision-related

24  injuries early on?

25       MS. KIDD:  Object to the form.

**MIL, R, 403**

1        THE DEPONENT:  Not early on.  Like when you --

2   specify "early on."

3   BY MR. BUTLER:

4        Q.    Within the first 30 days?

5        A.    I was not.

**MIL, R, 403**

6        Q.    Were you aware from her claims file that she had

7   documented rib fractures?

8        A.    Yes.

9        Q.    Hip and pelvis fractures?

10       A.    Yes.

11       Q.    She required home assistance?

12            MS. KIDD:  Object to the form.

13            THE DEPONENT:   I learned that later on in the

14   file, yes.

15   BY MR. BUTLER:

**MIL, R, 403**

16       Q.    You were aware of Mary Laseter's age from the

17   of this claim?

18            MS. KIDD:  Object to the form.

19   BY MR. BUTLER:

20       Q.    True?

21       A.    Yes.

22       Q.    Did you take your insured's age, circumstances,

23   and/or life expectancy into consideration at all with

24   to your claims handling in this case?

25            A.    As far as handling -- I guess, can you clarify the



1  question as far as --

2      Q.   Did you take your insured's age, circumstances,

3  and/or life expectancy into consideration at all with

4  to your claims handling in this case?

5      A.   Not necessarily.  I mean, I understand she's

6  but, no.

7      Q.   Did Russell Horne ever mention Mary Laseter's

8  life expectancy at any point during this claim?

9      A.   Not that I recall.

10     Q.   Based on your education, training, and experience

11 with injury claims what was your expectation in terms of

12 insured's life expectancy given her age, crash-related

13 injuries, and circumstances?

14     A.   Ask the beginning of the question again.  I'm

15     Q.   Based on your training, education, and experience

16 with injury claims --

17     A.   Mm-hmm.

18     Q.   -- what was your expectation in terms of your

19 insured's life expectancy, given her age --

20     A.   Mm-hmm.

21     Q.   -- crash-related injuries, and circumstances?

22     A.   I mean, I didn't really handle the portion of her

23 claim as far as her injuries go.  That was handled by a

24 separate department.  So I didn't have a lot of involvement

25 with that. But as far as her age, you know, I -- I can't say

1  how long I would project that she would live from the crash

2  moving forward.  Is that -- I don't know if that's what

3  trying to ask me.  But, yes, I mean, I understand that she's

4  older, but I couldn't project, like her, you know, how much

5  longer she's going to live. I understand that she's 89 and

6  still driving, so I -- so I would, kind of suspect she has

7  some, kind of good health.

8        Q.    By the time you got involved in her claim she

9        A.    I'm not sure if she had turned 90 yet or not.

MIL

10        Q.    She turned 90 sometime soon after your

11  would that be fair?

12        A.    It's -- it's possible.  Yes.

13        Q.    And you knew about those injuries that we talked

14  about that she sustained in this crash?

15        A.    Yes.

16        Q.    Given your experience, training -- strike that.

17  your training, experience, and education as of 2021 --

18        A.    Mm-hmm.

19        Q.    -- approximately how long would it take you in a

20  serious clear liability case you've been aware of and

21  investigating for about seven months to complete your review

22  a demand package with approximately a hundred pages of

23  and other records?

24        A.    How long would it take me to review it?

25        Q.    Yeah.



1      A.    It just -- a hundred pages, I would say maybe an

2    to two.    It just -- it depends on how much verbiage is on

3    sheet.

4      Q.    Sure.    You certainly could and would complete your

5    review within seven days or less?

6      A.    Yes.

7      Q.    I want to talk about the seven months or so of

8    investigation prior to your receiving the demand package in

9    this case.    Aside from the information provided in the

10   package were you aware from your own claims investigation

11   Amber Mills was a wife, mother, and professional Pilates

12   instructor?

13     A.    I learned that once I received the demand packet.

14     Q.    And aside from the information provided in the

15   package did you become aware of those items that you were

16   seeing in front of you?    That is what role Pilates, kind of

17   played in her life.    A bit about her Pilates instructor

18   and a little bit about what Pilates entails?

19     A.    Prior to the demand?    No.    After, like I said, I'd

20   understood that she was a Pilates instructor.

21     Q.    Did you have some knowledge regarding Pilates or

22   it your business to obtain some sort of understanding as to

23   what Pilates is and what a Pilates instructor like Amber

24   would be engaged in?

25     A.    I mean, I've -- I've attended a Pilates class

1    so I'm familiar.

2        Q.    Okay.

3        A.    So -- but for exactly what she does, no.  I did

4    have -- you know, I mean, I could get an idea from attending

5    class, but --

6            (WHEREUPON, Exhibit 17 was marked for

7    identification.)

8            MR. BUTLER:

9        Q.    The items in front of you in item, Exhibit 17,

10   you aware of any of these items generally or specifically

11   during the negotiation phase of this claim?

12       A    Like -- like I said, I knew that she was

13   Pilates, but not necessarily, I guess, through the whole --

14   well, yes, I guess, yes.  I knew she was a Pilates

15       Q.    And you knew she was married?

16       A.    Yeah.

17       Q.    You knew she had kids?

18       A.    Correct.

19       Q.    Are you saying that you didn't check out her

20   media, her business at all --

21       A.    I didn't.

22       Q.    -- using any of those tools that you have at your

23   disposal?

24       A.    I did not.

25       Q.    From your involvement and awareness of Pilates --



1      A.    Mm-hmm.

2      Q.    -- is this item a true and accurate

3  what you understood Pilates to encompass?

4      A.    Yes.

5      Q.    For the record, that's the third page of

6  Exhibit 17.

7      A.    This one.

8      Q.    Correct?

9      A.    Yes.

10     Q.    Okay.  You can put those back.  You knew from your

11 databases that Amber Mills had not previously made any

12 injury claims, true?

13          MS. KIDD:  Object to the form.

14          MR. BUTLER:  Let me repeat that.

15 BY MR. BUTLER:

16     Q.    You knew from your databases that Amber Mills

17 previously made any type of injury claims, true?

18          MS. KIDD:  Object to the form.

19          THE DEPONENT:  No previous, correct.

20          MR. BUTLER:  All right.  It's my intention to make

21 the next exhibit the Plaintiff's demand package.  I have it

22 here somewhere.  It's got the Bates stamp numbers and --

23          MS. KIDD:  Mm-hmm.

24          MR. BUTLER:  -- and all of those kinds of

25 --

```
 1           MS. KIDD:  You don't need to give me a copy.

 2           (WHEREUPON, Exhibit 18 was marked for

 3  identification.)

 4           MR. BUTLER:  That's going to be composite

 5  And it will include the fax confirmation receipt --

 6           THE DEPONENT:  Yeah.

 7           MR. BUTLER:  -- of March 28th, 2022, and all of

 8  things.  Okay.  There it is.

 9  BY MR. BUTLER:

10      Q.   So first, can you confirm for us that Plaintiff's

11  Exhibit 18 is the demand package received by State Farm

12  on March 28th, 2022?

13      A.   Yes.

14           MR. BUTLER:  And Plaintiff's Exhibit 19 is going

15  be certain things that are in that demand package, but I

16  to just start with the beginning of it.

17           (WHEREUPON, Exhibit 19 was marked for

18  identification.)

19  BY MR. BUTLER:

20      Q.   And let's look at this claims handling activity

21  context timeline that's on top there. It indicates that the

22  crash occurred on July 29th, 2021?

23           MS. KIDD:  Object to the form.

24           THE DEPONENT:  Yes.

25  BY MR. BUTLER:
```

Exh.
19



NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

Exh. 19

1       Q.    About a week later State Farm sent Mary Laseter a

2    letter saying that, quote, "State Farm will investigate and

3    pursue settlement if appropriate."

4           MS. KIDD:  Object to the form.

5    BY MR. BUTLER:

6       Q.    That's Bates Number 1776.  True?

7           MS. KIDD:  Object to the form.

8           THE DEPONENT:  I do see that on here.

9    BY MR. BUTLER:

10      Q.    Approximately seven months went by during that

11   until March 28th, 2022, when you received the demand package

12   front of you?

13          MS. KIDD:  Object to the form.

14          THE DEPONENT:  Yes.

15   BY MR. BUTLER:

Exh. 19

16      Q.    All right.  So if you'll go to Exhibit 19 and go

17   the third page there.  State Farm received a fax from Butler

18   Law Group in this case where it indicated that the

19   being extended up through April 27th, 2023, regarding the

20   payment of the $25,000 policy limits to settle any and all

21   claims against Mary Laseter.

22          MS. KIDD:  Object to the form.

23   BY MR. BUTLER:

24      Q.    Correct?

25      A.    Yes.



L

1    Q.   And in the demand, to the extent that you didn't

2   already know it, it indicated that this was a frontal offset

3   crash in which both vehicles were totaled and there was

4   deployment in both vehicles?

5        MS. KIDD:   Object to the form.

6        THE DEPONENT:   Yes.

7   BY MR. BUTLER:

8    Q.   It indicated, to the extent that State Farm didn't

9   already know it, that Amber Mills was extremely active,

10   healthy, mother of two children who enjoyed exercising,

11   teaching Pilates, and otherwise being active with her

12   and two children?

13        MS. KIDD:   Object to the form.

14        THE DEPONENT:   Yes.

15   BY MR. BUTLER:

16    Q.   And there was a photograph of Amber Mills and her

17   family out on one of their outings prior to the collision

18   showing her husband in a kayak.  She in a paddleboard with

19   two children together?

20        MS. KIDD:   Object to the form.

21        THE DEPONENT:   I see that, yes.

22   BY MR. BUTLER:

23    Q.   The demand package indicated that she had

24   head, neck, right shoulder, right hand, and lower back?

25        MS. KIDD:   Object to the form.

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

L

1          THE DEPONENT:  Yes.

2    BY MR. BUTLER:

3          Q.    And if you would find this page right here so

4    just briefly show that to the camera.

5          A.    Is it on this one?

6          Q.    It's in Exhibit 19.

7          A.    Okay.  Okay.  Got it.

L

8          Q.    If you would -- yeah, just hold that up.  And if

9    you'll go to the next one, the next page.  And let's look at

10   this together.  This is part of the medical records that were

11   contained in that demand package.  If you look kind of from

12   left to right you see where it indicates that she was

13   on the right hand?

14          MS. KIDD:  Object to the form.

15          THE DEPONENT:  Yes, I see that.

16   BY MR. BUTLER:

17          Q.    N plus T; numbness and tingling?

18          MS. KIDD:  Object to the form.

19          THE DEPONENT:  Yes.

20   BY MR. BUTLER:

21          Q.    That she has a headache?

22          MS. KIDD:  Object to the form.

23          THE DEPONENT:  Yes.

24   BY MR. BUTLER:

25          Q.    That an airbag hit her hand and two airbags hit



L

1     **MS. KIDD:** Object to the form.

2     **THE DEPONENT:** Yes.

3  **BY MR. BUTLER:**

4     **Q. And that she had a LOC or a loss of**

5  **a few seconds.**

6     **MS. KIDD:** Object to the form.

7     **THE DEPONENT:** Yes.

8  BY MR. BUTLER:

9     **Q. Go to the next one, please.** And if you'll hold

10  up. This is Bates Number 1508. **As of the date of this crash**

11  **July 29th, 2021, what is the physician's note indicating in**

12  **terms of where we've highlighted that for you?**

13     A. As far as the injuries. It states: She has a

14  cranial headache, cervical pain, bilaterally, left-sided arm

15  pain, thoracic spine pain, low back pain, bilateral side of

16  buttock, left shoulder, right elbow, and right wrist. She

17  dizzy with nausea, constipation, lightheaded with fogginess.

18  On the -- did you --

19     **Q. What does it say about the onset of those**

20     A. The onset of this injury was shortly after the

21     **Q. And how did it describe the pain in the upper**

22  **extremities?**

23     A. The pain is described as grabbing, tightness,

24  and severe. The pain radiates down both arms.

25     **Q.** If you'll hold up the next one just briefly for

Angela Butler    May 15, 2024 - NDT Assgn # 74664

1    camera.    Again -- Thank you. Again, this is July 29th, 2021,

2    what is indicated under objective in terms of the range of

3    motion?

4        A.    Cervical range of motion was as follows; forward

5    flexion, 10/50, extension 25/60, left lateral flexation

6    30/45, right --

7        Q.    Let me just stop you --

8        A.    Okay.

9        Q.    -- for a second there. So do you understand that

10   based on your training, education, and experience, that

11   flexion was 10 out of 50 in terms of degrees?

12       A.    Yes.

13       Q.    Extension was 25 out of 60 --

14            MS. KIDD:   Object to the form.

15   BY MR. BUTLER:

16       Q.    -- in terms of degrees?

17       A.    Yes.

18       Q.    Left lateral flexion was 30 out of 45 in terms of

19   degrees?

20            MS. KIDD:   Object to the form.

21            THE DEPONENT:   Yes.

22   BY MR. BUTLER:

23       Q.    Go ahead.  That's where you left off and continue.

24       A.    Oh, right lateral flexation, or flexion is 30

25   45.  Left rotation is 45/80.  And right rotation is 40/80.

1  Pain was noted in forward flexion, extension, left lateral

2  flexion, left rotation, and right rotation.

3      Q.    All right.   If you would go to the next one and

4  it up briefly. This is July 30th, 2021, the next day.

5  being indicated under objective?

6      A.    Muscle spasm was palpitated -- palpitated at --

7  not know how to pronounce that word.

8      Q.    Suboccipital.

9      A.    Yes.   Muscles, especially right, left temporalis

10 muscle, cervical spine, paraspinals, and then -- I'm not

11 how to pronounce that, scalenus muscle bilaterally.   And

12 do not know how to pronounce that word.

13     Q.    She was having --

14     A.    Sternum.

15     Q.    -- muscle --

16     A.    Spasms.

17     Q.    -- spasms in her --

18     A.    Basically.

19     Q.    Throughout the neck.   Is that fair?

20     A.    Yes.

21     Q.    Let me point you to the next item among those

22 included in the demand package.   And if you'll just hold

23     A.    This?

24     Q.    Yes.

25     A.    This page?

1    Q.    Mm-hmm.  All right.  What is this that we're

2  at?

3    A.    A disability certificate.

4    Q.    And the date of this disability certificate is

5    A.    August 9th, 2021.

6    Q.    So that would have been about 11 or 12 days

7  subject collision?

8    A.    Correct.

9    Q.    And what does it indicate?

10    A.    It confirms:  Amber Mills has been under my

11  professional care, completely incapacitated from July 29th,

12  2021 to current.  Still unable to return to work or school.

13    Q.    In that demand package you saw where Dr. Huber

14  referred Amber Mills out for an MRI?

15    MS. KIDD:  Object to the form.

16    THE DEPONENT:  Yes.

17  BY MR. BUTLER:

18    Q.    You saw where she referred her out for

19  follow-up by a neurologist?

20    MS. KIDD:  Object to the form.

21    THE DEPONENT:  Yes.

22  BY MR. BUTLER:

23    Q.    So let's go to the next item, which I think is the

24  Precision Imaging --

25    A.    This one?

1      Q.    -- MRI.  Do you see that?

2      A.    Yes.

3      Q.    If you'll hold that up for us. All right.   What is

4  the date of this cervical MRI study?

5      A.    8/6/21.

6      Q.    So this would have been about a week after the

7  subject collision?

8      A.    Correct.

9      Q.    And what did it note at the C6-7 level?

10      A.    There is a right paracentral disc herniation.

11  is a high signal annular fissure seen.

12      Q.    And tear and fissure are synonymous with one

13  correct?

14           MS. KIDD:   Object to the form.

15           THE DEPONENT:   Yes.

16  BY MR. BUTLER:

17      Q.    And let's look at the next item.  You can hold

18      A.    On the same page?

19      Q.    Yeah.

20      A.    The impression part or the next page?

21      Q.    Yeah.

22      A.    This one?

23      Q.    Actually, just stay with that.  What --

24      A.    Okay.

25      Q.    -- what was the impression --

1      A.    Impression.

2      Q.    -- on the cervical MRI dated August 6, 2021?

3      A.    C6-7 right paracentral disc herniation with

4  fissure indents.  Sorry, I couldn't see that.  The -- the

5  -- fecal sac, responding is age indeterminate, but could be

6  related to the reported trauma.

7      Q.    All right.  If you'll go to the next item.  And if

8  you'll --

9      A.    Oh, sorry.

10      Q.    -- show it.  This item which was included in that

11  demand package is the handwritten review of the cervical MRI

12  films by Dr. Richard Boehme, neurologist at Neurologists

13  Associates of North Florida, right?

14      A.    Mm-hmm.

15      Q.    I'm sorry.  I didn't hear you.

16      A.    Yes.  I'm sorry.

17      Q.    Okay.  And if you'll go to the second page there

18  some highlights --

19      A.    This -- this one?

20      Q.    -- there.  If you'll just hold that up for a few

21  minutes.  Okay. And this review by Dr. Boehme of those MRI

22  images was in connection -- well, when was it done, first of

23  all?

24      A.    August 12th, 2021.

25      Q.    And he was reading those same August 6th, 2021,

1    cervical MRI --

2        A.    Yes.

3        Q.    -- studies?

4        A.    Yes.

5        Q.    And what did he note there where we have --

6        A.    Excuse me.

7        Q.    -- highlighted for you?

8        A.    Reversal of thoracic curve and then C6-7 -- I'm

9    assuming that's right.

10        Q.    Mm-hmm.

11        A.    "R" circled right.   Paracentral to -- I'm not sure

12    what that says.

13        Q.    Lateral.

14        A.    Okay.   Lateral post disc.

15        Q.    Protruded disc?

16        A.    Protruded, okay.

17        Q.    Or disc protrusion.

18        A.    And then, I guess, or protrusion at AT.

19        Q.    And AT, annular tear?

20        A.    Gotcha.

21        Q.    Protrusion and annular tear --

22        A.    Annual tear.   Yeah.

23        Q.    -- is that what it says?

24        A.    Correct.

25        Q.    And protruded disc is synonymous with a herniated

L

L

1    disc?

2        A.    Yes.

3            MS. KIDD:    Object to the form.

4    BY MR. BUTLER:

5        Q.    Okay.  If you'll flip to the next --

6        A.    Okay.

7        Q.    -- item.  If you'll show that to the --

8        A.    Oh, sorry.

9        Q.    These are the dates of treatment records that were

10   included in the demand package?

11           MS. KIDD:    Object to the form.

12           THE DEPONENT:    Yes.

13   BY MR. BUTLER:

14       Q.    In fact, we've, for each one of those, even

15   Bates number down in the lower right-hand corner.

16       A.    Okay.

17       Q.    Do you see that?

18       A.    Yes.

R, 403

19       Q.    And Bates numbers are numbers that State Farm and

20   their attorneys assigned to the documents that are in their

21   claims file that they had back at the time that these items

22   were noted, correct?

23           MS. KIDD:    Object to the form.

24           THE DEPONENT:    Yes.

25   BY MR. BUTLER:

1        Q.    So is it fair to say that in that demand package

2    you received, you had records from July 29th, 2021, up

3    and including January 28th, 2022?

4        A.    Based on this, yes.

5        Q.    Do you -- if you would like and need to check?

6        A.    Yes.  I would definitely have to -- I don't -- I

7    mean, I'll have to look, but --

8        Q.    You can see the Bates number is 1565 at the bottom

9    one, that would be the last one, which is dated January

10   2022.

11       A.    Okay.

12       Q.    Should be pretty near the end --

13       A.    Yes.

14       Q.    -- and it's Number 1565, I believe.

15       A.    Okay.  Gotcha.  Yes.

16       Q.    Okay.  So can we agree that you were given

17   records for a six-month period, almost to the day?

18       A.    Yes.

19       Q.    If you'll go to the next item.  And hold that

20   we'll refer -- well, we -- we can see it, that's why I had

21   hold it up. This exhibit is entitled, Records of Objective

22   Clinical Injury Findings in Demand.  And it goes date by

23   and reflects in the records that State Farm was provided

24   various findings having to do muscle spasms, reduced range

25   motion, and those kinds of things, correct?

L

L

1      A.    Yes.

2            MS. KIDD:    Object to the form.

3            THE DEPONENT:    Yes.

4    BY MR. BUTLER:

5        Q.    Is that a true and accurate summary of the

6    contained in those records based on your review of this

7        A.    Yes.

8        Q.    And at the end of that six months there on January

9    28th, 2022, what did the treating physician indicate in

10   records?

11       A.    She has now chronic pain and a permanent injury to

12   her neck due to the injuries from this MVA.

13       Q.    Go to the next item.    And it may be two items

14   It's the one that says:    Numbness and tingling, Clinical

15   Findings in Demand.    Do you see that?

16       A.    This one?

17       Q.    Can you confirm for us that this is a true and

18   accurate summary of various medical records, physician

19   Stike that.    We'll just --

20            THE VIDEOGRAPHER:    We're off the video record.

21   time is 1:42.

22            (WHEREUPON, a recess was taken.)

23            THE VIDEOGRAPHER:    We're on the video record.    The

24   time is 2:04.

25   BY MR. BUTLER:

1     Q.    We were talking about the numbness and tingling,

2   clinical findings in demand.    I think you had held that

3   --

4     A.    Yes.

5     Q.    -- if you could do so.

6     A.    This one.

7     Q.    Thank you.    Does that correctly -- strike that.  Is

8   that a true and correct summary of the various medical

9   and physician notes contained in the demand package that

10  indicate ongoing numbness and tingling down into the right

11  and hand in this case?

12          MS. KIDD:    Object to the form.

13          THE DEPONENT:    Yes.

14  BY MR. BUTLER:

15    Q.    Backing up one.    Do you see one that says, Post-

16  Concussion Syndrome Findings?

17    A.    Yes.

R, 403

18    Q.    Does this timeline truthfully and accurately

19  findings made during that six-month treatment period

20  symptoms related to post-concussion syndrome?

21          MS. KIDD:    Object to the form.

22          THE DEPONENT:    Yes.

23  BY MR. BUTLER:

24    Q.    Go to the next item.

25    A.    This one?



1      Q.    Yes.   We had looked earlier at one of the records

2   that showed bruising and numbness and tingling to the right

3   wrist as we see on the timeline.   Do you recall that?

4      A.    Yes.

5      Q.    And then we had a note here from August 11th,

6   that indicates what?   Where we've highlighted some

7   for you.   August --

8      A.    Yes.

9      Q.    -- 11th, 2011.   What does that note say in the

10  highlighted portion?

11     A.    Amber returns to the clinic today with the

12  permanent complaints; cervical, thoracic, and lumbar

13  patient also notes paresthesia in the left arm and right

14  hand/wrist.   She's --

15     Q.    All right.   And then two days later there is an

16  electrodiagnostic study, and what does it indicate in the

17  section highlighted?

18     A.    It says:   Mild right media, and then it's -- it's

19  kind of blurred.

20     Q.    Mild right median entrapment --

21     A.    Neuropathy.

22     Q.    -- neuropathy at the wrist?

23     A.    Yes.   Sorry.   I see a word I couldn't see.

24     Q.    And that's on the right side?   The right wrist,

25  correct?

1       A.    Yes.   Right.

2       Q.    Are those true and accurate summaries of medical

3   records in that demand package?

4       A.    Yes.

5       Q.    Go to the next.   And if you'll show that.

6       A.    This one.

7       Q.    All right.   And again, on this context timeline

8   looking at records that were included in that demand

9   Again, we see the initial record that indicated a

10  radiating pain into the right extremity, right upper

11  and the neck pain, and so forth.   It talked about the loss

12  consciousness and being struck by multiple airbags?

13      A.    Yes.

14      Q.    And the airbags did deploy in this offset frontal

15  crash that we're here about today; didn't it?

16            MS. KIDD:   Object to the form.

17            THE DEPONENT:   Yes.

18  BY MR. BUTLER:

19      Q.    And then on August 11th, 2021, what did that

20  note say, under impression?   And this is the neurologist.

21      A.    Yes.   The PT has noted range of motion in her C

22  --

23      Q.    No.   It's -- this is August 11th --

24      A.    Is that --

25      Q.    -- on that timeline.

1    A.    Yes.  That's what I'm --

2    Q.    **Oh, I -- you were up at the physical examination**

3    A.    Yes.

4    Q.    **-- portion.**

5    A.    I'm sorry.

6    Q.    **I -- I was --**

7    A.    The --

8    Q.    **-- just asking you about the impression.**

9    A.    Oh, I'm sorry.  Radiculopathy cervical closed head

10   injury.  And then post-traumatic H -- HA.

11   Q.    **Headaches?**

12   A.    Headaches.

13   Q.    **All right.  The next item.  And that timeline**

14   **discusses the findings on July 29th, 2021, in connection**

15   **then the MRI showing that herniated disc with associated**

16   **annular tear at C6-7, by way of MRI?**

17   A.    Yes.

18         **MS. KIDD:**  Object to the form.

19   BY MR. BUTLER:

20   Q.    **Next item.  All right.  What does this tell us on**

21   **July 29th, 2021, what was indicated in terms of the**

22   A.    On the July 29th, 2021 it says -- it states:

23   shoulder pain to the right.

24   Q.    **And then as of 9/9/21?**

25   A.    Shoulder -- right shoulder, I'm assuming that's

R, 403



1  to AC and upon range of motion.

2       Q.    All right.   And then on 5/18/22 Precision

3  MRI of the shoulder indicated what?

4       A.    Labral tear.

5       Q.    Go to the next.   And if you would, take us through

6  what was going on, on January 28th, 2022, in terms of the

7  highlighted portion of the records in that demand.

8       A.    The impression is the radiculopathy, cervical,

9  head injury, post-traumatic headaches.

10      Q.    Are you looking at this one?  They're the same one
11  me.

12      A.    Is that the one?  Oh, you want me to read the
13  highlighted one at the --

14      Q.    Yeah.

15      A.    -- bottom section?  I'm sorry.

16      Q.    I -- I was just going to ask you from the January

17  28th, 2022 --

18      A.    Oh, yes.  I'm sorry.

19      Q.    -- note that was set out in the demand package and

20  also included the actual physician's record itself, what did

21  tell you?

22      A.    A patient enters today with complaints of neck

23  as her main complaint.   Pain down her right arm, which is

24  numbness and tingling.   The numbness and tingling goes to

25  middle, ring, and pinkie, fingers on the right hand, which

1  happens daily.  Limited range of motion with pain to the

2  cervical and dorso-lumbar spine. And then hypertonicity to

3  cervical and dorso-lumbar -- dorso-lumbar spine muscles.

4  has now chronic pain and permanent injury to her neck due to

5  the injuries from this MBA.  This is --

6      Q.   And in the demand package we, as her

7  said:  Unfortunately, the nature of her collision and

8  injuries are that they will be permanent, painful, and

9  progressive over time. Based on your training, your

10  and experience is an injury such a herniated disc with an

11  associated annular tear and radiculopathy or radiculitis

12  nerve is that something that progresses over time?

13      A.   It can, yes.

14      Q.   The next item is the actual note that that was

15  from.  You can just show that --

16      A.   Okay.

17      Q.   -- very briefly.  That -- that is that January

18  2022, office note, correct?

19      A.   Yes.

20      Q.   And if you'll flip over a few, couple pages

21  that.

22      A.   This one?

23      Q.   And what did we indicate in, at least the

24  portion?  And this is the final paragraph of the demand

25  What did it say?

NAEGELI
DEPOSITION & TRIAL

CELEBRATING
40
YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

1        A.    With her newfound limitations on her abilities to

2    exercise, be active, and otherwise engage in rigorous

3    activities and hobbies of her own choosing has had a

4    impact.  Her losses stemming from the collision greatly

5    the 25,000 limited -- or liability coverage under your

6    insurance policy.

7        Q.    And did that demand offer to accept the $25,000

8    policy limits in exchange for releasing State Farm's

9    Mary Laseter, from any and all claims arising out of the

10   subject collision?

11       A.    I'm sorry.  What was the question?  Sorry.

12       Q.    Didn't that demand indicate that despite the

13   greatly exceeding $25,000, that the plaintiff, Ms. Mills,

14   willing to accept the $25,000 policy limits, and in exchange

15   for that she would release Mary Laseter of any and all

16   associated with this subject collision?

17            MS. KIDD:    Object --

18            THE DEPONENT:    Yes.

19            MS. KIDD:    -- to the form.

20            THE DEPONENT:    Yes.  Sorry.

21   BY MR. BUTLER:

22       Q.    And if you'll flip over, just one more thing

23   Can you confirm for us that contained in that demand package

24   were records that we see here indicating certain

25   medications that had been prescribed to Amber Mills as a



NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

1   of the subject collision?

2       A.   Yes.

3       Q.   Did you have any contrary medical evidence to the

4   information and the medical records contained in the

5   a result of your claims investigation or any other source?

6       A.   No.

7       Q.   Did you have any contrary medical evidence from

8   reviewing physician, nurse, or healthcare provider at any

9   prior to May 13th, 2022, when a lawsuit was filed?

10      A.   No.

L

11      Q.   During your seven-plus month investigation you

12  sent a letter requesting any additional information in

13  connection with this auto injury claim, correct?

14          MS. KIDD:   Object to the form.

15          THE DEPONENT:   No letter requesting information,

16  BY MR. BUTLER:

17      Q.   You never sent any letters enclosing one of those

18  State Farm information authorization forms like the one we

19  earlier, true?

20      A.   True.

21          MS. KIDD:   Object to the form.

22  BY MR. BUTLER:

23      Q.   After receipt and review of the demand package

24  we just looked at, you made an offer of $6,550 and requested

25  single additional item, which was a Precision Imaging MRI



```
L
```

1    correct?

2              MS. KIDD:   Object to the form.

3              THE DEPONENT:   Yes.

4    BY MR. BUTLER:

5        Q.   That one item you requested, that Precision

6    bill was provided to you within a day or two?

7              MS. KIDD:   Object to the form.

8              THE DEPONENT:   I'm not sure how soon I received it

9    after the request.  I think it was a little bit longer than

10   that just because I had been out of the office and I had

11   back to make an updated offer and request -- make sure

12   guys had seen my request for that. So I think it came in

13   a week or so after.  I don't know the exact date though.

14   have to look.

15   BY MR. BUTLER:

16       Q.   The best source of information for that would be

17   look at the claims file?

18       A.   Yes.

19       Q.   Whatever it reflects you wouldn't quarrel with

20       A.   Correct.

21       Q.   And that one additional item you requested was a

22   in the amount of $2,092 and some change --

23       A.   Mm-hmm.

24       Q.   -- correct?

25       A.   Correct.  Correct.



1        Q.    And after receiving and reviewing that one

2    bill you further evaluated the value of this claim and --

3    you sent a revised offer of $7,000 in this case, true?

4        A.    Mm-hmm.  Yes.

5        Q.    And in your letter setting forth that $7,000 offer

6    you did not include any requests for additional

7        A.    No.

8             MS. KIDD:  Object to the form.

9             THE DEPONENT:  Not at that time.  No, I did not.

10   BY MR. BUTLER:

11       Q.    You didn't send one of those State Farm

12   authorization forms to Amber Mills seeking any additional

13   desired information, correct?

14            MS. KIDD:  Object to the form.

15            THE DEPONENT:  Not at that time, no.

16   BY MR. BUTLER:

17       Q.    Is it your contention that the later garage

18   sideswipe incident was in some way a significant issue which

19   prevented State Farm from being able to reasonably

20   settle this case?

21            MS. KIDD:  Object to the form.

22            THE DEPONENT:  I'm sorry, ask the question again.

23   BY MR. BUTLER:

24       Q.    Is it your contention that the later garage

25   incident was in some way a significant issue which prevented



NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM



1    State Farm from being able to reasonably evaluate and settle

2    this case?

3          MS. KIDD:  Object to the form.

4          THE DEPONENT:  No.

5    BY MR. BUTLER:

6          Q.   The demand package that was sent to State Farm

7    actually contained some physician records regarding that

8    backing garage-sideswipe incident; didn't it?

9          MS. KIDD:  Object to the form.

10         THE DEPONENT:  I don't recall seeing those.

11   BY MR. BUTLER:

12         Q.   Okay.  Who at State Farm was it that ran any of

13   3PET programs regarding the valuation of this case?

14         A.   I would have access to that -- to do that.

15         Q.   Were you the one that ran the 3PET --

16         A.   Yes.

17         Q.   -- program runs in this case?

18         A.   Yes.

401, 403

19         Q.   Did anyone else run any 3PET program runs?

20         A.   Not that I'm aware of.  Not to my knowledge.

21         Q.   None that are in the claims file, correct?

22         MS. KIDD:  Object to the form.

23         THE DEPONENT:  Correct.

24   BY MR. BUTLER:

25         Q.   Could others in State Farm management run 3PET



1    program runs in the Mills versus Laseter matter, had they

2    wanted to?

3         A.    Yes.

4         Q.    Based on our review we saw a total of three 3PET

5    injury reports in this claim, all generated on April the

6    2022.   Does that sound consistent with your review of this

7    and your participation in this matter?

8         A.    Yes.

9              (WHEREUPON, Exhibit 20 was marked for

10   identification.)

11   BY MR. BUTLER:

12        Q.    All right.   Referring you to Plaintiff's composite

13   Exhibit 20.   And if you'll hold that up.

14        A.    This one?

15        Q.    No, the first page.

16        A.    Oh, this one.   I'm sorry.

17        Q.    So this is the 3PET injury report that you

18   on April the 9th, 2022.   It says, 8:23 PDT, which I assume

19   would have been 10:23 your time, Central Standard Time.

20   that make sense?

21        A.    We're -- we're an hour behind, so I don't know

22   PDT -- is that Eastern Time?

23        Q.    I -- I --

24        A.    I don't know.   I -- I don't know how to answer

25   one --

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

Angela Butler   May 15, 2024   NDT Assgn # 74664                    Page 105

1        Q.    As we --

2        A.    -- time.

3        Q.    -- talked about before, the 3PD -- strike that.

4    Farm's 3PET program itself is located out on the West Coast.

5        A.    Okay.  Gotcha.  Yes.  Yes.

6        Q.    Is that correct?

7        A.    Yes.

8        Q.    And you would log in remotely here in Dallas,

9    Standard Time.

10       A.    Mm-hmm.

11       Q.    And thus would be an hour or two later than --

12       A.    Yes.

13       Q.    -- the West Coast time, right?

14       A.    Correct.

15       Q.    All right.  So this -- this first item that you

16   showed us in the camera there, is that the first 3PET injury

17   report that you generated in this case?

18       A.    Yes.

19       Q.    All right.  And if you'll hold up the second page

20   there.  All right. Now, this first report has the West Coast

21   time of 8:23 PDT, is that 10:23 your time?  Local time, or

22       A.    Most likely, yes.

23       Q.    All right.  And looking at the information that

24   inputted and that generated this report, what did it say

25   any head injury?

**EXH. 20**

1   A.   It says, Head injury level, no, and then physical

2   signs, no.

3       Q.   It actually says, Head trauma, no.

4   A.   Yes.

5       Q.   Physical signs, no.   Did I read that correctly?

6   A.   Yes.

7       Q.   And in terms of mechanism consistent with injury,

8   what did you input?

9   A.   So it looks like that might be for the herniation.

10      Q.   Okay.   So am I correct that the only two areas of

11  injury that were input into this 3P -- 3PET injury report

12  one, minor closed head injury/mild concussion head, and,

13  non-surgical disc injury, herniation/tear cervical C6-7?

14  A.   Yes.

15      Q.   No injury input at all was put in for the right

16  shoulder, correct?

17  A.   No.

18      Q.   No injury input was put in at all for the right

19  wrist?

20  A.   No, not from this document.

21      Q.   No injury input was put in for the lumbar spine?

22  A.   Not for the lumbar, no.

23      Q.   And in terms of the impact on lifestyle you input

24  what?

25  A.   None minimal.

1      Q.    None/minimal?

2      A.    Minimal, yes.

3      Q.    Going two pages further there's a report generated

4    that looks like this.  Can you --

5      A.    Yes.

6      Q.    -- hold that up.

7      A.    Is that the same -- same one?

8      Q.    Yeah, it's this one.

9      A.    Okay.

10      Q.    This is a portion of that report that you ran at

11    8:23:35 PDT which is 10:23 a.m. Dallas time?

12      A.    Yes.

13      Q.    And that report generated a range for past medical

14    bills?

15      A.    Yes.

16      Q.    As to future medical bills what was input or

17    indicated and generated from this report?

18      A.    None at this time.

19      Q.    So there's no figures at all for any future

20    expense related to the subject collision?

21      A.    Correct.

22      Q.    All right.  And as we go down to generals, under

23    and suffering there is a range that was generated by this

24    report?

25      A.    Yes.

NAEGELI
DEPOSITION & TRIAL                    (800)528-3335
                                       NAEGELIUSA.COM

1      Q.    And then in terms of any future pain and suffering

2  what, if anything, is indicated?

3      A.    There is not any future pain and suffering.

4      Q.    At the time that you generated this report you had

5  all of the information we just looked at in that demand

6  package, correct?

7      A.    No.   That's where I'm a little lost.   Because I

8  believe the demand package that I initially received was

9  like 104 pages.   So some of this is a little new to me.   I

10  don't know if this came after litigation, we received this.

11      Q.    When you received what?

12      A.    The -- some of the additional documents that I'm

13  seeing in here.   That's why I was kind of skimming through

14  because some of this -- like when you said the treatment was

15  through 1/28 of '22.   I don't recall seeing those documents.

16      Q.    They're Bates stamped.   They're part of the demand

17  note that was sent to you.

18      A.    Yeah.

19      Q.    They're actually discussed in the demand itself --

20      A.    Itself, mm-hmm.

21      Q.    -- and portions of them are actually put in the

22  demand itself, so. So again, I want to go back to the

23  You received the demand package and all of those Bates

24  items that we just went through on March the 28th of 2022.

25  said it would have taken you maybe a few hours or a few days

1    get through that.  And then about 11 or 12 days later you

2    generating this 3PET report that we've just been going

3    here.

4         A.   Correct.

5         Q.   So my question to you was, at the time that you

6    generated this 3PET report you had all of that information

7    the demand package in this case, correct?

8         A.   I -- I honestly can't say yes because some of

9    documents go to, like 9/9, and I just -- I don't recall some

10   it.  I'm not saying it wasn't there.  Just -- I don't --

11   looking at it now, I don't recall.

12        Q.   All right.  So if you'll go to the next page and

13   that up.  This is the second of those 3PET reports that you

14   generated in this case. No, it should look like this.

15        A.   Oh, I'm sorry.

16        Q.   And this one was generated just a -- a few minutes

17   later at 8:24:40 PDT, which would be about 10:24:40 Dallas

18   time.  Is this the second 3PET injury report you generated

19   this case?

20        A.   Yes.

21        Q.   All right.  And likewise, let's now go to the

22   page.  If you'll hold that up.

23        A.   This one.

24        Q.   So in the second page -- strike that. So in the

25   second 3PET report that you generated a few minutes later,



1  again, as to head trauma what input did you put?

2       A.    Level, it says, No.

3       Q.    Now, under head trauma -- yeah, I mean, the injury

4  factor -- there's an injury factor and a level.  The injury

5  factor under head trauma you put under level what?

6       A.    No.

7       Q.    Under physical signs related to head trauma what

8  you put?

9       A.    No.

10      Q.    Now, down below as we get into the cervical

11 the second injury that was included.

12      A.    Mm-hmm.

13      Q.    As to radiculopathy, what did you input?

14      A.    So that's a factor that I included.  So the -- the

15 radiculopathy is something that I selected that she had.

16      Q.    Didn't you put -- as to radiculopathy, no?

17      MS. KIDD:    Object to the form.

18      THE DEPONENT:    Oh, I'm sorry, yes.  That's no on

19 here, I'm sorry.

20 BY MR. BUTLER:

21      Q.    Okay.  So now that you've had a chance to look --

22      A.    Sorry.

23      Q.    -- at this, I'm going to ask you again.  As to the

24 cervical injury in this case under radiculopathy, your input

25 was what?

1       A.      No.

**Altered**  2       Q.      **Under considered treatment period, your data input**

3    **was what?**

4       A.      Less than six months.

5       Q.      **Under your data input for mechanism consistent**

6    **injury, as to the cervical injury, you put what?**

7       A.      Questionable.

8       Q.      **And as to impact on lifestyle in the second 3PET**

9    **report generated, you put what?**

10      A.      None to minimal.

11      Q.      **And if you'll go to the second page, is this the**

12   **printout -- strike that. Going to the second page, is this**

13   **valuation printout of the second 3PET report you generated?**

14      A.      Yes.

15      Q.      **And if you would show that to the camera as well.**

16              **MR. BUTLER:**   For the record, this is Bates Number

17   1331.

18              **MS. KIDD:**   I'm going to object to that, given

19   added things to that Bates.

20   **BY MR. BUTLER:**

21      Q.      **And what is indicated in terms of future medical**

22   **bills in this valuation?**

23      A.      Zero.   There's none added.

24      Q.      **And in terms of future pain and suffering what is**

25   **indicated in this valuation?**

1      A.    So there's no future pain and suffering for this

2      Q.    If you'll turn two pages further.  Should look

3  that.

4      A.    This one?

5      Q.    No.  It's -- it's --

6      A.    This one?

7      Q.    -- one before that, I think.

8      A.    Oh.  I thought you said two pages.  Oh, yeah.

9      Q.    Okay.  Now, we're looking at the third 3PET injury

10  report you generated on April the 9th, 2022, a few minutes

11  later yet.  This one says 8:25 and 15 seconds PDT which

12  presumably is about 8:25 and change Dallas time.  Is that

13  correct?

14     A.    Yes.

15     Q.    And if you'll go to the next page and hold it up,

16  just --

17     A.    This one?

18     Q.    No, the last one.

19     A.    The very last page --

20     Q.    No.

21     A.    -- or this one?  Oh.

22     Q.    And am I correct again, that for the third time,

23  only two injuries for which any data was input in this

24  regarding the head and the neck?

25     A.    Yeah, the cervical and the head, yes.

Angela Butler    May 15, 2024    NDT Assgn # 74664                  Page 113

1      Q.    All right.   And now looking at this third run

2    the closed head injury/mild concussion head portion as to

3    trauma, what did you input?

4      A.    It says, no.

5      Q.    And now going down under the cervical injury

6    under the considered treatment period you input what?

7      A.    Less than six months.

8      Q.    As to radiculopathy you input what?

9      A.    No.

10      Q.    As to mechanism consistent with injury you input

11    what?

12      A.    Questionable.

13      Q.    And as to impact on lifestyle you put what?

14      A.    None to minimal.

15      Q.    Going to the next page.   And if you would hold

16    up.

17      A.    This one?

18      Q.    And likewise this is a portion of the report

19    generated on that third 3PET run that you made on April the

20    9th, 2022?

21      A.    Yes.

22      Q.    And what does it indicate based on your inputs

23    respect to future medical bills?

24      A.    No future medical bills.

25      Q.    And as to future pain and suffering what is

1   **here?**

2       A.    So just for clarification, this is pain and

3   suffering, like, for out-of-scope, like for an out-of-scope

4   injury that may not be an injury that's a dropdown option

5   within 3PET. So, like, if say she had, like a severe head

6   injury, something like that, like I was explaining earlier,

7   with a brain bleed, then that's where you would probably

8   would enter an out-of-scope injury. So no future pain and

9   suffering you -- you don't really add the future pain and

10  suffering in 3PET.

11      **Q.    Do you add -- strike that. As the claim specialist**

12  **you add any figure into the 3PET program in any place,**

13  **or form regarding pain and suffering, or does the program do**

14  **that for you?**

15      A.    So when you enter those option you select the

16  as -- as the severity to the injury, the impact, how long

17  treatment was.  Things of that nature.  That will spit out a

18  value of the injury. You can enter an out-of-scope injury,

19  when you enter an out-of-scope injury it's kind of based on

20  your experience and maybe speaking with superiors as far as

21  gauging what that value might be within that -- that county.

22      **Q.    My question is, does the 3PET program come up with**

23  **that pain and suffering, quote, "in scope figure", or do you**

24  **some way, shape or form come up with that figure?**

25      A.    3PET does.



1    Q.    And is there any way for the claims specialist

2    in their own pain and suffering figure based on their

3    education, and experience, different than that?

4    A.    Not in 3PET, no.

5    (WHEREUPON, Exhibit 21 was marked for

6    identification.)

7    THE DEPONENT:  Oh.

8    BY MR. BUTLER:

**R, 403**

9    Q.    I'm showing you Plaintiff's composite Exhibit

10   this case.   Do you recognize the first page there as being a

11   side-by-side comparison on the three different 3PET runs you

12   generated on April 9th, 2022, in this case?

13   A.    Yes.

**R, 403 (Exh.)**

14   Q.    Okay.   If you'll just show that to the -- And if

15   you'll go to the next page, we have highlighted a

16   you'll show that to the camera. As far as any preexisting or

17   prior treatment you indicated what in all three of those

18   that you did?

19   A.    No.

20   Q.    If you'll go to the next and show that to the

21   In all three of these runs the only two injuries that were

22   included had to do with the head and the cervical injury,

23   correct?

24   A.    Correct.

25   Q.    If you'll go to the next one and hold it up.



NAEGELI
DEPOSITION & TRIAL          (800)528-3335
                            NAEGELIUSA.COM

**R, 403 (Exh.)**

1    no injury input in any of your three 3PET reports generated

2    regarding the right shoulder, the right hand, or the lower

3    back, true?

4         A.    Correct.

5         Q.    Go to the next.  If you'll hold that up. On all

6    of the reports that you did as to head trauma, you indicated

7    what?

8         A.    No.

9         Q.    And if you'll show the next one to the camera.

10        A.    Oh.

11        Q.    All right.  The next item, and I think you

12   that this is in relationship to the cervical injury as to

13   mechanism consistent with injury you answered what in all

14   of those reports generated?

15        A.    Questionable.

16        Q.    The next one.  In all three of the 3PET runs or

17   reports that you generated as to impact on lifestyle you

18   indicated what?

19        A.    None to minimal.

20        Q.    And if you would show the next one.  On the

21   recognize that as a picture of Amber Mills the morning

22   this crash.

23             MS. KIDD:  Object to the form.

24   BY MR. BUTLER:

25        Q.    Do you not?

```
 1        A.    I have to assume that's her.

 2        Q.    If you'll go to the next one.  Go to the -- the

 3   one after that.  I think it's this one right here.

 4        A.    This one?

 5        Q.    I think that's the one.

 6        A.    This one.

 7        Q.    Does that show the -- down on the bottom on the

 8   the disabilities certificate that was contained in the

 9   package?

10        A.    Yes.

11        Q.    And then there is a note dated August 11th from

12   treating physician, and what did it say in the -- under plan

13   the bottom paragraph?

14        A.    ADLs were discussed as for her son running to

15   her to lift him up, and activities such as housework at

16   She is instructed to not do Pilates or any exercise at this

17   time due to the severity of her whiplash and current

18        Q.    And then there's a later note from August 23rd,

19   what does it indicate?

20        A.    We've -- we've reviewed ways to modify her

21   instructions to her Pilates clients using verbal commands

22   utilizing a long wooden dowel instead of any bending or

23   placement of body parts on the former machine, et cetera --

24   reformer machine, et cetera.

25        Q.    And those are all items that were contained in the
```

1    demand package, correct?

2         A.    Yes.

3         Q.    And if you'll show that again --

4         A.    This one?

**R, 403
(Exh.)**

5         Q.    -- to the camera.    And with that information as to

6    impact on lifestyle in all three of those reports you

7    what?

8         A.    None to minimal.

9         Q.    If you'll go to the next one.    We have highlighted

10        A.    This?

11        Q.    -- in all three of those reports you generated

12    nerve impingement you indicated what?

13        A.    It states, no.

14        Q.    And if you'll go to the next slide and hold it up.

15        A.    Oh.    Sorry.

16        Q.    Again, if you'll hold that up --

17        A.    Oh.

18        Q.    -- for a minute. Having information regarding the

19    airbag deployment and the speeds and forces at which it

20    having had the notation of the bruise and numbness and

21    on the right wrist there and having those other

22    finally on August 13th, 2021, an electrodiagnostic study

23    right wrist indicating a mild right median entrapment

24    neuropathy at the wrist. You had all of that information

25    demand package; didn't you?

Angela Butler   May 15, 2024   NDT Assgn # 74664

R,
403
(Exh.)

1        **MS. KIDD:**  Object to the form.

2        **THE DEPONENT:**  Yes.  It shows to be in this demand

3   package.

4   **BY MR. BUTLER:**

5        **Q.    Okay.  If you'll go to the next and if you'll show**

6   **that to the camera.  As to radiculopathy what did you**

7   **in the first 3PET run that you made?**

8        **A.    It says, yes.**

9        **Q.    And then in the second run that you made?**

10       **A.    No.**

11       **Q.    And in the third run that you made as to**

12   **radiculopathy you input what?**

13       **A.    No.**

14       Q.    And if you'll go to the next page and hold it up.

15       A.    Is that it?

16       **Q.    And if you'll go to the next page.  As to**

17   **treatment period in all three of the 3PET reports that you**

18   **generated on April the 9th, 2022, you put what?**

19       **A.    Less than six months.**

20       **Q.    And if you'll go to the next and show it to the**

21   **camera. Based on the information that you had and your**

22   **training, education, and experience, did you anticipate that**

23   **Amber Mills' symptoms and need for treatment would continue?**

24       A.    Based on a conversation with you, I believe that

25   had, you advised verbally that she was going to continue to

```
 1    treat.

 2         Q.    And you know that she did continue treating?

 3         A.    Yes, I do know that.

 4              MS. KIDD:  Object to the form.

 5    BY MR. BUTLER:

 6         Q.    So after running those three 3PET reports in this

 7    case you made a demand -- strike that.  After running those

 8    three 3PET valuation reports on April the 9th, 2022, you

 9    extended an offer in this case?

10         A.    Yes.

11         Q.    And that offer was --

12         A.    The initial one is $6,550, I believe.

13         Q.    $6,550.  Does that sound right?

14         A.    Yes.

15         Q.    And that's the one that you asked for the

16    medical record which you received and it was an additional

17    Precision Medical Imaging bill of $2,094 and change?

18         A.    Yes.

19              MS. KIDD:  Object to the form.

20    BY MR. BUTLER:

21         Q.    At that same time you and State Farm decided to

22    perform an additional --

23              MS. KIDD:  This one.

24    BY MR. BUTLER:

25         Q.    -- past medical expense valuation.
```

1              **MS. KIDD:**  Object to the form.

2    **BY MR. BUTLER:**

3        **Q.    Is that true?**

4        A.    Ask that question again.  I'm sorry.

R, 403
(Exh.)

5        **Q.    On May the 2nd, 2021, did you perform using some**

6    **State Farm software program from the same source as the 3PET**

7    **program, a medical expense valuation or adjustment-type of**

8    **analysis?**

9              **MS. KIDD:**  Object to the form.

10              **THE DEPONENT:**  Yes.

11              **(WHEREUPON, Exhibit 22 was marked for**

12    **identification.)**

13              **THE DEPONENT:**  Oh.  Sorry.

14    **BY MR. BUTLER:**

15        **Q.    So I'm showing you Plaintiff's composite Exhibit**

16    **And the first thing I want to ask about is a claims handling**

17    **activity context timeline.  Do you see that?**

18        **A.    Yes.**

19        **Q.    And if you'll just hold that up, just for a**

20    **to the camera there. I want to make sure that this is**

21    **You received the demand package on March the 28th, 2022.**

22    **12 days later you did those 3PET reports that we looked**

23    **there were a total of three of those, on April the 9th,**

24    **And we know that you, after that, made an offer of $6,550**

25    **settlement of all claims by Amber Mills and you asked for an**

1  additional medical record, which was the Precision Imaging

2  --

3       A.    Mm-hmm.

4       Q.    -- and that was supplied to you, of $2,094 and

5  change. And then on May the 2nd, 2022, you performed a

6  injury report summary related to past medical expenses in

7  case.  Is that accurate?

8            MS. KIDD:  Object to the form.

9            THE DEPONENT:  Yes.

10           MR. BUTLER:  Okay.

11  BY MR. BUTLER:

12       Q.    So let's look at that bodily injury report and you

13  can show that. And again, this is where you input

14  into a State Farm program that is companion to, or at least

15  from the same folks that developed that State Farm 3PET

16  that we looked at before, and it generates a report?

17       A.    Yes.

18       Q.    All right.  And so when was this done according to

19  the report?

20       A.    Five -- it looks like 5/2/22.

21       Q.    Looks like you did it in the morning of May the

22  2022.  It was generated about 8:21 in the morning?

23       A.    Yes.

24       Q.    All right.  And this software that you're using to

25  look at past medical expenses is developed by an outfit

R, 403, L

**R, 403, L**

1  Mitchell ACS, and that's the same outfit that does the 3PET

2  software program, correct?

3          MS. KIDD:  Object to the form.

4          THE DEPONENT:  Yes.

5  BY MR. BUTLER:

**R, 403**

6      Q.   And look at the second page there and hold that

7  Right there in the report, it has some disclaimer

8  and what does it tell us in terms of this valuation that is

9  going to be done in terms of the past medical expenses?

10     A.   It states:  Mitchell ACS is not a healthcare

11  and does not directly or indirectly practice medicine or

12  dispense medical services. Mitchell ACS does not guarantee

13  warrant the accuracy of the data and information contained

14  this product and assumes no liability for the data and

15  information contained therein.

16     Q.   And so what you do is you take the medical bills

17  particular claim and you run it through this software

18  and it analyses it and adjusts it as it sees fit based on a

19  number of business factors, I guess.

20     A.   Usually the --

21          MS. KIDD:  Object to the form.

22          THE DEPONENT:  -- procedure codes that are on the

23  billings.  It kind of -- it will kind of base it off of

24  procedure codes.

25  BY MR. BUTLER:

1    Q.    All right.  So if you'll go to the next page and

2    A.    Mm-hmm.

3    Q.    -- hold that up. Now, in this particular case for

4    your analysis of the past medical bills you put in 43 days'

5    worth of treatment billing, from July 29th, 2021, when this

6    collision happened, up through September 9th of 2021.  Is

7    correct?

8    A.    So I actually don't input this information.  It's

9    generated by the bills that are submitted through the

10    system.  So it's not -- like it's not a report that I

11    or I'm able to adjust or put any information in. The

12    system does it all in the background and spits it out for us

13    review.

14    Q.    Where does it get the information from?

15    A.    From the bills that they're submitted.  So when we

16    submit -- like the three bills that I received, so when --

17    the -- when those are reviewed by that third party or that

18    vendor this report is generated by that information that

19    they're -- those documents that they're reading.

20    Q.    So you give them the bills that you've been

21    A.    Mm-hmm.

22    Q.    -- in a particular claim and it does its magic

23    through the software program?

24    A.    Correct.

25    Q.    All right.  And what we know is that for

1   this program report that was generated, they used 43 days of

2   bills from the date of loss up through September 9th, 2021?

3           MS. KIDD:   Object to the form.

4           THE DEPONENT:   Yes.

5           MR. BUTLER:   All right.

6           THE DEPONENT:   That's what it's reading, yes.

7   BY MR. BUTLER:

8       Q.   And they made an adjustment out of those amounts

9   charged, which was $9,206.20, they adjusted that downward

10   came up with an allowed figure?

11      A.   Correct.

12           MS. KIDD:   Object to the form.

13   BY MR. BUTLER:

14      Q.   And that arrow points to what they look at and

15   they used in order to make those adjustments in this case

16   want to look at those with you just a little bit. The

17   that they used to adjust this is the 2007 CMS limiting

18      A.   (Nods head.)

19           MS. KIDD:   Object to the form.

20   BY MR. BUTLER:

21      Q.   Now, the bills we're talking about were

22   the year 2021, true?

23           MS. KIDD:   Object to the form.

24           THE DEPONENT:   Yes.

25   BY MR. BUTLER:

1      Q.    Do you think that whatever that 2007 limiting

2  for charges in the medical industry, do you think it that

3  been updated at all since 2007?

4           MS. KIDD:  Object to the form.

5  BY MR. BUTLER:

6      Q.    Fourteen years before these bills?

7      A.    I would not -- I'm not sure.  I wouldn't be able

8  answer that accurately.

**R, 403**

9      Q.    Do you think that the bills in -- strike that.

10  think that medical bills in the year 2021 would be

11  different than the 2007 medical bill standard charges?

12     A.    I'm sure there's probably been changes from that

13  period of time, yes.  Increase in prices, if -- if that's

14  you're asking, yes.

15     Q.    Another one --

16     A.    It would be reasonable to believe that.

17     Q.    Another one is down at the bottom, The Florida

18  Workers' Comp Fee Schedule.  Did this case have anything

19  with workers' comp?

20     A.    This case, no.

21     Q.    The workers' comp fee schedule would not be

22  to the Mills versus Laseter case, correct?

23           MS. KIDD:  Object to the form.

24           THE DEPONENT:  I would -- it would not.

25  BY MR. BUTLER:



1    Q.    If you go to the next page and hold that up. This

2  shows the medical providers whose bills are being considered

3  and the only ones that are considered here are Dr. Huber and

4  Precision Imagine Centers, Kevin Jones being the

5  Is that correct?

6           MS. KIDD:    Object to the form.

7           THE DEPONENT:    Yes.

8  BY MR. BUTLER:

9    Q.    And under Dr. Huber, up at the top, it tells you

10  was used to adjust her bills downward utilizing this program

11  and they specifically say, Fee schedule 2007 CMS limiting

12  charge. Do you see that?

13    A.    Yes.

14    Q.    And they specifically say, Fee schedule Florida

15  Workers' Comp Fee.   Do you see that?

16    A.    Yes.

17    Q.    Neither one of those would apply in this case,

18  they?

19           MS. KIDD:    Object to the form.

20           THE DEPONENT:    The workers' comp, there's no

21  comp involvement.   As far as the billing again for the 2007

22  CMS, that -- I wouldn't really be able to answer to that.

23  BY MR. BUTLER:

24    Q.    Let's skip two pages forward.

25    A.    Two?

1    Q.    Mm-hmm.    It should look like this.

2    A.    Yes.    This one.

3    Q.    So these are the neurology bills from Neurology

4  Associates in the Amber Mills case that we included in our

5  demand package to State Farm.    And I want to have you

6  for us that none of those bills were in any way included in

7  this past medical bill assessment using this State Farm

8  software program?

9    A.    It's not -- I do not see it in here.    Do not see

10  here.

11    Q.    So those bills were not taken into account in that

12  report?

13         MS. KIDD:    Object to the form.

14         THE DEPONENT:    This bill was not, no.

15  BY MR. BUTLER:

16    Q.    And just to be clear, if you'll go to the next

17  since that report only took into account 43 days rather than

18  the six months of treatment that was included in the demand

19  package, we pulled out particular bills and dates of

20  in that bill that would have fit in that 43-day period.

21  need you to confirm for us that none of those were

22  this past medical expense assessment?

23    A.    Correct.

24    Q.    If you'll go to the next item that should look

25  this.

1       A.    Yes.

2       Q.    Go ahead and -- in the diagnostic summary that

3    report gleaned from the medical bill codes that I think you

4    said it used or the information that you input or whatever.

5    What does it indicate diagnosis summary as being?

6       A.    Cervical disc disorder with radiculopathy,

7    unspecified cervical region.

8       Q.    And if you'll go to the last page there.

9       A.    This one.

10       Q.    On that same day after you ran this past medical

11    assessment using this State Farm software you sent out the

12    revised offer --

13       A.    Offer.

14       Q.    -- which was the final offer until December 1st of

15    2022, and that was in the amount of what?

16       A.    $7,000.

17       Q.    And in that letter where you convey that offer,

18    you indicate that you needed more time?

19       A.    No.

20       Q.    Did you indicated that you needed any additional

21    information of any sort?

22       A.    Not at the time, no.

23             MS. KIDD:   Is this a good stopping point for a

24             MR. BUTLER:   Sure.   Let me get to a stopping

25    BY MR. BUTLER:

1    Q.    So the adjusted past medical figure --

2    A.    Mm-hmm.

3    Q.    -- for just that 43-day period which didn't include

4    the neurology records was $8,053.48.

5        MS. KIDD:  Object to the form.

6        THE DEPONENT:  I believe that's what the number

7    Yes.

8    BY MR. BUTLER:

9    Q.    And your offer was what?

10    A.    Seven.

11    Q.    And, of course, that adjusted figure in the

12    that you had run for that 43-day period it did not include

13    amounts for future medical expenses to be obtained in the

14    future as a result of the collision-related injuries?

15        MS. KIDD:  Object to the form.

16        THE DEPONENT:  No.  As there was no future medical

17    expenses suggested that there would be at the time when I

18    ran this evaluation.

19    BY MR. BUTLER:

20    Q.    Does that program run future medical evaluations?

21    A.    No.

22        MR. BUTLER:  We can take that break now.

23        MS. KIDD:  Okay.

24        THE VIDEOGRAPHER:  We're off the video record.

25    time is 3:28.

NAEGELI DEPOSITION & TRIAL    CELEBRATING 40 YEARS IN BUSINESS    (800)528-3335    NAEGELIUSA.COM

1          (WHEREUPON, a recess was taken.)

2          THE VIDEOGRAPHER:  We're on the video record.  The

3   time is 3:47.

4   BY MR. BUTLER:

5      Q.   Who would you consider to be the most

6   person or persons at State Farm related to the claims

7   of Mary Laseter's July 29th, 2021, auto liability claim up

8   through and including entry of the final judgment?

9      A.   I'm sorry.  Ask the -- the beginning of the

10  again.  I'm sorry.

R, 403

11     Q.   Who would you consider to be the most

12  person or persons at State Farm related to the claims

13  of Mary Laseter's July 29th, 2021, auto liability claim from

14  the outset up through final judgment?

15     A.   Probably myself, potentially management at that

16     Q    Anyone else?

17     A.   I guess the leaders -- leadership above as in our

18  claims manager -- or section manager that may have

19  file.  It just depends if she was given notice to review it,

20  what point. But I would say myself and at least my -- my

21  leadership at the time

22     Q.   Which was?

23     A.   Russell Horne.

24     Q.   Did you or anyone else at State Farm ever share

25  State Farm-generated valuation reports?  That is those three



NAEGELI
DEPOSITION & TRIAL
CELEBRATING 40 YEARS IN BUSINESS
(800)528-3335
NAEGELIUSA.COM

R, 403

1   3PET reports generated on April 9th, 2022, or the May 2nd,

2   2022, past medical expense program run with Mary Laseter

3   to December 1st, 2022?

4        A.   You're asking, would we have shared it with her?

5        Q.   I'll ask it again.

6        A.   Sorry.

7        Q.   Did you or anyone else at State Farm ever share

8   State Farm generated valuation reports generated on April

9   2022, and May 2nd, 2022, with Mary Laseter prior to December

10  1st, 2022?

11       A.   No.

12       Q.   Did you personally speak to Mary Laseter about

13  claim during the nine-plus months after the collision when

14  claim was being investigated and negotiated prior to a

15  being filed?

16       A.   I spoke to her once and then her son took over the

17  as a designated person to communicate with.

18       Q.   Do you remember when it was that you spoke to Mary

19  Laseter?

20       A.   I could look in the file document.  But it was

21  shortly after I received the file.  Maybe around March, late

22  March, early April of '22, to discuss her passengers.  To

23  obtain her passengers' information so I could verify their

24  injuries if they were injured in the accident.

25       Q.   And Russell Horne testified that there never

1   other claims by anyone else other than Amber Mills regarding

2   Mary Laseter, correct?

3        A     Correct.

4              MS. KIDD:   Object to the form.

5              THE DEPONENT:   Sorry.

6   BY MR. BUTLER:

**A&A, R, 403**

7        Q.   Did I understand you to say that you and perhaps

8   Russell Horne would be the nost -- the most knowledgeable

9   people in terms of the claims handling of the Amber Mills

10  against Mary Laseter in this case?

11             MS. KIDD:   Object to the form.

12             THE DEPONENT:   Mostly like we --- yes.

13  BY MR. BUTLER:

14       Q.   Did you and Russell Horne monitor the litigation

15  process closely from the beginning?

16       A.   Yes.

17       Q.   Did Russell Horne actively participate in the

18  litigation decision-making process with State Farm's chosen

19  defense firm, Cole Scott & Kissane?

20       A.   I'm the one who selected them, like a random

21  selection, yes, but he did not disagree with my selection.

22       Q.   Yeah, and I --

23       A.   Mm-hmm.

24       Q.   -- my question was, did you and Russell Horne

25  actively participate in the litigation decision-making



L, A&A

1   along with your chosen defense firm, Cole Scott & Kissane?

2       A.   Yes.

3       Q.   Did the two of you participate in decisions

4   to trial strategy in this case?

5       A.   Not for the trial.  As far as, like -- I mean, I'm

6   sure we had some input along with theirs.

7       Q.   We talked about the fact that there never was any

8   question regarding fault or liability in this case, true?

9           MS. KIDD:  Object to the form.

10          THE DEPONENT:  No.  I don't think there was ever a

11  question.

12  BY MR. BUTLER:

13      Q.   A hundred percent of the fault was attributable to

14  State Farm's insured, Mary Laseter, and zero percent fault

15  the part of Amber Mills, correct?

16      A    Yeah.

17          MS. KIDD:  Object to the form.

18          THE DEPONENT:  That's what we adjusted it at, yes.

19  BY MR. BUTLER:

20      Q.   Yet during the litigation of Mills versus Laseter

21  fault was disputed and denied and Amber Mills was blamed for

22  the collision, true?

23          MS. KIDD:  Object to the form.

24          THE DEPONENT:  I was not aware of that.

25          (WHEREUPON, Exhibit 23 was marked for



1  identification.)

2  BY MR. BUTLER:

L, R, 403

3      Q.   Let me refer you to Plaintiff's composite

4  that you have in front of you.   And we -- I'll have you hold

5  this particular item. We looked earlier at other cases where

6  State Farm admitted liability for crashes and disputed

7  causation and fault, but in this particular case, they

8  fault or responsibility for the collision?

9          MS. KIDD:   Object to the form.

10 BY MR. BUTLER:

11     Q.   Correct?

12     A.   It does say, Denied.

13     Q.   And if you go to the next item where it's asking

14 Mary Laseter was negligent in causing the collision.   What

15 the position taken?

16     A.   It says, Denied.

17     Q.   And if you go to the next item.   And I want you to

18 hold this one up. This is one of the affirmative defenses

19 raised by Ms. Laseter's attorneys in this case.   And what

20 it say?   What does affirmative defense Number 4 say?

21     A.   At all times material hereto Plaintiff was

22 and such negligence caused or contributed to her injuries,

23 bare -- barring or reducing the plaintiff's right to recover

24 amount appropriate with her own negligence.

25     Q.   In an amount proportionate with her own --

1      A.    Sorry.

2      Q.    -- negligence, right?

3      A.    Yes.

4      Q.    And affirmative defense Number 7, if you'll hold

5  up.  Okay.  What does it say?

6      A.    It says:  All injuries, losses, or damages claimed

7  Plaintiff were not a result of any negligence or want of

8  want of care on the part of the defendant, the defendant's

9  agents, servants, and/or employees.

10      Q.    Number 8 raised the negligence of a third party

11  beyond the control of the defendant as being responsible in

12  whole or part.  Were there ever any other negligent third

13  parties to this case outside of Amber Mills and Mary Laseter

14  for consideration?

15      A.    Not that I'm aware of.

16      Q.    And affirmative defense Number 12.

17      A.    Any injuries or damages allegedly incurred by

18  Plaintiff are the result of an unavoidable accident rather

19  there being any negligence on the part of the defendant, her

20  agents, or employees.

21      Q.    As a claims specialist you and State Farm knew

22  in a Florida auto liability case the fact that a particular

23  driver was determined by the investigating officer to be at

24  fault and ticketed for the crash is inadmissible at trial to

25  prove fault, right?

L, LC



L,
LC

1              MS. KIDD:    Object to the form.

2              THE DEPONENT:    Yes.

3    BY MR. BUTLER:

4         Q.    That's because Florida has what's called the

5    Reporting Privilege and the fact that --

6         A.    Mm-hmm.

7         Q.    -- Mary Laseter had been ticketed --

8         A.    Mm-hmm.

9         Q.    -- for this crash, the fact that she had pled

10   to causing this crash you knew that that couldn't be used to

11   prove the case because of that accident reporting privilege,

12   right?

13        A.    Correct.

14              MS. KIDD:    Object to the form.

15              THE DEPONENT:    Correct.

16   BY MR. BUTLER:

L,
MIL

17        Q.    And thus the denial of fault in this case and

18   maintaining that denial meant that State Farm's insured, 90-

19   year-old Mary Laseter, would need to be deposed in order for

20   Mills to prove her legal entitlement to any damages for her

21   losses, correct?

22              MS. KIDD:    Object to the form.

23              THE DEPONENT:    Yes.

24   BY MR. BUTLER:

25        Q.    You have to prove fault before you're entitled to



1  receive anything at all for your losses, right?

2      A.    Correct.

3      Q.    Both you and Russell Horne were aware of Mary

4  appearing for her video deposition in the Mills versus

5  case on July 1st, 2022, right?

6          MS. KIDD:  Object to the form.

7          THE DEPONENT:  Yes.  I knew that she was taking a

8  deposition.

9  BY MR. BUTLER:

MIL, R, 403

10     Q.    And that Mary Laseter, at that time, was described

11  and presented as a -- an elderly, very frail, person, true?

12          MS. KIDD:  Object to the form.

13          THE DEPONENT:  Yes.  One can make that

14  her age.

15  BY MR. BUTLER:

16     Q.    Do you recall that a State Farm trial observer who

17  watched that same video deposition of Mary Laseter, the one

18  taken back in 2022, described her as being, quote,

19  "sympathetic, elderly, and very frail?"

20          MS. KIDD:  Object to the form.

21          THE DEPONENT:  I have -- I have no knowledge of

22  BY MR. BUTLER:

MIL, L, R, 403

23     Q.    Mary Laseter's condition at that earlier video

24  that is appearing elderly and very frail didn't surprise

25  given what you already knew about her age and the injuries



MIL,
L, R,
403

1    had sustained in this collision, right?

2              MS. KIDD:   Object to the form.

3              THE DEPONENT: Yes.

4    BY MR. BUTLER:

5         Q.    And at that July 1st, 2022, video deposition State

6    Farm's insured, Mary Laseter, testified that she proceeded

7    turn left in a busy area despite being unable to see the

8    oncoming lane of traffic due to a large vehicle stopped

9    opposite of her waiting to make its own left-hand turn,

10   correct?

11        A.    Yes.

12             MS. KIDD:   Object to the form.

13   BY MR. BUTLER:

14        Q.    And Mrs. Laseter testified that Amber Mills'

15   had the right of way, true?

16             MS. KIDD:   Object to the form.

17             THE DEPONENT:   I believe she did.

18   BY MR. BUTLER:

19        Q.    And Mrs. Laseter testified that Amber Mills'

20   Ms. Laseter's vehicle would have been obstructed by that

21   vehicle that was obstructing Laseter's view of Amber Mills'

22   vehicle, correct?

23             MS. KIDD:   Object to the form.

24             THE DEPONENT:   Correct.

25   BY MR. BUTLER:

L, C,
S, AR

1       Q.    And after that deposition, State Farm continued to

2  maintain its dispute regarding fault and liability until the

3  plaintiff filed a motion for summary judgment on the issue

4  fault.   Set a hearing.   And obtained an order granting

5  judgment as to liability, true?

6            MS. KIDD:   Object to the form.

7            THE DEPONENT:   I believe so.

8  BY MR. BUTLER:

9       Q.    You and your supervisor, Russell Horne, were

10 reminded of Mary Laseter's age, condition, and circumstances

11 after observing her around the time of the mediation in the

12 Mills versus Laseter case in October of 2022?

13            MS. KIDD:   Object to the form.

14            THE DEPONENT:   Ask -- I'm sorry.   What was the

15 question regarding her again?

16 BY MR. BUTLER:

L,
MIL

17       Q.    You and your supervisor, Russell Horne, were

18 reminded of Mary Laseter's age, condition, and circumstances

19 after observing her in October 2022, around the time of the

20 mediation in this case?

21            MS. KIDD:   Object to the form.

22            THE DEPONENT:   Yes.   As far as her age.   Her

23 condition, I'm not aware of.

24 BY MR. BUTLER:

25       Q.    At that point, in October of 2022, State Farm made

1    decision not to raise its $7,000 offer until or unless the

2    plaintiff first came below Laseter's $25,000 policy limits

3                MS. KIDD:    Object to --

4    BY MR. BUTLER:

5        Q.    -- correct?

6                MS. KIDD:    -- the form.

7                THE DEPONENT:    I'm not sure.

8    BY MR. BUTLER:

9        Q.    Okay.    If that's been the testimony in the case

10    that's what's documented in the claims file, do you have any

11    reason to dispute that?

12        A.    No.

13        Q.    At that time -- strike that. At the time of that

14    decision State Farm knew that Amber Mills was going to be

15    prevailing party and that Mary Laseter would be legally

16    responsible for Mills' taxable costs; didn't they?

17                MS. KIDD:    Object to the form.

18                THE DEPONENT:    No.    Not necessarily because, I

19    we hadn't gone to trial yet.

20    BY MR. BUTLER:

21        Q.    Based on the order granting summary judgment as to

22    fault and based on the evidence in the case didn't State

23    know at that point that Amber Mills was going to be the

24    prevailing party and as such Mary Laseter would be

25    for Mills' prevailing party costs or taxable costs?

R, 403

R, 403, L, MIL, AR

NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

**R, 403, L, MIL, AR**

1          MS. KIDD:  Object to the form.

2          THE DEPONENT:  I mean, I wouldn't be able to

3   that.

4   BY MR. BUTLER:

5          Q.    Why can't you answer that?

6          A.    I mean, I wouldn't know who the prevailing party

7   until the -- the trial was actually conducted.

8          Q.    Well --

9          A.    I mean, in this case, you could assume --

10         Q.    -- I guess, as a --

11         A.    -- but you can't --

12         Q.    -- matter of --

13         A.    -- really assume.

14         Q.    -- absolutely 100 percent certainty, but based

15   plus percent certainty --

16         MS. KIDD:  Object to the form.

17   BY MR. BUTLER:

**R, 403, A&A**

18         Q.    -- what -- strike that. At that point in time what

19   was your assessment as to the percentages of the plaintiff

20   being the prevailing party in the case of Mills versus

21         A.    I mean, I -- I wouldn't be able to answer that

22   truthfully without knowing a hundred percent until we

23   went to trial and they advised that she was the prevailing

24   party.

25         Q.    At that point in time there was absolutely no



**R,
403,
A&A**

1  question about fault or liability in a legal sense --

2      A.    Mm-hmm.

3      Q.    -- correct?

4          MS. KIDD:  Object to the form.

5          THE DEPONENT:  There was no question as far as

6  liability, you're asking?

7  BY MR. BUTLER:

8      Q.    No.  I'm saying there was no question --

9      A.    Mm-hmm.

10      Q.    -- as far as fault or liability was concerned at

11  point in time as the judge had entered a summary judgment as

12  that issue, true?

13      A.    That is true.

14          MS. KIDD:  Object to the form.

15          THE DEPONENT:  That is true.

16  BY MR. BUTLER:

**R,
403,
AR,
L**

17      Q.    And was it your position that maybe the plaintiff

18  wasn't injured at all and wasn't going to recover anything

19  this case and thus not be the prevailing party?

20      A.    I mean, I wouldn't be able to predict what a jury

21  would decide, so that's why I -- I wouldn't be able to

22  that question to say, yes, you would be a hundred percent

23  prevailing party.

24      Q.    And your opinion or approach was that until you

25  100 percent certain after a jury verdict --



NAEGELI
DEPOSITION & TRIAL

(800) 528-3335
NAEGELIUSA.COM

R,
403,
AR,
L

1        A.    Mm-hmm.

2        Q.    -- the reasonable value of this claim was $7,000.

3              MS. KIDD:  Object --

4    BY MR. BUTLER:

5        Q.    Correct?

6              MS. KIDD:  -- to the form.

7              THE DEPONENT:  Assumably, yes.  I mean, there

8    be more value to it potentially.  But again, that was

9    this case, for the jury to, kind of decide that.

10   BY MR. BUTLER:

L, LC
11       Q.    At the time that those decisions were being made

12   State Farm knew that Laseter would be responsible for Mills'

13   future medical expenses established by the greater weight of

14   the evidence regardless of any permanent injury, true?

15             MS. KIDD:  Object to the form.

16             THE DEPONENT:  Yes.

17   BY MR. BUTLER:

18       Q.    And the lifecare planner expert hired by State

19   put those future medical expenses at about $174,000.

20             MS. KIDD:  Object to the form.

21   BY MR. BUTLER:

22       Q.    Correct?

23       A.    I don't recall the exact number, but that's

24   probably accurate, around that number.

25       Q.    Did you and Russell Horne discuss with the defense

1  counsel chosen by State Farm things like what witnesses to

2  and if so, whether to call them live or by video.  Those

3  of things?

4       A.   I -- that wasn't discussed between Russell and I.

5       Q.   Do you know if Russell Horne had discussion of

6  general type with the defense counsel --

7       A.   I'm not --

8       Q.   -- chosen to defend this case?

9       A.   I'm not sure.

10      Q.   Well, that --

11      A.   Not to my knowledge, I should say.

12      Q.   Isn't that one of the typical things that you or

13 someone in his position at State Farm would do with defense

14 counsel?  Talk about those kinds of strategic decisions?

15      A.   As far as, like choosing them and them actually

16 coming to a trial in person, you're asking?

17      Q.   Discussing which witnesses to call to testify and

18 then discuss, you know, the logistics or best way to present

19 that testimony?

20      A.   They do have that discussion.  I did not have that

21 with defense counsel.

22      Q.   State Farm notified Mary Laseter of their request

23 that she attend the five-day trial in person?

24           MS. KIDD:   Object to the form.

25           THE DEPONENT:   I think she was given the option

R, 403, S



R,
403,
S

1    whether she wanted to attend or not, but I'm not -- I'm not

2    sure.  I -- I didn't have that discussion with them as far

3    if they were going to make her attend or not.

4              (WHEREUPON, Exhibit 24 was marked for

5    identification.)

6    BY MR. BUTLER:

R,
403,
S

7         Q.    I'm showing you Plaintiff's composite Exhibit 24,

8    just take a look at that.  Can you see now that Mary Laseter

9    was requested to attend the trial in this case?  In fact,

10   was told to be at the courthouse by 8:15 a.m., and that it

11   indicated that she was going to be prepped to testify

12   the accident --

13              MS. KIDD:  Object to the form.

14              THE DEPONENT:  It does note --

15   BY MR. BUTLER:

16        Q.    -- in this case?

17        A.    It does note that here, yes.  I see that.

18        Q.    State Farm's policy for Mary Laseter included a

19   supplemental payments provision that in addition to the

20   policy's liability coverage they would pay court costs that

21   were incurred by her at their request?

22              MS. KIDD:  Object to the form.

23              THE DEPONENT:  Yes.  We did pay her court costs.

24   BY MR. BUTLER:

25        Q.    Did State Farm ever offer any financial



1    **towards the payments of costs to Amber Mills in settlement**

2    **negotiation in this case?**

3                    **MS. KIDD:**  Object to the form.

4                    **THE DEPONENT:**  Not that I'm aware of.

5    BY MR. BUTLER:

6        Q.   Do you recall State Farm's own assessment that the

7    likely verdict in the Mills versus Laseter case would

8    $100,000 and $800,000 exclusive of costs?

9                    MS. KIDD:  Object to the form.

10                   THE DEPONENT:  Okay.  I'm sorry.  Can you ask that

11   again?  That question.

12   BY MR. BUTLER:

S, L, AR

13       Q.   **Were you aware that State Farm's own evaluation**

14   **to trial --**

15       A.   Mm-hmm.

16       Q.   **-- in this case was that a likely verdict would be**

17   **between $100,000 and $800,000 exclusive of costs?**

MIL, R, 403

18                   **MS. KIDD:**  Object to the form.

19                   **THE DEPONENT:**  I was not aware of that, no.

20   **BY MR. BUTLER:**

21       Q.   **You never saw any evaluation with those figures in**

22   **it?**

23       A.   No.  I mean, I -- I might have.  I just can't

24   right now.

25       Q.   **Did you and Russell Horne monitor the trial of**



MIL, R, 403

1    **case?**

2        A.    I mean, I was still the adjustor at the time.    I

3    don't know what you mean -- I don't know what you mean by

4    "monitor" as far as the extent.    I mean I was still

5    correspondence that was related to the file as things were

6    moving along. But as far as -- what do you mean by

7    "monitoring?"    I don't know what you mean by that

8        Q.    **Were you or Russell Horne in communication with**

9    **defense counsel and other folks during the course of the**

10   **of Mills versus Laseter?**

11       A.    Yes.

S, AR, A&A

12       Q.    **And you're saying that you didn't receive, or at**

13   **least you don't recall ever receiving any type of evaluation**

14   **anyone at State Farm or State Farm's chosen defense**

15   **this case indicating that a likely verdict would fall within**

16   **the range of $100 to 800,000 exclusive of costs?**

17           **MS. KIDD:**    Object to the form.

18           **THE DEPONENT:**    I mean, it's possible I did because

19   know that they did do -- I think you guys had your own

20   like you mentioned before, planner and we did as well. So

21   if I recall there was probably some documentation with that

22   evaluation if this is granted that, yes, she, you know,

23   going to need this lifecare plan or future treatment, things

24   that nature.    Moving forward this could be the outcome.    But

25   -- I don't recall exactly a hundred percent what those



NAEGELI DEPOSITION & TRIAL    (800)528-3335    NAEGELIUSA.COM

S,
AR,
A&A

1    were.

MIL,
L

2         Q.    The first time that State Farm offered it's

3    policy limits with no consideration of taxable costs was

4    December 1st, 2022, correct?

5              MS. KIDD:   Object to the form.

6              THE DEPONENT:   Yes.   I believe so.

7    BY MR. BUTLER:

L

8         Q.    For several months before that defense counsel

9    had been chosen by State Farm had recommended that they

10   their $25,000 policy limits, true?

11             MS. KIDD:   Object to the form.

12             THE DEPONENT:   I believe they did.

13   BY MR. BUTLER:

14        Q.    Based on your knowledge the evidence presented at

15   trial related to the same injuries that were discussed in

16   plaintiff's demand package?

17             MS. KIDD:   Object to the form.

18             THE DEPONENT:   You're saying, were they the same

19   injuries presented at trial?

20   BY MR. BUTLER:

21        Q.    Yeah.   I'm asking --

22        A.    Yeah.

R,
403

23        Q.    -- you, based on your knowledge, were the injuries

24   claimed at the trial in this case the same injuries that had

25   been claimed in that demand package?

R

1      A.    Yes.

2      Q.    And the same physicians and the same evidence were

3  presented at trial that had been included in the prior

4  package?

5      A.    As far --

6           MS. KIDD:   Object to the form.

7           THE DEPONENT:   -- as my knowledge, yes.

8  BY MR. BUTLER:

9      Q.    You were aware that after the evidence was

10  at trial by both sides that The Court entered a directed

11  verdict as to the C6-7 injury being permanent?

12           MS. KIDD:   Object to the form.

13           THE DEPONENT:   A permanent aggravation to a

14  preexisting injury.   To my knowledge.

15  BY MR. BUTLER:

16      Q.    The Court has determined and now instructs you

17  the C6-7 injury to Ms. Mills is permanent. Was that your

18  understanding as to what happened at the conclusion of all

19  the evidence presented by both sides in the case of Mills

20  versus Laseter?

21      A.    Yes.

22           MS. KIDD:   Object to the form.

23           THE DEPONENT:   Yes.

24           (WHEREUPON, Exhibit 25 was marked for

25  identification.)

BY MR. BUTLER:

R,
403

Q.   I'm just handing you that to confirm that

Exhibit 25 is what you understood to be what occurred in

case?

A.   Yes.

           (WHEREUPON, Exhibit 26 was marked for

identification.)

BY MR. BUTLER:

Q.   I'm showing you, what's been marked as Plaintiff's

composite Exhibit 26.   As of August 29th, 2022, State Farm's

chosen defense counsel had recommended that State Farm

it's $25,000 policy limits, correct?

           MS. KIDD:   Object to the form.

           THE DEPONENT:   Yes.

BY MR. BUTLER:

S

Q.   And that recommendation from the Cole Scott &

firm that was chosen by State Farm to represent Mary

they did not copy Mary Laseter on that correspondence that

sent to State Farm in this case, correct?

           MS. KIDD:   Object to the form.

           THE DEPONENT:   I don't see it on this particular

letter.

BY MR. BUTLER:

Q.   Now, in that same package is some emails that

Laseter sent to State Farm --



```
 1              MS. KIDD:  Object to the form.

 2   BY MR. BUTLER:

 3        Q.    -- on October 24th, 2022.

 4        A.    Which one?  I'm sorry.  Are you looking at?

 5        Q.    It's in this --

 6        A.    This - okay.  This one?

 7        Q.    -- package.

 8        A.    Right here.

 9        Q.    It's -- it's -- they should probably be

10   --

11        A.    This one.

12        Q.    -- we'll call that 26.  And beginning with the

13   October 24th, 2022, email from Scott Laseter, we'll make

14   composite Exhibit 27.

15              (WHEREUPON, Exhibit 27 was marked for

16   identification.)

17   BY MR. BUTLER:

18        Q.    And it looks like that's three pages?

19        A.    Yes.

20        Q.    Did you and Russell Horne receive an email on

21   24th, 2022, from Scott Laseter?

22        A.    That is my email address, yes.

23        Q.    And Scott Laseter is the adult son of Mary

24   who I think you said you, kind of dealt with in matters

25   pertaining to this case?
```

1        A.     Yes.

2        Q.     And in that first email of 10/24/22 at 6:13 p.m.

3    he indicate that State Farm declined to authorize any new

4    unless the plaintiff first agreed to negotiate at a level

5    the $25,000 per occurrence limit on the State Farm policy?

6        MS. KIDD:    Object to the form.

7        THE DEPONENT:    That is what it states.

8    BY MR. BUTLER:

9        Q.     Does that refresh your recollection at least

10   that that was State Farm's position?

11       A.     At that time, yes.

12       Q.     And in that same email he said what, as we've

13   highlighted on that?

14       A.     My mother continues to have no choice but to

15   State Farm's superior knowledge and experience in deciding

16   it wishes to negotiate with the plaintiffs.   However, we

17   expressly -- we express -- we expressly demand that State

18   protect my mother from any judgment in excess of the policy

19   limits.

20       Q.     And the last part of that highlighted email says

21   what?

22       A.     Alternately, State Farm can simply acknowledge

23   it will protect my mother from any excess judgment that may

24   result from the insurer's decision to press the defense to

25   trial despite the evulations -- evaluations of counsel.

MIL,
R,
403



NAEGELI
DEPOSITION & TRIAL
(800)528-3335
NAEGELIUSA.COM

1    Q.    Let -- let me make sure that we got that last part

2  right.   The -- the -- where it's underlined.

3    A.    Yes.

4    Q.    Can you read that again?

5    A.    That may result from the insurer's decision to

6  the defense to trial despite the evaluations of counsel. Oh,

7  these are separate.   Here's this.

8         (WHEREUPON, Exhibit 28 was marked for

9  identification.)

10  BY MR. BUTLER:

11    Q.    I'm showing you Plaintiff's Exhibit 28, which is

12  email dated February 14th, 2023, at 1:36 p.m.   Who is this

13  email from?

14    A.    It says, Sonya B. Johnson.

15    Q.    And according to her email address who is she?

16    A.    She is a hybrid injury field assignment adjuster.

17    Q.    For who?

18    A.    State Farm Insurance Companies.

19    Q.    And this email is sent to who?

20    A.    This was sent to myself and Russell.

21    Q.    And what is the subject matter?

22    A.    It says, Trial Summary, Day 2, in the morning.

23    Q.    And what does she note happened that morning in

24  at 12:06 p.m.?

25    A.    At 12:06 p.m.:   Plaintiff played 17-minute

R,
403,
MIL



R,
403,
MIL

1  deposition of Defendant, Mary Laseter, presented as a fair

2  witness.  Appeared a little confused at times.  May have

3  elicited some sympathy as she was elder and very frail. Do

4  you want me to finish?  Jurors paid attention and alternate

5  juror was seen taking notes.

R,
403,
LC, L

6        Q.    Are you personally familiar with a Florida

7  form and statute referred to as a Civil Remedies Notice or

8  N for short?

9        A.    Yes.  I've -- I've seen them before, yes.

10        Q.    That particular form, protocol, and statute is

11  limited just to Florida as opposed to other states where

12  Farm issues auto liability policies, correct?

13            MS. KIDD:  Object to the form.

14            THE DEPONENT:  From my knowledge, yes.

15  BY MR. BUTLER:

16        Q.    The Civil Remedies Notice is a particular form and

17  protocol through the Florida Department of Insurance whereby

18  Florida insured like Mary Laseter can complete and submit it

19  the department and their auto liability carrier, putting

20  both on formal written notice of circumstances where an

21  believes their insurance carrier is not living up to its

22  faith obligations, true?

23            MS. KIDD:  Object to the form.

24            THE DEPONENT:  Yes.  That it -- yes.

25  BY MR. BUTLER:

R,
403,
LC, L

1          Q.    And the filing of a CRN triggers certain

2    responsibilities and obligations on the part of the auto

3    liability carrier, true?

4              MS. KIDD:   Object to the form.

5              THE DEPONENT:   Yes.

6    BY MR. BUTLER:

7          Q.    Based on your training and experience as a Florida

8    auto injury liability insurance adjuster what percentage of

9    Florida insured would you perceive to have any familiarity

10   CRNs?

11         A.    I would not know.   I don't know.

12         Q.    What would be your expectation in that regard

13   can --

14         A.    Are you -- are you saying from, like a first-party

15   stance or, I guess, because I don't handle a ton of CRNs.  I

16   get them occasionally from third party, but mainly from

17   party, I believe.

18         Q.    Well, my question to you has to do with State Farm

19   insureds.

20         A.    Mm-hmm.

R,
403

21         Q.    And so my question to you is, is that what

22   of State Farm insureds are knowledgeable about the civil

23   notice statute and forms?

24              MS. KIDD:   Object to the form.

25   BY MR. BUTLER:

R,
403

1      Q.      Based on --

2      A.      I would --

3      Q.      -- your --

4      A.      -- say a low percentage.

5      Q.      -- long experience.   I'm sorry?

6      A.      I would say probably a low percentage.

7      Q.      Did you or anyone else at State Farm ever advise

8   State Farm's insured, Mary Laseter, of the exitance of

9   statute, protocol, or form at any point during this claim up

10  entry of the final judgments against her?

11     A.      I personally have no knowledge of that.

12     Q.      You didn't do that, did you?

13     A.      I did not.

14     Q.      To your knowledge did anyone else at State Farm

15  send her a letter or otherwise advise her about the

16  of that CRN statute and form and those things?

17     A.      I would have to review -- review the file to see

18  they did.  I'm not sure.

19     Q.      If the file --

20     A.      I don't recall.

21     Q.      If the file doesn't reflect that anybody ever

22  mentioned any such thing, would you have any reason to

23  with that?

24     A.      No.

25     Q.      And that remained the case even after Mary

1   through her son, advised State Farm in writing that their

2   continued failure to settle the case was putting her at

3   significant financial risk?

4            MS. KIDD:  Object to the form.

5            THE DEPONENT:  Ask the question again.  I'm sorry.

6   BY MR. BUTLER:

R, 403, MIL, L, S

7        Q.   That failure to advise them about the CRN

8   form, and protocol, that continued to be the case even after

9   Mary Laseter, through her adult son, Scott Laseter, advised

10  State Farm in writing that State Farm's failure to settle

11  case was putting her at significant financial risk, correct?

12           MS. KIDD:  Object to the form.

13           THE DEPONENT:  I mean, I -- again, I don't know if

14  that was ever a discussion with the family or not.  It -- it

15  BY MR. BUTLER:

16       Q.   Well, as far as you know it wasn't.

17       A.   As far as I personally know, no.

18       Q.   To be fair, you were the primary claims specialist

19  this case, correct?

20           MS. KIDD:  Object to the form.

21           THE DEPONENT:  Yes.

22  BY MR. BUTLER:

23       Q.   You -- strike that. Do you think that you or

24  Horne had more interaction with Mary Laseter, or her son,

25  Laseter?

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

```
 1        A.    Yes.  With Scott.

 2        Q.    I'm asking you --

 3        A.    We had --

 4        Q.    -- between you and Russell Horne who had the most

 5   interaction with either Mary Laseter or Scott Laseter?

 6        A.    Probably both of us.  I mean, me more so at the

 7   beginning and probably equal parts towards the litigation.
```

R,
403

```
 8        Q.    Did you ever see any letter from Russell Horne

 9   Laseters about the civil remedy notice provision, statute,

10   form, or anything related to it?

11        A.    Not to my knowledge.

12        Q.    Did you ever hear Russell Horne verbally advise

13   regarding the existence of the CRN statute form, protocol,

14   anything regarding it?

15        A.    I personally did not.
```

R,
403,
MIL,
L, AR

```
16        Q.    And that -- strike that. And that continued and

17   State Farm maintained that same settlement posture knowing

18   Amber Mills' taxable costs were continuing to rise in this

19   litigation, true?

20              MS. KIDD:  Object to the form.

21              THE DEPONENT:  I mean, our offer remained 7,000,

22   that's what you're asking, yes.

23   BY MR. BUTLER:

24        Q.    And throughout that time that you maintained that

25   $7,000 offer --
```



R,
403,
MIL,
L, AR

1    A.    Mm-hmm.

2    Q.    -- you knew that Amber Mills' litigation expenses

3    were continuing to rise; didn't you?

4         MS. KIDD:    Object to the form.

5         THE DEPONENT:    Yes.

6    BY MR. BUTLER:

7    Q.    And you previously told us that there was never

8    financial consideration offered pursuant to that

9    benefits provision related to prevailing party costs in this

10   case, right?

11        MS. KIDD:    Object to the form.

12        THE DEPONENT:    Correct.

13   BY MR. BUTLER:

R,
403

14   Q.    And at no time when all of that was going on, at

15   least as far as you know, nobody was telling the Laseters

16   anything about the CRN statute, form, and protocol?

17   A.    Not to my knowledge.

R,
403,
MIL

18   Q.    Did you or anyone else at State Farm, to your

19   knowledge ever advise Mary Laseter that her policy had a

20   supplemental benefits provision covering taxable costs in

21   addition to her bodily injury liability limits?

22   A.    Not to my -- I personally did not.  And not to my

23   knowledge. How can you find the time --

24   Q.    Do you ever recall a case in which the defense

25   attorneys chosen by State Farm ever notified a State Farm

1  insured about the CRN statute, form, and protocol?

2          MS. KIDD:  Object to the form.

3          THE DEPONENT:  I'm sorry.  So are you asking if

4  defense counsel?  Yes.  Yes.  That's something that they

5  --

6  BY MR. BUTLER:

7      Q.   No.  I'm asking you, to your knowledge --

8      A.   Oh.

9      Q.   -- have you ever seen a claim --

10     A.   Okay.

11     Q.   -- where defense counsel chosen by State Farm

12  notified State Farm's insured that they were defending about

13  the existence of the CRN statute and form?

14     A.   I mean, I wouldn't -- I'm not sure.

R, 403, A&A, AR

15     Q.   Can you think of even one other Florida auto

16  liability claim that you were involved in during the 2021,

17  timeframe where State Farm advised any insured about the

18  existence of that CRN statute, protocol, or form?

19          MS. KIDD:  Object to the form.

20          THE DEPONENT:  I mean, not to my knowledge.

21  BY MR. BUTLER:

22     Q.   We're going to pull up something on the screen

23  It's, I think Bates Number 652 to 661.  You'll have to

24  because I don't see it.  You have to --

25          MS. KIDD:  It is up now.



1          MR. BUTLER:  All right.

2          THE DEPONENT:  Defense trial analysis form.

3          MR. BUTLER:  Let me see what it is first.

4          MS. KIDD:  Yes.

5          THE DEPONENT:  Okay.

6          MR. BUTLER:  That's great.  But you're going to

7   to make it a little bigger.

8          THE VIDEOGRAPHER:  A little bigger?

9          MR. BUTLER:  Yeah.  For reading.  That's --

10         THE VIDEOGRAPHER:  He can form it up.

11         MR. BUTLER:  -- for each of them.

12         THE VIDEOGRAPHER:  He can blow it up.

13         MS. KIDD:  Are you going to be okay if I move the

14  screen a little bit closer to her?  It's going to be in the

15  frame, but she won't be able to --

16         MR. BUTLER:  Put it -- yeah.

17         MS. KIDD:  Okay.

18         MR. BUTLER:  To the --

19         THE VIDEOGRAPHER:  It won't be --

20         MR. BUTLER:  -- outside.

21         THE VIDEOGRAPHER:  -- time.  Yeah.  I've got it.

22         THE DEPONENT:  I can see it right now.

23         MS. KIDD:  You can see.  Okay.

24         THE DEPONENT:  If -- if I have questions, I'll let

25  you know.

1            MS. KIDD:  Okay.

2            THE REPORTER:  Is this getting marked?

3            MR. BUTLER:  What's that?

4            THE REPORTER:  Is it getting marked?

5            MR. BUTLER:  I'll mark it --

6            THE REPORTER:  Okay.

7            MR. BUTLER:  -- after the fact.

8    BY MR. BUTLER:

**R, 403**

9        Q.    All right.  We're looking on the screen at a

10   11th, 2023, letter that says up at the top: Attorney-Client

11   Privilege Communication. Do you see that?

12       A.    Yes.

13       Q.    And who is that letter from and who is that letter

14   to?

15       A.    It's addressed to me.

16            MR. BUTLER:  If we can pull it down.  There we go.

17   BY MR. BUTLER:

18       Q.    Who is it from?

19       A.    Oh, CSK, Cole Scott & Kissane.

20       Q.    And Cole Scott & Kissane is the defense

21   think that you said that you had chosen to defend this

22       A.    Yes.

23       Q.    And this is being sent via email to who?

24       A.    State Farm claims.

25       Q.    And specifically to you at State Farm claims?



R, 403

1      A.    Yes.

2      Q.    All right.  And this is a letter that has within

3  pretrial analysis, and plan.

4      A.    Yes.

5      Q.    And let's go to the end of this letter because I'm

6  curious.  I want to see if this attorney-client privileged

7  document being sent to you is copied to Mary Laseter or her

8  representative.  And the answer to that is what?

9           MS. KIDD:  Object to the form.

10          THE DEPONENT:  No.  Not this particular document.

11  BY MR. BUTLER:

12     Q.    All right.  And this particular document is

13  that State Farm requires of its chosen defense counsel in

14  accordance with its State Farm defense attorney manual in

15  cases?

16     A.    That they send us a pretrial report analysis, yes.

17     Q.    All right.  And let's look at the item on the

18  that's at the Bates numbered Page 661.  Do you see that?

19     A.    Yes.

20     Q.    And what does it say beginning with the Number 1,

21  down there?

22     A.    Assuming the case is tried and lost what is the

23  highest potential verdict amount?  And the highest potential

24  verdict amount may likely be approximately 815,000.  Am I

25  reading that right?

R,
403

1      Q.    And what does the Number 2 say?

2      A.    What is the realistic range of possible verdicts?

3    The realistic range of possible verdicts is between 100 and

4    815,000.    This, of course, is dependent on the future

5    and pain and suffering a jury decides to award.

6      Q.    Now, did -- did that comport with State Farm's own

7    internal beliefs regarding the likely range of verdicts?

8      A.    I -- I'm not -- I mean, I -- I don't know if it

9    or not.

10     Q.    It doesn't indicate anywhere in there that zero is

11   realistic verdict under the circumstances, does it?

12     A.    It does not in this letter.

13     Q.    And do I understand that you're not aware of any

14   State Farm document that reflects those same figures, that

15   realistic or likely verdict would be between approximately

16   $100,000 and $815,000 exclusive of costs?

17     A.    I -- I'm not understanding the question.  I'm

18     Q.    Do you now recall this letter?

19     A.    Yes.  I have seen this.  Yes.

20     Q.    Does this jog your memory a bit about whether, you

21   know, you had ever received --

22     A.    Yes.

23     Q.    -- any analysis of likely jury verdicts --

24     A.    Yes.

25     Q.    -- under the circumstances?  And so my question

1  is have you seen any other documents or letters of State

2  that likewise reflect this same kind of verdict range?

3        A.   I mean, not -- not that I can recall at this

4            MR. BUTLER:   Okay.   We'll attach that as our next,

5  which I think is Exhibit 29.

6            (WHEREUPON, Exhibit 29 was marked for

7  identification.)

8  BY MR. BUTLER:

9        Q.   Given Ms. Laseter's age, condition, being

10 as, quote, "very frail," unquote, what, if any, effect did

11 expect the trial and all of its attendance circumstances to

12 have on a 90, 91-year-old individual from a physical,

13 emotional, and anxiety perspective?

14           MS. KIDD:   Object to the form.

15           THE DEPONENT:   I mean, I wouldn't be able to

16 answer that.   I mean, I don't know how she felt about going,

17 her condition when she was there.   I -- I'm not sure. But, I

18 mean, being elderly I'm -- I'm sure it wasn't comfortable,

19 I mean, I -- I don't -- I mean, it's hard for me to speak on

20 how she truly felt about it.

21 BY MR. BUTLER:

22       Q.   Did Mary Laseter know when she was going to court

23 that she and she alone was going to be on that verdict and

24 final judgment for whatever monetary amount between $100 and

25 800,000 that the jury assessed these losses at?

1          MS. KIDD:  Object to the form.

2          THE DEPONENT:  What -- can you ask the question

3   again.  Sorry.

4   BY MR. BUTLER:

R, 403, S

5          Q.    Was Mary Laseter aware before going to trial that

6   State Farm's perspective was that she, Mary Laseter, was

7   to be financially responsible for whatever that verdict

8   out to be?

9          MS. KIDD:  Object to the form.

10         THE DEPONENT:  I'm not sure.

R, 403, L

11   BY MR. BUTLER:

12         Q.    Didn't you, having received word that the likely

13   verdict was to be between $100 and 815,000, exclusive of

14   send out a note to make sure that defense counsel made your

15   insured aware that --

16         A.    That is usually --

17         Q.    -- she was going to be responsible for any excess

18   verdict?

19         A.    That is usually the case.  Yes.  They're usually

20   aware from our defense counsel.  But I can't say for sure

21   they did make her aware.

22         Q.    But you directed them to after seeing defense

23   counsel's pre-trial report we just looked at saying that a

24   likely verdict is between $100 and 815,000 exclusive of

25   true?

R,
403,
L

1              MS. KIDD:  Object to the form.

2              THE DEPONENT:  Yes.  I mean, I -- I can't say that

3    they for sure provided that information, but in cases, yes,

4    they're directed to keep the insured informed as well.

5    BY MR. BUTLER:

R,
403,
MIL

6         Q.    Have you, yourself, ever attended or been a

7    a five full-day trial?

8         A.    Personally, no.

9         Q.    I mean, you -- are you generally aware that

10   considered to be pretty grueling, particularly for the

11   participants?

12             MS. KIDD:  Object to the form.

13             THE DEPONENT:  It -- I'm assuming they could be

14   depending on the situation.

15   BY MR. BUTLER:

16        Q.    High stress?

17        A.    Yeah.

18        Q.    High anxiety?

19             MS. KIDD:  Object to the form.

20             THE DEPONENT:  It's possible.

21             MS. KIDD:  Let me know when you're at a good point

22   for a break.  We've been going an hour and a half probably.

23             MR. BUTLER:  Yeah.  I'll get to one and then we'll

24   try to fold up.

25   BY MR. BUTLER:



```
 1        Q.    What, if any, reaction did you anticipate State
 2   Farm's elderly insurer, Mary Laseter, would have upon
 3   verdict of nearly a quarter of a million dollars exclusive
 4   court costs against her personally?
 5             MS. KIDD:  Object to the form.
 6             THE DEPONENT:  I'm sorry.  Ask the question again.
 7   BY MR. BUTLER:
 8        Q.    I'm asking what, if any, reaction did you
 9   Mary Laseter having upon hearing a verdict of what was
10   quarter of a million dollars, but whatever, between $100 and
11   815,000 --
12        A.    Right.
13        Q.    -- against her personally?
14             MS. KIDD:  Object to the form.
15             THE DEPONENT:  I mean, I -- I -- I guess, I didn't
16   think about it at -- at the time.  I mean, I -- it's -- it's
17   hard to answer because I don't know how she would react.
18   BY MR. BUTLER:
19        Q.    Scared?
20             MS. KIDD:  Object to the form.
21             THE DEPONENT:  It -- possible.
22   BY MR. BUTLER:
23        Q.    Frightened?
24             MS. KIDD:  Object to --
25             THE DEPONENT:  Worried.
```

NAEGELI
DEPOSITION & TRIAL

(800)528-3335
NAEGELIUSA.COM

1          MS. KIDD:  -- the form.

2          THE DEPONENT:  I mean, possible.

3   BY MR. BUTLER:

4       Q.   Anxious?

5          MS. KIDD:  Object to the form.

6          MR. BUTLER:  Let's take a little break and I'll

7   through my notes and --

8          MS. KIDD:  Okay.

9          THE DEPONENT:  Okay.

10          THE VIDEOGRAPHER:  We're off the video record.

11   time is 5:03.

12             (WHEREUPON, a recess was taken.)

13          THE VIDEOGRAPHER:  We're on the video record.  The

14   time is 5:09.

15          MS. KIDD:  Oh, is it -- oh, that's the old one,

16   right?  Okay.  Sorry.

17          THE DEPONENT:  Yeah.

18             (WHEREUPON, Exhibit 30 was marked for

19   identification.)

20   BY MR. BUTLER:

21       Q.   I'm showing you Plaintiff's composite Exhibit 30

22   are some items from CSK, or the Cole Scott & Kissane firm

23   defended this case. Earlier I think you said that you either

24   chose or -- or helped choose them as defense counsel --

25       A.   Mm-hmm.

R,
403



R,
403

1        Q.        -- in the Mills versus Laseter case.

2        A.        Yes.

3        Q.        Correct?

4        A.        Yes.

5                  MS. KIDD:   Object to the form.

6    BY MR. BUTLER:

7        Q.        They are one of State Farm's go-to outside defense

8    firms in Florida?

9                  MS. KIDD:   Object to the form.

10                 THE DEPONENT:   Correct.

11   BY MR. BUTLER:

12       Q.        And does the information in front of you, do you

13   of recognize it from their website about who they are and

14   type of work they do and who they represent; that kind of

15   thing?

16       A.        Yes.

17       Q.        And did you see in those materials, towards the

18   there, where they were talking about this $247,000 and

19   verdict exclusive of costs and the fact that that was a

20   result and that it was a reduced verdict?

21                 MS. KIDD:   Object to the form.

22                 THE DEPONENT:   I mean this is the first time I've

23   seen this, so I was not aware of this before, no.

24   BY MR. BUTLER:

25       Q.        Okay.  But you do see there where they were

R,
403

1   about that given the evidence in the case and so forth that

2   this was a very favorable verdict to the defendant and was a

3   reduced verdict as they saw it?

4              MS. KIDD:   Object to the form.

5              THE DEPONENT:   I do read that here, yes.

6   BY MR. BUTLER:

7        Q.   We saw the pretrial analysis report to State Farm

8   from Cole Scott & Kissane.   Is there also such thing as a

9   trial analysis report that again is required of defense

10  pursuant to the State Farm defense attorneys' policy manual?

11       A.   We do typically get a post-trial report, yes.

12       Q.   And do you recognize that as coming from the post-

13  trial report in the Mills versus Laseter case?

14       A.   Yes.

15       Q.   And what does the highlighted portion of that item

16  state?

17       A.   So we're on this page?

18       Q.   Is that --

19       A.   Or --

20       Q.   -- Page 2?

21       A.   Yes.

22       Q.   Why don't you hold up --

23       A.   Yes, it's Page 2.

24       Q.   Hold up Page 1 so we --

25       A.   Okay.



R,
403

1          Q.    -- know exactly what you're looking at.   Okay.

2    go to the second page and tell us what it says.

3          A.    Oh.   The jury deliberated for a few hours and

4    returned a verdict of $245,782.   Settlement options, the

5    verdict is in excess of $25,000 policy limits of Defendant.

6    would recommend State Farm pay the verdict.   This would

7    the plaintiff from proceeding with any bad faith lawsuit

8    against State Farm.

9                MR. BUTLER:  I'm just checking my notes so just

10   with me, please.

11               MS. KIDD:  Is that marked as 31?

12               THE DEPONENT:  Yes.

13               (WHEREUPON, Exhibit 31 was marked for

14   identification.)

15               MR. BUTLER:  What's that?  Is that Number 31?

16   That's all I have.  Thank you.

17               MS. KIDD:  All right.  I don't have any questions.

18   just need to lodge some objections for the record,

19   to the exhibits. I object to Exhibit 2.

20               MR. BUTLER:  I don't think we -- well, I mean --

21               MS. KIDD:  Well --

22               MR. BUTLER:  -- you can do whatever you want to.

23               MS. KIDD:  Exhibit 3, Exhibit 4, Exhibit 5,

24   8, Exhibit 9, Exhibit 10, Exhibit 11, Exhibit 12.

25               MR. BUTLER:  And I want you to state your

1  on the record, please.

2          **MS. KIDD:**  Sure.

3          **MR. BUTLER:**  If you would.

4          **MS. KIDD:**  Exhibit 13, Exhibit 14, Exhibit 15,

5  Exhibit 16, Exhibit 17, Exhibit 20, Exhibit 21, Exhibit 22,

6  Exhibit 23, Exhibit 25, Exhibit 26, Exhibit 27, and

7  And the Exhibit 29, which I don't have a copy of.  That

8  I didn't have an object to Exhibit 29. I have an objection

9  Exhibit 30. And Exhibit 31 I've -- to the extent it's not

10 complete copy because I don't -- I can't -- I don't know

11 -- I think -- I can't -- I don't see it, I'll object on that

12 basis. I also object to the witness, to the extent this is

13 played --

14         **MR. BUTLER:**  What -- hang on.  Hang on.

15         **MS. KIDD:**  -- in front -- hold on.  To the

16         **MR. BUTLER:**  No.

17         **MS. KIDD:**  -- this is played in front --

18         **MR. BUTLER:**  State your --

19         **MS. KIDD:**  -- of a jury.

20         **MR. BUTLER:**  State your objections to --

21         **MS. KIDD:**  To the extent this is --

22         **MR. BUTLER:**  -- the earlier --

23         **MS. KIDD:**  -- played in front -- I will. To the

24 extent this --

25         **MR. BUTLER:**  All right.

1              **MS. KIDD:**  -- is played in front of a jury I

2     to the witness publishing any of the exhibits. And -- okay.

3     I don't have -- I said -- I withdraw the objection to

4     2. Exhibit 3, I -- I object -- I object to this composite

5     exhibit.  This is not evidence in the case.  There's no

6     authentication that this is correct.

7              **MR. BUTLER:**  So your objection was what?

8              **MS. KIDD:**  This is not evidence in the case.

9     no authentication that this is evidence in the case.  The

10    relevance.  Prejudicial. I don't have an objection to

11    4, I guess. Exhibit 5, this is prejudicial in regard to the

12    images. Exhibit 8, this appears to be a demonstrative

13    not evidence. Objection to Exhibit 9, again a demonstrative

14    exhibit, not evidence.  Not evidence this was the car

15    in the crash. I object to Exhibit 10, again this is a

16    demonstrative exhibit it appears.  Medical.  This is not an

17    expert witness to testify to the authenticity of any of

18    The same objection would be for Exhibit 11, in addition to

19    snippets of what it appears to come from, an article. Same

20    objection to Exhibit 12.

21              Also contains hearsay from other testimony.  It

22    like we've got incomplete portions of records contained

23    that composite exhibit. Same objection with regard to this

24    demonstrative exhibit for Exhibit 13.  No authentication.

25    Again, it's medical records. Exhibit 14, objection

1  work product, as it relates to other State Farm cases,

2  prejudicial. Same for Exhibit 15. Same for Exhibit 16.

3  17 no authentication here by this witness.  Not evidence

4  case. Exhibit 20, my objections would contain the -- where

5  Plaintiff has added circles as to things omitted, so this is

6  improperly commenting on the evidence in the case, so that

7  would be improper. Same would be for the same as to

8  as well.  We've got superimposed imaging.

9          Again, we've got incomplete records.  We also have

10  circles as to omissions. Object to Exhibit 22 as to the

11  demonstrative exhibit there. Exhibit 23, hearsay. Exhibit

12  hearsay. Exhibit 26, Plaintiff adding additional information

13  onto exhibits in this case.

14          **MR. BUTLER:**  Let me see what you're looking at

15  can --

16          **MS. KIDD:**  Exhibit 26.

17          **MR. BUTLER:**  Hang on.  No, let me see.

18          **MS. KIDD:**  Mary Laseter not cc'd --

19          **MR. BUTLER:**  Oh.

20          **MS. KIDD:**  -- about cases --

21          **MR. BUTLER:**  Exhibit 29.

22          **MS. KIDD:**  And then --

23          **MR. BUTLER:**  Yeah.  Okay.

24          **MS. KIDD:**  -- the addition to the underlying --

25  underlining of part of the correspondence. The Exhibit 27,

```
 1  is the addition to underlining the -- underlining the

 2  correspondence, also to the extent it calls for mediation

 3  communications. The same for Exhibit 28, the underlaying

 4  underlining of the correspondence adding to the exhibit.

 5  the objections.

 6              MR. BUTLER:  No questions?

 7              MS. KIDD:  No questions.

 8              MR. BUTLER:  All right.

 9              MS. KIDD:  And she'll read.

10              MR. BUTLER:  You want to instruct her on -- she'll

11              THE REPORTER:  Yes, sir.

12              MR. BUTLER:  -- need to --

13              THE REPORTER:  Would you like to order the

14  transcript for this?

15              MR. BUTLER:  Yes.

16              THE REPORTER:  Would you like a copy?

17              MS. KIDD:  Yes.

18              THE REPORTER:  And I do have the read and sign

19              MS. KIDD:  Okay.

20              MR. BUTLER:  And -- and I want to make sure that

21  gets that 30-day notice of that and everything so that

22  done timely.

23              THE REPORTER:  Okay.

24              MR. BUTLER:  We had another witness that said they

25  wanted to read and for six months they never did.
```

1              THE REPORTER:  Oh, no.  That definitely -- we will

2    make sure that it's -- it's not that. Okay.  Those are all

3    noted and I will definitely make a sure -- make a -- a

4    within 30 days for that read and sign.

5              MR. BUTLER:  Yeah.  That's what your letter

6    know, the --

7              THE REPORTER:  Yes.  Absolutely.

8              MR. BUTLER:  Got it.  Okay.  Thank you.

9              THE VIDEOGRAPHER:  We're off the video record.

10   time is 5:22.

11             (WHEREUPON, the deposition of ANGELA BUTLER was

12   concluded at 5:22 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

NAEGELI
DEPOSITION & TRIAL

CELEBRATING 40 YEARS IN BUSINESS

(800)528-3335
NAEGELIUSA.COM

```
 1                          CERTIFICATE

 2

 3          I, the undersigned, Brian James, am a

 4     videographer on behalf of NAEGELI Deposition & Trial. I

 5     do hereby certify that I have accurately made the video

 6     recording of the deposition of Angela Butler, in the

 7     above captioned matter on the 15th day of May, 2024,

 8     taken at the location of 545 K Avenue, Boardroom

 9     Plano, TX 75074.

10

11          No alterations, additions, or deletions were made

12     thereto.

13

14          I further certify that I am not related to any of

15     these parties in the matter and I have no financial

16     interest in the outcome of this matter.

17

18
                _____
19
                          Brian James
20

21

22

23

24

25
```

```
1                        CERTIFICATE

2

3        I, Barbara Molina, do hereby certify that I reported

4   all proceedings adduced in the foregoing matter and that

    the foregoing transcript pages constitutes a full, true

5   and accurate record of said proceedings to the best of my

6   ability.

7        I further certify that I am neither related to

    counsel or any party to the proceedings nor have any

8   interest in the outcome of the proceedings.

9        IN WITNESS HEREOF, I have hereunto set my hand this

10  9th day of February, 2024.

11

12

13

14   _____

15              Barbara Molina

16

17

18

19

20

21

22

23

24

25
```

```
 1  Date:     May 31, 224               Assignment #: 74664

 2  Deponent: Angela Butler

 3  Case:     Mills vs. State Farm Mutual

 4

 5  DEPONENT:  It has been requested that you read and sign

 6  your transcript.  This transcript is to be read only by

 7  you.  Please make any corrections necessary on the

 8  Correction Sheet ONLY.  You are to sign the Correction

 9  Sheet where indicated.

10

11  After signing the Correction Sheet, do the following:

12       1.The ORIGINAL executed Correction Sheet needs to be

13         returned to our corporation.

14       2.Forward a COPY of the executed Correction Sheet

15         directly to the attorney(s) listed below.

16       (The address(es) can be found on the Appearance Page

17         of your deposition.)

18       3.Retain a copy for your records.

19

20  CC:  Naegeli Deposition & Trial

21       Howard Butler, Esquire

22       Andrew Baskin, Esquire

23       Amanda L. Kidd, Esquire

24

25
```

```
 1                       CORRECTION SHEET

 2   Deposition of: Angela Butler          Date: 05/15/24

 3   Regarding:    Mills vs. State Farm Mutual

 4   Reporter:     Molina/Munro

 5   _____

 6   Please make all corrections, changes or clarifications

 7   to your testimony on this sheet, showing page and line

 8   number.  If there are no changes, write "none" across

 9   the page.  Sign this sheet on the line provided.

10   Page    Line   Reason for Change

11   _____   _____  _____

12   _____   _____  _____

13   _____   _____  _____

14   _____   _____  _____

15   _____   _____  _____

16   _____   _____  _____

17   _____   _____  _____

18   _____   _____  _____

19   _____   _____  _____

20   _____   _____  _____

21   _____   _____  _____

22   _____   _____  _____

23   _____   _____  _____

24                  Signature_____

25                       Angela Butler
```

```
 1                     DECLARATION

 2  Deposition of: Angela Butler          Date: 05/15/24

 3  Regarding:    Mills vs. State Farm Mutual

 4  Reporter:     Molina/Munro

 5  _____

 6

 7  I declare under penalty of perjury the following to

 8  be true:

 9

10  I have read my deposition and the same is true and

11  accurate save and except for any corrections as made

12  by me on the Correction Page herein.

13

14  Signed at _____, _____

15  on the _____ day of _____, 2024.

16

17

18

19

20

21

22

23

24              Signature_____

25                      Angela Butler
```