1          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF FLORIDA
2             JACKSONVILLE DIVISION

3

            CASE NO.: 3:23-CV-00477-TJC-LLL

4

5  AMBER MILLS, an individual,

6     Plaintiff,

7  vs.

8  STATE FARM MUTUAL AUTOMOBILE,
   INSURANCE COMPANY,
9
     Defendant.
10  _____

11

12           DEPOSITION OF

           **MARY M. LASETER**
13

14      Taken on behalf of Defendants

15

DATE TAKEN:     January 12th, 2024
16
      TIME:     10:00 a.m. - 11:17 a.m.
17
      PLACE:   13475 Atlantic Boulevard
18           Suite 8
           Jacksonville, Florida 32225
19

20

21    Examination of the witness taken before:

22       Kimberly R. Robinson
     Court Reporter, Notary Public
23        State of Florida

24

25          - - -

EXHIBIT
A

```
 1                    A P P E A R A N C E S

 2

 3         HOWARD BUTLER, ESQUIRE

 4              BUTLER LAW GROUP
                1506 Prudential Drive
 5              Jacksonville, Florida 32207
                Dwb@butlerlawgroup.com
 6
                Appearing on behalf of Plaintiff.
 7

 8
           KRISTEN M. VAN DER LINDE, ESQUIRE
 9
                BOYD & JENERETTE
10              201 N. Hogan Street
                Suite 400
11              Jacksonville, Florida 32202
                Kvanderlinde@boydjen.com
12
                Appearing on behalf of Defendants.
13
       ALSO PRESENT:
14
                John Krull, Videographer
15

16

17

18

19

20

21

22

23

24

25
```

**I N D E X**

WITNESS:

**MARY M. LASETER**

Direct Examination by Ms. Van der Linde ...... 5
Cross Examination by Mr. Butler.............. 39
Redirect Exam by Ms. Van der Linde........... 56
Recross Exam by Mr. Butler................... 59

**E X H I B I T S**

DEFENDANT'S

1 - Notice.................................... 15
2 - 4/11/22 ltr.............................. 23
3 - 8/5/21 ltr............................... 25
4 - 4/9/22 ltr............................... 25
5 - CSK 6/21 ltr............................. 27
6 - CSK 7/5 ltr.............................. 27
7 - CSK 8/4 ltr.............................. 28
8 - Assignment............................... 32

PLAINTIFF'S

1 - Answers.................................. 47
2 - Photo.................................... 55

1    THE VIDEOGRAPHER:  This is the

2    videotaped deposition of Mary Laseter, in

3    the matter of Amber Mills versus State Farm

4    Insurance Company, case number

5    3:23-CV-00477-TJC-LLL, being heard in the

6    U.S. District Court for the Middle District

7    of Florida, Jacksonville Division.

8        The deposition is being held at

9    LionShare Cowork on January 12th, 2024 at

10   10:00 a.m.

11       My name is John Krull with Advantage

12   Video.  The court reporter is Kim Robinson

13   with For The Record Reporters.

14       Counsel, will you now, please, introduce

15   yourselves and the witness will be sworn.

16       MR. BUTLER:  Howard Butler on behalf of

17   Amber Mills, individually and via

18   assignment, of Mary Laseter.

19       MS. VAN DER LINDE:  Kristin Van der

20   Linde, on behalf of State Farm.

21   **MARY M. LASETER,**

22   having been produced and first duly sworn as a

23   witness on behalf of the Defendants, after

24   responding "I do" to the oath, then testified as

25   follows:

*For The Record Reporters*

```
 1                    DIRECT EXAMINATION
 2      BY MS. VAN DER LINDE:
 3           Q    Ms. Laseter, my name is Kristen Van der
 4      Linde and I'm here to ask you some questions
 5      today.  Do you understand that?
 6           A    Uh-huh.
 7           Q    And a couple of things.  Even though
 8      we're on videotape, if you could answer
 9      everything out loud.  I know.  It's hard.  I'll
10      try and remind you.  Fair enough?
11           A    Certainly.
12           Q    Okay.  Thank you.  If I ask you
13      something that you can't hear or just doesn't
14      make sense to you, will you tell me it's my job
15      to ask you a question that makes sense?
16           A    Okay.
17           Q    Fair enough?
18           A    Fair enough.
19           Q    And I know you've given a disposition
20      before so do you remember some of the rules; if
21      you need to take a break, just tell me?
22           A    Honestly, I don't remember the rules but
23      that's --
24           Q    That's all right.  I'll share some with
25      you.  Actually, there are no rules.  It's just
```

1        common courtesy.  How about that?

2                If you need to take a break, just say, I

3        need to take a break.  You don't even need to

4        tell me why.  We'll just take a break.

5            A    Okay.

6            Q    We'll take a break for as long as you

7        need.  We'll sit here for a couple hours.

8        Whatever you need.

9                I don't think we're going to be here

10       very long today.  Okay.  So, I know depositions

11       can be uncomfortable for people.  That's not what

12       we're trying to do here today.

13               There's just a lawsuit.  I'm trying to

14       find out what you may or may not know and then it

15       will be over today.

16               If I ask you something you don't know,

17       just say, I don't know.

18               We're not trying to make you force a

19       memory or something that you don't know the

20       answer to.  Fair enough?

21           A    Fair enough.

22               MR. BUTLER:  Just for the record, object

23            to the form.

24           Q    Do you have any questions before we

25       start?

1          A    No, I don't.

2          Q    All right.  Perfect.  Well, we'll

3     getting going, then.

4          A    I don't really understand why I'm here

5     so...

6          Q    That's perfect.  So, do you remember you

7     were in a car accident back in 2021?

8          A    Yes.

9          Q    And a woman by the name of Amber Mills

10    sued you.  Do you recall that?

11         A    Huh-uh.  I could not have told you the

12    date but, yes.

13         Q    Understood.  It's been a while.

14              Do you remember that the Amber Mills

15    case went to trial?

16         A    I'm sorry.

17         Q    Sure.  Do you remember that the Amber

18    Mills case went to trial?

19         A    Oh, yes.  Definitely.

20         Q    In fact, you gave a deposition, just

21    like we're doing here today, in that case, right?

22         A    Yes.  Um-hum.

23         Q    And you also participated in the trial

24    as well.

25         A    Yes.

1    Q    In fact, you were a witness at it.  Do

2    you recall that?

3    A    I was there at the trial.  Yes.

4    Q    So because the verdict was above your

5    policy limits, there's another lawsuit, so that's

6    why we're here today.

7    A    I wondered.

8    Q    So that's why we're here today.  The

9    other lawsuit is over.

10    This one is totally separate.

11    A    Okay.

**MIL, R, 403**

12    Q    Let me ask you some questions.  First of

13    all, how old are you today?

14    A    I'm 91 years old.

15    Q    When is your birthday?

16    A    March 29th.

**MIL, R, 403**

17    Q    Congratulations.  Do you have any type

18    of hearing or vision problems?

19    A    Hearing or vision?  I wear hearing

20    aides.

21    Q    Okay.  Are you hearing me okay?

22    A    I'm hearing you okay now.  Yes.

23    Q    Well, let me know.  Let me know if I'm

24    talking too loud or too soft.

25    A    That's much better.  You raised it just

R, 403, MIL

1    a little bit.

2        Q    You just go like this to me and I'll

3    pump it, all right.

4            What about vision issues; do you have

5    any vision issues?

6        A    No.

7        Q    How is your health, currently?

8        A    How is my health, currently?

9        Q    Yes.

10       A    So-so.  For anybody who is 91 years old,

11   I think I'm doing good.

12       Q    Do you still like to dance?

13       A    Still --

14       Q    Are you still dancing?

15       A    No.

16       Q    No more dancing?

17       A    No more dancing.

18       Q    I know you were part a group during

19   COVID.  Has that group gotten back together?

20       A    No.  It did not get back together.

21       Q    All right.  I'm sorry to hear that.

22            What about, as far as your memory

23   goes -- I'm sorry to ask this but how is your

24   memory?  Do you have a good memory?

25       A    As far as I know, it's good.

1      Q   What do your kids tell you?

2      A   Sorry.

3      Q   Do your kids tell you you have a good

4   memory?

5      A   They never discuss it but I've got a

6   notion they think I don't.

**R, 403**

7      Q   Tell me about your family.  Tell me

8   about your family.

9          How many kids do you have?

10     A   I have two sons.

11     Q   What are their names?

12     A   Older boy is Doug.  He lives down in

13   Tarpon Springs.  And the second son is Scott.  He

14   lives in Atlanta.

15     Q   And Scott Laseter is here with you

16   today.

17     A   He is.

18     Q   And he's a lawyer as well; right?

19     A   Yes.

20     Q   Is he your lawyer here today?

21     A   No.

**R**

22     Q   He's just here as your son and support?

23     A   He brought me here.  Yes.

24     Q   You don't drive anymore; right?

25     A   No, I do not.

R, 403

1      Q   So Scott gave you a ride over.  Sorry.

2    Mr. Laseter gave you a ride here.  My apologies

3    for the first name.  Scott is okay.

4          I'll try not to but thank you.

5          So your son, Mr. Laseter, gave you a

6    ride here today?

7      A   Yes, he did.

8      Q   Do you have any family that lives in

9    Jacksonville?

10     A   No, I do not.

11     Q   But you've been here a long time?

12     A   I was born in Jacksonville.  Yes.

13     Q   And what about -- are you currently

14   married?

15     A   Huh.

16     Q   Are you currently married?

17     A   No.

18     Q   And where do you live?

19     A   I live in Atlantic Beach.

20     Q   Do you live by yourself?

21     A   Yes, I do.

22     Q   And any plans to move, currently?

23     A   No.  I live in a condominium townhouse

24   complex.  I've got close neighbors.

25     Q   Any plans to move, currently?

R,
403

```
 1        A    No.
 2        Q    So you're able to live on your own.
 3        A    Yes.
 4        Q    Great.  Do you pay your own bills?
 5        A    No.
 6        Q    Who takes care of that?
 7        A    My daughter-in-law.
 8        Q    Mr. Laseter's wife?
 9        A    That's correct.
10        Q    What is her name?
11        A    Helen.
12        Q    How come they take care of your bills
13   for you?
14        A    I can't hear.
15        Q    Sure.  How come Mrs. Laseter helps you
16   with your bills?
17        A    I asked her to.
18        Q    To just get some help, right.  It's
19   easier on the computer --
20        A    I asked her to when I went to the
21   hospital and rehab.
22        Q    Yeah.  I completely understand.
23        A    I asked her to and she was very willing
24   and agreed to do it.
25        Q    Perfect.
```

```
 1        A    So I asked her to keep on doing it.

 2        Q    Sounds like a good arrangement.

 3        A    For me, it is.

 4        Q    Do you have a computer?

 5        A    Yes, I do.  Don't I have a computer?

 6             I can't ask you that.

 7        Q    I, actually, don't mind but that's okay.

 8   Don't worry about it.

 9             If you look over to Mr. Laseter, that's

10   okay.  We'll wait.  It's natural to do that.

11        A    I do not open it every morning.  No.

12        Q    When you had the claim with Ms. Mills,

13   with State Farm, did you communicate with State

14   Farm via e-mail or was it by telephone; you,

15   personally?

16        A    I did not communicate with anybody,

17   personally.

18        Q    Okay.  Do you, currently, use e-mail

19   yourself?

20        A    Do I currently --

21        Q    Do you use e-mail yourself?

22        A    I would say yes.  I have not gotten back

23   in the habit of doing it like I used to do it

24   but, yes, I would do e-mail.

25        Q    Okay.  In the underlying case, do you
```

1    remember you had lawyers from Cole, Scott &

2    Kissane?

3           Do you remember the lawyers who defended

4    you at trial?

5        A    Yes.  I don't remember their names.

6        Q    That's okay.  But you do remember you

7    had lawyers there?

8        A    Yes.

R, 403

9        Q    When you would communicate with them,

10   was it usually they would send you a letter or

11   would you e-mail them; if you remember?

12       A    I don't remember communication with

13   them, at all.  I'm sure there was but I don't

14   remember it.

15       Q    Fair enough.  I'll ask you some

16   questions later and show you some documents.

17       A    I'm sure they did let me know when to be

18   here and be there, and whatnot.

R, 403

19       Q    Here with us today, we also have Mr.

20   Howard Butler.  Do you see Mr. Butler over there?

21       A    Yes.

22       Q    Have you ever met him before?

23       A    Not before this started, no.

24       Q    Is this the first time you've ever seen

25   Mr. Butler?

R, 403

1      A    No, it is not.

2      Q    When is the last time you saw him?

3      A    At the trial.

4      Q    Do you have any recollection of speaking

5   with Mr. Butler, or someone from his law firm,

6   from the time of trial until today?

7      A    From his law firm, I do not remember any

8   conversation, whatsoever.

9      Q    Thank you.  I'm going to show you what

10  we've marked as Defendant's Exhibit 1 and it is

11  just the Notice of Deposition that we sent for

12  your deposition here today.

13         My first question is very easy.  Have

14  you ever seen this document before?

15      A    Have I ever seen this document?

16      Q    Yes.

17      A    No.

18         MR. BUTLER:  Is that the Fourth Amended

19      one?

20         MS. VAN DER LINDE:  It is, yes.  We're

21      going to attach it as an exhibit, defendant

22      State Farm's Exhibit Number 1.

23         (Defendant's Exhibit 1 was marked for

24      identification.)

25      Q    And it doesn't look like you have

R, 403

1    anything with you here today, so I'm just going

2    to ask some questions so, hopefully, we don't

3    have to come back someday.  Fair enough?

4         A    Huh-uh.

5         Q    We had asked you to bring any

6    correspondence, e-mails, letters, text messages

7    or notes that were related to the accident that

8    occurred back in July 29th of 2021.

9              Do you have anything that would be

10   responsive to that?

11        A    I do not.

12        Q    What did you do with any letters that

13   you may have received regarding the accident?

14        A    If I received anything, I would mail it

15   to my son.

16        Q    You didn't even keep a copy, just sent

17   it right to him.

18        A    Right.

19        Q    What about e-mails; would you have any

20   e-mails from anybody?

21        A    I'm sure there were but I don't

22   remember.  I mean, I can't say yes or no.

23        Q    I appreciate that, Ms. Laseter.

24        A    Yes.

25        Q    So, from your standpoint, if you got

1    some communication, you sent it to your son Scott

2    Laseter and he was helping you with the lawsuit.

3        A    Yes.

4        Q    I'm helping my parents, too, with stuff.

5    Lawsuits can be difficult sometimes, so it's good

6    to get some support; right?

7        A    Right.

8             MR. BUTLER:  Object to the form.

R, 403

9        Q    Have you taken any medications in the

10   last 24 hours that would affect your ability to

11   understand and respond to my questions here

12   today?

13       A    Unh-unh.

14       Q    No?

15       A    No.

16       Q    Do you currently have any health

17   conditions that would affect your ability to

18   understand and respond to my questions?

19       A    To my knowledge, no.

20       Q    When we get through all these pages,

21   we're done but it's in 25 font so it's shorter

22   than it looks.

23            Do you, currently, have a cell phone?

24       A    Cell phone?  Yes.

25       Q    What is your number?

```
 1            A    Area code 904-625-2828.

 2            Q    What did you do to prepare for the

 3       deposition here today?

 4            A    Nothing.  I got up and got ready to

 5       come.  Scott said come and I came.

 6            Q    When did Scott come in town?

 7            A    Last night.

 8            Q    Are you going to get a good dinner?  Is

 9       he going to take you out for dinner?

10            A    No.  He came in about 10 o'clock.

11            Q    Well, I hope you get a good meal out of

12       him before he leaves.  Fair enough?

13            A    Fair enough.

14            Q    What is your favorite restaurant here?

15            A    I don't have one.

16            Q    And in preparation of the deposition,

17       did you speak with anyone from Mr. Butler's

18       office?

19            A    Of this deposition?

20            Q    Yes.

21            A    No, I did not.

22            Q    Have you reviewed any type of notes or

23       timelines that were provided to you from anybody

24       in preparation of this deposition?

25            A    No, I have not.
```

*For The Record Reporters*

```
 1          Q    Have you reviewed any of State Farm's
 2    claims materials related to the 2021 accident?
 3          A    This accident we're talking about?
 4          Q    Yes.
 5          A    No, I have not.
 6          Q    Do you recall at the time of the
 7    accident in 2021, you had an automobile insurance
 8    policy with State Farm?
 9          A    Yes.
10          MR. BUTLER:  Kristen, I want to give you
11          a lot of latitude but, of course, you have
12          her prior deposition where State Farm was in
13          attendance and all of these kinds of
14          questions were asked so I'm hoping we're not
15          going to go back and plow that field again.
16          MS. VAN DER LINDE:  Are you done?
17          MR. BUTLER:  Uh-huh.
18          MS. VAN DER LINDE:  Thank you.
19    BY MS. VAN DER LINDE:
20          Q    Do you recall that your policy of
21    insurance with State Farm was $25,000?
22          A    Yes.
23          Q    Do you recall how you selected the
24    $25,000 in coverage?
25          A    I'm sorry?
```

1          Q     Sure.  Do you recall how you selected

2     $25,000 in coverage?

3          A     Probably because I had advice.

4     Honestly, that's a long time ago.  I don't know.

5          Q     When did you stop driving?

6          A     When did I stop driving?

7                Well, when I no longer had the car to

8     drive.

9          Q     From the 2021 accident or do you know

10    when?

11         A     Right.  I mean, I'm confused over that

12    particular part of it because --

13         Q     And Ms. Laseter, I'm sorry --

14         A     He asked me not to go certain places

15    and not to drive there so I can't, really, give

16    you a specific answer to that.

17         Q     Thank you.  I appreciate that.

18         A     But, at least, since the accident I have

19    not driven because there is no car.

20         Q     Do you recall, after the accident, how

21    you became aware that Ms. Mills was pursuing a

22    claim against you for injuries?

23         A     I'm not -- are you asking me -- ask that

24    again, please.

25         Q     Sure.  Sure.  After the accident with

1    Ms. Mills in 2021, do you remember how you

2    learned that she was bringing a claim against you

3    for injuries?

4         A   I do not remember learning about it.  I

5    could not answer that.

**R, 403**

6         Q   At any time during the litigation with

7    Ms. Mills, did you ever want to contribute your

8    own money towards the settlement?

9         A   I never would have thought about it so I

10   can't answer that.  I don't understand why.

11        Q   As you sit here today -- and, again,

12   remember when we started, I said, if you remember

13   you remember, if you don't you don't.  So, I'm

14   just trying to find out what you recall.

15             As you sit here today, do you recall the

16   offers and demands between Ms. Mills and State

17   Farm regarding the 2021 accident?

18        A   You mean ahead of time?

19        Q   No.  Do you just remember what the

20   numbers were going back and forth between Ms.

21   Mills and State Farm?

22        A   I honestly, don't.  I mean --

23        Q   Thank you.

24        A   Specifically, no.  I don't.

25        Q   How are you doing?  Do you need to take

1    a break?

2         A    No.   I am getting very dry.

3         Q    Let's take a water break.   Let's all

4    take a sip.

5              THE VIDEOGRAPHER:   Off the record at

6         10:17.

7              (Short break.)

8              THE VIDEOGRAPHER:   We're back on the

9         record at 10:19.

10   BY MS. VAN DER LINDE:

11        Q    Ms. Mills, do you -- I called you Ms.

12   Mills.   I apologize for that.   Let's try that

13   again.

R,
403

14              Ms. Laseter, do you have any

15   recollection regarding the injuries that Ms.

16   Mills was claiming?

17        A    All I can remember which I learned about

18   the accident is that she had a neck injury.

19        Q    Do you recall speaking with anyone at

20   State Farm about the accident?   And I'm just

21   going to throw some names at you.

22              Does the name Angela Butler ring a bell?

23        A    Unh-unh.

24        Q    Is that a no?

25        A    Yes.   No, it does not ring a bell.

1          Q    Thank you.    I know that's annoying but

2    if I don't do it, we won't be able to read the

3    transcript, later.

4               Did you read the deposition your son Mr.

5    Scott Laseter, gave in this case?

6          A    No, I did not.

7          Q    Have you recovered from the injuries you

8    had in the 2021 accident?

9          A    I had to stop and think.   Yes.   I

10   recovered, slowly, but...

11         Q    I'm going to show you some letters and

12   you may or may not recall getting them but I'm

13   going to go through and I'll mark them and share

14   them with counsel, as well.

15              Somehow, I've got them out of order.

16   Bear with me.

R, 403

17              I'm going to mark as State Farm's Number

18   2 a letter from State Farm dated April 11th,

19   2022, to Ms. Laseter.

20              Ms. Laseter, have you had a chance to,

21   briefly, review the letter dated April 11th,

22   2022?

23         A    Just now.   Yes.

24              (Defendant's Exhibit 2 was marked for

25   identification.)

*For The Record Reporters*

R, 403

1    Q    And do you have recollection of

2    receiving this letter?

3    A    No, I do not.

4    Q    And do you see it's where State Farm was

5    letting you know Ms. Mills was making a claim?

6    A    It says we're in the process of

7    reviewing the information.  This is in April

8    2022.

9    Q    I guess I can ask the question a better

10   way.

11       The letter speaks for itself.  It says

12   what it says; is that fair?

13   A    I guess so I but I don't remember

14   receiving a letter such as this.

15       MR. BUTLER:  Can I just -- my pen

16        crapped out on me.

17   Q    All right.  Ms. Laseter, I don't have

18   any more questions for you about that document,

19   but you're free to read it some more if you want.

20   A    I was puzzled about the date -- it's

21   okay.

22   Q    I'm just going to move the exhibits over

23   here.

24       So, really, my questions are going to be

25   pretty simple for you.

```
1              I'm going to show you some more letters

2     and just ask you if you have any recollection of

3     receiving the letter; is that fair enough?

4          A   So not question the letter itself?

5          Q   I'm not going to do that.

6          A   Okay.

7          Q   Because the letters say what the letters

8     say.

9              I just want to ask you, when you see

10    them, if you recall getting them; does that make

11    sense?

12             Exhibit Number 3 is going to be a letter

13    dated August 5th, 2021, from State Farm to Ms.

14    Laseter, and my question is simple:  Do you

15    recall receiving this letter?

16         A   I can't understand this.

17             (Defendant's Exhibit 3 was marked for

18    identification.)

19         Q   Thank you.  The next exhibit we're going

20    to mark is Exhibit Number 4, State Farm letter

21    dated April 9th, 2022, to Ms. Laseter.

22             Same question.  Do you recall receiving

23    this letter?

24         A   No, I don't.  Can I question something?

25             (Defendant's Exhibit 4 was marked for
```

1    identification.)

2         Q    Sure.

3         A    You've got the date 2022.  Exactly when

4    was that accident?

5         Q    2021.

6         A    2021.  I'm just looking at how long it

7    was before.

8         Q    Just make sure --

9         A    That's almost a year after the accident.

10        Q    Just to make sure I didn't misspeak when

11   I was questioning you, the date of the letter is

12   April 9th, 2022.  I want to make sure I didn't

13   say it wrong, too.

14        A    You're right.

15        Q    We're in agreement that's what it was?

16        A    Yes.

R   17        Q    The next item we're going to mark as

18   State Farm's Number 5 is a letter dated June

19   21st, 2022 from Cole, Scott & Kissane, to Angela

20   Butler at State Farm, but Ms. Laseter you are

21   cc'd on the back as receiving a copy.

22             And so, my question to you is:  Do you

23   recall receiving this letter --

24        A    Unh-unh.

25        Q    -- from your lawyers?

R

1        A    Unh-unh.  No.

2            (Defendant's Exhibit 5 was marked for

3    identification.)

4        Q    Ms. Laseter, some of these letters we

5    went through, are these examples of things you

6    would have sent to your son Mr. Scott Laseter?

7        A    I'm sure they are, but I could not say

8    yes, I did.

9        Q    Next, we're going to mark State Farm's

10   Number 6.  It's a letter dated July 5th, 2022

11   from Cole, Scott & Kissane, to Angela Butler at

12   State Farm, with a copy to you.

13           And this is, actually, a report on your

14   own deposition.

15           Do you recall receiving this letter?

16           (Defendant's Exhibit 6 was marked for

17   identification.)

18       A    Unh-unh.

19       Q    No.  Okay.

20       A    No.

21       Q    Next, we're going to show you what's

22   been marked as State Farm Number 7.

23           It's a letter dated August 4th, 2022

24   from Cole, Scott & Kissane, to Angela Butler, at

25   State Farm, with a copy to you.

R

1              Do you have any recollection about this
2   letter?
3              It was, actually, a report regarding the
4   deposition testimony of Ms. Mills.
5        A    So the accident was July 2021?
6        Q    Yes.
7        A    So this is a year later.  No.  I don't
8   remember seeing that.
9              (Defendant's Exhibit 7 was marked for
10  identification.)
11       Q    Thank you.  Do you recall if, at some
12  point, your son Mr. Scott Laseter became the
13  point of contact for the accident for you and
14  just started handling it all, for you?
15       A    Would you ask that, again, please?
16       Q    Sure.  Do you remember if your son Mr.
17  Scott Laseter started becoming the contact point
18  for you for the accident, handling it for you?
19       A    He became the contact for me for
20  anything so I cannot say that, specifically, for
21  that accident, because he's always been my
22  contact for anything.
23       Q    Does anyone, currently, have your power
24  of attorney for your everyday activities?
25       A    I assume he has.  He and my other son.

1     Q   Did your son Mr. Scott Laseter, to the

2   best of your recollection -- we're a couple years

3   later, so if you don't remember, that's fine.

4        Do you recall him ever sitting down and

5   talking to you and providing updates to you about

6   what was going on in the Amber Mills case?

7     A   No, I do not.

8     Q   Do you recall meeting your defense

9   lawyers in person at the trial?

10     A   At the trial, yes, I remember that.

**R, 403**

11     Q   Do you remember meeting them before

12   that, as well?

13     A   Not those two, no.

14     Q   But people were present with you at your

15   deposition?

16     A   Yes.  That wasn't in person, I don't

17   think.

18     Q   Maybe, by Zoom.  I don't remember.

19     A   I'm not sure.

20     Q   The record will show what it was.

21     A   By television.  I, honestly, don't

22   remember.

23     Q   Do you remember being at the trial?

24     A   The trial itself, yes.

25     Q   And do you remember that the plaintiff

1    got a verdict at the trial?

2        A    Huh?

3        Q    Do you remember the jury gave Ms. Mills

4    some money at the trial?

5        A    Yes.

6        Q    Did you testify at the trial?

7        A    I was called to sit up to the front.  Is

8    that what you mean?

9        Q    Yes.

10       A    Yes.

11       Q    Were you happy with the work that your

12   trial lawyers did, on your behalf, at the trial?

13       A    I'm sure I was.

14       Q    Do you recall being cross-examined by

15   Mr. Butler, or another lawyer from his firm, at

16   the trial?

17       A    At the trial itself?

18       Q    Yes.

19       A    No, I don't.

20       Q    Do you know how much the judgment was

21   after the jury trial, how much money was awarded?

22       A    Amount of money, I couldn't tell you,

23   specifically, but I do know judgment was made.

24           I'm kind of puzzled by the whole thing

25   that it's not followed through.

```
 1            Q    What do you mean by that?
 2            A    It sounds to me like there's a complaint
 3       about the payment.
 4            Q    Do you, personally, have any
 5       recollection of speaking with Mr. Butler or
 6       someone from his firm after the jury reached its
 7       verdict?
 8            A    No.  I could tell you I did not talk to
 9       anybody.  We left and came home.
10            Q    Next, I'm going to mark State Farm's
11       Exhibit Number 9.
12                 It's an assignment of claims related to
13       the accident on July 29th, 2021.
14                 MR. BUTLER:  What was Number 8?  Let me
15            see that one.
16                 MS. VAN DER LINDE:  Here.  I'll give you
17            a copy.  Make sure I got the exhibits tagged
18            correctly.  I think I'm on 8.
19            A    What am I reading?
20            Q    Bear with me.  I got the numbers wrong.
21                 When I do this myself, sometimes I skip
22       numbers.
23                 All right.  You may not even know what
24       this document is.  That's why I'm going to ask
25       the question.
```

R, 403

1          (Defendant's Exhibit 8 was marked for

2     identification.)

3          MR. BUTLER:  Object to the form of the

4          question.  Move to strike.

5     A    Sounds like --

6     Q    Hang on one second.  Let me get a

7     question on the record so the deposition reads

8     clearly, okay.

9          Ms. Laseter, do you have Exhibit Number

10    8 in front of you?

11         You can't read my handwriting?

12    A    If that's a number up there, I can't

13    read it.

14    Q    Let me try again.  Let's try this again.

15    I'm going to do this right.

16         I can't even read it.  Exhibit 8.  Okay.

17    Let's try this again.

18         Ms. Laseter, do you have Exhibit 8 in

19    front of you?

20    A    Yes, I do.

21    Q    And at the top, it says it's an

22    assignment of all claims and rights related to

23    July 29th, 2021 collision.

24    A    Yes.

25    Q    Do you see that?

1          A    Uh-huh.

2          Q    Yes.

3          A    Yes.  I'm sorry.

4          Q    If you turn to the last page, do you see

5     your signature on it?

6          A    Yes, I do.

7          Q    It looks like it was signed on February

8     20th, 2023; does that look accurate?

9          A    That's what the date says.

10         Q    Do you have any recollection of signing

11    this document?

12         A    If that's my signature, I'd have to be

13    there, but do I remember, actually, doing it?

14    No, I do not remember, actually, signing it.

15         Q    Do you know what the document means or

16    what it's trying to accomplish?

17         A    It looks, to me, like it's a settlement

18    of claim.

19         Q    All right.

20         A    And it looks like it's not happening.

21         Q    Do you understand that that document

22    means that Ms. Mills cannot enforce the judgment

23    against you?

24              MR. BUTLER:  Object to the form.

25         A    No.  I'm sorry.  I do not understand

```
1        legal things.
2             Q    Fair enough.  That's okay.  Thank you.
3                  You know, earlier, I forgot to ask you
4        some questions, earlier, in trying to get to know
5        you a little bit better and you told me you lived
6        in Jacksonville your whole life, so where did you
7        go to high school?
8             A    Robert E. Lee.
9             Q    Did you do any schooling after Robert E.
10       Lee?
11            A    I went to one year at Florida State.
12            Q    What did you study?
13            A    That was just one year.  I just took
14       general courses.
15            Q    And then, what did you do, did you have
16       a profession?
17            A    After that?
18            Q    Yes.
19            A    After that, I went to California to live
20       with a friend whose husband had been deployed.  I
21       stayed out there for several months.  Then, came
22       back and went to work.
23            Q    What did you do for work?
24            A    I worked for Travelers Insurance
25       Company.
```

1    Q    What did you do for them?

2    A    The automobile department.

3    Q    And how long did you work there for?

4    A    Eight years.

5    Q    When is the last time you worked?

6    A    Last time I worked --

7    Q    Yes.

8    A    -- was.  Gracious.  1995.

9    Q    All right.  What were you doing then?

10   A    I was working for an eye surgeon.

11   Q    And have you ever filed for bankruptcy?

12   A    Have I ever what?

13   Q    Filed for bankruptcy?

14   A    No.

15   Q    Any plans to do so?

16   A    I don't know how to do that.

17   Q    Then the answer is no, probably.

18   A    (No audible response.)

**MSJ**

19   Q    Were you aware that, as part of this

20   case, that Mr. Butler has alleged that you broke

21   your hip as a result of the trial; are you aware

22   of that?

23   A    After the trial, that night, I broke my

24   hip.  And I just got home from rehab in August of

25   this year.

*For The Record Reporters*

**MSJ**

1    Q    What happened that night; how did you

2    fall?

3    A    I misstepped on the stairwell.

4    Q    Where in your --

5    A    My own home.

6    Q    Is your condo two stories?

7    A    Huh-uh.

8    Q    Yes?

9    A    Yes, it is.

10    Q    Were you carrying anything?

11    A    My phone.

12    Q    Do you know why you fell?

**MIL/ MSJ**

13    A    Do I know why?

14    Q    Yes.  Did you slip?  What happened?

15    A    It, probably, was because it had been

16    such an exhausting day, I was still, probably,

17    reflecting on things and I wasn't paying

18    attention to what I was doing.

19    Q    What time did you fall?

20    A    What time?

21    Q    Yes.

22    A    Early evening.  About 7 or 7:30, I

23    think.

24    Q    At the time of the accident -- I'm

25    sorry.  Let me ask it a little bit better because

1    we have the auto accident and then your hip

2    incident.

3              So at the time you fell, had you been

4    having any type of balance issues?

5        A    No, I had not.  I mean, the trial ended

6    at noon and I fell that evening at 7:30.  I mean,

7    I guess it was still --

8        Q    What did you do between noon and the

9    time you fell?

10       A    I couldn't tell you.  Of course, went

11   home and Scott had to go back to Atlanta so I

12   just hung around the house.

**MIL/ MSJ** 13       Q    What did you do after you fell?  Were

14   you able to call somebody?

15       A    That's why I carry a phone.  I called my

16   next door neighbor.  She came and she called 911.

17   And that was it.

18       Q    Has any doctor told you that you fell

19   because of stress from the trial?

20       A    No.

**MIL/ MSJ** 21       Q    Before you fell, had you ever had any

22   problems with your hip or falling?

23       A    No.

24       Q    Can you tell me the names of the doctors

25   who have treated you for your hip?

MIL/ MSJ

1        A    I could but I can't pronounce it.

2        Q    Which group is he or she with?

3        A    Baptist Health.

4        Q    Okay.

5        A    At the beach.

6        Q    Baptist Beaches.

7        A    Baptist Beaches.

8        Q    Where did you go to rehab?

9        A    Fleet Landing.

10        Q    And then, you were discharged, you said,

11   this year, back home.

12        A    That's correct.  My home was renovated

13   to make me have a downstairs bedroom.

14        Q    What else did you have to do at your

15   home, if anything, after you hurt your hip?

16        A    After I --

17        Q    Sure.  You said you have a downstairs --

18   let me ask a better question.

MIL/ MSJ

19        What changes did you have to make to

20   your condo after the fall?

21        A    Well, they -- the dining room was

22   changed into a bedroom and the powder room was

23   changed into a full bathroom.

24        Q    Are you, currently, receiving any

25   treatment for your hip?

```
 1        A    My hip?

 2        Q    Yes.

 3        A    No.

 4        Q    What do you do, currently, and what are

 5   your activities now?

 6        A    I don't do anything.  I'm confined to

 7   the area because I have no transportation, so

 8   consequently, I'm not doing what I used to do.

 9        Q    And you said you have some good friends

10   in the complex where you live?

11        A    Yes.  Very good neighbors.

12             MS. VAN DER LINDE:  Well, thank you for

13        your time.

14        I don't have any other questions.

15             MR. BUTLER:  I have a few.

16                  CROSS EXAMINATION

17   BY MR. BUTLER:

18        Q    Ms. Laseter, I'm sorry that you and your

19   son needed to appear here for a deposition again

20   in this matter but since you are here, pursuant

21   to State Farm's Notice, we're appreciative of you

22   and him being here.

23             When do you turn 92?

24        A    March 29th.

25        Q    And do I understand that you have some
```

MIL/
MSJ

R,
403,
MIL

R,
403,
MIL

1       sort of walking device here with you today?

2           A    I have my walking stick.  Yes.

3           Q    And your son Scott Laseter came in from

4       Atlanta and brought you here today to this

5       deposition?

6           A    Yes.

7           Q    You're a lifelong resident of

8       Jacksonville.

9           A    Correct.

10          Q    You and your husband raised your family

11      in this community.

12          A    Yes.

13          Q    During your adult life, have you always

14      taken your financial responsibilities and

15      obligations seriously?

16          A    Oh, yes.

17          Q    Did you try and instill that same trait

18      in your own children?

19          A    I hope I did.

20          Q    In your adult life, had you ever had to

21      file for bankruptcy, in your life, to ever try

22      to --

23          A    That's a second question so I don't know

24      where it came from.

25          Q    I just want to -- for the first 90 years

R,
403,
MIL

R,
403,
MIL

1      that you were here, did you ever file bankruptcy,

2      for any reason, to avoid any debt?

3          A    I can't imagine that I did, but I --

4          Q    So, as far as you know, you've never

5      filed bankruptcy.

6          A    No.

7          Q    And you would never want to have to file

8      bankruptcy.

9          A    I never would want to.  No.

10         Q    Have you always valued your

11     independence?

12         A    I never thought about it but I'm sure I

13     did.

14         Q    Your physical independence, your

15     financial independence, and so forth.

16         A    Yeah.

17         Q    In your experience, when it comes to a

18     person's most precious resources, do you believe

19     that the less one has, the more important it is

20     to them?

21         A    I never thought about it so I can't

22     answer that properly.

23              I'd have to spend some time thinking.

R,
403

24         Q    Fair enough.  What was the reason, in

25     the first place, that you purchased auto

R,
403

1    liability insurance from State Farm?  What was

2    the reason for that?

3         A    You know, I've been wondering that

4    myself.  I cannot answer that.  I'm sorry.

5         Q    Well, and I understand after what you've

6    been through, you might question that but was

7    protection among the things that you were trying

8    to get when you purchased that insurance?

9         A    I can't answer that because it never

10    occurred to me.

11         You buy auto insurance to insure your

12    car and everything.  I never questioned anything

13    about it, even though I worked for an automobile

14    insurance company.

15         Q    Did you believe that State Farm was a

16    leader in the auto liability insurance industry,

17    based on what you had seen, read, and heard back

18    at that time?

19         A    Would you ask that again, please?

20         Q    Back at the time that you purchased your

21    auto insurance from State Farm, did you believe

22    that they were a leader in the auto liability

23    insurance industry, based upon what you had seen,

24    read, or heard?

25         A    Excuse me.  To be honest with you, I

1    don't know why I have State Farm Insurance.

R,
403

2        Q    Had you ever recalled seeing and hearing

3    their ad slogan, Like a good neighbor, State Farm

4    is there?

5        A    I heard it many times.  Yes.

6        Q    Did you place your trust in State Farm

7    to protect you, given your limited resources?

8        A    Since I had that insurance, yes, I did.

9    I thought they would honor everything about it.

10       Q    Did you expect them to use their size,

11   expertise and knowledge to protect you from

12   personal liability in excess of the policy

13   limits?

14       A    Yes, I would.

15       Q    Did you expect them to do what they said

16   they would do in their various letters that they

17   sent to you?

18       A    Yes.  I thought they were an automobile

19   company and follow through on what they said.

20   Yes.

MIL,
R,
403

21       Q    Now, after that July 2021 crash, you

22   yourself were injured; right?

23       A    Huh-uh.

24       Q    According to the records that State Farm

25   has in this case, you broke some ribs, you

*For The Record Reporters*

MIL, R, 403

1    fractured your acetabulum and your sacrum.

2            Do you recall having some serious

3    injuries after this?

4        A    Yes.

5        Q    And did you require ongoing home care

6    for months after that July 29th --

7        A    Yes.  Huh-uh.

8        Q    -- 2021 crash?

9        A    I'm trying to think.

10        Q    Let me ask it again so that the question

11    is clear to you.

12        A    I'm confused about two occasions here.

13        Q    Right.  So, I'm talking about the July

14    29th, 2021 crash.

15        A    Okay.  I went to the hospital.  I came

16    home.  Yes, I had to have home care.

17        Q    And that went on for a number of months,

18    as I understand it from the records?

19        A    It could have been.  It was an awful

20    long time.

21        Q    During that period of time, did your son

22    Scott Laseter, step in and help you with any

23    dealings with State Farm that were necessary?

24        A    I'm sure.  Yes.  I would have to --

25        Q    Prior to the -- strike that.

1    Do you recall, at some point, learning
2    that Amber Mills had attempted to settle her case
3    with State Farm and release you from all claims
4    of liability in exchange for State Farm paying
5    their $25,000 policy limits?
6        A    It seems to me like yes, I did hear
7    something about that.
8        Q    And at some point, did you learn that
9    State Farm never offered more than $7,000 of that
10   $25,000 policy limit?
11       A    Yes, I did hear that.  Yes.
12       Q    And so, a lawsuit had to be filed.  And
13   I want to ask you this:  Prior to that lawsuit,
14   had you ever been personally sued, at any time?
15       A    No.
16           MS. VAN DER LINDE:  Objection to form.
17       I was trying to get an objection on there
18       without interrupting the question.  Please
19       note that.  Thank you.
20       Q    Did you or State Farm call the shots
21   regarding the defense of the Mills versus Laseter
22   case?
23       A    I'm not sure I understand that question.
24       Q    Who made the decisions on how to defend
25   the case of Mills versus Laseter; was it you or

R, 403

R, 403, S

*For The Record Reporters*

R, 403, S

1    was it State Farm?

2        A    I'm not sure I can answer that question

3    because I don't understand.  I'm not sure I

4    understand it.

5            I don't remember.  I've had

6    conversations back and forth but I thought it a

7    given State Farm would take care of it.  Is that

8    what you mean?

9        Q    Yeah.  Do you recall that it was State

10   Farm that chose the attorneys that defended you

11   in the case of Mills versus Laseter?

12       A    I have to say yes, I guess.

13       Q    You didn't choose them.

14       A    I didn't choose them.  No.

15       Q    And so, in terms of the decision-making

R, 403, S

16   in the defense of that case, did you make those

17   decisions or did State Farm make those decisions?

18       A    I assume State Farm did because they

19   were supposed to -- you know, honorable company.

20   They would do what they're supposed to do.

21       Q    Now, State Farm filed a number of what

22   are called affirmative defenses to that case.

23            MS. VAN DER LINDE:  Objection to the

24       form.  State Farm did not file any

25       affirmative defenses in the underlying case.

**R,
403,
C**

1        It was her attorneys.

2       Q   The attorneys chosen by State Farm filed

3 a number of affirmative defenses in that case

4 where they blamed Amber Mills for causing this

5 collision and denied that you had any

6 responsibility in the collision.

7       I'm going to mark these as Plaintiff's

8 Exhibit Number 1.

9       (Plaintiff's Exhibit 1 was marked for

10 identification.)

11     Q   And because of that, we needed to take

12 your deposition in that case.

13       Do you recall coming to a court

14 reporter's office, like this --

15     A   Yes, I do.

16     Q   -- with your son Scott Laseter?

17     A   Yes.

18     Q   Do you remember being asked questions

19 about the circumstances and how this crash

20 occurred?

21     A   Yes.  Can I respond to this?

22     Q   You don't need to.  That's the defenses

23 that were raised in response to this lawsuit.

24 Let me ask you, were you -- strike that.

25       Prior to coming to that lawsuit --

R,
403,
C

```
 1    strike that.
 2              Prior to that deposition that you
 3    appeared for, and I'm talking about the earlier
 4    deposition, had you ever given a sworn
 5    deposition?
 6         A    No, I had not.
 7         Q    Were you a bit nervous and apprehensive
 8    about having to do that?
 9         A    I didn't know what it was all about.
10         Q    Were you treated by myself with dignity
11    and respect during that deposition?
12         A    Yes.
13         Q    Did you and your son later attend a
14    settlement mediation in this case?
15         A    What would that be?  I don't remember
16    anything like that.
17         Q    All right.  That's okay.  You were asked
18    some questions about this document, earlier.  And
19    I'm showing that to your son there, so let's just
20    take a look at that.
21              And, if you would, just go to that last
22    page there where it has your signature there.
23              What does it say underneath your
24    signature?
25         A    Mary Laseter defendant, after
```

1    consultation with Scott Laseter, Esquire, or

2    counsel of their choosing.

3        Q    And does that refresh your recollection,

4    at all, that you and your son talked about that

5    document at the time and that you, in fact,

6    signed that document?

7        A    I'm sure I signed it.  Yes.  It's my

8    signature.  This is after the trial?

9        Q    It is.

10       A    Well, then, yes.  I'm sure we did.  Yes.

11       Q    So let's talk about the trial of this

**R, 403**

12   case.  Had you ever had to -- let me talk to you

13   about the trial of this case at the Duval County

14   Circuit Courthouse, here in Jacksonville.

15           Prior to that, had you ever been a party

16   to a case and been at a trial?

17       A    No, I have not.

18       Q    Did you, in fact, attend five

19   consecutive full days of trial in the case of

20   Mills versus Laseter?

21       A    Yes, I did.

**R**

22       Q    Did your son Scott come to Jacksonville

23   and stay at your place that entire week?

24       A    Yes.

25       Q    Did he take you to the courthouse in the

**R**

1    morning?

2         A    Yes.

3         Q    Was he in the courtroom throughout the

4    trial?

5         A    As far as I know, he was.  He was behind

6    me so I didn't see him leave.

7         Q    Did he take you home in the evening each

8    day after court adjourned and after any

9    discussions you had with your defense attorneys?

10        A    Yes.

11        Q    I recall when Ms. Van der Linde was

**R, 403, MSJ**

12    asking you some questions, you said that you were

13    exhausted after the trial.

14             I want to ask you some questions about

15    that.

16        A    Yes.

17        Q    If Scott Laseter testified under oath

18    that that was a grueling week for you, would that

19    be accurate or inaccurate?

20        A    Yes, it was.

21        Q    How would you describe those days,

22    physically and emotionally, for you that entire

23    week?

24        A    Well, it was physically pulling on me.

25    And not really understanding what was happening,

R, 403, MSJ

1    being puzzled by so much of it, I think my mind

2    was going around in circles.

3         Q    Was your normal -- strike that.

4              Was your normal sleep impacted

5    negatively that week, in general?

6         A    I do not remember making notice of that.

R, 403, MSJ

7         Q    On Friday; after Monday, Tuesday,

8    Wednesday, Thursday and Friday, did you wait

9    around the courthouse while the jury deliberated?

10        A    I'm sure we did because we had to come

11   back to --

12        Q    Were you there when they announced that

13   a verdict had been reached in the case?

14        A    Yes.

15        Q    Bear with me just a minute.  Were you in

16   the courthouse when the jury foreperson handed

17   over the verdict form to the bailiff and it was

18   read out loud in open court?

19        A    Yes.

20        Q    And do you recall the pronouncement in

21   open court by the bailiff that in the case of

22   Amber Mills, individually, versus Mary McRae

23   Laseter, individually, the verdict -- the jury

24   finds as following.  And went on to announce that

25   a verdict of $245,782 had been rendered?

R,
403,
MSJ

1        A    I remember the occasion but the exact

2    amount, I would not remember.

3        Q    Did that confusion and your mind racing,

4    and so forth, continue after hearing that?

5            MS. VAN DER LINDE:  Objection to form.

6        The witness did not say she was confused.

7            MR. BUTLER:  Whatever she said before.

8        Let me just restate it.

9    BY MR. BUTLER:

R,
403,
MSJ

10        Q    Did your mind continue to race after

11    hearing news of that verdict?

12        A    You mean did I relive it?

13        Q    I mean, did you continue to think about

14    it and --

15        A    Oh, yes.

16        Q    -- it continued to run through your

17    mind?

18        A    It ran through my mind -- the whole week

19    ran through my mind.

20        Q    Did it continue to for a period of time

21    after hearing that news?

22        A    Actually, yes.

23        Q    And --

24        A    And still.

25        Q    And did that affect your normal sleep

```
 1        that night after getting that news?
 2            A    After the trial?
 3            Q   Yes, ma'am.
 4            A    That night is when I fell.
 5            Q   And so immediately prior to your fall,
 6        how would you describe your physical and mental
 7        state?
 8            A    I, honestly, don't remember.  I remember
 9        talking to neighbors.  I remember --
10            Q   And I may have misspoke so I want to be
11        clear so that we're on the same page.
12                Immediately before you fell, how were
13        you feeling physically and emotionally and you've
14        said --
15            A    Well, I was still exhausted.  I'm sure I
16        had been watching television.  I'm sure at that
17        point I was home alone.  So I was doing what one
18        does when one is alone.  Just a normal day but I
19        remember just sighing a lot and just being
20        perplexed about things.
21            Q   Do you believe, in your mind, that state
22        of exhaustion and running through the mind played
23        a significant role in your falling?
24                MS. VAN DER LINDE:  Objection to the
25            form.
```

R,
403,
MSJ/
MIL

R,
403,
MSJ/
MIL

1        Q    You can answer.

2        A    Could be, you know, now that you bring

3    it up.  It could be that was on my mind as I was

4    going up the first step.  I just --

5        Q    Now, that fall that you had, it required

6    you to have some surgery.

7        A    Yes.

8        Q    It required you to have some significant

9    rehabilitation after the surgery.

10       A    Yes.

11       Q    It affected where you lived and under

12   what circumstances, for a number of months.

13       A    Yes.

14       Q    Separate and apart from any physical

15   aspects of that fall, did it cause you any

16   additional mental anguish?

17       A    I'm not sure what you want to know.  I

18   do know it was on my mind, constantly, what's

19   next?  What am I gonna do?  If that's what you

20   mean.

21       Q    I have a picture, Ms. Laseter.  We'll

22   mark this as Plaintiff's Exhibit 2, and I'll

23   represent to you that that is a still from your

24   video deposition that was taken the first time --

25       A    Huh-uh.

*For The Record Reporters*

1       Q    -- in this case.  Does that appear to

2   fairly and accurately depict you as you appeared

3   that day --

4       A    Yes.

5       Q    -- in your deposition in this case?

6       A    Yes.

7            (Plaintiff's Exhibit 2 was marked for

8   identification.)

9       Q    The document entitled Assignment of all

10  Rights and Claims, is it your understanding that

11  this assignment will allow Amber Mills to stand

12  in your shoes, for purposes of pursuing all extra

13  contractual damages related to State Farm's

14  bad-faith claims handling in this case, pursuant

15  to Florida law?

16           MS. VAN DER LINDE:  Objection to form.

17      A    I'm not sure I understand all the words

18  that you were saying but if it's here, I'm sure.

19      Q    And that would include any and all

20  mental anguish that you endured as a result of

21  State Farm's bad-faith claims handling in this

22  case, pursuant to Florida law?

23           MS. VAN DER LINDE:  Objection to form.

24      A    I'm surprised they're not honoring the

25  claim.

R,
403

1      Q   You're surprised State Farm is not

2   honoring their claims.

3      A   I am.  I thought they were -- it's just

4   beyond my imagination that they are trying to get

5   out of it.

6           MR. BUTLER:  All right.  That's all I

7       have.  Thank you.

8           MS. VAN DER LINDE:  I have a few

9       follow-up questions and then we'll be done,

10      hopefully.

11              REDIRECT EXAMINATION

12   BY MS. VAN DER LINDE:

13      Q   Have you asked Mr. Butler, or anyone at

14   his office, to make a claim for you that you

15   fractured your hip or broke your hip as a result

16   of the stress from the trial?

17           MR. BUTLER:  Object to the form.

18      A   I've not talked to anyone at Mr.

19   Butler's office.

20      Q   So that means you did not ask anyone to

21   try and get money for you, for your hip?

22      A   Right.

23           MR. BUTLER:  Object to the form.

24      Q   Have you seen any type of doctor or

25   counselor or therapist, for stress from the

1      trial?

2              A    Stress?

3              Q    Yes.

4              A    No, I have not.

5              Q    And you told me you treated at Baptist

6      Beaches, right, for the hip?

7              A    That's where the surgery took place.

8      Yes.  Rehab took place at Fleet Landing.

9              Q    Do you remember who your followup doctor

10     was, from Beaches, if you remember their name?

11             A    Doctor -- what do you mean?

12             Q    Sure.  So the surgery was at Baptist and

13     you would go have followup appointments, after;

14     were they all at Fleet?

15             A    No, I went to my doctor's office.

16             Q    Who was that?

17             A    I can't pronounce his name.

18             Q    All right.

19             A    V-o -- I just can't pronounce his name.

20     V-o-n.

21             Q    It's all right.  Is it all right if we

22     ask your son after the deposition if he'll tell

23     us the name?

24             A    Say that again.

25             Q    Is it okay if we ask Mr. Laseter for the

1    name, after the deposition?

2          A    Yes.  I was going to give it to you

3    myself.

4          Q    Who is your primary care doctor?

5          A    Primary care doctor is Dr. Diez-Hoeck.

**R, 403**

6          Q    And you mentioned, earlier -- you were

7    asked some questions about State Farm and what do

8    you think they did wrong?

9                What are you unhappy about, if anything?

10          A    Well, they're not owning their claim.  I

11    think that's wrong.  I've always heard of State

12    Farm ever since it began so, you know, I guess

13    I'm not surprised.

14          Q    You understand that there was a dispute

15    over the value of Ms. Mills' claim?

16               MR. BUTLER:  Object to the form.

17          Q    Sure.  Do you understand that there was

18    a dispute between Ms. Mills and State Farm

19    regarding how much her injuries were worth?

20          A    I thought -- if I remember correctly,

21    which I, probably, don't -- that somehow State

22    Farm did not pay up what they would accept.  They

23    refused to honor something.

**R, 403**

24          Q    Do you know why?  Do you know why they

25    didn't pay the claim?

R,
403

1        A     No, I don't.    How would I have known

2     that?

3        Q     I'm just asking if you do.

4        A     Yeah.   No.

5        Q     Your son may have been handling the

6     claim at that point.

7        A     He didn't talk about things like that,

8     to me.

9        Q     I understand we're on a big circle now

10    so I was just trying to figure out what you knew

11    because you had stated that opinion.

12           Have you ever heard the saying,

13    Reasonable minds can disagree?

14           MR. BUTLER:  Object to the form.

15       A     Heard what?

16       Q     Have you ever heard the saying,

17    Reasonable minds can disagree?

18       A     No, I've never heard that.

19           MS. VAN DER LINDE:  Thank you for your

20     time.

21                RECROSS EXAMINATION

22    BY MR. BUTLER:

23       Q     One followup to that.

24           Ms. Laseter, your son attempted to

25    obtain a comfort letter or a Consent Assignment

```
 1    of Rights from State Farm, to buy you peace and

 2    make this dispute between just Amber Mills and

 3    State Farm but they've never agreed to do that;

 4    is that correct?

 5         MS. VAN DER LINDE:  Objection to the

 6          form.

 7    A    I don't know how to answer that.  It's

 8    beyond my thinking.

 9    Q    Would your son be able to answer that

10    question?

11    A    Yes.

12    Q    All right.  He can and he did.  Thank

13    you.

14    A    Okay.

15         MS. VAN DER LINDE:  Ms. Laseter, you

16          have the right to read this deposition

17          transcript and make sure everything was

18          taken down accurately or you can waive that

19          right.  It's up to your son and you to make

20          that decision, together.

21         THE WITNESS:  Would you repeat that?

22         MS. VAN DER LINDE:  So the court

23          reporter is going to type this all up and

24          then it's going to be in writing, like,

25          this, and you can read it to make sure that
```

1     you gave the answers you wanted to give here

2     today.  And if you want to change something,

3     you can but then we get to come back and ask

4     you more questions, maybe.

5         THE WITNESS:  So this is going to come

6     to me at home, or do I sit here and wait for

7     this?

8         MS. VAN DER LINDE:  The court reporter

9     will type it up.  We'll send it Mr. Scott

10    Laseter.

11        MR. BUTLER:  Why don't you talk to your

12    son and then you can tell us if you want to

13    read.

14        THE WITNESS:  That sounds good.

15        THE VIDEOGRAPHER:  Off the record at

16    11:17.

17        (The deposition was concluded at 11:17

18    a.m.)

19

20

21

22

23

24

25

<u>CERTIFICATE OF OATH</u>

STATE OF FLORIDA)
                )
COUNTY OF DUVAL )


        I, the undersigned authority, certify that
MARY M. LASETER personally appeared before me and
was duly sworn.


        WITNESS my hand and official seal this
22nd day of January, 2024.



                        _____
                        Kimberly R. Robinson
                        Notary Public - State of Florida
                        My Commission No. HH 215004
                        Expires:  January 10, 2026

1          REPORTER'S DEPOSITION CERTIFICATE

2    STATE OF FLORIDA)
                     )
3    COUNTY OF DUVAL )

4

5          I, Kimberly R. Robinson, certify that I
     was authorized to and did stenographically report
6    the deposition of MARY M. LASETER; and that a review
     of the transcript was not requested; and that the
7    transcript is a true and complete record of my
     stenographic notes.

8          I further certify that I am not a
     relative, employee, attorney, or counsel of any of
9    the parties, nor am I a relative or employee of any
     of the parties' attorney or counsel connected with
10   the action, nor am I financially interested in the
     action.

11

12         I further certify the original deposition
     will be delivered electronically to Kristen Van der
13   Linde, Esquire, attorney for Defendant, for filing
     with the Court or her safekeeping.

14         DATED this 22nd day of January, 2024.

15

16   _____
     Kimberly R. Robinson
17   Notary Public, Court Reporter

18

19

20

21

22

23

24

25