| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE MIDDLE DISTRICT OF FLORIDA |
| 2 | JACKSONVILLE DIVISION |

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE MIDDLE DISTRICT OF FLORIDA
 2                    JACKSONVILLE DIVISION

 3

 4    AMBER MILLS, AN              )
      INDIVIDUAL,                  )
 5                                 )
                    Plaintiff,     )    CASE NO.:
 6                                 )    3:33-CV-00477-TJC-LLL
         vs.                       )
 7                                 )
      STATE FARM MUTUAL            )
 8    AUTOMOBILE INSURANCE         )
      COMPANY,                     )
 9                                 )
                    Defendant.     )
10

11

12            VIDEOTAPED DEPOSITION OF
                SCOTT LASETER, ESQUIRE
13

14                    1:08 p.m.
                  November 8, 2023
15

16

17          Janice S. Baker & Associates
          235 Peachtree Street, Northeast
18            North Tower, Suite 400
              Atlanta, Georgia  30303
19

20

21

22    ERIC A. EDWARDS, CCR No. 4520-6049-0760-1920

23          Janice S. Baker & Associates
          235 Peachtree Street, Northeast
24            North Tower, Suite 400
              Atlanta, Georgia  30303
25               (404) 969-1206
```

EXHIBIT A

On Behalf of the Plaintiff:
  HOWARD G. BUTLER, ESQUIRE
  DREW W. BASKIN, ESQUIRE (via videoconference)
  Butler Law Group
  1506 Prudential Drive
  Jacksonville, Florida  32207
  (904) 398-2308
  (904) 398-3000 (Fax)
  hgb@butlerlawgroup.net


On Behalf of the Defendant (via videoconference):
  AMANDA L. KIDD, ESQUIRE
  Boyd & Jenerette, PA
  201 North Hogan Street
  Suite 400
  Jacksonville, Florida  32202
  (386) 319-1026
  (904) 353-2863 (Fax)
  akidd@boydjen.com

Also Present:
  Lance Davies, videographer

```
 1                  INDEX OF EXAMINATIONS

 2     SCOTT LASETER:                               Page

 3     Examination by Mr. Butler                    6
       Examination by Ms. Kidd                      108
 4     Further Examination by Mr. Butler            179
       Further Examination by Ms. Kidd              180
 5

 6

 7
                    INDEX OF EXHIBITS
 8
       No.  Description                             Page
 9
       P-A    Plaintiff's Notice of Taking Video    11
10            Deposition Scott Laseter, ESQ

11     P-1    Composite of Notice of Intent to Serve   11
              Subpoena, Subpoena to Produce Documents,
12            Information, or Objects or to Permit
              Inspection of Premises in a Civil Action,
13            E-mail chain with Scott Laseter to Amanda
              Kidd dated September 25, 2023, E-mail from
14            Scott Laseter to Amanda Kidd dated
              November 1, 2023
15
       P-2    Composite of demonstratives including    17
16            diagram of accident scene, excerpt of
              citation, excerpts of auto claim file,
17            court docket, and excerpt of State Farm
              letter
18
       P-3    Composite of demonstratives including    24
19            Disability Statement, picture and
              definition of sacrum fracture, and e-mail
20            from Scott Laseter dated October 26, 2021,
              to State Farm with attached invoices from
21            Visiting Angels

22     P-4    Composite of demonstratives including    33
              demand cover sheet and fax transmittal
23            sheet

24     P-5    Demand and supporting documents          33

25
```

| | | | |
|---|---|---|---|
| 1 | P-6 | Demonstrative entitled Claims Handling Activity Context Timeline | 52 |
| 2 | | | |
| 3 | P-7 | Demonstrative entitled Claims Handling Activity Context Timeline | 54 |
| 4 | P-8 | Composite of demonstratives including e-mail from Scott Laseter to Russell Horne and Angela Butler dated August 26, 2022, and case law excerpts | 64 |
| 5 | | | |
| 6 | | | |
| 7 | P-9 | Composite of demonstratives including e-mail from Scott Laseter to State Farm dated October 20, 2022, Consent of State Farm as to Mary Laseter's Assignment of Rights and Claims to Amber Mills, and demonstrative entitled Assignment of Rights and Claims Mary Laseter - Mills | 74 |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | P-10 | Composite of demonstratives entitled Verdict of $245,782 (Exclusive of Costs) Rendered February 17, 2023, Final Judgment Entered March 30, 2023, and Taxable Cost Judgment Entered April 21, 2023 | 94 |
| 12 | | | |
| 13 | | | |
| 14 | P-11 | Assignment of All Claims and Rights Related to July 29, 2021, Collision with attachments | 95 |
| 15 | | | |
| 16 | P-12 | Composite of demonstratives including excerpts from letter from Cole, Scott & Kissane to Angela Butler dated February 28, 2023 | 99 |
| 17 | | | |
| 18 | P-13 | E-mail from Scott Laseter to Howard Butler dated July 29, 2023 | 103 |
| 19 | | | |
| 20 | P-14 | Composite of demonstratives entitled April 14, 2022, Letter from State Farm with Offer, April 14, 2022, Letter to State Farm with Additional Requested Medical Billing, April 29, 2022, Follow-Up Letter to State Farm with Fax Confirmation, and May 2, 2022, State Farm Response Letter with $7,000 Offer | 104 |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |
| 25 | | | |

| | | |
|---|---|---|
| P-15 | Composite of demonstratives with excerpts from letter from State Farm to Mary Laseter dated April 9, 2022 | 106 |
| P-16 | Composite of demonstratives with excerpts from letter from State Farm to Mary Laseter dated August 5, 2021 | 106 |
| P-17 | Composite of demonstratives with excerpts from State Farm response letter to Mary Laseter | 106 |
| P-18 | Composite of demonstratives including demonstratives entitled CKS's Role in Florida's Tort Reform Legislation, and releases from Florida Justice Reform Institute | 181 |

```
 1              Videotaped Deposition of Scott Laseter
 2                       November 8, 2023
 3              THE VIDEOGRAPHER:  Today's date is November
 4      8th, 2023, and the time is 1:08.  We're on the
 5      record for the deposition of Scott Laseter.
 6              Would all counsel present please state your
 7      names for the record after which time the witness
 8      may be sworn in.
 9              MR. BUTLER:  Howard Butler on behalf of Amber
10      Mills individually and via assignment.
11          MS. KIDD:  Are you going to announce, Drew,
12      or --
13          MR. BASKIN:  Drew Baskin here on behalf of the
14      plaintiff as well.
15              MS. KIDD:  All right.  Amanda Kidd on behalf
16      of the defendant State Farm.
17                       SCOTT LASETER,
18       the witness herein, having been first duly sworn,
19      was examined and testified as follows:
20                        EXAMINATION
21      BY MR. BUTLER:
22          Q.   Please introduce yourself to the Court and
23      members of the jury.
24          A.   My name's Scott Laseter.
25          Q.   And what is your relationship to Mary Laseter?
```

1    A.    I am her second child.

2    Q.    How old is your mom, Mary Laseter, as of

3    today?

4    A.    91.

5    Q.    And do you recall her date of birth or at

6    least her birthday?

7    A.    I think so.  March 29, 1932.

8    Q.    Where did you grow up?

9    A.    In Jacksonville on the west side in Ortega

10    particularly.

11    Q.    Was Jacksonville home for the Laseter family?

12    A.    Yes.

13    Q.    How long have you and your immediate family

14    been here in Atlanta?

15    A.    Approximately 1990.

16    Q.    And we're here in Atlanta today to take your

17    deposition with respect to a case involving the claims

18    handling of a July 29th, 2021, wreck that happened in

19    Jacksonville, Florida, involving your mom.  Is that your

20    understanding?

21    A.    Yes.

22    Q.    Am I correct that you are an attorney?

23    A.    Correct.

24    Q.    In what general area of law do you practice?

25    A.    Environmental.

```
 1        Q.    In the years leading up to 2021, are you in
 2   close contact with your mom?  You being -- been living
 3   here in Atlanta, her being in the Jacksonville area, do
 4   you stay in close contact?
 5        A.    Without asking you for a definition of close,
 6   I think as -- as children not living in the same city
 7   would be, yes.
 8        Q.    And that's what I mean.  Would --
 9        A.    Yeah.
10        Q.    -- you talk to her on a regular basis either
11   by phone or some other form of communication?
12        A.    Yes, and visit her frequently enough and...
13        Q.    Where was she living at that time in
14   Jacksonville, that is, in the latter part of July 2021?
15        A.    In the Ocean Village condominiums in Atlantic
16   Beach.
17        Q.    Was there anyone else living with her at that
18   address other than her at that time?
19        A.    No.
20        Q.    Did you come to learn at some point on July
21   29th, 2021, that your mom had been involved in a serious
22   car wreck?
23        A.    Yes.
24        Q.    Was she transported via ambulance or rescue
25   from the scene of that wreck?
```

R,
MIL

1      A.   Yes.

2      Q.   Was she hospitalized?

3      A.   She was taken to the hospital.  My

4  recollection is that they actually attempted to

5  discharge her and then took her back.  And I believe

6  that she actually ended up going home that night, but

7  I'd have to verify if that's correct.  This is during

8  the COVID period, and so hospital protocols were

9  completely out of whack.

10      Q.   Did you assist your mom in -- strike that.

11           Did your mom fracture her sacrum and a rib in

12  that wreck?

13      A.   Correct.

14      Q.   Did your mom require some home care assistance

15  with everyday activities of daily living for a number of

16  months after that wreck?

17      A.   It -- certainly a number of weeks.  I think

18  that probably it was in the order of one and a half to

19  two months.

20      Q.   And we have some records here --

21      A.   Yeah.

22      Q.   -- that we'll look at with you together on

23  that subject.

24           Did you assist your mother in navigating

25  certain matters related to this wreck in connection with

1  things like her injuries, her vehicle, insurance
2  matters, things like that?
3      A.   Yes.
4      Q.   Did you assist her by dealing with certain
5  people in businesses on her behalf on those fronts?
6      A.   Yes.
7      Q.   Who was Mary Laseter's auto liability
8  insurance carrier?
9      A.   State Farm.
10     Q.   Do you know approximately how long State Farm
11 had been her auto liability insurance carrier?
12     A.   As far as I know, they had been her auto
13 liability carrier as long as she's had autobi- --
14 automobile liability insurance.  A de- -- and certainly
15 decades.
16     Q.   Did you communicate with State Farm on your
17 mom's behalf with regard to this wreck?
18     A.   Yes.
19     Q.   Was State Farm timely notified about this
20 crash?
21     A.   Yes.
22          MS. KIDD:  Object to form.
23     Q.   (BY MR. BUTLER)  Did State Farm assign a claim
24 number for this particular case that you referenced on
25 all of your communications?

1    A.   They certainly assigned --

2         MS. KIDD:  Object to form.

3         THE WITNESS:  -- a claim number, and I --

4    it's -- I -- I believe I included that reference

5    number frequently.  I can't say I did it on every

6    communication, but...

7    Q.   (BY MR. BUTLER)  I'm going to show you some

8    items in that regard so that we can verify what that

9    case number was.  So let me start by saying prior to

10   your deposition in this case, State Farm's counsel, Ms.

11   Kidd, who is here with us today, sent you a subpoena via

12   e-mail and asked you to provide certain items; is that

13   true?

14   A.   Correct.

15   Q.   We have marked the notice of deposition as

16   Plaintiff's Exhibit A to the deposition.

17        (Plaintiff's Exhibit A marked/identified.)

18   Q.   (BY MR. BUTLER)  Now, marking as Composite No.

19   1 the notice of intent to serve a subpoena with the

20   subpoena to Scott Laseter, some e-mail correspondence in

21   connection with that, and your response to Amanda Kidd

22   that also went to me and my office on behalf of Amber

23   Mills on November 1st, 2023.  That'll be Composite No.

24   1.

25        (Plaintiff's Composite Exhibit No. 1

```
 1          marked/identified.)
 2               MS. KIDD:  Just for clarification is that just
 3          the e-mails, Howard --
 4               MR. BUTLER:  It's --
 5               MS. KIDD:  -- not the production itself?
 6               MR. BUTLER:  It is your notice of intent, the
 7          subpoena, the e-mails regarding that back and forth
 8          between you and Mr. Laseter, and his response that
 9          has that itemization of all of the categories.  I
10          haven't included in this all of those documents,
11          but you have them.  We have them.  And if you want,
12          we can even make those part of this.  But it -- to
13          keep it --
14               MS. KIDD:  Yeah.  That's what I'm just trying
15          to clarify, the -- what the extent of the exhibit
16          was.  Was it ac- -- be actually the production in
17          addition to just the e-mails.
18               MR. BUTLER:  It is the share file attachments
19          that go on for several pages, four pages, I guess.
20          Q.   (BY MR. BUTLER)  So let me just ask you to
21     take a quick look at that.
22               MS. KIDD:  Uh-oh.  You guys are frozen.  Or
23          Mr. Laseter's frozen.  There you -- I think we're
24          back.  Hopefully, wasn't -- wasn't a question or
25          answer there.
```

```
 1              MR. BUTLER:  There wasn't, so...

 2              MS. KIDD:  Perfect.

 3         Q.   (BY MR. BUTLER)  So, Mr. Laseter, my question

 4    to you is:  Are the items in Plaintiff's Composite No. 1

 5    a true and accurate copy of the subpoena that was

 6    e-mailed to you, the e-mail correspondence regarding the

 7    subpoena, and your November 1st, 2023, production of

 8    items that are listed there?

 9         A.   I have no reason to question that this is

10    accurate in its entirety.  Just by clarification the --

11    the e-mail with that three- or four-page list is

12    actually something the ShareFile produces.  Those aren't

13    the actual documents.  It's basically just an inventory

14    of what's in the ShareFile.

15         Q.   And that's what we were talking about --

16         A.   Yeah.

17         Q.   -- before I did not attach --

18         A.   Right.

19         Q.   -- to that just for brevity's sake the actual

20    documents pursuant to each of those categories.

21         A.   Yeah.

22         Q.   But what is there, is that true and accurate?

23         A.   Yes.  To the best of my knowledge, yeah.

24         Q.   All right.  And is it true that that response

25    would have been the first time you or Mary Laseter had
```

```
1    ever provided Amber Mills or her attorneys a copy of

2    your e-mails to State Farm on behalf of Mary Laseter

3    related to their claims handling?

4         A.   I think that's right.

5         Q.   All right.  I'm going to have you just take a

6    look at some items to...

7              MS. KIDD:  What is it that you're going to

8         take a look at, Howard?

9              MR. BUTLER:  It -- if you'd like, I could -- I

10        didn't want to put them up on the screen yet, but

11        these are documents that had been produced in this

12        case or that were in his subpoenas related to the

13        crash, the vehicle damage, that kind of thing.

14             Do you want me to show them to you somehow?

15             MS. KIDD:  Yes, if you don't mind.

16             MR. BUTLER:  Okay.

17             MS. KIDD:  [Audio failure] -- identify them

18        for me.

19             MR. BUTLER:  I'm sorry?

20             MS. KIDD:  But it may be easier if you just

21        had the court reporter scan them and -- or -- or

22        somehow put them on the screen.

23             MR. BUTLER:  Yeah.  What we'll do is I'll have

24        Mr. Laseter just hold them up so -- one at a time

25        so that you can see these.
```

```
 1              MS. KIDD:  Okay.  Okay.  Thank you.

 2         Q.   (BY MR. BUTLER)  Mr. Laseter, that first item,

 3    does that look familiar to you from this case having

 4    attended your mother's deposition in the underlying

 5    case, having been at trial, and so forth?  Does that

 6    look familiar to you?

 7         A.   Certainly the information depicted on this is

 8    familiar to me.  I can't say that I actually have ins-

 9    -- have recall of this particular document.  But

10    certainly the information is familiar.

11         Q.   Okay.  All right.  And show the second item

12    there if you would.

13              MS. KIDD:  Okay.  Thanks.

14         Q.   (BY MR. BUTLER)  And, Mr. Laseter, was your

15    mother cited for this wreck, that is, making a left-hand

16    turn directly into the right-of-way of Amber Mills?

17         A.   I -- I know that she was --

18              MS. KIDD:  Object to form.

19              THE WITNESS:  I know she received a citation,

20         and this appears to be a -- a type of copy of that

21         citation and have no reason to think it's not

22         accurate.  Yeah.  This -- this -- this

23         particular -- this -- this looks like a -- a

24         demonstrative exhibit, just kind of blowout on a

25         copy of the citation.
```

```
 1        Q.   (BY MR. BUTLER)  And if you will show us the

 2   next item.

 3             MS. KIDD:  Okay.

 4        Q.   (BY MR. BUTLER)  And if you would show us the

 5   next item.

 6             MS. KIDD:  Okay.

 7        Q.   (BY MR. BUTLER)  And so was State Farm advised

 8   early on and did they note early on following this wreck

 9   that your mom had been cited and that the other party --

10   that would be Amber Mills -- was not cited for any

11   reason?

12             MS. KIDD:  Object to form.

13             THE WITNESS:  I believe that they -- I have no

14        reason to -- to -- to doubt the information that's

15        showing up on these -- these documents.  I am

16        confident that they knew she had been cited and

17        would have seen the police report and known that

18        Amber had not been cited.  I'm not sure I'm

19        familiar enough with the claims.  Wouldn't be able

20        to say one way or the other.

21        Q.   (BY MR. BUTLER)  Okay.  All right.  And the

22   last item or next item.

23             MS. KIDD:  Go a little bit closer.

24             Okay.  Thanks.

25        Q.   (BY MR. BUTLER)  Your mom pled guilty or was
```

1   found guilty of the citation for causing the subject

2   crash, true?

3           MS. KIDD:   Object to form.

4           THE WITNESS:   She didn't contest the citation.

5       I don't know that she ever appeared and pled, so

6       I'm not exactly sure how the form of that is.   But,

7       yeah, she didn't contest.   She acknowledged

8       responsibility.

9           MS. KIDD:   Okay.

10      Q.    (BY MR. BUTLER)   Do you recall what the extent

11   of damage was to your mother's vehicle from this wreck?

12      A.    It was totaled.

13      Q.    And did State Farm acknowledge the fact that

14   it -- that vehicle owned by Mary Laseter was totaled in

15   this wreck soon after this crash?

16      A.    Correct.

17      Q.    All right.   We'll -- just for brevity's sake,

18   we'll mark that as Plaintiff's Composite No. 2.

19        (Plaintiff's Composite Exhibit No. 2

20        marked/identified.)

21          MS. KIDD:   All right.   I'm going to object to

22      that exhibit based upon the form of completion.

23      But otherwise -- put that on the record.

24      Q.    (BY MR. BUTLER)   Let me ask you to take a look

25   at these items so we can go back and talk a little bit

1    about your mom's injuries in this July 29th, 2021,

2    wreck.

3              And so did you do as part of your assisting

4    your mother provide State Farm with some documentation

5    from her physician as to crash-related disability?

6         A.    Yes.

7         Q.    If you would --

8         A.    Display this?

9         Q.    Is this a true and accurate copy of the

10   disability form that State Farm and its -- it says State

11   Farm up in the top left-hand side.  Is this information

12   that you obtained from the doctor and provided to State

13   Farm?

14              THE WITNESS:  Amanda, have you seen this?

15              MS. KIDD:  Yeah.  I can see it.

16              THE WITNESS:  Mr. Butler, I -- I -- I'm

17          assuming that this is -- is the document that I

18          submitted to -- you know, that I would have only

19          had that in nonelectronic form, so it's not coming

20          out of -- may know, but if you -- this is part of

21          what I produced.  Yeah.  This is the document

22          that --

23         Q.    (BY MR. BUTLER)  I'll represent to you --

24         A.    Yeah.

25         Q.    -- that's exactly --

1    A.    Yeah.

2    Q.    -- where it comes from.

3    A.    Yeah.

4    Q.    So with that understanding, does that appear

5    to be a true and accurate copy of the State Farm

6    disability form that you provided to State Farm in this

7    particular case or the underlying case?

8    A.    Yeah.  And to maybe be hypertechnical, this

9    may have actually been submitted by Dr. Gould directly

10   to State Farm.  I'm not sure whether I got it from him

11   and then submitted it.  But, yes, this was prepared by

12   Dr. Gould and submitted to State Farm.

13   Q.    And he talks about her having that fractured

14   sacrum?

15   A.    Mm-hmm.

16         MS. KIDD:  Object to form.

17         THE WITNESS:  The form does in fact reference

18         to fractured sacrum.  Yes.

19   Q.    (BY MR. BUTLER)  And we have a diagram there

20   so that we can kind of understand where the sacrum is.

21   And based on your observation and interaction with your

22   mom back during that time frame, where this shows the

23   sacrum being on the body, does that appear to be

24   consistent with your recollection of events and at least

25   a part of her injury?

```
 1              MS. KIDD:  Object to form.

 2              THE WITNESS:  Yeah.  I believe this is a

 3         accurate anatomical depiction of the pelvis

 4         including the sacrum.  I understand that my

 5         mother's fracture was on her right sacrum.  It was

 6         an inline fracture as I understand it.  This

 7         doesn't actually, that I can see, depict any

 8         fractures or purpor- -- this does not purport to be

 9         her sacrum, but --

10         Q.   (BY MR. BUTLER)  It's just to show where the

11    sacrum --

12         A.   Yeah.

13         Q.   -- is --

14         A.   Right.

15         Q.   -- generally.

16         A.   Yeah.  So it's kind of the wing part of the --

17    of the -- the hip and pelvis structure.

18         Q.   And in addition your mom fractured a rib in

19    this wreck, you said?

20         A.   Correct.

21         Q.   All right.  Going back to that disability

22    form, did Dr. Gould indicate any kind of limitations

23    with respect to activities of daily living and those

24    kinds of things given your mom's injuries?

25              MS. KIDD:  Object to the form.
```

MIL, R, 403

1    THE WITNESS:   The form in Section 9, Subpart 1

2    says that limited weightbearing due to fracture.

3    Q.   (BY MR. BUTLER)  Isn't there also a section on

4    there -- and if I can see it for --

5    A.   Yeah.

6    Q.   -- just a second, I can maybe help.

7         Look at No. 7 and 9.  What does No. 7 say?

8    A.   7 is a -- checked a box that says has this

9    motor vehicle accident for which you are treating in the

10   above named person caused a physical impairment, and the

11   box for yes is -- is marked.  And No. 9 the -- the

12   prompter question is has this impairment limited your

13   patient's ability to work on their job or do household

14   activities, and the box is checked yes as well.

15   Q.   And the next items have to do with I think

16   some of the activity of daily living items.  If you'll

17   just flip through those a coup- -- I'm sorry.  Maybe --

18   A.   Yeah, this -- yeah.

19   Q.   Let me keep going through the others.  Did

20   we --

21   A.   No.  It's not --

22   Q.   -- include that --

23   A.   -- this group.  No.  The other two are just

24   the --

25   Q.   Do you recall your mom receiving home care for

MIL, 403, R

1  activities of daily living related to her wreck-related

2  injuries?

3       A.   Yes.  I mean, the -- that I --

4       Q.   And before you couldn't remember if it was

5  some weeks or some months.  Let's go back to that

6  disability form again and see if there is an indication

7  of a time period.

8       A.   Yeah.  Thi- -- this goes through December 2nd,

9  2021, from the date of the wreck, July 29, 2021.  And

10  that's generally consistent with the time frame I would

11  remember.

12       Q.   So August 29th would be one month.  September

13  29th would be two months.  October 29th would be three

14  months.  November 29th would be four months.  And this

15  slip goes up until when?

MIL, 403, R

16       A.   December 2nd, 2021.  I -- I think that they --

17  a possible point of confusion is I'm not sure when --

18  and -- and the records will make it clear.  I'm not sure

19  when the actual home healthcare agency quit coming.  The

20  doctor said she was disabled through the -- through the

21  2nd of December at least.  She had limited capacity even

22  after that point.  I'm not exactly sure if -- if the

23  Visiting Angels, you know, care te- -- care keeper team

24  left before or after that date.

25       Q.   Your production of records would have

1    information concerning that.  I know that I saw some

2    records pertaining to some of that generally.

3         A.    Correct.  And it was submitted to State Farm

4    as -- you know, and they in fact paid something toward

5    that cost.  I can't remember if they paid it all or...

6         Q.    Did you assist your mom in understanding her

7    rights and responsibilities in terms of her auto

8    liability insurance generally?

9         A.    Yes.

10        Q.    And in the items that you produced to State

11   Farm and to us on November 1st, there is a folder, a

12   copy of the State Farm insurance policy?

13        A.    I -- I'm sure there is.  Yeah.

14        Q.    Let's make that disability slip --

15        A.    The whole composite or just the slip?

16        Q.    Let me see it and see what I think we need.

17        A.    And, however, I can clarify my last question.

18   If -- if in fact I produced a copy of her policy, what I

19   produced and I had it sitting here today, I'm not

20   perfectly sure whether I have actually a copy of her

21   policy or would've merely seen it at her -- at her

22   place.  So yeah.  I assume the policy's not in dispute.

23        Q.    That's -- that's part of it too.  So let's

24   include the -- that's Plaintiff's Exhibit No. 3,

25   Composite No. 3?  All right.

```
1            (Plaintiff's Composite Exhibit No. 3

2      marked/identified.)

3            MS. KIDD:  Let's -- what wasn't part of it?

4      I'm sorry.  I think it kind of -- it --

5            MR. BUTLER:  Plaintiff's Comp- --

6            MS. KIDD:  -- a bit.

7            MR. BUTLER:  Plaintiff's Composite No. 3 was

8      the disability slip that we looked at, the diagram

9      showing the sacrum, and then the itemization

10     pertaining to what was sent to State Farm regarding

11     some of the Home [sic] Angels information.

12           MS. KIDD:  Okay.  I'm going to object to that

13     exhibit as far as the demonstrative.

14     Q.   (BY MR. BUTLER)  Per of the terms of your

15 mother's policy -- strike that.

16           Per the terms of the auto liability policy

17 that your mother had with State Farm, who had the

18 exclusive rights to investigate, negotiate, and settle

19 the claim?

20     A.   My understanding is --

21           MS. KIDD:  Object to form.

22           THE WITNESS:  -- State Farm -- my

23     understanding is State Farm had all those rights

24     under the policy.

25     Q.   (BY MR. BUTLER)  The item in front of you,
```

```
 1   does that appear to be a true and accurate portion of
 2   that provision that says just that?
 3           MS. KIDD:  Can I see what he's got?
 4           THE WITNESS:  Yeah.
 5           MS. KIDD:  Can you please show that.
 6           MR. BUTLER:  Yeah.  Sure.
 7           MS. KIDD:  All right.  Thank you.
 8           THE WITNESS:  Yeah.
 9           So, Howard, I -- I don't know that I can make
10      a representation about this being a precise
11      replication of the policy itself.  I can say with
12      high degree of confidence that this is typical
13      language.  I fully believe this is the provision
14      that would be in her policy and --
15      Q.   (BY MR. BUTLER)  And I'll represent --
16      A.   Yeah.
17      Q.   -- to you --
18      A.   Yeah.
19      Q.   -- that is the language from her policy.
20      A.   Yeah.
21      Q.   Assuming that to be correct, what specifically
22   does that policy say in terms of who has the exclusive
23   right to investigate, negotiate, and settle the claim?
24      A.   Yeah.  The -- well --
25           MS. KIDD:  Object to form.
```

```
 1              THE WITNESS:  The provision states we -- and
 2         "we" is defined elsewhere to be State Farm -- have
 3         the right to investigate, negotiate, and settle any
 4         claim or lawsuit, defend an insured in any claim or
 5         lawsuit, the attorneys chosen by us -- and, again,
 6         "us" is defined as State Farm -- and appeal any
 7         award or legal decision for damages payable under
 8         this policy's liability coverage.
 9         Q.   (BY MR. BUTLER)  If for whatever reason the
10    case were to go into litigation, who had the exclusive
11    right to choose and pay the defense attorneys?
12         A.   State Farm.
13              MS. KIDD:  Object to form.
14         Q.   (BY MR. BUTLER)  In accordance with the
15    policy, who had the exclusive right to make all
16    litigation-related decisions?
17         A.   State Farm.
18              MS. KIDD:  Object to form.
19         Q.   (BY MR. BUTLER)  Did State Farm in fact handle
20    all aspects of the claim, investigation, negotiations,
21    and decisions regarding settlement in the Mills versus
22    Laseter case?
23              MS. KIDD:  Object to form.
24              THE WITNESS:  State Farm did all the
25    investigation and handling that anybody did.
```

Whether they did all of it or not is a -- is beyond
my knowledge.

Q.    (BY MR. BUTLER)  Whatever investigation was
done was done --

A.   By State Farm.

Q.   Who between State Farm and Mary Laseter
handled in fact all of the negotiations and decisions
regarding settlement in the Mills versus Laseter case?

A.   State Farm and its --

     MS. KIDD:  Object to form.

     THE WITNESS:  -- its appointed counsel.

Q.   (BY MR. BUTLER)  Did Mary Laseter have any
involvement in those decisions?

A.   No.

Q.   Did State Farm in fact choose the particular
insurance defense firm, the Cole, Scott & Kissane firm
or who we refer to CSK sometimes to defend this case?

A.   Yes.

Q.   Did your mom or you for that matter have any
involvement in that decision?

A.   No.

Q.   Did State Farm in fact handle all
litigation-related decisions and strategy?

A.   Yes.

     MS. KIDD:  Object to form.

```
 1        Q.    (BY MR. BUTLER)  Did your mo- -- strike that.
 2              Did Mary Laseter have any involvement in
 3     those?
 4              MS. KIDD:  Object to form.
 5              THE WITNESS:  I think it's fair to say no.
 6        Q.    (BY MR. BUTLER)  Did Mary Laseter rely upon
 7     State Farm's knowledge and expertise to properly
 8     investigate, evaluate, and negotiate Amber Mills' claim
 9     so as to protect Mary Laseter from personal liability?
10              MS. KIDD:  Object to form.
11              THE WITNESS:  Can I have you repeat that
12     question, please?
13        Q.    (BY MR. BUTLER)  Sure.
14              MR. BUTLER:  And, Amanda, your form objection,
15     I'll stipulate that it remains.
16              MS. KIDD:  Sure.
17        Q.    (BY MR. BUTLER)  Did Mary Laseter rely upon
18     State Farm's knowledge and expertise to properly
19     investigate, evaluate, and negotiate Amber Mills' claim
20     so as to protect Mary Laseter from personal liability?
21        A.    Yes.
22        Q.    Following this July 29th, 2021, wreck, did
23     your mom receive certain correspondence from State Farm
24     from time to time, I guess?
25        A.    Yes.
```

HS

HS

1    Q.   Did she receive a letter from State Farm dated

2    August 5th, 2021 -- that would be about a week after

3    this wreck -- that said, quote, State Farm will

4    investigate and pursue settlement if appropriate,

5    unquote?

6            MS. KIDD:  Object to form.  Are you showing

7        him a document?  I don't -- if you don't mind, if

8        you can just tell me when you're showing him a

9        document, that'd be great.

10           MR. BUTLER:  Sure.  Again, I -- I didn't want

11       to show it until I had laid some sort of foundation

12       for it.

13   Q.   (BY MR. BUTLER)  So --

14           MS. KIDD:  Okay.

15   Q.   (BY MR. BUTLER) -- again, my question was:

16   Did State Farm send Mary Laseter a letter dated August

17   5th, 2021, which said, quote, State Farm will

18   investigate and pursue settlement if appropriate,

19   unquote?

20           MS. KIDD:  Object to form.

21           THE WITNESS:  I know that she got a letter

22       that -- and letters plural at about this time from

23       State Farm.  I don't have specific knowledge or at

24       least recollection sitting here today of whether

25       August 5th was the date of the letter I recall.  If

```
 1        this was in my production, then it certainly would

 2        be something that -- that would be an accurate copy

 3        of the letter that they sent her.

 4        Q.   (BY MR. BUTLER)  And I will tell you that --

 5   that either is a letter that State Farm produced to

 6   us --

 7        A.   Mm-hmm.

 8        Q.   -- in this case or that came from your

 9   production.

10        A.   Yeah.

11        Q.   We'll figure that out.

12             Approximately a month after this July 29th,

13   2021, crash, did State Farm send Mary Laseter a letter

14   that said, quote, we will attempt to conclude this claim

15   as reasonably as possible with the attorneys

16   cooperation, unquote?

17             MS. KIDD:  Object to form.

18             Can you keep zooming?  Keep going.  I can't

19        see the date.

20             THE VIDEOGRAPHER:  I'm maxed out.

21        Q.   (BY MR. BUTLER)  Does it say August 26th,

22   2021, at the top?

23        A.   Yes.  This appears to be a August 26, 2021,

24   letter from State Farm to my mother about the automobile

25   accident.  And it does in fact say that we will -- that
```

Amber Mills has hired an attorney.  And it says that
State Farm will attempt to conclude this claim as
reasonably as possible with the attorney's cooperation
among other things.

    Q.  Now, during all of this time and up through at
least December or so of 2021, your mom was receiving
some home healthcare from injuries related to this
collision?

    A.  Yeah.  I mean, certainly approximately from
that time period.  The exact date's to be determined.

    Q.  And you -- strike that.

        Did you or Mary Laseter know what level of
investigation and evaluation and so forth that State
Farm was doing in this case after their August 5th
letter that said State Farm will investigate and pursue
settlement if appropriate, unquote?

    A.  Yeah, not at this time.

        MS. KIDD:  Object to form.

        THE WITNESS:  Meaning not at the time

        referenced in the letter.

    Q.  (BY MR. BUTLER)  About six and a half months
or a little more after this wreck, Amber Mills through
her attorneys sent a demand to State Farm in connection
with this case.  Is that your general understanding?

    A.  Correct.

1    Q.   So let's start with the first page there.

2  This is a demand package dated February 18th, 2022.

3        Does it reference the names Amber Mills and

4  State Farm's insured Mary Laseter?

5    A.   Yes, it does.

6    Q.   Does it state the date of crash correctly as

7  July 29th, 2021?

8    A.   It does.

9    Q.   Does it have the proper claim number on it

10 that matches the claim number that's on all the other

11 documents back and forth, that is, 5922S627R?

12   A.   It does have that number, and I believe that's

13 the correct claim number.  Yes.

14   Q.   And the second item that you have there is

15 that same item with a fax confirmation sheet confirming

16 receipt of a hundred and some odd pages?

17   A.   Yes, a hundred and four pages.  And for

18 clarity this -- this document, this letter was a package

19 of information.  It was lengthy.  A hundred and four

20 pages sounds plausible.  Yeah.

21   Q.   And that fax confirmation sheet was a

22 rescinding of those items based on some concern or

23 complication or whatever.  But it shows receipt of those

24 hundred and four pages of that settlement package on

25 what date?

```
 1            MS. KIDD:  Object to form.

 2            THE WITNESS:  The -- the confirmation at the

 3       top of the fax transmittal sheet says March 28th,

 4       2022.

 5            Is that responsive?

 6       Q.   (BY MR. BUTLER)  Yep.

 7            And I'm going to make that a composite along

 8  with this more lengthy document, which has those

 9  attachments to it.  But I want to ask you some separate

10  questions about that.  So let's go ahead and make

11  that -- what you have in your hand Plaintiff's Composite

12  No. 4.

13        (Plaintiff's Composite Exhibit No. 4

14       marked/identified.)

15            THE WITNESS:  And this just the two pages?

16       Q.   (BY MR. BUTLER)  Yes.  Thank you.

17            MS. KIDD:  [Audio failure.]

18            THE REPORTER:  Amanda, I'm sorry.  Did you

19       object?

20            MS. KIDD:  I objected to the composite.

21            THE REPORTER:  Okay.

22       Q.   (BY MR. BUTLER)  We'll go ahead and mark

23  Plaintiff's Composite Exhibit No. 5.

24        (Plaintiff's Composite Exhibit No. 5

25       marked/identified.)
```

```
 1        Q.    (BY MR. BUTLER)  And that's the demand with

 2   the attachments, and I'll need that back because I'm

 3   going to ha- -- ask some questions about it.

 4              MS. KIDD:  Are we at a good stopping point for

 5        a comfort break?  It's been about an hour.

 6              MR. BUTLER:  If -- if you can -- and, listen,

 7        if you have to, I'll -- I can stop right this

 8        second.  But if you can give me about three, four

 9        minutes to get to a pausing point?

10              MS. KIDD:  Yeah.  That's fine.

11              MR. BUTLER:  It's up to you.

12              MS. KIDD:  Yeah.  I can wait three or four

13        minutes.  Okay.  I just didn't know how long you

14        were going to be.

15              MR. BUTLER:  Yeah.

16              MS. KIDD:  If you were about to get into the

17        demand.

18              MR. BUTLER:  Sure.  No -- no problem there.

19        Q.    (BY MR. BUTLER)  So -- so let me ask you some

20   questions about that demand if I can.  And...

21              THE REPORTER:  Amanda, he's showing it on the

22        screen for you.

23              MS. KIDD:  Oh.  Thank you.

24        Q.    (BY MR. BUTLER)  So I want to discuss the

25   information and items provided to State Farm on behalf
```

```
 1  of Amber Mills in addition to State Farm's own
 2  investigation over that six and a half, seven months or
 3  so following this wreck.  We talked about the fact that
 4  the demand has the correct identifying information, but
 5  let's talk a little bit about the -- some of the content
 6  there.
 7          Does the demand specifically discuss Amber
 8  Mills' healthy, active lifestyle as the wife and mother
 9  and that she is a Pilates instructor?
10      A.   Yes.
11          MS. KIDD:  I'm frozen.  Or Mr. Laseter's
12      frozen.
13          MR. BUTLER:  Okay.  You haven't missed
14      anything.  We're -- did you get his answer?
15          MS. KIDD:  Nope.  I didn't get -- I don't
16      think I got the complete question.  I -- it stopped
17      at Pilates.
18          THE WITNESS:  And there's a connection notice
19      now.
20          MR. BUTLER:  Are we back on?
21      Q.   (BY MR. BUTLER)  Your answer to the last
22  question was yes?
23      A.   Correct.
24      Q.   Let me just repeat so that we have it in case
25  there was any technical problems.
```

```
 1          Does --

 2          MS. KIDD:  Okay.  And it froze at -- I -- I

 3     heard have it in case there were technical problems

 4     out of you, Howard.  So I don't -- maybe we need to

 5     re- -- repeat that question to Mr. Laseter.

 6     Q.   (BY MR. BUTLER)  Does the settlement demand

 7  package specifically discuss that Amber Mills -- strike

 8  that.

 9          Does the demand package specifically discuss

10  that Amber Mills -- strike that.

11          Does the demand package specifically discuss

12  Amber Mills' healthy, active lifestyle as a wife and

13  mother and that she is a Pilates instructor?

14     A.   Yes.

15          MS. KIDD:  Object to the form.

16     Q.   (BY MR. BUTLER)  Does it include a photo of

17  Amber Mills, her husband, and kids out on a paddle board

18  and canoe prior to this collision right on the first

19  page?

20     A.   It --

21          MS. KIDD:  Object to the form.

22          THE WITNESS:  There's a photograph of -- of a

23     woman on paddle board with children and a -- a man

24     in a kayak who I assume to be her family.  At this

25     point I didn't know -- I'd never seen Amber or her
```

1    family, so that...

2    Q.   (BY MR. BUTLER)  In the first paragraph does

3    it specifically reference that Amber Mills sustained,

4    quote, serious injuries, unquote?

5         MS. KIDD:  Object to form.

6         THE WITNESS:  Yes.  It says that in the first

7    paragraph.

8    Q.   (BY MR. BUTLER)  And in the very next

9    sentence, it says what?

10   A.   The last sentence of the -- well, that -- the

11   second sentence the letter says in an effort to timely

12   resolve this matter, we offer the following information,

13   colon, and then it proceeds on.

14   Q.   Does it include a description and diagram

15   describing how the crash in -- occurred on Page 2?

16   A.   Yes.

17        MS. KIDD:  Object to form.

18   Q.   (BY MR. BUTLER)  Does it reference a copy of

19   the crash report?

20        MS. KIDD:  Object to form.

21        THE WITNESS:  And it says that the copy of the

22   crash is enclosed.

23   Q.   (BY MR. BUTLER)  Does it contain a copy of the

24   citation issued to State Farm's insured?

25   A.   Yes.

1    Q.   Does --

2         MS. KIDD:  Object to form.

3    Q.   (BY MR. BUTLER)  Does it set out the Florida

4    statute cited in that citation?

5    A.   It does.

6         MS. KIDD:  Object to form.

7    Q.   (BY MR. BUTLER)  Does it include information

8    and a photo regarding Amber Mills' vehicle damage, air

9    bag deployment, and injurious forces involved in this

10   collision?

11        MS. KIDD:  Object to form.

12        THE WITNESS:  It does.

13   Q.   (BY MR. BUTLER)  You can answer.

14   A.   It does.

15   Q.   Does it include both in the demand and in the

16   attachments the initial clinical symptoms findings and

17   treatment immediately after the collision and documented

18   over a six-month period of time?

19        MS. KIDD:  Object to form.

20        THE WITNESS:  The demand package certainly

21        presents medical records reflecting injuries and

22        along with diagrams and descriptions.

23        Is it -- is that responsive?

24   Q.   (BY MR. BUTLER)  Sure.  And let me just -- if

25   you'll look on the tabs, I've put some numbers on some

```
 1    things that have -- now, if you'll just find the yellow

 2    sticky No. 1 without --

 3         A.   It seems to be gone.

 4         Q.   It's at the end there, I think.  It's pretty

 5    far down.

 6         A.   Yeah.

 7         Q.   Is that a record from January 28th, 2022, that

 8    is about six months after the wreck?

 9              MS. KIDD:  Object to form.

10              THE WITNESS:  Yeah.  This appears to be a

11         chart -- so chart notes for Amber Mills dated

12         January 28, 2022, from Kelly Huber, DC.

13         Q.   (BY MR. BUTLER)  So it references and

14    discusses records from a Dr. Kelly Huber?

15         A.   Correct.

16              MS. KIDD:  Object to form.

17         Q.   (BY MR. BUTLER)  Does the demand include the

18    cervical MRI radiology report from Precision Imaging

19    read by their radiologist?  This should be Tab 2.

20         A.   Yeah.  It includes a rec- --

21              MS. KIDD:  Object to form.

22              THE WITNESS:  -- includes a record from

23         Precision Imaging Centers being directed to Dr.

24         Richard B-o-e-h-m-e -- Boehme?

25         Q.   (BY MR. BUTLER)  Boehme, I think.
```

```
 1        A.   Boehme, I think -- to -- to Dr. Richard Boehme
 2   regarding Ms. Mills.
 3        Q.   And does that Precision Imaging radiology
 4   report discuss a herniated disk at C6-7 with an annular
 5   fission or tear down at the bottom?
 6             MS. KIDD:  Object to form.
 7             THE WITNESS:  The -- the final impression at
 8        that end says C6 dash 7 right paracentral disk
 9        herniation with annular fissure incident -- excuse
10        me, indents, the thecal sac.
11        Q.   (BY MR. BUTLER)  Thecal sac.
12        A.   Thecal sac.
13        Q.   That's right.
14        A.   Thank -- yeah.
15        Q.   Does the demand include -- and you can go --
16   go back for -- does the demand include a neurological
17   assessment performed by a neuro -- by -- strike that.
18             Does the demand include a neurological
19   assessment by a neurologist regarding Amber Mills'
20   postconcussion and cervical radiculitis related to the
21   C6-7 disk herniation with annular tear in Tab 3 where
22   the --
23             MS. KIDD:  Object to form.
24        Q.   (BY MR. BUTLER) -- the -- a general --
25        A.   See --
```

```
 1        Q.   -- place to look?

 2        A.   It says -- I see a -- some handwritten notes.

 3        Q.   Let's start back in the demand itself and

 4   see if you see a section there that talks about the

 5   neurology assessment that was done.

 6        A.   I see a reference to the -- her being seen by

 7   Neurology Associates on August 11th, 2021.

 8        Q.   And does it discuss postconcussion or closed

 9   head injury or something to that effect?

10             MS. KIDD:  Object to form.

11        Q.   (BY MR. BUTLER)  Are you looking in the

12   records or in the -- if you'll --

13        A.   I'm looking in the demand at the moment.

14        Q.   Okay.  Because, yeah, we highlighted and --

15        A.   So --

16        Q.   -- extracted --

17        A.   Yeah, in the --

18        Q.   -- parts.

19        A.   I'm seeing reference to symptoms.  I'm not

20   seeing descriptions of conclusion.

21        Q.   All right.

22             MR. BUTLER:  Why don't we take a break so

23        that -- that's give us a chance to look and get a

24        little more precise there.

25             THE VIDEOGRAPHER:  We're going off the record
```

```
 1        at 2:10.
 2          (Recess taken from 2:10 p.m. until 2:16 p.m.)
 3            THE VIDEOGRAPHER:  We're back on the record at
 4        2:16.
 5        Q.   (BY MR. BUTLER)  Mr. Laseter, we were looking
 6    at the demand package.  And the page that's in front of
 7    you down towards the bottom, does it have a section
 8    where it talks about Dr. Huber referring Amber Mills for
 9    a neurological assessment and the discussion of -- of
10    the neurologist's findings?
11            MS. KIDD:  Object to form.
12            THE WITNESS:  Yes.  It says the patient was
13        evaluated after the inc- -- accident and has been
14        treated for closed head injury and cervical spine
15        pain since by a chiropractor.
16        Q.   (BY MR. BUTLER)  And we included from the
17    neurologist's records a -- a portion of the records at
18    the top of the next page.  Can you hold that up so that
19    we can see that?
20            All right.  Let me have you look at Tab 4.
21    Did the demand include a disability form for Amber Mills
22    from the treating physician, Dr. Huber?
23            MS. KIDD:  Object to form.
24            THE WITNESS:  Yes.  There's a disability
25        certificate from Dr. Kelly Huber dated August 9,
```

1      2021.

2          Q.   (BY MR. BUTLER)  If you would pull that

3      temporarily off and just hold it up so that we can --

4      all right, sir.  Thank you.

5              And I'm going to refer you back to Tab No. 1.

6              On this note that is almost six months to the

7      day after this wreck, the treating physician discusses

8      in reference to the C6-7 herniation with associated

9      annular tear, quote, she now has chronic pain and a

10     permanent injury to her neck due to the injury from this

11     MVA -- which I'll tell you means motor vehicle

12     accident -- unquote.

13             MS. KIDD:  Object to form.

14         Q.   (BY MR. BUTLER)  Did I read that correctly?

15         A.   Yeah.  That's a -- yeah, last sentence on

16     chart notes regarding Amber Mills from Kelly Huber, DC.

17         Q.   All right.  Let's take a look at the demand

18     letter portion itself.  And I want to go to the last

19     page of the letter.

20             MS. KIDD:  Thanks.

21         Q.   (BY MR. BUTLER)  Let me see that for just one

22     second and -- if you read the paragraph beginning with

23     demand up through the end of the date referenced.

24             MS. KIDD:  Is there a question?  You just want

25         him to read?

```
 1            MR. BUTLER:  Did you have a hard time hearing,

 2       Amanda?

 3            MS. KIDD:  Yeah.  I didn't -- I didn't hear a

 4       question.

 5       Q.   (BY MR. BUTLER)  If you would, sir, what does

 6  the letter say on the last page under the section

 7  "Demand"?

 8       A.   Demand -- demand section reads Mrs. Mills has

 9  new-found limitations on her ability to exercise, be

10  active, and otherwise engage in activities, slash,

11  hobbies of her own choosing.  Ms. Mills continues to try

12  and do as much as she safely can, but her new-found

13  limitations on her abilities to exercise, be active, and

14  otherwise engage in rigorous activities and hobbies of

15  her own choosing has had a negative impact.

16            As much or more than the limitations it is a

17  diminished quality of these life experiences, her losses

18  stemming from this collision greatly exceeds the $25,000

19  of liability coverage under your insureds' policy.

20  Nonetheless, we've been authorized to settle Mrs. Mills'

21  claims for the policy limits of $25,000 -- with an

22  asterisk -- contingent upon timely tender of the policy

23  limits amounts at my office on or before noon Eastern

24  Standard Time on March 23, 2022.

25            The $25,000 has an asterisk that says this
```

1    offer is contingent upon compliance with Florida statute

2    627.4137.  If your insured's policy limits are different

3    than the amount stated, please advise immediately in

4    writing, and this offer shall be deemed null and void.

5        Q.   So in connection with the date at the top of

6    the demand, which was February 18th, 2022, the demand

7    required payment a bit more than a month later.  Would

8    that be fair?

9        A.   That'd be correct.

10       Q.   And I already told you that due to some

11   concern or whatever the demand was refaxed to State Farm

12   at a later point in time and the time for accepting the

13   demand was extended up to May 6th of 2022.  Can we agree

14   that based on that later faxed transmittal May 6th

15   would've been more than a month later for the acceptance

16   of that settlement, that is, the payment of the policy

17   limits, in exchange for Mary Laseter being released of

18   all liability in connection with this case?

19           MS. KIDD:  Object to form.

20           THE WITNESS:  I'd have to look back.  I think

21       that the -- but I believe you're correct because I

22       believe that that fax transmittal was sometime in

23       March and the extended date sometime in May.  So

24       it's more than a month.

25       Q.   (BY MR. BUTLER)  You can put a clip back on so

1   that we -- right there.  That big clip in front of --

2       A.   Mm-hmm.

3       Q.   -- you there.

4       A.    And I lost Tab 5 over here, so I'll put it

5   back on.

6       Q.    Let me show you some additional items there.

7   If I can have my last page back for just a second.  All

8   right.

9            Did State Farm send a letter dated April 9th,

10  2022 -- that would be a bit more than eight months after

11  this wreck -- to the attention of Mary Laseter?

12            MS. KIDD:   Object to the form.

13            THE WITNESS:   The -- the exhibit -- let me

14       display that if I can.

15            MS. KIDD:  Thank you.

16            THE WITNESS:  -- shows a blowup from a letter

17       dated April 9, 2022, that appears to be -- it

18       refers to Mary Laseter as our insured.  I can't

19       actually see from this particular version of it who

20       it was delivered to.  But I assume that it reflects

21       it on the letter itself.

22       Q.   (BY MR. BUTLER)  April 9th would have been

23  more than eight months after the wreck?

24       A.    Correct.

25       Q.    April 9th would have been after the demand

1  package was sent and resent and confirmed via fax in the

2  latter part of March there?

3      A.   Correct.

4      Q.   And we highlighted a portion of that letter on

5  the first of those two things that says what?

6      A.   The highlighted portion says if this case

7  settles for an amount less than or equal to the amount

8  of your coverage, there will be no personal exposure to

9  you.

10      Q.   Did Mary Laseter interpret that to mean that

11  until and unless State Farm tenders their $25,000 policy

12  limits there's no financial exposure on her part?

13          MS. KIDD:   Object to form.

14          THE WITNESS:   That's certainly how I

15      understand it.  I frankly doubt that my mother had

16      any understanding of this.

17      Q.   (BY MR. BUTLER)   Her understanding would've

18  come from you doing your best to inform your 90-year-old

19  mother of her rights and responsibilities in connection

20  with her auto liability?

21      A.   Correct.

22      Q.   Another portion of the April 9th letter says,

23  quote, the total amount of damage claimed is currently

24  unknown, unquote.  Do you see that?

25      A.   I do.

R,
HS

```
 1        Q.    Show that to the camera as well.

 2              Now --

 3              MS. KIDD:   Thanks.

 4        Q.    (BY MR. BUTLER) -- didn't we see in a fax

 5   confirmation sheet back in March where the demand

 6   package was resent to State Farm that clearly indicated

 7   the amount being claimed in this case, that is, the --

 8              MS. KIDD:   Object to form.

 9        Q.    (BY MR. BUTLER) -- $25,000 policy limits, in

10   exchange of a release of all liability of Mary Laseter?

11              MS. KIDD:   Object to form.

12              THE WITNESS:   Correct.   This April 9th, 2022,

13        letter that says the amount of damage that's

14        claimed is currently unknown is subsequent to

15        evidence of delivery of the demand package that

16        asked for a $25,000 settlement.

17        Q.    (BY MR. BUTLER)   And then a final part of the

18   April 9th, 2022, letter talks about litigation or

19   attorneys, those kinds of things?   What does it say?

20              MS. KIDD:   Object to form.

21              THE WITNESS:   Yeah.   The -- the highlighted

22        sentence says in event this case is not settled and

23        litigation should ensue, we will select and

24        compensate attorneys to defend you.

25        Q.    (BY MR. BUTLER)   All right.   So to put that
```

1   all in its context so that we can keep in mind the

2   timing of what's happened -- first I want you to take a

3   look at that.  Does that context timeline true

4   [verbatim] and accurately reflect the timing of those

5   letters that you have testified about here today in

6   connection with the demand and so forth up to where we

7   are now?

8           A.   Yeah.  I think so.

9               MS. KIDD:  Object to form.

10          Q.   (BY MR. BUTLER)  I'm sorry.  You can answer.

11          A.   Yeah.  I see -- I see nothing inaccurate about

12   the timeline.

13          Q.   All right.  If you would, let's...

14              MS. KIDD:  Okay.

15          Q.   (BY MR. BUTLER)  Did Mary Laseter have the

16   benefit of all of that information and the expertise --

17   strike that.

18              Did Mary Laseter have the benefit of all of

19   that information attached to that demand package and the

20   expertise to evaluate it medically and legally?

21              MS. KIDD:  Object to form.

22              THE WITNESS:  So I -- I do believe that we had

23          a copy of that demand package.  Clearly, we'd not

24          be in a position to evaluate it.

25          Q.   (BY MR. BUTLER)  Did you and Mary Laseter come

to some sort of understanding regarding -- strike that.

Did State Farm issue any settlement offers at any point in time in this case that Mary Laseter became aware of at some point?

A.   Yes.  They made a counteroffer to the $25,000 demand sometime after the date of that demand and I believe prior to the lawsuit being filed.

Q.   And we have in this case the record of the back-and-forth that took place in the extended period for acceptance that was given in this case.  But what was your understanding as to the offers that State Farm extended approximately nine months or so after this wreck in settlement of all claims of Amber Mills for the permanent injuries that were discussed?

MS. KIDD:   Object to form.

THE WITNESS:   My recollection sitting here today is that they countered the $25,000 demand with something on the order of a $6500 or thereabout offer that was rejected.  The demand for $25,000 was reinstated.  They then countered maybe with another $500 like to $7,000 or thereabouts.  And then that was the extent of the offers made prior the lawsuit being filed.

Q.   (BY MR. BUTLER)  And did State Farm maintain that same $7,000 offer up until December 1st, 2022,

```
 1   about two months before trial in this case?
 2        A.   That's --
 3             MS. KIDD:  Object to form.
 4             THE WITNESS:  I -- I know that they continued
 5        an offer and well below $10,000 well after the
 6        lawsuit was filed and I believe maybe even after
 7        mediation.
 8        Q.   (BY MR. BUTLER)  All right.  So did we hold
 9   that up already?
10        A.   No.
11        Q.   Let's hold up this context diagram that you
12   indicated is a true and accurate reflection of the
13   activities shown and the timing of them.
14        A.   So now I'm showing a different one that we had
15   looked at before --
16        Q.   Oh.
17        A.   -- just --
18        Q.   That -- it was the other one I was thinking --
19        A.   Yeah.
20        Q.   -- in fact.
21        A.   So turning back to the one --
22        Q.   Did we show that one already?
23        A.   We've already talked about this one.  And I
24   believe we've shown this.  And I did say that I see
25   nothing about this timeline that appears incorrect.
```

```
 1        Q.   I want to mark that as our next.

 2         (Plaintiff's Exhibit No. 6 marked/identified.)

 3            MS. KIDD:  And I'll object to the --

 4            THE WITNESS:  And we just displayed this one,

 5       but I've not testified to that.

 6        Q.   (BY MR. BUTLER)  Do you recall if Mary Laseter

 7   was copied on a State Farm letter dated April 14th,

 8   2022, offering $6,550 in settlement of all claims by

 9   Amber Mills?

10        A.   Sitting here today, I don't recall that

11   particular letter.  But as I testified a moment ago, I

12   am aware that that offer approximately in that amount

13   was made, and I'm sure it came from that letter.

14        Q.   And at some point we might get to that

15   letter --

16        A.   Mm-hmm.

17        Q.   -- here and actually --

18        A.   Yeah.

19        Q.   -- look it at.  But I want you to assume that

20   that's --

21        A.   Yeah.

22        Q.   -- there is such a letter in the production of

23   this case either from State Farm or in your own

24   production.  Does that sound --

25        A.   Correct.
```

1        Q.   -- correct?

2        A.   Yeah.

3        Q.   All right.  And likewise do you recall that

4   being copied on a letter from State Farm dated May 2nd,

5   2022, increasing their offer to $7,000 in settlement of

6   all claims of Amber Mills?  Does that sound consistent

7   to you with your recollection of events?

8        A.   Correct.  I think I testified before that --

9   that actually my recollection was that the initial

10  offer, which now I -- I -- except with $6550 was

11  rejected by the plaintiffs.  The plaintiffs reasserted

12  the demand for the policy limits of $25,000 in response

13  to which State Farm then offered an extra $450 to $7,000

14  on or about May 2nd, 2022.

15       Q.   Does the context timeline in front of you

16  appear to be true and accurate regarding the timing of

17  those events that are depicted on it?

18       A.   I have no --

19            MS. KIDD:  Object to form.

20            THE WITNESS:  -- specific recollection of the

21       dates.  I have no reason to think that this is

22       not -- not a correct reflection of the letters in

23       the lawsuit.

24       Q.   (BY MR. BUTLER)  All right.  We'll mark that

25  as plaintiff's next.

```
 1              (Plaintiff's Exhibit No. 7 marked/identified.)

 2              MS. KIDD:  And we'll object.

 3         Q.   (BY MR. BUTLER)  You attended the trial of

 4    this case in Duval County Circuit Court in February of

 5    2023?

 6         A.   I did.

 7         Q.   Do you recall that the same physicians that

 8    you noted in the demand package, that is, Dr. Huber, the

 9    Precision Imaging radiologist --

10         A.   Dr. Boehme?

11         Q.   No.  He's the neurologist.  So let me -- let

12    me reask the question.

13              So the physicians whose records and

14    information were discussed in the demand package that we

15    went through a few minutes ago, which included Dr.

16    Huber, the Precision radiologist -- strike that.

17              The demand package that we reviewed a few

18    minutes ago included records and information from

19    treating physician Dr. Kelly Huber, the Precision

20    Radiology reading radiologist Kevin Jones, and the

21    neurologist Dr. Boehme, those were the same physicians

22    that testified at the jury trial in this case?

23         A.   That's right.  You're using the term

24    "physician," which I sometimes think of as a medical

25    doctor.  I believe that Dr. Kelly is a chiropractor.
```

R

1    But if she was the attending doctor.

2         Q.    She's a chiropractic physician.

3         A.    Yeah.  Is that -- yeah.

4         Q.    And the injuries that are discussed in that

5    settlement demand package are the injuries that were

6    discussed at the jury trial of this case in February of

7    2023?

8         A.    Yes, they -- they were.  I mean, there --

9    there were no new injuries or problems brought at trial

10   that had not been part of the demand.

11        Q.    Did you attend --

12        A.    Let me make sure I'm being clear in that

13   answer.  There were no new -- I'm not aware there being

14   any medical problems brought up during trial that

15   weren't part of the demand.  There was lots of other

16   stuff brought up at trial that was not part of the

17   demand, but...

18        Q.    Did you attend the court-ordered mediation

19   along with Mary Laseter via Zoom?

20        A.    Virtually, yes.

21        Q.    I want to talk about a couple of items in your

22   subpoena production in this case.  Before I do that, as

23   a -- an attorney in environmental law areas, are you

24   generally familiar with the relative significance or

25   insignificance of litigation costs to individual parties

```
 1   such as Mary Laseter or Amber Mills who eventually may
 2   be responsible for them?
 3        A.   Yeah.  Yeah.  I'm -- I'm acutely familiar with
 4   litigation costs and attorney's fees and bills and --
 5        Q.   And I want to --
 6        A.   -- have participated in many of them myself.
 7        Q.   And I want to stick with the cost side of
 8   things.
 9             Are litigation-related costs significant or
10   insignificant?
11        A.   Certainly significant and they're --
12             MS. KIDD:  Object to form.
13             THE WITNESS:  Yeah.  Just one -- one of the
14        things that was immediately apparent upon receiving
15        the demand is that the plaintiff's side had spent
16        obviously considerable resources in seeing a bunch
17        of different doctors and having them produce a
18        significant report.  That was -- yeah.  This was
19        thousands upon thousands of dollars' worth of -- of
20        costs beyond the attorney's fees that the
21        plaintiff's side had incurred.  It was immediately
22        apparent from seeing the demand letter.
23        Q.   (BY MR. BUTLER)  When a case has to be filed,
24   that is, a formal lawsuit is filed, there is a cost
25   associated with that, is there not?
```

R,
403

1    A.    There's a filing fee, but the greater cost is,

2  you know, all the experts.  They -- they all don't --

3  they all want to be paid.  Yeah.  They're all paid in

4  cash.  They're all paid up front.  They're not

5  contingent.

6    Q.    Depositions, all of those kinds of things,

7  like we're here today, those things cost real money,

8  don't they?

9    A.    Yeah.  I mean, the -- and to be clear, the

10  biggest part of the cost is usually attorney's fees

11  itself.  But the -- but the court reporters and

12  everybody else that -- that those nonattorney's fees

13  cost are significant.  They're thousands upon thousands

14  of dollars, tens of thousands of dollars.  Mediation is

15  expensive.  That's -- the -- the cost of the mediator is

16  thousands of dollars.

17    Q.    Did there come a point in time when you

18  expressed concerns from Mary Laseter's perspective to

19  State Farm regarding their claims handling in this case

20  pursuant to Florida law?

21    A.    Yes.  And I'm sorry.  Was your question

22  whether I expressed that or came to hold that belief?

23    Q.    I said expressed it, but I assume that if you

24  expressed it --

25    A.    Yes.

```
 1        Q.   -- you held that belief --

 2        A.   Yes.  That's right.

 3        Q.   -- at some point --

 4        A.   Yeah.

 5        Q.   -- before that.

 6        A.   Yes.  I made that clarification because it was

 7   apparent that the -- that the case should have been

 8   settled very, very early.  I -- I did not actually write

 9   that to State Farm until -- you know, you're now into

10   May of almost a year later when the settlement offers

11   were then well below the medical so obviously already

12   incurred.

13        Q.   And let me refer you first your August 26th,

14   2022, e-mail to State Farm.  Do you recall that e-mail?

15        A.   I do.

16        Q.   And first of all what prompted you at that

17   point to express it in writing from Mary Laseter the

18   concerns that you stated in this e-mail?

19        A.   The specific prompt reference in the e-mail is

20   that the plaintiffs have raised their demand from the

21   $25,000 that would've been available for settlement

22   prior to filing of the lawsuit to I believe more than

23   $300,000 after the new demand had been submitted.

24        Q.   At some point after litigation had ensued and

25   the litigation expenses were incurred and so forth, the
```

```
 1    plaintiff sent a formal proposal to State Farm in an

 2    amount greater than $25,000; is that --

 3         A.   That's my --

 4         Q.   -- a fair --

 5         A.   -- recollection.

 6         Q.   -- summary?

 7         A.   Yeah.  From the standpoint of the insured,

 8    what had -- what had occurred is that an offer to settle

 9    for the policy limits had been retracted and replaced by

10    a much higher offer.

11              MS. KIDD:  Object to the form.

12         Q.   (BY MR. BUTLER)  An offer can't be accepted

13    unless the offer is actually extended or made.  Does

14    that make sense?

15              MS. KIDD:  Object to form.

16              THE WITNESS:  Yes.  I guess that's a fair

17         statement.

18         Q.   (BY MR. BUTLER)  Let me restate it.

19              The plaintiff, Amber Mills, could never accept

20    an offer for the policy limits of $25,000 until and

21    unless the $25,000 was tendered by State Farm, correct?

22         A.   That would be fair.  Yeah.

23              MS. KIDD:  Object to form.

24         Q.   (BY MR. BUTLER)  Did the State Farm policy

25    covering Mary Laseter have a provision in it for court
```

R, 403

R, 403

```
 1    costs in addition to the $25,000 liability limits?

 2         A.   I would need to --

 3              MS. KIDD:  Object to form.

 4              THE WITNESS:  -- actually look at the policy

 5         to -- to know whether there was a -- a cost.

 6         Sitting here today, my recollection would've been

 7         that the $25,000 was the absolute cap on -- on

 8         liability.  But there may have been a court cost.

 9              MR. BUTLER:  Drew, are you there?  Perhaps you

10         could put up that provision.

11              THE WITNESS:  I don't...

12              You -- you're referring so something on

13         payment provision.  Yeah.  I --

14         Q.   (BY MR. BUTLER)  Yes, sir.

15         A.   Yeah.

16         Q.   So did the State Farm policy for your mom have

17    a supplemental payment provision that covered

18    court-related or litigation-related costs that are

19    incurred in a situation where State Farm has defended

20    the case with the attorneys of their own choosing?

21         A.   Yeah.  There's a supplemental --

22              MS. KIDD:  Object to --

23              THE WITNESS:  -- payment provision in the

24         policy.  Yeah.

25         Q.   (BY MR. BUTLER)  In this particular case are
```

MIL, R, 403

1   you aware of State Farm ever making offer to the

2   plaintiff which included any payments for her

3   court-related costs in this case?

4        A.   No, not -- and -- and no -- no offer in excess

5   of policy limits or even -- I'm not completely sure I

6   recall that for other limits prior to trial.

7        Q.   I'll tell you that on December 1st,

8   approximately two months before trial, that was the

9   first time that State Farm offered its $25,000 --

10        A.   Mm-hmm.

11        Q.   -- policy limits and no additional

12   consideration for any costs.

13        A.   Mm-hmm.

14        Q.   Is that a true and accurate copy of the e-mail

15   that you sent to State Farm on August 26th, 2022?

16        A.   So this is -- appears to be an accurate copy

17   of the first part of it.  The -- the entire e-mail is

18   not here.  It goes on down this, but this appears to

19   reflect the --

20        Q.   The entire one will be in your records in

21   response to the subpoena.

22        A.   Yes.

23        Q.   So tell me who that e-mail was sent to.

24        A.   So Ms. Butler was the claims handler that had

25   been identified early on as the person handling the

1  matter.  Mr. Horne, I believe may have been her

2  supervisor.  And so two -- two people at State Farm in

3  the claims department.

4      Q.   Angela Butler is no relation to Howard Butler.

5  She's the State Farm --

6      A.   Is --

7      Q.   -- one of the State Farm adjusters in this

8  case?

9      A.   That's my understanding.

10     Q.   Let me see that for just a second.

11          And had you also shared that information with

12  the attorneys chosen by State Farm, that is, the Cole,

13  Scott & Kissane firm, that was defending this case?

14     A.   Yes.

15          MS. KIDD:  Object to form.

16     Q.   (BY MR. BUTLER)  And in that case -- strike

17  that.

18          In that e-mail you actually reference a couple

19  of Florida cases on the subject of bad faith or the

20  failure to -- strike that.

21          In your e-mail you actually reference a couple

22  of Florida case citations --

23     A.   Mm-hmm.

24     Q.   -- true?

25     A.   Correct.

DEMO

```
 1      Q.   What case citations are they, and what were

 2    they generally for?  What proposition did you feel like

 3    they stood for?

 4            MS. KIDD:  Object to form.

 5            THE WITNESS:  So the -- there'll be three case

 6       citations that are in the e-mail, at least on this

 7       page, Harvey v. GEICO General Insurance, which is a

 8       259 Southern 3rd 1 from 2018, Florida Supreme Court

 9       case.  Another case Deary V. Progressive American

10       Insurance Company, which is at 356 Federal

11       Supplement 3rd, 1258 Southern District of Florida

12       case from 2021.  And then another Southern District

13       of Florida --

14            MS. KIDD:  Object to --

15            THE WITNESS:  -- case, Davis v. Nationwide

16       Insurance Company of America, which is at 545

17       F.Supp 3d, 1295.

18            All three of those cases relate to automobile

19       insurance claims handling matters in which the

20       courts were asked to evaluate whether or not the

21       claims handling was in good faith or bad faith, in

22       other words, subject to sanctions under Florida

23       law.  And the distinction that was being made is in

24       some cases an insurance company's refusal to pay

25       the policy limits on relatively low policy limit
```

```
 1          policies is reasonable and sometimes it's not.
 2               And in the cases found to be not reasonable --
 3          the most obvious case is one in which the
 4          plaintiffs in which the offer made by the insurance
 5          company was below the actual medical expenses
 6          demonstrated by the plaintiff.  In that case the --
 7          the Court said that's bad faith, which mirrors the
 8          situation we have here where the -- obviously the
 9          expenses that the plaintiff that incurred, just
10          straight-up medical expenses, exceeded the offers
11          that State Farm had made.
12          Q.   (BY MR. BUTLER)  Following that e-mail and
13     those case citations being sent to State Farm, did they
14     continue to maintain their $7,000 offer in this case?
15          A.   Yeah.  I think like --
16               MS. KIDD:  Object to form.
17               THE WITNESS:  -- maybe up to and perhaps even
18          through mediation if I recall correctly.  Certainly
19          up to mediation.
20          Q.   (BY MR. BUTLER)  We'll attach a copy of the
21     8/26/2022 e-mail and the cases cited that were attached
22     to it as Plaintiff's next composite --
23               THE REPORTER:  It'll be 8.
24               MR. BUTLER:  Yeah, Number 8.
25            (Plaintiff's Composite Exhibit No. 8
```

```
 1          marked/identified.)
 2     Q.    (BY MR. BUTLER)   And --
 3          MS. KIDD:   [Audio failure] attaching the
 4     cases --
 5          THE WITNESS:   Just --
 6          MS. KIDD:  -- themselves?
 7          THE WITNESS:   Yeah.   So I'm going to show
 8     the -- so this is the first --
 9          MS. KIDD:  E-mail.
10          THE WITNESS:  -- part of the e-mail.
11          MS. KIDD:  All right.
12          THE WITNESS:   This is an excerpt from the
13     Deary case.
14          MS. KIDD:  Okay.   Yeah.   I object to that.
15          THE WITNESS:   And then it looks like a second
16     excerpt from the Deary case.
17     Q.    (BY MR. BUTLER)   On October 24th, 2022, did
18     you send another written communication to State Farm
19     expressing Mary Laseter's concern about their bad faith
20     claims handling in this case?
21     A.    I did send another one.
22          MS. KIDD:  Object to form.
23          THE WITNESS:   Some- -- sometime around the
24     time you referenced, I did send out a message.   I
25     think -- I -- I assume you're correct about the
```

```
 1          date.
 2                  I believe Drew has pulled up a...
 3          Q.    (BY MR. BUTLER)   Okay.   Are you able to see
 4     that from where you're at?
 5          A.    No.
 6          Q.    Are -- are we able to put that up on the
 7     screen closer to him?
 8            (Off-the-record discussion.)
 9          Q.    (BY MR. BUTLER)   All right.   Are you --
10          A.    Yeah.
11          Q.    -- able to --
12          A.    Yes.
13          Q.    -- see that?
14          A.    I can.   And I recall it.
15          Q.    Okay.   On October 24th, 2022, you sent an
16     e-mail to State Farm.   Who specifically did you send
17     that to?
18          A.    Again to Mr. Horne and Ms. Butler.
19          Q.    And did you likewise share that information
20     with State Farm's chosen attorneys in this case from the
21     Cole Scott Kissane firm?
22          A.    Yes.
23          Q.    And what did you say in your own words at that
24     time?
25          A.    Would you like me to read the things or you
```

```
 1    actually asking what -- what at that time and --
 2         Q.    You can read it and tell us what --
 3         A.    Yeah.
 4         Q.    -- you were -- what you meant by that.
 5         A.    Well, hopefully, it's perfectly clear.  It --
 6    so:  Dear Mr. Horne and Ms. Butler:  As you no doubt
 7    know, a mediation was held in the above-referenced
 8    matter last Thursday that was declared an impasse after
 9    State Farm declined to authorize any new offer unless
10    the plaintiff first agreed to negotiate at a level below
11    the $25,000 per occurrence limit on the State Farm
12    policy.
13         Q.    Let me stop you there.
14               Was it your understanding as of October 24th,
15    2022, that State Farm's position was that they were not
16    going to increase their $7,000 offer until or unless the
17    plaintiff came down below the $25,000 policy limits for
18    their demand?
19         A.    That's essentially correct.
20               MS. KIDD:  Object to form.
21         Q.    (BY MR. BUTLER)  All right --
22         A.    Yeah.
23         Q.    -- sir.  Continue.
24         A.    Yeah.  State Farm has been on express notice
25    for many months that counsel believes a judgment in
```

excess of the policy limit is a distinct possibility as
explained in my August 26, 2022, e-mail, a copy of which
is attached for convenience.  State Farm's handling of
this matter appears to fall in the realm that has
resulted in findings of bad faith in other cases.

My mother continues to have no choice but to
rely upon State Farm's superior knowledge and experience
in deciding how it wishes to negotiate with the
plaintiffs.  However, we expressly demand that State
Farm protects my mother from any judgment in excess of
the policy limits.  One way to accomplish that end would
be for State Farm the consent to the assignment as
requested by plaintiffs in the attached e-mail.

Alternatively, State Farm can simply
acknowledge that it will protect my mother from any
excess judgment that may result from the insured's
decision to press the defense to trial despite the
evaluation of counsel.  Please acknowledge receipt of
this e-mail.  Thank you for your kind attention.

Q.   So had you previously approached State Farm
about consenting to an assignment from Mary Laseter to
Amber Mills in this case?

A.   So I know that I had received a request for an
assignment of rights to which the insurance company
would need to consent because it's prejudgment.  I can't

1  sitting here today say whether that this was the first
2  time that that had been forwarded to them or if that had
3  been forwarded to them before.  My belief sitting here
4  today is that I had forwarded it to them, asked for them
5  to respond to it, and they didn't, and then I sent the
6  subsequent letter.  But it's possible this is the first
7  I'd sent it.

8       Q.   What is an assignment of rights and generally

9  what would that accomplish from Mary Laseter's

10 perspective back at that time?

11           MS. KIDD:  Object to form.

12           THE WITNESS:  So generally speaking, what's

13      being offered, as I understand it, the -- the

14      plaintiff is agreeing that it would not seek

15      amounts in excess of the policy limits from my

16      mother but would rather rely on the ability to

17      recover it from the insurance company through a bad

18      faith claim or through an agreement by the

19      insurance company to be liable absent a bad faith

20      claim for amounts beyo- -- for amounts of any

21      judgment beyond the policy limit.

22      Q.   (BY MR. BUTLER)  Would it essentially allow

23 Mary Laseter to step aside and -- and State Farm and

24 Amber Mills deal directly with one another in connection

25 with the losses sustained in the case?

MIL,
R,
403

1     A.    Yeah.   It --

2               MS. KIDD:   Object to form.

3               THE WITNESS:   -- theoretically removed my

4     mother from the economic interest in the outcome of

5     the lawsuit.

6               MR. BUTLER:  Drew, let's put up the request

7     for consent assignment if we can.  And I think we

8     have Mr. Laseter's e-mail to State Farm requesting

9     that consent.

10              MR. BASKIN:  Yeah.  Okay.  Just the -- do you

11    have the date for me?

12              MR. BUTLER:  I don't have the date handy,

13    Drew, but it's -- should be in the keynote there.

14              MR. BASKIN:  Okay.  I think it's up.

15    Q.    (BY MR. BUTLER)  Can you see what's on --

16    A.    I -- I --

17    Q.    -- the screen?

18    A.    -- can't see if this is the October 24 e-mail

19 for me.  You may have been referring to an August 20 --

20              MR. BUTLER:  Yeah.  No, Drew.  This is not it.

21    This is --

22              THE WITNESS:  It --

23              MR. BUTLER:  It's his e-mail with the consent

24    assignment to State Farm asking them to consent to

25    an assignment.  It was in the evening.  I remember

```
 1        that.
 2             THE WITNESS:  Yeah.
 3             MR. BUTLER:  Early evening.
 4             MR. BASKIN:  I think it -- I think it's up.
 5             THE WITNESS:  Yes.  That's correct.
 6        Q.   (BY MR. BUTLER)  Okay.  Hang on one second.
 7   Let me --
 8        (Off-the-record discussion.)
 9        Q.   (BY MR. BUTLER)  On October 20th, 2022, did
10   you send a request to State Farm asking them to consent
11   to an assignment of rights between Mary Laseter and
12   Amber Mills?
13        A.   Yes, I did.
14        Q.   Is this item that we see on the screen -- and
15   I'm looking for the Bates number.  I think it's 00836.
16             Is that true and accurate copy of the e-mail
17   that you sent at that time?
18        A.   It appears to be.  The attachments aren't
19   reflected.
20        Q.   Okay.  We'll look at that in a minute.
21             And what does your e-mail say to State Farm?
22        A.   It --
23        Q.   Who is it being sent to and --
24        A.   Yeah.
25        Q.   -- what does it --
```

403

403

403

1    A.    Yeah.

2    Q.    -- say?

3    A.    So this is being sent to the claims

4    department.  I should clarify that to communicate in the

5    ordinary course with State Farm, the only way an insured

6    in my mother's situation could do that was to simply

7    send an e-mail address with a subject matter that had

8    the claims number to an unspecified claims mailbox.

9          So this was directed to that -- down that

10   avenue.  And it said, Dear Sir and Madam:  Please advise

11   as whether State For -- Farm will agree to execute the

12   attached form in the manner requested by the plaintiffs

13   in the e-mail below.  Thank you for your kind attention

14   to this matter.

15   Q.    And that went to State Farm claims as well as

16   to the attorneys chosen by State Farm to defend this

17   case?

18   A.    Correct.

19         MR. BUTLER:  Go to the next, Drew.

20   Q.    (BY MR. BUTLER)  And is this a copy of the

21   proposed consent assignment?

22   A.    I have no reason to -- to doubt that it's --

23   it is.  My recollection is that actually there was an

24   e-mail from your law firm including this and I forwarded

25   both the e-mail and the attachment.

```
 1      Q.    All right.
 2            MR. BUTLER:  And so, Drew, put up No. 40.
 3      Q.    (BY MR. BUTLER)  Does that context timeline
 4   truly and accurately reflect the assignment of rights in
 5   this case with respect to the items depicted, that is,
 6   when you asked State Farm to consent to such an
 7   assignment, versus when -- after the verdict of an
 8   assignment of rights was executed between Mary Laseter
 9   and Amber Mills?
10            MS. KIDD:  Object to form.
11            THE WITNESS:  There -- there's nothing on the
12         timeline that is inaccurate.  The initial request
13         was a form that was asking for State Farm's
14         consent.  The ultimate assignment was done after
15         the verdict when the consent was required.  It's a
16         different form.
17      Q.    (BY MR. BUTLER)  Correct.  And that's what --
18   I'm just trying to put the --
19      A.    Yeah.
20      Q.    -- the context in terms of the dates into
21   perspective.  So let's put all of those items pertaining
22   to the consent assignment, and let me make sure we've
23   got everything here.
24            THE REPORTER:  That'll be 9.
25      Q.    (BY MR. BUTLER)  Plaintiff's Composite No. 9.
```

```
1          (Plaintiff's Composite Exhibit No. 9

2      marked/identified.)

3           MS. KIDD:  Object to form.

4           Are we getting to a good point for another

5      comfort blake -- break?

6           MR. BUTLER:  If you need to.  You want five

7      minutes?

8           MS. KIDD:  All right.  Thank you.

9           MR. BUTLER:  Okay.  Let's take five minutes.

10          THE VIDEOGRAPHER:  Going off the record at

11      3:18.

12        (Recess taken from 3:18 p.m. until 3:23 p.m.)

13          THE VIDEOGRAPHER:  We're going back on the

14      record at 3:23.

15      Q.   (BY MR. BUTLER)  We talked a little bit about

16  an assignment of rights and claims.  I want to talk

17  about another potential item known as a blue sky or

18  comfort letter.  Are you familiar generally with that

19  term?

20      A.   Yes.  That's more common in Florida than it is

21  in Georgia, but...

22      Q.   What is your understanding generally about

23  what a blue sky or a comfort letter is?

24      A.   It's essentially the same thing that would be

25  accomplished of the consent of an assignment prior to
```

403,
R

403,
R

1  trial, which is if an insurance company to say that we

2  are proceeding with defending the case, it might be

3  questionable with regard to whether or not there will be

4  an excess judgment, meaning a judgement above the policy

5  limits.  But we, the insurance company, are going to

6  protect you, the injured, no matter what happens.

7      Q.   And that was one of the things that you had

8  asked for on behalf of your mother back on August the

9  26th, 2022, correct?

10      A.   Well, not in that --

11          MS. KIDD:  Object to form.

12          THE WITNESS:  -- not using the term of art

13      blue sky law, but, yes, that's -- but the concept,

14      yes.

15      Q.   (BY MR. BUTLER)  Were you aware that on August

16  29th, 2022, that the lawyers chosen by State Farm to

17  defend this case had told State Farm that their

18  recommendation was to tender the policy limit?

19          MS. KIDD:  Object to form.

20          THE WITNESS:  Yeah.  I don't know about the

21      date of that, but I certainly know that the counsel

22      had recommended to State Farm to tender the limits.

403,
R

23      Q.   (BY MR. BUTLER)  And yet State Farm refused to

24  do so?

25      A.   Correct.

R,
403

1    Q.   Okay.  Did State Farm -- strike that.

2         Did you become aware at some point shortly

3    before trial that State Farm's evaluation of this case

4    was that a likely or realistic range of verdicts was

5    between $100,000 and $815,000 exclusive of costs?

6         A.   Yes.

7              MS. KIDD:  Object to form.

8    Q.   (BY MR. BUTLER)  Without getting into your

9    mother's financial situation, would a personal judgment

10   of say $250,000 require her to seriously consider

11   bankruptcy-type protection options?

12             MS. KIDD:  Object to form.

13             THE WITNESS:  I'm not sure that I can answer

14        that with the qualifier that you placed on it,

15        which is that without getting into my mother's

16        finances.  So I -- in the -- that -- that -- that a

17        person who had available funds that would be

18        reachable by a judgment would certainly have to

19        consider all options if they were faced with a

20        judgment in that size.

21   Q.   (BY MR. BUTLER)  Including bankruptcy --

22   A.   That --

23   Q.   -- type protection?

24   A.   If -- yeah, if -- if had reachable assets --

25   ac- -- actually, the -- your statement's fair.  It is --

```
 1    it is true even -- even someone who is pretty certain

 2    that they would be judgment proof, to use a term of art,

 3    has to go through bankruptcy in order to take advantage

 4    of those protections.

 5                MS. KIDD:  Object.

 6        Q.    (BY MR. BUTLER)  Did your mom and you

 7    cooperate with State Farm throughout the entire claims

 8    process including the litigation and trial?

 9        A.    In every way we thought we possibly could.

10        Q.    Did State Farm or the lawyers that State Farm

11    chose to defend this case ever voice any problems or

12    concerns in terms of Mary Laseter's or your cooperation?

13        A.    No.

14        Q.    Just the opposite, right?

15        A.    Yeah.  They thought -- they were very grateful

16    for the effort my mother put in.

17        Q.    Well, in -- in fact we know from your

18    production of documents on November 1st that while

19    attending your mom's videotaped deposition and trial,

20    you were in communication with State Farm's chosen

21    defense lawyers giving them your observations and

22    suggestions which they described as, quote, very

23    helpful, unquote.

24        A.    That's correct.

25                MS. KIDD:  Object to form.
```

R

1    MR. BASKIN:  You can answer.  But I don't

2    think they picked it up.

3    Q.  (BY MR. BUTLER)  Go ahead and answer.

4    A.  I said they -- the -- your -- you -- your

5    statement was accurate, an accurate description of what

6    counsel had said.

7    Q.  Had State Farm paid its $25,000 limits, Mary

8    Laseter would never have been served with a lawsuit?

9    A.  Correct.

10    Q.  Had State Farm agreed to accept service for

11    their insured, Mary Laseter, after rejecting plaintiff's

12    repeated offers to accept payment of State Farm's

13    $25,000 policy limits, Mary Laseter would not have been

14    personally served in the lawsuit?

15    MS. KIDD:  Object to form.

16    THE WITNESS:  Can you repeat that question?

17    Q.  (BY MR. BUTLER)  Sure.

18    A.  Yeah.

19    Q.  Had State Farm agreed to accept service for

20    their insured, Mary Laseter, after State Farm rejected

21    plaintiff's repeated offers to accept payment of State

22    Farm's $25,000 policy limits in exchange for releasing

23    Mary Laseter, there would have been no need for Mary

24    Laseter to have been personally served with a lawsuit?

25    A.  I'm not understanding --

```
 1              MS. KIDD:  Object to form.

 2              THE WITNESS:  -- your use of the word

 3         "service" at the very beginning of that question.

 4         Do you mean by -- by service do you mean had they

 5         offered to protect her in a blue sky sense?

 6         Q.   (BY MR. BUTLER)  No.  I -- I meant --

 7         A.   Yeah.

 8         Q.   -- that State Farm being the real party in

 9    interest in a case like this can agree to accept service

10    on behalf of their insureds so that their insured

11    doesn't actually have lawsuit papers personally served

12    upon them.

13         A.   Yeah.  Just -- just --

14              MS. KIDD:  Object to form.

15              THE WITNESS:  -- referring to the physical

16         service?

17         Q.   (BY MR. BUTLER)  Yes, sir.

18         A.   Yes.  Yes.  They -- could have accepted

19    service.

20         Q.   Had State Farm paid its $25,000 limits, there

21    would not have been any litigation between Amber Mills

22    and Mary Laseter?

23         A.   Correct.

24              MS. KIDD:  Object to form.

25         Q.   (BY MR. BUTLER)  There would not have been any
```

R, 403

1  litigation-related expenses on the part of the plaintiff

2  that could result in additional personal judgment

3  amounts against Mary Laseter?

4       A.   That's correct.

5            MS. KIDD:   Object to form.

6       Q.   (BY MR. BUTLER)   There would be no reason the

7  now 90-year-old Mary Laseter to have to give a

8  deposition?

9       A.   Correct.

10           MS. KIDD:  Object to form.

11      Q.   (BY MR. BUTLER)  You were -- strike that.

12           You came from Atlanta to Jacksonville to

13  personally attend the deposition of your mother with the

14  consent of the plaintiff?

15      A.   Correct.

16      Q.   Likewise defense counsel from Coles Scott

17  Kissane attended the deposition as well I think via

18  Zoom?

19      A.   Virtually, yeah.

20      Q.   Do you recall that State Farm and their chosen

21  counsel raised affirmative defenses wherein they blamed

22  Amber Mills in whole or part for the collision --

23           MS. KIDD:  Object to form.

24      Q.   (BY MR. BUTLER) -- requiring Mary Laseter to

25  be deposed and asked questions about that?  Do you

```
 1    recall that at her deposition?
 2              MS. KIDD:  Object to form.
 3         Q.   (BY MR. BUTLER)  And if you don't, we can put
 4    up those and --
 5         A.   I'm -- I'm not sure I followed the -- is -- is
 6    the question whether I'm aware that they asserted the
 7    comparative negligence or -- or contributory negligence
 8    defense?
 9         Q.   Let me just --
10         A.   Yeah.
11         Q.   Let me help by showing you --
12              MR. BUTLER:  Drew, let's put up the
13         affirmative defense.
14         Q.   (BY MR. BUTLER)  All right.  Can you see the
15    screen okay?
16         A.   Yes, I can.
17         Q.   I will represent to you that this is the
18    Affirmative Defense No. 1 that was raised by State Farm
19    and its chosen attorneys in the underlying case.
20              Does it appear that they took the position
21    that the plaintiff caused the crash in whole or part and
22    any recovery should either be diminished or declined as
23    a result?
24         A.   That's fair.
25         Q.   Okay.
```

R

```
 1              MR. BUTLER:  Drew, was there another one?

 2              MS. KIDD:  [Audio failure] -- question.

 3         Q.   (BY MR. BUTLER)  Here is Affirmative Defense

 4    No. 4.

 5              Was it clear from the very beginning of this

 6    case that fault rested with State Farm's insured, Mary

 7    Laseter?

 8              MS. KIDD:  Object to form.

 9              THE WITNESS:  Certainly, it was clear that

10         part of the problem was her because she's --

11              MS. KIDD:  We're frozen here, so I'm not

12         getting any of that answer.

13              MR. BUTLER:  Okay.  Just...

14              THE WITNESS:  How about now?

15              MS. KIDD:  Still frozen.  Oh, we're back.

16              THE WITNESS:  Okay.

17              MS. KIDD:  Okay.

18         Q.   (BY MR. BUTLER)  Do you recall me asking

19    questions at the deposition regarding how this collision

20    happened and --

21              MS. KIDD:  Hey.  I'm sorry.  Can we go back

22         and read that answer because I didn't hear the

23         answer.  Can the court reporter repeat it?

24              MR. BUTLER:  I think he stopped in the middle

25         of it when you chimed in.  Do you want --
```

```
 1            MS. KIDD:  Okay.  So he didn't answer?

 2            MR. BUTLER:  Do you want me to reask and let

 3       him answer it or just move on?

 4            MS. KIDD:  Ye- -- I mean, yeah.  He -- so I

 5       assumed he answered, and I -- I want to hear the

 6       answer.  So either reask it or somebody repeat it

 7       back.

 8            THE REPORTER:  It was just a half a sentence.

 9        (The record was read by the reporter as requested.)

10            MS. KIDD:  Okay.  Thank you.

11       Q.   (BY MR. BUTLER)  Do you recall the items we

12  looked at in the beginning of the deposition that Mary

13  Laseter was cited for the crash and the plaintiff was

14  not?

15       A.   Correct.

16       Q.   Your mom's situation was as the -- because of

17  a car or an SUV that was sitting, she could not see the

18  oncoming traffic at the time she took a left-hand turn;

19  is that --

20            THE WITNESS:  I think that's right.

21            MS. KIDD:  Object to form.

22       Q.   (BY MR. BUTLER)  And whatever that obstacle

23  was, the same would be true for the oncoming traffic not

24  being able to see your mom.  Do you recall that?

25       A.   I recall that line --
```

```
 1              MS. KIDD:  Object to form.

 2              THE WITNESS:  -- of questioning.  Yes.

 3        Q.    (BY MR. BUTLER)  And at the trial of the case,

 4   Mary Laseter was determined to be a -- 100 percent

 5   responsible for the crash?

 6        A.    My recollection is that that was something

 7   stipulated to.  Yeah.  Yeah.

 8        Q.    Even --

 9        A.    Yeah.

10        Q.    Thank you for reminding me.  State Farm

11   stipulated or agreed that Mary Laseter was 100 percent

12   at fault for the subject collision?

13        A.    Correct.

14              MS. KIDD:  Object to form.

15              THE WITNESS:  That's my understanding.

16              MR. BUTLER:  Drew, you want to put up the

17         summary judgment there?

18              THE WITNESS:  And so perhaps it was not a

19         stipulation.  Perhaps it was a judgment prior to

20         trial.  Yeah.

21        Q.    (BY MR. BUTLER)  It --

22        A.    Yeah.

23        Q.    -- it -- it -- it was but --

24        A.    After it was --

25        Q.    Yeah.  So as we can see by the stipulated
```

R, 403

1   order on plaintiff's motion for partial summary

2   judgment, the plaintiff filed a summary judgment on the

3   issue of fault and the defendant consented to the entry

4   of an order finding that to be the case?

5          A.    Yeah.

6          Q.    Had State Farm admitted fault for the

7   collision as opposed to choosing to deny all fault and

8   assert that Amber Mills was negligent in causing the

9   collision in whole or part, there would've been no

10  reason for Mary Laseter to have -- have to give a -- a

11  deposition?

12              MS. KIDD:  Object to form.

13              THE WITNESS:  I -- I think that a fair way

14      of -- of saying it is had State Farm acknowledged

15      the obvious extent of the insured's liability and

16      settled the case for the $25,000 that was offered,

17      none of the litigation including the deposition

18      would've occurred.

19         Q.    (BY MR. BUTLER)  Had State Farm agreed to your

20  request for either a blue sky type letter or comfort

21  letter, that would have eliminated going forward in a

22  further mental worry or anguish on Mary Laseter's part?

23         A.    It would've relieved --

24              MS. KIDD:  Object to form.

25              THE WITNESS:  I would relieve the worry about

MIL, R, 403

1    the economic cost.  That was not the only, you

2    know, part of this.  It would not be fun for a

3    91 -- 91-year-old to go through.

4        Q.   (BY MR. BUTLER)  Had State Farm agreed to the

5    consent assignment of claims between Mary Laseter and

6    Amber Mills that you requested back on August 26, 2022,

7    that would have eliminated or minimized any further

8    mental worry or anguish on Mary Laseter's part?

9        A.   Only about the economic part of it.  She still

10   would've had to go through the entire process, which had

11   its own problems, its own anguish.

12       Q.   In accordance with the duty to cooperate

13   provision of its policy, did State Farm ask Mary Laseter

14   to attend a weeklong jury trial in Duval County Circuit

15   Court?

16       A.   I think --

17            MS. KIDD:  Object to form.

18            THE WITNESS:  -- that she was asked to attend

19       as much of it as she thought she could do.  And my

20       mother's a very determined person, and so she

21       attended the whole thing.

22       Q.   (BY MR. BUTLER)  And she attended that trial

23   with the knowledge that State Farm had declined to

24   provide her with either a comfort letter or consent to

25   an assignment of rights and claims?

1    A.    I certainly under- --

2          MS. KIDD:  Object to form.

3          THE WITNESS:  I certainly understood that.  I

4    am not sure how much of the detail of the legal

5    subtleties Mom would've understood.  She certainly

6    understood that she was having to go through trial

7    because State Farm had declined to settle.

8          Q.    (BY MR. BUTLER)  How would you describe a

9    normal, routine day in the life of 90-year-old Mary

10   Laseter after the crash but beyond that first five or

11   six months from a physical and mental perspective when

12   there weren't any legal proceedings that she had to

13   think about or participate in?  What was a --

14         MS. KIDD:  Object to form.

15         Q.    (BY MR. BUTLER) -- day like for her?

16         A.    She's a -- she was a reasonably active person

17   as a 90-year-old would be no longer driving living on

18   her own.  So she certainly, you know, would get out and

19   go see friends.  She would -- yeah.  She'd go to the

20   store.  She'd go to church.  She actually -- I'm not

21   sure she if did resume because I think her tap dancing

22   troupe is not -- is still not tap dancing because of

23   COVID.  But I think she at least attempted to resume

24   taking some dance lessons.  And so she -- she was up and

25   about.

1      Q.    Would she takes naps during the day and that

2  kind of thing?

3      A.    As someone watching her from the outside, we'd

4  see her fall asleep in her chair.  She would -- she

5  would not tell if she was taking a nap, but yes.

6      Q.    And would she watch TV --

7      A.    Yes.

8      Q.    -- throughout the day?

9            Did she tend to go to bed early or, you know,

10  what -- what was kind of her --

11      A.    Yeah.

12      Q.    -- normal routine?

13      A.    So for my whole life, my mother has gotten up

14  at a crazy early hour, and she still does that.  We're

15  talking 5 or 5:30 in the morning.  And then typically

16  would go to bed between 9 and 10.

17      Q.    I want to talk about some of the differences,

18  if any, physically, mentally, and emotionally during

19  this litigation during the lead-up to and throughout the

20  weeklong consecutive day trial itself.  As the jury

21  trial approaches -- I think we talked about the --

22  certainly you are aware of and you made her as aware as

23  possible of the situation in terms of the request for a

24  blue sky or a comfort letter or a considered

25  assignment -- and that was not the case, correct?

1           A.     Correct.

2                  MS. KIDD:  Object to form.

3           Q.    (BY MR. BUTLER)  She's generally aware that

4    State Farm's not willing to a consent to an assignment

5    of rights from Laseter to Mills as you had requested?

6           A.     Yeah.  She's certainly --

7                  MS. KIDD:  Object to form.

8                  THE WITNESS:  -- certainly aware that State

9           Farm was not willing to make the case go away.

10          Q.    (BY MR. BUTLER)  Is she now aware of the fact

11   that State Farm's own internal assessment says a likely

12   verdict between -- against her will be between 100,000

13   and $815,000 exclusive of costs?

14          A.     I can't say for sure --

15                 MS. KIDD:  Object to form.

16                 THE WITNESS:  -- how much of that she would

17          know.  She's certainly -- certainly aware that an

18          excess judgment would be possible.  I can't say how

19          much she would really appreciate the significance

20          of that.

21          Q.    (BY MR. BUTLER)  Is Mary Laseter aware that

22   she will be the defense's last witness called at trial

23   in their case?

24                 MS. KIDD:  Object to form.

25                 THE WITNESS:  She does not know that she's

1    going to be called for sure until the -- she's

2    actually called.  She knows it's possible that she

3    will be called as a witness, but she doesn't know

4    that for sure.

5         Q.   (BY MR. BUTLER)  Do you recall being there

6    when the defense announced to the judge that Mary

7    Laseter was going to be their last witness in their case

8    in chief a day or two before it -- it happened?

9         A.   Yes.

10        Q.   How would you compare the differences in the

11   physical requirements of her typical day versus the days

12   during that trial at the courthouse in Jacksonville,

13   Florida, for five consecutive days there?

14        A.   Oh, it was grueling --

15             MS. KIDD:  Object to form.

16             THE WITNESS:  -- compared to her regular

17   routine.  You know, we're talking about -- not

18   getting up any earlier because she gets up very

19   earlier [sic], but we're, you know, driving

20   together from the beaches to downtown Jacksonville.

21   We're parking in a parking deck across the street

22   but walking from a parking deck all the way into

23   the courthouse.

24        Just that -- that walk through the parking lot

25   into the courthouse one way would be as much or

1     more exercise than she would normally get in a

2     given day.  And we're doing it four times a day

3     because we're walking from the parking lot to the

4     courthouse, going back out for lunch, which we'd

5     eat in the car every day, and then walking back in

6     the courthouse and then walking back out.  So

7     that's four of those trips every day.

8          Driving back home then having to get up and do

9     it again.  Sitting up, as you say, you know, from

10    the beginning of trial to the end of the trial, you

11    know, not getting in the normal time with her eyes

12    closed in her chair that would appear to be a nap

13    to anybody else.  You know, all those things were

14    much more physically difficult than her regular

15    day.  And then doing it five days in a row is

16    extraordinary.

17        Q.   (BY MR. BUTLER)  And would the required

18  concentration so to speak being in a trial setting from

19  morning until early evening, would that to be very

20  different than what she normally would experience, her

21  day-to-day 90-year-old lifestyle?

22        A.   Certainly.  I mean, a -- you know, for most

23  people not in the business of -- of litigation, to have

24  anything to do with a trial ever in your life is a -- is

25  an outlier.  She had no prior experience at anything

1  close to this.

2     Q.   Your mom had fractured her sacrum, as we had

3  heard before, and she had had a -- a broken rib.  Was

4  the prolonged all-day sitting during that trial Monday

5  and then Tuesday then Wednesday then Thursday then

6  Friday more difficult on her than her normal, everyday

7  lifestyle?

8     A.   Certainly more difficult.  I --

9        MS. KIDD:  Object to form.

10       THE WITNESS:  -- can't say that there is a

11    direct connection to the prior injury.  But -- but

12    putting aside the -- the prior injury, in a normal

13    day, you know, she's at home.  She's in a

14    condominium.  She's sitting in a nice comfortable

15    chair.  One thing, the seating arrangements in the

16    courtroom are not made to be comfortable for

17    anybody and certainly not for her.  So definitely

18    much more grueling setting.

19    Q.   (BY MR. BUTLER)  Was your mom in the courtroom

20  when the jury came back with an award of just under a

21  quarter of a million dollars against her alone?

22    A.   Yeah.

23    Q.   You were with her at least for a period of

24  time after that.  I assume that you took her back home

25  or whatever happened.  You tell us.

MIL, R, 403

1  A.  Yeah.  We -- I -- I spent -- so that was

2  Friday.  I spent Friday night.  I left Saturday morning

3  to come back to Atlanta.

4  Q.  You had been away from Atlanta and your family

5  for the week of this trial, and I assume the plan was

6  for you to head back --

7  A.  Yeah.

8  Q.  -- just as soon as possible?

9  A.  Correct.

10  Q.  Do you know -- well, strike that.

11  Was the events of the trial and what happened

12  on your mom's mind as y'all went home and at -- at least

13  until you left the following morning to head back to

14  Atlanta?

15  A.  Sure.  You know, it being her understanding of

16  the subtleties of -- you know, and -- and no one can

17  know what's -- you know, a -- a layperson really absorbs

18  with all this but certainly on her mind.

19  Q.  You -- after that verdict you -- strike that.

R

20  After that verdict did you participate in the

21  negotiation and finalization and execution of an

22  assignment of all right and claims related to the July

23  29th, 2021, collision on behalf of Mary Laseter?

24  A.  Yes.

25  MS. KIDD:  Object to form.



1    Q.   (BY MR. BUTLER)  After you left for Atlanta,

2    did anything unusual occur as far as your mom is

3    concerned?

4        A.   Yeah.  The --

5             MS. KIDD:  Object to form.

6             THE WITNESS:   The night after I left, she fell

7    and broke her hip.

8        Q.   (BY MR. BUTLER)   This would have been the

9    night after the evening that the verdict had been

10   received?

11       A.   Yes.   This is Saturday evening around 7

12   o'clock.

13       Q.   Bear with me for just a minute while I try

14   to...

15            Let me show you --

16            MR. BUTLER:  Before we get to this document,

17       I'm going to attach -- Amanda, just for brevity's

18       sake, I'm going to attach the jury verdict form and

19       the two consents -- the -- the two final judgments

20       as plaintiff's next composite as the next exhibit

21       in line.

22        (Plaintiff's Composite Exhibit No. 10

23        marked/identified.)

24            MS. KIDD:  The jury verdict in on -- on the

25       case?  Is that what you're talking about?

```
 1          MR. BUTLER:  Yes, the jury verdict form and
 2      the final judgment -- the two separate final
 3      judgments that were entered, those items.
 4          MS. KIDD:  Postjudgment, you're talking --
 5          MR. BUTLER:  Yes.  That would be the third
 6      one.
 7      Q.   (BY MR. BUTLER)  Is it your -- strike that.
 8           The item in front of you is entitled what?
 9      A.   Assignment of all claims and rights related to
10   July 29, 2021, collision.
11      Q.   And is that a true and accurate copy of the
12   executed assignment of rights between Mary Laseter and
13   Amber Mills that you participated in the negotiation and
14   execution and all of that of?
15      A.   It appears to be.  The only question that I
16   would have looking at it right now is that the attached
17   exhibit, which is the original demand letter, is just
18   the demand letter and not the attachments to that.  And
19   I can't sitting here today recall whether the
20   attachments were also included as part of it.  But
21   everything here appears to be accurate.
22      Q.   All right.  That'll be plaintiff's next in
23   line.
24          THE REPORTER:  It's up to 11.
25       (Plaintiff's Exhibit No. 11 marked/identified.)
```

1          THE WITNESS:  You put the verdict form and the

2      judgments all in the same --

3          THE REPORTER:  That's -- that's 10.  Yeah.

4      Q.   (BY MR. BUTLER)  Do you recall at the trial of

5  the case that the defense medical expert, Dr. Gabriel,

6  indicated that Amber Mills was cooperative and did not

7  exaggerate her symptoms and so forth in any way, shape,

8  or form?

9      A.   So I don't have --

10         MS. KIDD:  Object to form.

11         THE WITNESS:  -- perfect recollection of that,

12     but what you just described sounds -- sounds

13     correct.  I can't recall it verbatim, but it's --

14     that sounds I think reasonable summary.

15     Q.   (BY MR. BUTLER)  I'm looking at a CSK report

16 to Angela Butler at State Farm Insurance Company on

17 January 11th, 2023.  This would have been a month or so

18 before the verdict.  And it said, quote, although our

19 main argument is medical causation, our CME doctor, Dr.

20 Gabriel, opined that it is likely that the plaintiff

21 sustained a concussion and an aggravation of her

22 preexisting cervical degenerative disk disease and lower

23 back pain.

24         MS. KIDD:  Is there any question?

25     Q.   (BY MR. BUTLER)  And went on to say, quote,

```
 1   however, her neck issues likely represent a permanent

 2   aggravation of a preexisting condition, unquote.

 3            Is that generally consistent to what you

 4   recalled seeing and hearing --

 5            MS. KIDD:  Object to the form.

 6       Q.   (BY MR. BUTLER) -- in the trial?

 7       A.   Yeah.

 8       Q.   And in that same communication, Cole, Scott &

 9   Kissane advised State Farm's Angela Butler that what is

10   the realistic of possible verdicts, question mark.

11   Realistic range of possible verdicts is between $100,000

12   and $815,000.

13            MS. KIDD:  To the extent there's a question, I

14       object.

15       Q.   (BY MR. BUTLER)  Is that consistent with your

16   recollection of events generally?

17       A.   Meaning I had --

18            MS. KIDD:  Object to form.

19            THE WITNESS:  I -- I do recall that that was

20       the assessment of the defense counsel given to

21       State Farm.  Yes.

22       Q.   (BY MR. BUTLER)  Can you think of any reason

23   why State Farm could not have gotten their evaluation

24   and that information many, many months before the trial

25   of this case?
```

```
 1              MS. KIDD:  Object to form.
 2              THE WITNESS:  No.  I can't think of any
 3        reason.  I -- I assume actually that they had
 4        something similar to it.
 5        Q.    (BY MR. BUTLER)  Do you recall your mother's
 6   testimony at the trial of the case?
 7        A.    I recall her testifying.  I can't say that I
 8   recall much about the content of it.  There wasn't a lot
 9   of content, but...
10        Q.    (BY MR. BUTLER)  What, if anything, do you
11   recall about defense counsel's comments about her brief
12   testimony when it was concluded?
13              MS. KIDD:  Object to the form.
14              THE WITNESS:  I don't know that I recall -- I
15        mean, I think everybody was happy with how she had
16        done.  No one said she did anything wrong.
17        Q.    (BY MR. BUTLER)  And there was no
18   cross-examination of your mother --
19        A.    Correct.
20        Q.    -- there at trial?
21              Here are those -- the verdict form and the two
22   judgments there.
23              Let me show you a -- some excerpts from a
24   document produced by State Farm in this case.  This one
25   is -- and dated February 28th, 2023, from CSK to State
```

1    Farm.

2              Have you ever seen that document before or at

3    least back during the trial of the case or --

4              MS. KIDD:  Sorry.  Is there a Bates number?

5              MR. BUTLER:  Sure.

6              THE WITNESS:  It's SF000644 and 645.

7              MS. KIDD:  Thank you.

8              THE WITNESS:  You've got -- I mean --

9         Q.   (BY MR. BUTLER)  You can hold it up.

10        A.   -- is this an excerpt of Bates numbers, not

11   the whole --

12        Q.   Excerpts.

13        A.   Yeah.  So let me get it -- sorry.

14             MS. KIDD:  Thank you.  Thanks.  I'm good.

15        Q.   (BY MR. BUTLER)  If State Farm followed the

16   recommendations of its chosen insurance defense counsel,

17   would there be any need for your mother to testify in

18   this case, that is, the bad faith claims handling case?

19        A.   No.

20             MS. KIDD:  Object to form.

21        Q.   (BY MR. BUTLER)  We'll attach that as

22   plaintiff's next.

23         (Plaintiff's Exhibit No. 12 marked/identified.)

24             THE WITNESS:  Do you want to remove --

25             MS. KIDD:  We'll object.

```
 1          THE WITNESS:  -- the tab?  I think you just

 2     have one.  Remove it?

 3          Q.   (BY MR. BUTLER)  Yeah.  You can remove that.

 4     That's just...

 5          There is an e-mail that I want to look at with

 6     you wherein you -- it's an e-mail from you to me in

 7     connection with the assignment of rights and the

 8     discussion of your mom's fall the day after the verdict

 9     in this case.  Do you recall that e-mail generally?

10          A.   I recall us having exchanges certainly.

11          Q.   Do you recall --

12          MR. BUTLER:  Drew, can we find that e-mail?

13          MR. BASKIN:  Yeah.  Just one second.

14          THE WITNESS:  So the display here, can we --

15          MR. BUTLER:  Yeah -- no.  Drew, that's --

16     that's not -- well -- I'm sorry.  Put it back up.

17          Yeah.  No.  It's not that one.  It's later

18     than that.  It's --

19       (Off-the-record discussion.)

20          Q.   (BY MR. BUTLER)  All right.  Can you see this

21     e-mail?

22          A.   I can.

23          Q.   Is this -- what is the -- the date and

24     circumstances of this e-mail?  It's an e-mail from you

25     to --
```

R

A.   It's -- is -- I guess an e-mail from me to

you, to Howard Butler.  And I'm assuming that you must

have wanted to speak with me or my mom, perhaps my

mother about something to do with the -- the ongoing

case against State Farm.  And I let you know that she

had had her accident and asked you to make whatever

requests you had specific so that we could try to

address it in a way that was least impactful to my

mother.

        Q.   So in connection with the assignment of all

rights and claims from Mary Laseter to Amber Mills, we

contacted you in this case on behalf of your mother to

arrange for deposition dates or whatever that I think

had been requested of us.  And you wrote back this

e-mail, and you talked a little bit about the fall that

she had had.

              What did you say about the fall?  What was

your thought processes in that regard that you conveyed

to us on July 29th, 2023?

        A.   So my rec- --

              MS. KIDD:  Object to form.

              THE WITNESS:  My recollection is that this

        e-mail is either in response to a voice message

        from you or an e-mail from you that was actually

        asking to speak to me, I believe, initially

MIL, R, 403



1    probably to check in about the next -- next step.

2    And my response was:  Howard, my mother fell and

3    broke her hip the night after the trial ended in

4    February.  Causation is always hard to pin down,

5    but it seems likely that the stress she -- stress

6    and exhaustion played a role.  After nearly five

7    months in a care facility, she just got back home a

8    week ago.

9    Q.   (BY MR. BUTLER)  So let me stop you --

10    A.    Yeah.

11    Q.   -- there for a minute.



12         So when you talk about the stress and

13   exhaustion role in the fall, what stress and exhaustion

14   were you alluding to?

15         A.   To the trial specifically, experience of the

16   trial.

17         Q.   And based on your observations and

18   interactions of her during that entire week, was that

19   your honest assessment of the --

20         A.   Oh, absolutely.

21         MS. KIDD:  Object to form.

22    Q.   (BY MR. BUTLER)  Your mom is -- was -- strike

23   that.

24         Your mom is now 91 years old and next March

25   will be 92?

1    A.   Correct.

2    Q.   All right.  We'll attach a copy of that e-mail

3  to the deposition as our next exhibit.

4       (Plaintiff's Exhibit No. 13 marked/identified.)

5    Q.   (BY MR. BUTLER)  Is that a true and accurate

6  copy of the e-mail that you sent?

7    A.   I believe so.

8       MR. BUTLER:  Amanda, I think I'm done.  I

9    would like a couple of minutes just to look through

10   and see what I've missed.  But --

11      MS. KIDD:  Okay.

12      MR. BUTLER:  -- I'm very much close to being

13   through, so...

14      MS. KIDD:  Let's take a break -- five-minute

15   break while you look, and --

16      MR. BUTLER:  Sure.

17      MS. KIDD:  -- when we get back, I'll be ready

18   to get started.

19      MR. BUTLER:  That'd be great.  Thank you.

20      THE VIDEOGRAPHER:  Going off the record at

21   4:16.

22    (Recess taken from 4:16 p.m. until 4:22 p.m.)

23      THE VIDEOGRAPHER:  We're going back on the

24   record at 4:22.

25    Q.   (BY MR. BUTLER)  Mr. Laseter, earlier in the

deposition there was discussion about, you know, the
demand and the offers and so forth.  The composite that
I just handed you, does it contain the original $6550
offer and then our response back to that with a medical
bill that was requested and extending the settlement
deadline and then the final offer of $7,000 in this
case?

    A.   Yes.  Specifically, there's -- that's a April
14th, 2022, letter from State Farm to your law firm, to
the Butler firm; an April 14, 2022, letter from your law
firm to State Farm including invoices from Precision
Imaging; an April 29, 2022, letter from your law firm to
State Farm -- it appears to include a -- it's a faxed
trans- -- confirmation sheet -- and then a May 2nd,
2022, letter from State Farm to your law firm.

    Q.   All right.  Thank you, sir.  That'll be
plaintiff's next composite.

        (Plaintiff's Composite Exhibit No. 14
        marked/identified.)

        MS. KIDD:  Turn it around so I can see it just
        really quickly.  I'm sorry.

        Okay.  I'll object to that one.  Thanks.

        THE WITNESS:  Do you want me to show you each
        page or --

    Q.   (BY MR. BUTLER)  Do we have them in the

1    correct order?

2         A.   Yes.

3         Q.   There should be a numerical order there.

4         A.   Yeah.

5         Q.   All right.  Just show those to the camera.

6              THE WITNESS:  That's the one I already

7         displayed.  The second page.  The third page.  And

8         the final page.

9         Q.   (BY MR. BUTLER)  Put those together if you

10   would, sir.

11        A.   Did -- mark them --

12        Q.   Put that clip there, and he'll take it from

13   there.

14        A.   And you've given me three composites that

15   you've given me that we've not marked.

16        Q.   Oh, well, remind me of what those are.  Let me

17   see those.  I thought that we did.  These are the

18   letters going back to April 9th and the State Farm

19   policy that we've looked at there.  So let's make sure

20   that we have these marked.

21             THE REPORTER:  Do you want these marked

22        separately or --

23             MR. BUTLER:  Well, it -- I -- I thought that

24        they were already may have been marked, but if

25        they're not, they -- they should be marked in three

```
 1        grouping or whatever that you have there.

 2             THE WITNESS:  Do you want to publish them

 3        again to the --

 4             MR. BUTLER:  I don't -- I think we did publish

 5        them if --

 6             THE REPORTER:  They were shown to the camera

 7        but --

 8             MR. BUTLER:  Yeah.  I think they were shown to

 9        the camera.

10             THE REPORTER:  So 15, 16, and 17 are our next

11        numbers.

12         (Plaintiff Exhibit Nos. 15, 16, and 17

13        marked/identified.)

14             MR. BUTLER:  All right.

15        Q.   (BY MR. BUTLER)  The last area I want to ask

16    you about is the treatment from your perspective of your

17    mother from Amber Mills and her representation --

18    that -- that is me.  You were present when your mother

19    was deposed in the underlying Mills versus Laseter case?

20        A.   Correct.

21        Q.   And the reason it's the Mills versus Laseter

22    case is -- is that Florida's nonjoinder law doesn't

23    allow for the insurance company's name, just the --

24        A.   Mm-hmm.

25        Q.   -- individuals.  Is that your understanding?
```

R, 403

R, 403

1        A.    Yes.

2        Q.    Did you and your mom feel like she was treated

3   with respect and dignity during that deposition?

4        A.    Yes.

5             MS. KIDD:  Object to the form.

6        Q.    (BY MR. BUTLER)  Your mom even made a comment

7   to me on the way out, did she not, about she appreciated

8   how I handled the deposition.  Is that a --

9        A.    I don't recall sitting here, but I'm not

10  surprised.

11            MS. KIDD:  Object to form.

12       Q.    (BY MR. BUTLER)  All right.

13       A.    Yeah.

R, 403

14       Q.    At the trial of the case, the attorneys chosen

15  by State Farm chose to put your mom on as the last

16  witness and asked her a few questions.  I did not ask

17  her any questions in cross-examination; is that correct?

18       A.    That's my -- my recollection.

19            MS. KIDD:  Object to form.

20       Q.    (BY MR. BUTLER)  And since the assignment of

21  all rights and claims, have I attempted to minimize your

22  mother's continued personal involvement in this case

23  as -- as much as -- as we can?

24       A.    It seems so.

25            MS. KIDD:  Object to form.

```
 1        Q.    (BY MR. BUTLER)  And she's 91 at this point?

 2             MS. KIDD:  Object to form.  Asked and

 3        answered.

 4             THE WITNESS:  Correct.  Yeah.  That's right.

 5        Q.    (BY MR. BUTLER)  And she has since this crash

 6   had another substantial fall in which she broke her hip

 7   and had to have emergency surgery?

 8        A.    Correct.

 9             MS. KIDD:  Object to form.

10        Q.    (BY MR. BUTLER)  And did she have a -- an

11   additional significant period of disability and issues

12   associated with that?

13        A.    Yes.

14             MS. KIDD:  Object to form.

15             MR. BUTLER:  That's all I have.  Thank you.

16             Your witness.

17             MS. KIDD:  Thank you.

18                      EXAMINATION

19   BY MS. KIDD:

20        Q.    All right.

21             THE WITNESS:  Can I get you to turn the

22        monitor slightly so I can see --

23        Q.    (BY MS. KIDD)  Yeah.

24             THE WITNESS:  -- her?

25        Q.    (BY MS. KIDD)  Sure.  Let's get you --
```

```
 1          THE WITNESS:  That's good.  Yeah.

 2      Q.   (BY MS. KIDD)  Mr. Laseter, as you are aware,

 3  my name is Amanda Kidd.  I am State Farm's attorney.

 4  So -- and you're my witness now, so I'm going to ask you

 5  some follow-up questions.

 6          What's your date of birth, sir?

 7      A.   July 9, 1962.

 8      Q.   Before today have you ever had your deposition

 9  taken before?

10      A.   I have.

11      Q.   How many times?

12      A.   At least twice and possibly a third, although

13  sitting here right now, I'd go with two.

14      Q.   Okay.  What were those depositions in

15  connection with?

16      A.   Environmental litigation.  I was designated as

17  an expert in a environmental due diligence case and was

18  both a fact witness and designated by -- as an expert in

19  another contamination-related case.

20      Q.   So both depositions were in connection with

21  expert witness work; is that fair?

22      A.   It -- it's certainly in -- in connection with

23  environmental subject matter.

24      Q.   All right.  What is your current address?

25  Where do you live?
```

```
 1        A.    1294 Briardale Lane in Atlanta, Georgia.

 2        Q.    Okay.  Other than your mother do have any

 3   other family that presently lives in the greater

 4   Jacksonville area?

 5        A.    No.

 6        Q.    And what's your current phone number?

 7        A.    It -- that --

 8             MR. BUTLER:  Hang on just a second.

 9             Amanda, do we want to put that on the record

10        and out in the public and that kind of thing?  I

11        mean, I'll leave it up to you, but I -- I --

12             MS. KIDD:  It -- it might be pertinent, so

13        yeah, I'd like to get it on the record.

14             THE WITNESS:  (404) 812-0844 is a number that

15        is my -- both my work number and it gets me

16        everywhere I am all the time.

17        Q.    (BY MS. KIDD)  Okay.  And I know that you have

18   communicated with both myself and Mr. Butler in this

19   matter, and it appears to come from a work e-mail

20   address.  For the record what is that address, e-mail

21   address?

22        A.    Slaseter@kmcllaw.com.

23        Q.    Okay.  And is that fair that is your

24   professional e-mail address?

25        A.    Correct.
```

```
 1       Q.   With respect to any communications with State

 2   Farm, your mother, or the attorneys retained to

 3   represent your mother, would you have used any other

 4   e-mail address?

 5       A.   No.

 6       Q.   You're not currently taking any sort of

 7   medications or undergoing any medical treatment that

 8   would affect your ability to participate today?  I don't

 9   think we established that at the beginning.

10       A.   Correct.  I am not.

11       Q.   Great.  Have you ever been convicted of a

12   felony or a crime involving dishonesty?

13       A.   I have not.

14       Q.   You've already established you are an

15   environmental lawyer.  I believe you are licensed in the

16   state of Georgia; is that correct?

17       A.   Correct.

18       Q.   You hold law licenses in any other state?

19       A.   Not licenses, no.

20       Q.   Okay.  How long had you been licensed to

21   practice law?

22       A.   About 33 years, 1990.

23       Q.   Where did you graduate law school?

24       A.   Mercer.

25       Q.   And since you were admitted to the Georgia
```

```
 1    bar, have you ever been reprimanded or disciplined by
 2    that bar?
 3         A.   I have not.
 4         Q.   To your knowledge had ever had any bar
 5    complaints filed against you?
 6         A.   Not to my knowledge.
 7         Q.   And you told us that your current area
 8    specialty, I believe, is environmental law; is that
 9    correct?
10         A.   Correct.
11         Q.   Okay.  And the current firm name, what is
12    that?
13         A.   Kazmarek Mowrey Cloud Laseter, LLP.
14         Q.   Okay.  How long have you been with that firm?
15         A.   Since its inception in its modern version
16    since 2013, with its predecessor version since 2008.
17         Q.   Okay.
18         A.   And I practiced with the -- substantially the
19    same people since I -- before --
20         Q.   Oh, no.
21         A.   -- before graduating.
22              MS. KIDD:  I've got a frozen witness.  Wait
23         till he comes back.
24         Q.   (BY MS. KIDD)  Okay.  I think you're back.
25    Sorry --
```

1      A.   Okay.

2      Q.   -- about that.

3      A.   Yeah.

4      Q.   All right.  I think the last thing I heard was

5 its predecessor from 2008, and that was it.

6      A.   Cor- -- correct.  And I was saying that I had

7 practiced with the people who for- -- formed that firm

8 in 2008 since getting out of law school or even

9 beforehand.

10      Q.   Okay.  Okay.  Are you the Laseter of the named

11 Laseter in the firm name?

12      A.   I am.

13      Q.   Okay.  And generally speaking, is your firm

14 would you consider an environmental law firm, or what

15 are the areas of practice?

16      A.   We are an environmental law firm.  Yes.

17      Q.   So would it be fair to say that since two

18 thou- -- well, I'm sorry, 1990 when you got out of

19 school you've been primarily focused on doing

20 environmental law?

21      A.   Yeah.  That'd be fair.  I've done a fair

22 amount of coverage work in the environmental arena, but

23 it's all been environmental I'd say -- no.  That's not

24 true.  It has been primarily environmentally related.

25 I've occasionally done, as -- as we all do from time to

```
 1   time, things outside of that, but...
 2        Q.   Okay.   Is -- is any part of your practice any
 3   percentage of plaintiff's personal injury work?
 4        A.   No.
 5        Q.   Okay.   Is any part of your practice -- or --
 6   or do you represent insurance companies as part of your
 7   practice?
 8        A.   I do not currently represent insurance
 9   companies.   I've in the past represented a couple of
10   insurance companies in coverage matters.
11        MS. KIDD:  Oh, he froze again.  It's just my
12        luck.
13        Q.   (BY MS. KIDD)  Now you're back.  I'm sorry.  I
14   got that in the past you had represented insurance
15   companies, and that's all I got.
16        A.   Yeah.  So currently I represent no insurance
17   companies.  I don't believe the firm represents any
18   insurance companies.  And I can't give you dates other
19   than to say it's been a long time.  I have represented
20   insurance companies in the past.
21        Q.   Okay.
22        A.   But it's been a small --
23        Q.   When you say a long -- right.  When you say a
24   long time, what -- what does that mean to you?  More
25   than ten years ago?
```

1      A.   Certainly more than ten years ago.

2      Q.   And the representation of insurance companies

3  in the past, would that have been in connection with the

4  coverage work that you spoke about, or would it have

5  been something different?

6      A.   Yes.  So I represented a -- an environmental

7  insurance company in -- in a couple of coverage matters

8  just, again, possibly 20 years ago.  And then much

9  longer than that, I provided coverage help to actually

10  an HMO, a home -- a -- a health maintenance organization

11  in a nonenvironmental case.

12      Q.   And I'm sorry.  What was that representation

13  of the HMO?

14      A.   It's --

15      Q.   What were you defending?

16      A.   I was representing them in a -- in a coverage

17  action regarding a -- a burn case.

18      Q.   And as far as coverage, would that mean -- am

19  I to understand whether or not there was coverage for

20  the claims made under their policy?

21      A.   Correct.

22      Q.   And by coverage I mean insurance coverage.

23      A.   Correct.

24      Q.   Based upon what you've just told me, would it

25  be fair to say that you have never tried a personal

1  injury lawsuit?

2      A.   Correct.

3      Q.   Based upon what you've just told me, would it

4  be fair to say that you've never served -- oh, let me

5  ask you this.  I'm sorry.  Strike that.

6           Have you ever prosecuted or defended an

7  insurance bad faith case?

8      A.   Yes.

9      Q.   Okay.  When was that?

10      A.   I -- I've -- I've never defended a bad faith

11  case.  I've been on the plaintiff side certainly more

12  than once.  I'm not going to be able to give you an

13  accurate recount.  It's not a dozen, but it would at

14  least be a few.

15      Q.   Okay.  So you prosecuted an insurance bad

16  faith case against an insurance company in the past --

17      A.   Yeah.

18      Q.   -- is that accurate?

19      A.   Yeah.  I've been using the term "prosecution"

20  and mean- -- meaning that I represent the -- the

21  policyholder.

22      Q.   Okay.  So it was always the policyholder.

23  It -- was it ever an injured claimant?

24      A.   Well, the policyholder in the cases that I can

25  think of would have been the injured party.  These are

1  environmental coverage cases for the most part.  And so

2  the -- the plaintiffs would have -- the plaintiffs in

3  the insurance coverage case would've been the insured

4  that had a underlying claim they were seeking coverage

5  for.

6       Q.   Okay.  So was the actual lawsuit insurance bad

7  faith, or was it a lawsuit against the insurance company

8  for coverage?

9       A.   It was a -- they would be coverage cases in

10  which there are bad faith claims associated with it.  So

11  it -- it would not have been a uniquely bad faith claim,

12  meaning was -- was not filed only for bad faith.  It was

13  filed for to re- -- to recover on a policy with a

14  allegation of bad faith.

15       Q.   Okay.  And the allegations of bad faith would

16  have been because the insurance company was denying

17  coverage; is that fair?

18       A.   Or -- or a failure to investigate or some

19  combination of their claims handling activities, yes.

20       Q.   What insurance companies did you sue as part

21  of that practice?  Do you remember?

22       A.   I know the Travelers was one of them.  I

23  believe Continental is another one.

24       Q.   Okay.

25       A.   The Travelers case resulted in a reported

```
 1   decision.  The -- the other one did not.  So I -- and --

 2   and I can picture the plaintiff's name in the other one,

 3   but I'm not sure of all the insur- -- there -- there

 4   were multiple insurance carriers involved in, yeah, that

 5   one that I'm thinking of.  And there have probably been

 6   others where there had been a bad faith element to a --

 7   to a claim.  But I can't right now remember the -- the

 8   companies or -- or much about the facts.

 9        Q.   Have you ever sued State Farm?

10        A.   Sitting here today, I don't believe so.

11        Q.   The -- you said you were -- well, first do you

12   recall where these cases were pending, any of these bad

13   faith suits?

14        A.   Yeah.  So one's in Al- -- one was in Alabama.

15   One was in -- so that would've been in fe- -- initially

16   in federal district court in Birmingham.  So that -- I'm

17   not sure which district of Alabama that is if there's

18   more than one.  It actually got certified to the state

19   supreme court, so there's a -- it was both state supreme

20   court and -- and federal district in Alabama.

21            The John Alden case was in the Middle District

22   of Georgia.  It went to the 11th Circuit.  That's --

23   there was a case in New Jersey.  I can't now recall -- I

24   can't tell you which court in New Jersey that would've

25   been.  Is -- that -- that's -- goes back a long way.
```

1    Q.   Okay.  I presume you had to pro hac vice in to

2    these different states if you're not licensed anywhere

3    but Georgia?

4    A.   Correct.  There may have been one in -- in --

5    actually in the Middle District of Florida.  I know

6    I've -- I've been pro hac in the middle district before

7    at least once.

8    Q.   Okay.  You believe it might've been a -- a bad

9    faith -- insurance bad faith suit into the Middle

10   District of Florida?

11   A.   No.  I don't think that was an insurance case.

12   There -- there would've been an insurance piece in that,

13   but I don't -- I don't think that the litigation in that

14   case was -- was coverage.

15   Q.   Okay.  Have you ever to your recollection sued

16   an insurance company for bad faith with respect to a

17   Florida claim?

18   A.   I don't believe that I have filed a bad faith

19   claim in Florida.  I've been involved in assisting in

20   representation of cases in Florida involving bad faith.

21   Q.   Okay.  Do you recall any of the names of any

22   of those cases?

23   A.   No.  No.

24   Q.   Okay.  Those cases that you have assisted on,

25   what -- strike that.

1          Of any of the cases that you have either

2     assisted on or brought you were a named attorney, a

3     named counsel for the plaintiff, did any of those bad

4     faith cases involve personal injuries?

5          A.   No.

6          Q.   Have you heard -- well, no.  I think you've

7     already told me that, so strike that.

8               I take it you've never -- have you ever been

9     retained but never testified in an insurance bad faith

10    case as an expert witness?

11         A.   No.

12         Q.   Prior to this suit being filed against your

13    mother, did -- have you ever known or worked with Howard

14    Butler and his firm before?

15         A.   No.

16         Q.   Prior to -- same question -- this accident had

17    you ever known Amber Mills before?

18         A.   No.

19         Q.   As far as this deposition, what did you do to

20    prepare?

21         A.   Other than gathering the documents that I

22    shared with you, nothing.

23         Q.   So you gathered the documents.  Did you review

24    them at all?

25         A.   Well, I looked at them close enough to know

that they were responsive to the general question were

they related to the -- to the matter. I certainly

didn't, you know, read them page by page.

Q. Okay. Did you resu- -- review any sort of

case timelines or anything like that before your

deposition in preparation?

A. No.

Q. Okay. Did you meet with anybody in

preparation for the deposition today?

A. No.

Q. Talk to anybody on the phone in preparation

for your deposition today?

A. No.

Q. Have you reviewed, other than what we've

looked at today, any part of State Farm's claim file

that has been produced in discovery in this matter?

A. So I've not seen anything that's been produced

in the -- in this law -- in the -- in the current

coverage litigation. I -- I suspect I have seen

documents that are part of that -- of the claim file but

not -- not in -- not -- not as a part of the review of

the claims file itself.

Q. Understood. Okay.

And talking about the production that you made

to the parties on November 1st of this year, which I

1  believe was seven days ago, what did you do in order to

2  gather those documents?  How did you -- how did you

3  accomplish that production?

4      A.    So the documents were already stored because

5  I've been using my work e-mail.  They were fairly easy

6  to find using my work e-mail search function and

7  segregated them that way and converted them --

8      Q.    Okay.

9      A.    -- to PDFs.

10     Q.    All right.  So --

11     A.    I had no paper --

12     Q.    -- when the files were --

13     A.    -- files if that's --

14     Q.    Okay.

15     A.    Yeah.

16     Q.    That leads me to my next question.

17           Were any of these documents mailed to you and

18  they were scanned in, or was this all -- anything that

19  really you had that you produced was given to you or you

20  were provided via -- would it be fair to say via e-mail?

21     A.    Yeah.  Or if -- if they were scanned, they

22  were scanned at the time of originally being received

23  and only retained in electronic form.

24     Q.    Okay.

25     A.    So I don't have a hardcopy file related to the

```
 1    matter.
 2         Q.   Got it.
 3              We talked a little bit about your mother's
 4    policy of insurance with State Farm.  I believe you told
 5    us that you believe she has been a State Farm insured
 6    for as long as she's held automobile insurance.
 7              Were you involved at all with your mother in
 8    selecting those policy limits, the $25,000?
 9         A.   I'm sure we conferred about it.  I -- I handle
10    or help with most every aspect of her -- call it --
11    loose -- loosely calling it business.  Someone in her
12    circumstances doesn't really have business but her
13    affairs.
14         Q.   Okay.  So before the accident happened in July
15    of 2021, did you ever counsel her or talk to her at all
16    about the actual amount in policy limits that she
17    selected, the 25,000?
18         A.   Yes.
19         Q.   Okay.  And what do you recall discussing?
20         A.   I recall telling her that I thought that that
21    was an appropriate limit for her.
22         Q.   All right.  Why is that?
23         A.   In light of her financial circumstances.
24         Q.   Okay.  Do you have power of attorney over your
25    mother?
```

A.    I -- I ought to know the answer to that
quicker.  That -- I hadn't thought about it.  I think I
do.  Yes.  And I think that's a relatively recent even.
I don't think I had power of attorney or -- at the time
of the -- the accident.
     Q.    Okay.  Do you -- oh, is it -- so then how long
has it been approximately that you have had the power of
attorney?
     A.    Since her -- her accident following the trial
that we talked about earlier.
     Q.    Okay.  Going back to the time of the accident
and shortly before, did your mother pay her own bills at
that time?
     A.    And this is the automobile accident?
     Q.    Yeah.  I'm sorry.  When I talk about
accident --
     A.    Yeah.
     Q.    -- I mean the --
     A.    Sure.
     Q.    -- July of 2021 automobile accident, the kind
of -- the catalyst for all this.
     A.    And when you say did she pay her own bills,
maybe she -- did she pay her power bill, her light --
the -- that -- that -- the -- is that what you mean by
paying her bills?

Q.   Right.  Was she responsible for doing that, or

was -- were you the one taking care of that is --

        A.   Yeah.

        Q.   -- really what I'm trying to understand.

        A.   Yeah.  She -- she was handling her daily

financial affairs.

        Q.   Okay.  All right.  And is that not the case

now?  Now that you have power of attorney, are you

handling her daily financial affairs?

        A.   My wife and I provide substantial support in

that, not through the power of attorney.  It -- we -- we

don't exercise the power of attorney to -- to do

anything for her.  It's really a reserve in case we need

it.  But we do handle lots of her affairs including some

of the -- some things that you consider routine now.

        Q.   Okay.  Like what?

        A.   Paying bills, e- -- even -- even down to

things like helping get groceries and stuff like or --

we're -- we're involved in that.  Certainly we help with

transportation now.

        Q.   How do you accomplish that being in Georgia

and her in Jacksonville?

        A.   It's a -- a miracle of the digital age and

having a wife who's much better at that sort of stuff

than I am.

MIL, R, 403

1      Q.    Thank God for wives, right?

2      A.    Yeah.  Thank -- thank the -- and

3  daughters-in-law, it turns out.

4      Q.    When do you estimate what -- what -- did that

5  really change as far as, you know, you paying her bills,

6  taking care of her dri- -- groceries, that sort of

7  thing?  Is that again after the trial in this matter, or

8  is that more recent?  When did that occur?

9      A.    So after the accident the fall --  it was

10  literally the day after the trial, she had a hip

11  replacement.  She was, you know, in a rehab unit and

12  then in an assisted care facility for almost five

13  months.  So really you kind go from, you know, the

14  moment that happens somebody else was taking care of

15  everything.

16          We had done some that before then.  But, you

17  know, soon -- soon as that happened, you know, really

18  you need to pick up everything at that point.  And --

19  and then she's -- as time has gone on has resumed some

20  of it herself.  But we're still significantly involved.

21      Q.    Okay.  Is she back in her condo?

22      A.    You cracked a little.  I think you asked is

23  she back in her condo.  Yes, she is.

24      Q.    Is she still living alone in the condo?

25      A.    She is.

1          Q.   Does she have any sort of daily help or home

2     health or anything that comes in as of now?

3          A.   Yeah.  She has -- we have somebody who comes

4     in three days week and -- and then pro- -- probably

5     comes out to be three and a half days a week for short

6     visit for really just checking in.  But she's -- she's

7     generally taking care of herself.

8          Q.   When you say checking in, is it just to ensure

9     she's okay or did -- do they perform any services for

10    her?

11         A.   At the moment they perform very little in the

12    way of services.  It's -- it's just -- just mostly to

13    make sure she's okay.  They are qualified to render

14    whatever assistance she would need.  She does not like

15    any assistance.

16         Q.   All right.  At the time of the accident, what,

17    if anything, was your mother's sources of income?

18         A.   Social Security.

19         Q.   Social Security.

20              And has that changed?  Is that the same?

21         A.   Correct.  It's the same.

22         Q.   Has your mother ever had any of her assets in

23    a trust?

24         A.   No.  Well, not -- not a trust as I think

25    you're using the term.  She would've had at one point

```
 1   retirement accounts which are technically trusts but

 2   not -- not a private, nonqualified trust.

 3       Q.   And I take it she no longer has those

 4   retirement accounts?

 5       A.   Correct.

 6       Q.   Obviously, we're here today because there was

 7   a bodily injury claim made against her mother as a

 8   result of this accident.  When did you -- and I'm not

 9   looking for exact dates but generally become aware that

10   a bodily injury claim was being asserted --

11            MR. BUTLER:  Form.

12       Q.   (BY MS. KIDD) -- against your mother?

13       A.   We had learned -- and -- and actually I think

14   there was an exhibit we looked at earlier -- within a --

15   I think a couple of weeks of the accident that the

16   driver in the other car had retained counsel, which

17   would be a pretty good indicator that there's a

18   potential claim.

19       Q.   Okay.

20       A.   So within -- you know, within a matter of I

21   think weeks certainly.

22       Q.   Okay.  And you indicated you knew this because

23   the driver had retained counsel and this was -- how was

24   this communicated to you?

25       A.   I believe that may have come from State Farm.
```

1    Q. Okay.

2    A. But I'd actually --

3    Q. With -- with --

4    A. To -- to tell you the -- the -- si- -- sitting

5 here today, I can't recall whether we were notified

6 first and tendered it to State Farm or State Farm found

7 that first and reported it to us.  At this point I

8 can't...

9    Q. No.  That's okay.

10    A. Yeah.

11    Q. Did your -- you were shown a lot of documents

12 earlier today on direct examination that were -- one

13 being a demand, a very large demand package prepared on

14 behalf of Amber Mills.  Do you recall when in -- in what

15 general time frame you would have first seen that demand

16 before today?

17    A. Yeah, within -- within if not hours certainly

18 days of it having been delivered.  I believe that we may

19 have been actually copied on it when it was initially

20 delivered to State Farm.  Or if not -- if not, it was --

21 State Farm would've provided it to us and -- I don't

22 have it back in front of me now to know the -- it -- it

23 did go to State Farm.  So, yeah, I'm certain State Farm

24 would've provided it to us.

25    Q. Okay.  And when you say us, you mean you and

1    your mother?

2         A.   Correct.

3         Q.   Okay.  So at the inception of this case when

4    State Farm -- and when I say -- mean is that shortly

5    after the accident.  Accident occurs in July of 2021.  I

6    believe we get the demand in the May 2022 time frame.

7              MR. BUTLER:  Object to the form.  That's

8         incorrect.

9         Q.   (BY MS. KIDD)  We get to the demand in the

10   spring of 2022.  How about that?  There is I think some

11   confusion over when the demand was actually received by

12   State Farm.

13             But in any event how would you have received a

14   copy of that demand?  Would it have been by mail, or

15   would it have been by e-mail?

16        A.   So it's possible that my mother would've

17   gotten a hardcopy of it.  I was -- I would've not been a

18   direct correspondent of it.  Or she would've received it

19   as an attachment to an e-mail which basically would've

20   gotten it as a -- as an e-mail.  My -- sitting here

21   today, my guess is that it -- it came to us by e-mail

22   but --

23        Q.   Well, the --

24        A.   -- that's just a guess.

25        Q.   -- reason I asked is in your production there

1    is not a copy of that 400-page demand.  So does that

2    refresh your recollection of how you would have seen it

3    for the first time?

4         A.   No.  I think it was a hundred pages by the

5    way.  But -- maybe a hundred and four if I got the --

6    count I saw today.  But -- but no.  Is in -- I -- so I

7    likely would have -- would have seen it at my mother's.

8         Q.   So let's kind of talk about when you would've

9    seen it, and maybe this is refreshing your recollection

10   to an extent.  But logically speaking, if your mother

11   would've received it in Jacksonville, you would have

12   probably been in Atlanta at that time, correct?

13        A.   Yeah.  The odd -- the odds are -- although

14   we're down there a lot.  But, yeah, the odds are that we

15   would've been up here.  So if she receives something

16   like that in -- in a hardcopy form, she would've called

17   me, and I would've either, yeah, send me a picture of it

18   or I would've told her to hang on to it until we're down

19   there if we're going to be down there again soon, so --

20   and --

21        Q.   Okay.  Around the 2023 time frame, how often

22   were you coming to Jacksonville to visit your mother

23   roughly speaking?

24        A.   I wouldn't want to audit it, but I would -- it

25   felt like once a month.

1    Q.   Okay.

2    A.   Yeah.

3    Q.   Okay.  So when you would come to visit your

4  mother in Jacksonville in 2022, would it be common for

5  you-all to discuss anything she would've received by

6  State Farm with regard to the claim?

7    A.   Yeah.  If she had received something, we would

8  talk about it if she hadn't already sent it to me.

9    Q.   Do you --

10   A.   Yeah.

11   Q.   -- specifically recall speaking with her about

12 that demand package on -- on behalf of Amber Mills?

13   A.   No.  I -- I really don't.  I -- I do feel

14 certain that I had seen it, but I really can't tell you

15 whether I saw it.  And, you know, this would not have

16 been the sort of thing that my mother would've spent a

17 lot of time studying closely.  If she had seen it, she

18 would've -- she would've looked at it, but she -- she --

19 she would -- she would not have -- you know, not -- not

20 attempted to analyze it or, yeah, carefully scrutinize

21 it.

22   Q.   Do you recall discussing at all with her the

23 injuries that were being claimed or damages that were

24 being sought?

25   A.   No.  I don't have any -- any recollection of

```
 1   specific conversations.  I probably would've described
 2   to her in general what was -- what was going on.  By
 3   that point it was a -- fairly apparent that State Farm,
 4   yeah, had elected not to try to make a quick settlement
 5   of this.  So, yeah, I would've -- I would've explained
 6   at least that much to her.
 7            But beyond that I would've probably been of an
 8   attitude that this is State Farm's to decide how to
 9   handle and they're going to handle it however they're
10   going to handle it.  And so I would not have tried to
11   have my mother do all that.
12        Q.   Okay.  Were you present when she was served
13   with the lawsuit --
14        A.   No.
15        Q.   -- in this case or any other case?  No?
16        A.   No.
17        Q.   Do you know how she was served?
18        A.   I think she got a physical copy of it because
19   she sent me photographs of it, which I turn sent to
20   State Farm and...
21        Q.   We talked about the Cole, Scott & Kissane
22   attorneys that were hired to defend your mother when Ms.
23   Mills filed a lawsuit.  During the -- their
24   representation of your mother, did you ever express
25   concerns regarding their defenses?
```

R,
403

1    A.   No.  I never expressed concerns about their
2 tactical decisions about how they were handling the
3 defense.  We certainly did talk about State Farm's
4 overall handling of the claim.
5    Q.   You -- I'm trying to clarify.  You spoke with
6 who about State Farm's overall handling of the claim?
7    A.   Mirelis Castilla.
8    Q.   Okay.  And what conversations do you recall
9 having with Ms. Castilla about the overall handling of
10 the claim?
11    A.   So, of course, this is happening after the
12 lawsuit had been filed and she had been brought on, so
13 this is already well into the case.  But, you know,
14 in -- in real short version saying that the State Farm's
15 continuing frankly stubborn approach to the -- to the
16 claim made no sense whatsoever, which Ms. Castilla would
17 readily acknowledge the costs that they were -- that
18 State Farm was incurring just to have her made this a
19 ridiculous undertaking.  And she's said, yes, we know
20 that, but, you know, we've got to do our job.  And --
21 and in part some of the communications that I made to --
22 to State Farm followed on those conversations.
23    Q.   So just -- so -- so I'm understanding your
24 testimony correctly, is it your testimony that Ms.
25 Castilla was making the comment that State Farm was

1  being stubborn, it was a ridiculous undertaking, or was

2  this you expressing your frustration in that regard to

3  her?

4      A.   Those are words I'm using to describe the

5  conversation that we had and were both of a -- of a --

6  of a common mind on.  It's very apparent to me that she

7  shared the view that this is a case that should've been

8  settled.

9      Q.   Did she say that, that this --

10     A.   Yes.

11     Q.   -- was a case that should've been --

12     A.   Yes.  Or -- or that State Farm at least should

13  be trying much harder to settle than they're trying

14  right now and that she thought that the position that

15  State Farm was taking, she -- yeah, she could not

16  understand them --

17     Q.   Okay.

18     A.   There were certainly conversations we had

19  on -- on more than one occasion.

20     Q.   During the pendency of the lawsuit against

21  your mother -- I've seen some e-mails that you

22  produced -- you were not formally acting as your

23  mother's independent attorney for the accident, correct?

24     A.   Correct.

25     Q.   Although I understand you are yourself an

attorney though not licensed in Florida and State Farm
did hire CSK to defend your mother, were you aware that
your mother had the right to retain her own attorney at
her own expense in connection with that lawsuit?

    A.   Yes.

    Q.   Was your mother aware to your knowledge?

    A.   Yes.  Again, there is nothing -- I -- I
don't -- we -- we had no qualms with the way in which
the defense was being handled other than the
unwillingness to settle the case.  In fact the defense
team did an admirable job of -- of trying a damages only
case as evidenced by the fact that their -- you know,
the outcome was at the low -- very low end of the --
actually it was below the -- the predicted outcome.
Still 20 times or so of the -- the policy limits.  Or,
no, that's not true.  Ten times the policy limits.

    Q.   We talked about the e-mails you sent to State
Farm August, I believe, 2022 and October of 2022
expressing your concerns with the excess judgment
possibility.  Do you recall that?

    A.   Yes.

    Q.   Obviously at that point you were aware that
there was a possibility that there could be a judgment
in excess of her $25,000 policy limits.  But was your
mother also aware of that possibility at that time?

1      A.   My mother would have been told those words.

2   I'm not sure how much of that she would've understood

3   the significance of that.  Because she would also,

4   because I would've told her, wouldn't recognize that she

5   would ultimately would be judgment proof and that --

6   that -- that at this -- this is -- there are lots of

7   reasons you don't want to be involved in litigation that

8   are beyond economic, but the economic risks to her were

9   manageable.

10     Q.   If she was judgement proof, so you say, why

11  express the concerns to State Farm about the excess

12  judgment?

13          MR. BUTLER:  Form.

14          THE WITNESS:  Because we'd like to have the

15       case settled.  And when -- when you refer to the --

16       the term "judgment proof" is -- is slang, not --

17       not a legal concept.  So in order to -- to protect

18       oneself as we talked about in the direct testimony,

19       you still have to do an awful lot of work to -- to

20       protect yourself if it ever comes to that.  One --

21       one could readily predict that we would end up in

22       an assignment situation as we did.  But that's not

23       easy.

24     Q.   (BY MS. KIDD)  Were you aware that your mother

25  had the right to contribute her own personal funds

towards settlement of Ms. Mills's claim?

A.   That -- that offer was never made.  The policy gives the insurance company the complete right to control defense and settlement.  So that was never -- never broached.

Q.   Okay.  You don't recall any letters to your mother advising her of her right to contribute?

A.   No.  I saw a -- a letter that we actually looked at earlier today that had language that one could see is an allusion to that.  But it was never an offer to say let's put X amount of dollars on the table.  You put this much.  We'll put that much in.  And we'll -- we'll make an offer.  No- -- nothing -- nothing collaborative like that.

Q.   Okay.  Did -- at the time that this lawsuit was pending against her, could your mother have personally contributed any funds --

A.   Not mater- --

Q.   -- to someone --

A.   Not -- not -- not that would've been material.

Q.   We talked about that State Farm ultimately did offer the $25,000 policy limits in December of 2022.  Do you have any understanding as to why the policy limits were not accepted at that time?

A.   Only commonsense understanding, not -- I had

no direct understanding beyond what was communicated to defense counsel.  Yeah.  The commonsense understanding is at that point the plaintiff's side is tens if not hundreds of thousands of dollars into this.  And so the $25,000 settlement's not going to work.

Q.   I believe what -- in the beginning of the direct testimony, Mr. Butler was asking you some questions about costs associated with the lawsuit, and I believe you testified to the extent that it was apparent to you that they had -- Mills had undergone considerable costs and -- as far as her treatment and the doctors at the time of demand.

Do you recall testifying something of that sort?

A.   Correct.

Q.   Do you have an independent knowledge as to whether or not or -- or what Ms. Mills' out-of-pocket expenses, if any, were at the time of that initial demand?

A.   Sitting here right now, it -- it may actually be detailed in the -- in the demand.  I'm -- my recollection of conversations with defense counsel were that they had, you know, out-of-pocket or at least they had medical bills.  Whether they were paid a collateral source or not is not normally what matters.  But the

```
 1    medical bills and the $10,000 greater range cer- --

 2    certainly above the amount of the offer.

 3           Because one of the points made in that letter

 4    is just if you look at the bad faith case law, an -- an

 5    offer below policy limits but in excess of actual

 6    medical expenses generally holds up.  If you're making a

 7    settlement offer that's below someone's actual medicals,

 8    that's on thin ice.

 9       Q.   And -- and I apologize.  Maybe the court

10    reporter can read back your answer to me because I

11    got -- it froze at collateral source.  And you were

12    still going when I got my volume, so it sounds like you

13    had a lot to say.

14       A.   Yeah.  And I'll never be able to repeat it.

15       Q.   Exactly.

16           THE REPORTER:  Yeah.  It was long.  I'm just

17       going to play it back if that's okay.  Hang on.

18           MS. KIDD:  Okay.

19           THE REPORTER:  Let me know if you can hear it.

20        (The record was played back by the reporter as

21       requested.)

22           MS. KIDD:  Thank you, Mr. Court Reporter.

23       Q.   (BY MS. KIDD)  So let me follow up with that

24    question.  You said that collateral source payments are

25    not normally what matters.  What do you mean by that?
```

1      A.    Being my understanding is that you look at the

2   bills that the -- that the claimant has, not whether

3   somebody else is -- like an insurance or somebody else

4   has stepped in and -- and paid them in terms of -- of --

5   because, you know, that assessment is a -- is an

6   assessment of magnitude of someone's claim.  It's not

7   actually an assessment of the -- of the medical expenses

8   themselves.  But it's -- but the medical expenses,

9   there's already the proxy for how bad, you know, is this

10  person's accident.

11     Q.    Okay.  What is your understanding of what, you

12  know, a plaintiff can recover as far as damages in a

13  Florida automobile negligence lawsuit?

14     A.    I don't have any -- any detailed understanding

15  of that.  But I'm sure they can recover the -- the value

16  of their -- of their damaged property, their medical

17  expenses, pain and suffering, probably, you know, loss

18  of work.  We hear about loss of consortium at law

19  school.  I'm sure that's in there somewhere.

20     Q.    In order to recover noneconomic damages, do

21  you know what a plaintiff must prove in the state of

22  Florida?

23     A.    No.

24     Q.    And do you know -- well, if you don't know

25  that, I'll strike that.

```
 1              Let's talk about those case law -- the cases

 2     that you cited to State Farm in the e-mails of August

 3     2022.  I believe we talked about them a little bit.  I

 4     want to -- there's GEICO, Deary versus Progressive, and

 5     Das -- Davis versus Nationwide.

 6              Did you know about those cases prior to the

 7     lawsuit being filed against your mother?

 8         A.   No.

 9         Q.   Okay.  How did you come to find those cases

10     when you sent that e-mail to State Farm?

11         A.   Probably about 20 minutes on -- on Westlaw.

12         Q.   Okay.  So you just did your own independent

13     research; is that fair?

14         A.   Correct.  It's a fairly accessible area, so...

15         Q.   What's your understanding, if any, of the

16     obligations an insurance company owes to its

17     policyholder when its policyholder is faced with a claim

18     in the state of Florida?

19         A.   They would -- a -- a -- a good faith duty to

20     investigate and make reasonable efforts to settle within

21     policy limits.

22         Q.   You would agree, though --

23         A.   And they need -- and -- and they're supposed

24     to -- I mean, I -- and just to elaborate, they're

25     supposed to take in the best interest of the insured and
```

1  not supposed to be taking in the independent interest of

2  the insurance company beyond the -- the -- the four

3  corners of the policy.  I think that's probably a very

4  rough but general description of the rules.

5      Q.  Where did you come to that understanding?

6      A.  As I've said, I've done some bad faith work in

7  the past.  Actually, I have an insurance background so

8  that the -- that -- that would be an understanding I

9  would've had in any event.  And then probably in the 20

10 minutes, maybe -- maybe five of the 20 minutes in

11 looking up those cases would've -- each -- each of those

12 cases begins with a statement of -- of that rule.

13     Q.  Okay.  You would agree that, though -- that an

14 insurance company cannot just pay every policy limit

15 demand that's made upon them by a claimant.  Is that

16 fair?

17     A.  I -- I don't know that that's a -- can you ask

18 that question again, please?

19     Q.  You would agree an insurance company can't

20 just simply pay every policy limit demand that is made

21 upon them by a claimant --

22         MR. BUTLER:  Form.

23     Q.  (BY MS. KIDD) -- just because they -- that

24 they asked the policy limit?

25     A.  As -- as in more context to the -- to the

```
 1   claim facts, I'm not sure that's capable of an answer.

 2   I would think that if -- if they had no -- no other

 3   facts and other context, they certainly couldn't make a

 4   habit of paying every policy limit demand.

 5        Q.   They would have -- have to investigate, and it

 6   would have to be valued at the policy limits, you would

 7   agree?

 8        A.   Correct.

 9        Q.   Do you recall speaking with anyone from State

10   Farm on the phone about the accident?

11        A.   Yes.  I spoke with more than one person.  But

12   there were different silos.  There's someone I talked to

13   about my mother's medical.  There was someone we talked

14   to about her car being paid for.  Sitting here right

15   now, I'm not positive that I talked to either Ms. Butler

16   or Mr. Horne.  I may have talked to them on the phone.

17        Q.   Okay.  It looks like you were actually the one

18   according to the State Farm file that actually reported

19   the accident.  Do -- do you recall that?

20        A.   That seems -- actually, I suspect it got

21   reported through more than one channel, but I was sure

22   to make it a point.

23        Q.   Okay.  Did you document any of your verbal

24   conversations with State Farm anywhere?

25        A.   No.
```

1     Q.   Okay.  At the time -- well, let me strike

         2     that.

         3             We talked about your mother's injuries as a

         4     result of the accident.  Do you know if anybody in her

         5     car was injured?

         6     A.   I -- I believe that one of the other people in

         7     her car had something happen to her foot.  I don't know

         8     the details of it.  There was no -- I -- I don't believe

         9     it resulted in a claim.

        10     Q.   And we talked about that she had some

        11     treatment.  Do you have an approximate of when she

        12     recovered from the injuries she sustained in the

        13     accident, approximate date and time frame?

        14     A.   This is a layperson's response to that.  So

        15     she had a -- two fractures.  But I think that we would

        16     have said that she was back to herself subject to the

        17     passage of time end of the spring of 2022.  So perhaps

        18     six months maybe.

        19             And it's a curve.  You know, she was -- she

        20     was needing 24-7 care for, you know, a week to ten days,

        21     and it dropped off from there.  And then it got to where

        22     she didn't have to have any care, but there'd a period

        23     of time where there was still -- you still say that

        24     she's not a hundred percent.  And then --

        25     Q.   Oh, you -- you froze on...

1        A.    Amanda, you may be frozen.

 2             MS. KIDD:  Sorry.  I'm waiting for him to come

 3        back.

 4        Q.    (BY MS. KIDD)  Hi.  You're back.

 5        A.    All right.

 6             MS. KIDD:  Could you read me his answer back,

 7        Mr. Court Reporter?

 8          (The record was played by the reporter as

 9        requested.)

10             MS. KIDD:  Oh.  Thanks.  Got to love

11        technology sometimes.

12        Q.    (BY MS. KIDD)  So let's talk about, though,

13   there was some questions about, you know, the -- the

14   physical toll that it took on your mother to attend the

15   underlying trial that took place just this year in

16   February of 2023.

17             Did you ever express your concern about the

18   physical toll that it was taking on her to anyone?  To

19   CSK, State Farm?

20        A.    Yeah.  It was a topic of conversation with

21   the -- the defense team and, yeah, making a judgment

22   about the -- how much could she do.  You know, they

23   were -- they were always ready to say that if she's

24   physically unable to be there, yeah, she could be

25   excused.  But it was also clear that it was helpful to

1    have her there.  And I think that -- that proved out.

2    So that -- you know, she's -- she's a tough cookie.  And

3    so, yeah, this is her lawsuit, and she wanted to be

4    there.

5        Q.    All right.  We talked about the deposition

6    taken of your mother in the underlying case.  Do you

7    recall there being a refusal to your mother to attend

8    via Zoom for that deposition?

9        A.    Me- -- meaning was there no offer to her to

10   attend by Zoom?  Is that what your question --

11       Q.    Refusal.  Do you understand that there was a

12   refusal that she could attend by Zoom and there was an

13   insistence that it be in person?

14       A.    No.  I don't recall that.  I -- I -- I think

15   it was an election to do it in person on our part.

16       Q.    Okay.  There's some e-mails I believe within

17   your file and also Cole, Scott & Kissane's file back and

18   forth about her vaccination status and some concerns

19   there.  Does that refresh your recollection at all?

20       A.    No.  Again, this is in era of -- of COVID.

21   And -- and if you -- if there's a document that shows

22   that this was a controversy that I'm not remembering,

23   please show it to me, because I --

24       Q.    Well, now you're -- you --

25       A.    -- my recollection was that given the

```
 1   choice --

 2        Q.   -- frozen again.

 3        A.   Am I frozen?  Well...

 4        Q.   And you're back.

 5        A.   I think I --

 6        Q.   Got it.  This was a topic of controversy, and

 7   that was it.

 8             MS. KIDD:  So can you read it back, Mr. Court

 9        Reporter?

10         (The record was played by the reporter as

11        requested.)

12        Q.   (BY MS. KIDD)  Oh, well, you should've told me

13   that you stopped.  We could've saved --

14        A.   Yeah.

15        Q.   -- some time.

16        A.   Yeah.

17        Q.   Sorry about that.

18             So you don't recall there being any sort of

19   controversy over her attending via Zoom?

20        A.   No.  And -- and I -- and I -- I believe it was

21   actually a preference to do it in person as long as it

22   could be done somewhere nearby.  Her -- her ability to

23   navigate technology even with somebody helping her is --

24   would be limited and much better to -- to do it the

25   old-fashioned way.
```

R,
403

```
 1        Q.   Got it.

 2             What caused you --

 3        A.   I should elab- --  I should -- if -- if I

 4   could elaborate to make that make more sense.  If -- if

 5   it was going to be done by Zoom, I was going to need to

 6   be physically present in the room with her anyway.  So

 7   if I'm going to, yeah, already be in Atlantic Beach,

 8   the -- the extra step to go be in person somewhere is

 9   not a big deal, so...

10        Q.   Okay.  So I'm back to the trial.  Do you

11   recall approximately how long your mother was on the

12   witness stand timewise?

13        A.   It was one the shorter appearances --

14        Q.   Oh, I think you froze.  This is crazy.  I'm so

15   sorry.  I don't know what's happening.

16             Okay.  I don't know if you answered.  I asked

17   if you --

18        A.   Yeah.

19        Q.   -- recalled timewise --

20        A.   Sure.

21        Q.   -- how long your mom was on the stand.

22        A.   Yeah.  And I was going to say that it was one

23   of the shortest testimonies I've ever seen.  Yeah.  It

24   was minutes, you know.

25        Q.   Okay.  Great.
```

```
 1          And you being an attorney, you -- you know

 2    that unless the defense wins the case on some sort of

 3    legal issue, if a plaintiff wants to go to trial, it's

 4    completely within their control.

 5          MR. BUTLER:  Form.

 6          Q.   (BY MS. KIDD)  Is that fair?

 7          A.   Theoretically, yes.  So certainly that if --

 8    if the parties don't want to -- if either party doesn't

 9    want to settle and they're not willing to dismiss a

10    case, it's going to go to trial.

11          Q.   Thank you.

12          I take it your mother has not paid any amount

13    of a final judgment to Ms. Mills; is that fair?

14          A.   That's correct.

15          Q.   Okay.  And that would be because she entered

16    into an assignment with Ms. Mills; is that also correct?

17          A.   Correct.

18          Q.   This assignment appears to have been finalized

19    on February the 20th, and the verdict that came down in

20    this case was ordered February 17th, 2023.  So it's --

21    would it be fair to say that you guys finalized this

22    assignment within three days of the trial conclusion?

23          A.   I -- I don't remember the exact time frame,

24    but we did it very quickly.  And my recollection right

25    now is that Mr. Butler and I may have even had words in
```

1    the hallway after the -- after the verdict was over.

2    And so it -- it was all pretty easy to come together

3    with.

4        Q.    That -- that was going to be my next question

5    is how did that finally come about after -- well, how

6    did -- did you go and enter into that assignment after

7    the verdict?

8        A.    Yeah.  And -- so I -- I'm not sure that this

9    recollection is -- is accurate that we actually talked

10   in the hallway or -- or somewhere around the courthouse

11   after it was over but within a very short period of time

12   after it was over.  And I believe Mr. Butler approached

13   me, but maybe I approached him to say -- yeah, that

14   this is -- this is the obvious next step.

15       Q.    So you don't recall who approached who?

16       A.    No.  If -- if I had to pick between the two, I

17   would assume that -- I -- I believe that he would've

18   approached me.  But if he hadn't, I would've approached

19   him.  So...

20       Q.    The -- if your mother is judgment proof, why

21   the need for the assignment?

22       A.    So we've --

23              MR. BUTLER:  Form.

24              THE WITNESS:  -- talked about this a couple of

25         times already that even if you're judgment proof,

1     again, that's -- that's -- that's a slang term, not

2     a legal term.  There -- there's still an awful lot

3     of trouble one has to go through to actually

4     perfect being judgment proof.  Probably --

5     possibly --

6     Q.   (BY MS. KIDD)  So what --

7     A.   -- what's a -- you know, or -- or cer- -- or

8     certainly an awful lot of postjudgment work.

9     Q.   What's your understanding is that work?

10    A.   I'm sorry?  You -- you froze.

11    Q.   What kind of work -- yeah.  You -- you said an

12    awful lot of work.  What -- what kind of postjudgment

13    work do you understand that you have to do other than

14    bankruptcy to your knowledge?

15    A.   Well, you're -- you're confronted with someone

16    attempting to collect the judgment.  And so they go

17    through all the processes that one does to try to

18    collect the judgment.  And then you have to defend that

19    action that begins with postjudgment interrogatories and

20    then would proceed by their -- their attempt to attach

21    various assets.  And you have to make the decision how

22    you're going to try to defend that.

23         And that's -- if -- if -- if you want to talk

24    about when the stress level on a -- on a not wealthy

25    defendant really starts kicking in, that's it.  So

1  that -- that's something to be avoided.

2      Q.   Did your mother at the time of the verdict

3  have any assets that could be reached?

4           MR. BUTLER:  Form.

5      Q.   (BY MS. KIDD)  To your knowledge.

6      A.   She did not have meaningful assets that could

7  be reached.  Yeah.  Whether every -- every penny she

8  had, you know, was beyond reach is a -- is a matter

9  of -- of, you know, Florida bankruptcy law that we never

10  had to explore.  But there wasn't -- there would not

11  be -- there would not be enough to make a material dent

12  in the judgment, but there's certainly the process of

13  having to defend it would've been horrific for -- for

14  anybody and especially someone in my mother's situation.

15      Q.   You asked State Farm for permission to enter

16  into this assignment prior to trial.  Did you ask State

17  Farm to enter into this assignment posttrial?

18           MR. BUTLER:  Form.

19           THE WITNESS:  No.

20      Q.   (BY MS. KIDD)  Why not?

21      A.   I didn't think I needed to.

22      Q.   Why did you think that?

23      A.   Well, I gue- -- I guess the answer to that is

24  in the inverse.  Prior to a -- a verdict I believe that

25  you had to have the insurance company's consent.  I did

```
1    not believe you needed to have it after the verdict was
2    entered.  So it was really that -- that there wasn't --
3    there was a need prior to verdict.  It wasn't so -- so
4    much at the other end.
5              Is that responsive?  I'm not trying to --
6        Q.   No.  I'm just trying to understand what your
7    understanding was.
8        A.   Yeah.
9        Q.   Do you know at the time that your mother
10   entered into that assignment what -- if State Farm had
11   made any decision as to whether to appeal anything with
12   regard to the verdict or the final judgment?
13             MR. BUTLER:  Form.
14             THE WITNESS:  No -- no -- no information on
15        that.
16       Q.   (BY MS. KIDD)  Okay.  Were the Cole, Scott &
17   Kissane attorneys aware that your mother was entering
18   into this assignment?
19       A.   I believe so.
20       Q.   Do you know when they become aware?
21       A.   No.  And I -- I don't know -- they certainly
22   were not advising us on the details of it.  I have no
23   reason to think they would've seen even a form of the
24   assignment.  Again, my -- my recollection subject to
25   this not being right, but my recollection is that they
```

1   actually had courthouse conversations about this and
2   that that was relayed to the -- to the defense team and
3   about which they were relieved.  For understandable
4   reasons they -- they I think cared about my mother, and
5   that's a protective outcome.
6       Q.   Based upon the production that you gave us in
7   this case, it appears that Mr. Butler personally -- or
8   his office personally contacted you during the
9   litigation about this assignment; is that correct?
10      A.   I -- I don't recall that.  That -- that could
11  be right.  And in fact that would -- that would all sort
12  of make the speed with which we did this make more
13  sense.  And the fact that my -- my recollections about
14  having these passing conversations with the CKS
15  attorneys would make sense too because that would've
16  been -- been something that would've been on the radar.
17  But I -- sitting here right now, I don't have a
18  recollection of that.  Or sitting here right now, the
19  recollection is at best fuzzy.
20      Q.   Okay.  I'm going to try to find it, and we can
21  come back to it.
22          MS. KIDD:  Actually, we're probably at a good
23          stopping point for a -- a quick comfort break.  So
24          we'll take five minutes so everybody can do what
25          they need to do and I'll try to find that e-mail

```
 1          and we'll...
 2              THE VIDEOGRAPHER:  Off the record at 5:43.
 3          (Recess taken from 5:43 p.m. until 5:47 p.m.)
 4              THE VIDEOGRAPHER:  We're going back on the
 5          record at 5:47.
 6          Q.   (BY MS. KIDD)  All right.  So prior to break I
 7      was asking you, Mr. Laseter, about communications from
 8      Mr. Butler's office prior to the trial in this matter
 9      during the underlying lawsuit.  I'm going to show you --
10      it's part of your production to us that you gave us I
11      guess last week.  And let me share my screen.  This
12      is -- looks like October 20th of 2022.
13              MR. BUTLER:  Let me just --
14          Q.   (BY MS. KIDD)  Are you -- are you able to --
15              MR. BUTLER:  Let me just for the record assert
16          a mediation privilege if any of this encompasses
17          any of those kinds of things.  But, otherwise, go
18          ahead.
19          Q.   (BY MS. KIDD)  All right.  Are you able to see
20      that, Mr. Laseter, the e-mails?
21          A.   I am.  It's -- you -- it's showing up in a
22      split screen, which makes it very small.  So if I'm
23      leaning out of the camera, that's because I'm trying to
24      look close to see it.
25          Q.   Yeah.  And I apologize.  We've -- it's --
```

1  the -- the first e-mail to you was on the first screen,

2  and then the remainder of the e-mail was on the second

3  screen.  So if you want, I can zoom in just to -- looks

4  like actual e-mail and the body of the e-mail -- do you

5  see that now?

6      A.   I do.

7      Q.   Okay.  And I'll scroll up, and it looks like

8  that was sent to you on October 20th of 2022.

9      A.   Yeah.

10      Q.   Okay.  Does that refresh your recollection at

11  all of whether or not you were contacted by Mr. Butler

12  in his office during the pendency of the lawsuit against

13  your mother?

14      A.   So I thought that the question that you had

15  asked before was whether we had -- at what point had we

16  received communication about the assignment.  Are you --

17  and you're asking me for every conversation -- and I

18  don't know that there were any other conversations, but

19  I wouldn't -- I didn't -- I wasn't focusing on --

20      Q.   Sure.

21      A.   -- any communications as of --

22      Q.   And I -- no.  You're correct.  I first asked

23  you about the assignment.  You couldn't exactly

24  remember.  So that's where I came back to this first

25  communication here to see if that refreshed your

R

R

1  recollection of whether or not the discussion of an

2  assignment came up prior to the trial in the underlying

3  matter.

4       A.   So the -- I can recall three periods of time

5  when the loose concept of a assignment or to use what's

6  apparently a Florida term, a blue sky letter was

7  discussed.  I believe Mr. Howard actually mentioned the

8  concept of a blue sky letter to my mother during her

9  deposition, which would have been -- that -- that was

10  fairly early in the process.

11         There was a second period of time when Mr.

12  Butler made the proposal for an assignment with --

13  subject to the consent of State Farm, which I passed on

14  to State Farm.  And then there was the -- the final

15  assignment that we actually entered into, which I

16  believe was first discussed ei- -- either right at the

17  end of the trial or perhaps during the trial initially,

18  you know, maybe in a side conversation or could've been

19  e-mails around it.  I don't recall those e-mails, but --

20  is -- is that helpful?

21       Q.   It's helpful.  Yes.

22         Other than those three instances I believe you

23  talked about, do you recall having any other

24  communications with Mr. Butler or his office prior to

25  the verdict entered against your mother?

```
 1          A.    No.  I don't recall any as -- seems possible
 2     that we would have had some communication about the
 3     logistics of the deposition.  But aside from that I
 4     don't know of any conversation I had.
 5               And -- and I would say that as -- as evidenced
 6     by me having sent the proposed assignment to State Farm
 7     pretty quickly -- you know, I'm very cognizant of the
 8     fact that we as the insured owes State Farm a duty of
 9     cooperation, that it's State Farm's prerogative to -- to
10     control the defense, control settlement.  So that -- you
11     know, that's the communication -- I -- I don't --
12     I don't believe I would've gotten communications from
13     Mr. Butler that I would not have very quickly shared
14     with the defense team over to State Farm.
15          Q.   Okay.  With this assignment is it your
16     understanding that now your mother or her estate will
17     never be exposed to a judgment in excess of her policy
18     limits for this accident?
19               MR. BUTLER:   Form.
20               THE WITNESS:   Yeah.   That -- that's a --
21     the -- the practical understanding.   Yes.
22          Q.   (BY MS. KIDD)  It's not -- you don't have an
23     understanding that should Ms. Mills not be successful in
24     this lawsuit against State Farm, she can then go back
25     and try collect from your mother with this assignment?
```

```
 1    Is that your understanding?
 2               MR. BUTLER:  Form.
 3               THE WITNESS:  Yes.  I under- -- I understand
 4         that -- that -- that -- that provided my mother
 5         cooperates reasonably and the -- and the efforts
 6         to -- to pursue the assi- -- the rights under the
 7         assignment that she's done.  Or to say it
 8         differently, her only allegations are to cooperate
 9         in the ongoing efforts, which are -- may -- may not
10         be zero but -- or not economic.
11         Q.   (BY MS. KIDD)  And then I take it that Amber
12    Mills has not attempted to collect any of the final
13    judgment against your mother?
14         A.   Not to my knowledge.
15         Q.   Since the trial have you had any conversations
16    with Amber Mills?
17         A.   No.
18         Q.   Are you aware that Ms. Mills as part of her
19    bad faith claim against State Farm has alleged that your
20    mother, Mary Laseter, has incurred mental anguish
21    damages?
22         A.   I'm not -- to my knowledge seen the complaint
23    or any actual allegations in it.  I'm not surprised
24    by -- that that would be part of it.
25         Q.   Okay.  Is it your contention that your mother
```

```
 1   has in fact suffered mental anguish or emotional damages

 2   as a result of having a bodily injury claim being

 3   brought against her?

 4        A.   I -- I'm sorry.  Did you ask me if that was my

 5   contention?

 6        Q.   Correct.

 7             MR. BUTLER:  Object to the form.

 8             THE WITNESS:  Yeah.  I don't know that I've --

 9        I have a contention.  It's -- not to -- not to

10        parse words.  My belief is certainly that she has.

11        Q.   (BY MS. KIDD)  Okay.  Do you think she has had

12   to endure something different than any other person

13   would have to endure when faced with being sued by

14   someone?

15             MR. BUTLER:  Form.

16             THE WITNESS:  Yes.

17        Q.   (BY MS. KIDD)  How so?

18        A.   Well, I think that the predicate for your

19   question is -- is either overbroad or maybe in a

20   possibility.  But for -- I -- I do believe that my

21   mother has had to endure things that had State Farm

22   settled this case, had State Farm investigated the

23   case -- I mean, frankly, that's the -- the real problem

24   starts at the -- at the place where State Farm knows

25   that mother's broken her hip, her car has been totaled,
```

MIL, R, 403

1  the airbags have -- have deploy- -- deployed in -- in

2  both vehicles.  There's enough of an accident here that

3  it -- that -- for State Farm not to -- and -- and within

4  a couple of weeks that the drivers of the lawsuit --

5  other car has a -- has an attorney, there's enough facts

6  here for State Farm to realize, hey, yeah, this is going

7  to be a claim.  We've got a total of $25,000 on our

8  policy limits.  We're going to spend that in a heartbeat

9  to try to fool around with this.

10          And had State Farm been purely looking at this

11  within the four corners of the policy and my mother's

12  best interest, this would've got settled in a matter of

13  weeks after the trial and my mother would not have had

14  to endure that.  So if -- if -- my mother has not

15  suffered anything different than other 91-year-old

16  people who've had insurance companies who fail to settle

17  cases that -- that ought to have been settled.  But

18  that's a pretty small population, I hope.

19      Q.   Other than the age factor, that she's 91 years

20  old, did she have to endure anything different that any

21  other person who an insurance company did not settle

22  their claim and they had to go to trial?

23          MR. BUTLER:  Form.

24          THE WITNESS:  Not anything other than someone

25  whose -- who -- whose insurance company failed to

1    settle a claim that they should have settled.

2        Q.    (BY MS. KIDD)    Right.    I understand what

3    you're saying.    But cases go to trial -- well, let me

4    strike that.

5        A.    Yeah.    And then so part -- part of it -- you

6    know, part of the law says that anybody who suffered a

7    bad faith failure of an insurance company to settle a

8    claim is the hassle, agony, trouble, whatever heartache

9    of going through the process of litigating a case that

10    shouldn't be litigated, yes, that -- that -- so other

11    than being 91 years old, she's not in any different than

12    anyone else who had a bad faith failure to investigate

13    the claim occurs to them.

14        Q.    Understood.    Thank you.

15        Has your mother had any sort of mental health

16    counseling as a result of the trial?

17        A.    No.

18        Q.    Do you have -- I -- I know you produced I

19    believe some medical records or what you had at least

20    given to State Farm in this case as part of your

21    production.    Other than that do you have access to your

22    mother's medical records?

23        A.    I have durable medical power of attorney if --

24    if that's what you mean.

25        Q.    Well, I guess I -- I'm trying to understand

```
 1    have you reviewed your mother's medical records since
 2    the trial of this case.
 3         A.   Not systematically.  Not -- and cer- -- and
 4    certainly not in connection with litigation.  I'm aware
 5    of --
 6         Q.   Okay.
 7         A.   -- at least most of her medical treatments and
 8    what's going on with her, but...
 9         Q.   The -- the hip being broken after the trial
10    in -- in the case, I believe you told us that it
11    happened the -- the day after, the Saturday --
12         A.   Yeah.
13         Q.   -- after the trial.  You were not present when
14    that occurred?
15         A.   No.
16         Q.   Okay.  Was she by herself?
17         A.   She was.
18         Q.   Do you know the circumstances of what led to
19    that fall?
20         A.   No one knows precisely.  She was commencing
21    going up the stairs in what used to be -- she used to
22    live on two -- two stories in her condominium, and she
23    commencing going up the stairs and didn't get past the
24    first step.  So whether -- whether she fell before
25    getting on the first step, whether the hip severed
```

```
 1   itself from the weight of the -- of taking the step or
 2   whether she stubbled off the step, no one knows.
 3       Q.   So it did happen at her condo?
 4       A.   Correct.  Yes.
 5       Q.   And no witnesses to the fall?
 6       A.   Correct.
 7       Q.   Do you know what time of day it occurred?
 8       A.   Yeah.  It's a -- a little bit after 7 o'clock
 9   in the evening.
10       Q.   And do you know if any doctor has opined that
11   that hip fracture, break, what have you, was related to
12   stress from the trial?
13       A.   To my knowledge no one has evaluated that one
14   way or the other.
15       Q.   Does your mother have memory issues at all?
16            And maybe I should rephrase that.
17       A.   Yeah.  You --
18       Q.   For a -- a reasonable 91-year-old female --
19       A.   Yeah.
20       Q.   -- do you think your mother -- or do you know
21   of any diagnosed memory issues?
22       A.   No.  She is not diagnosed in any memory
23   issues.  She's -- she has age-related short-term memory
24   challenges but does -- does not qualify as being --
25   having even early-stage dementia or any other
```

1   diagnosable issues.

2        Q.   Has she suffered from falls before right after

3   the trial -- that -- before that time is what I'm trying

4   to say.

5        A.   She had fallen a couple of times before to my

6   knowledge in her life.  None of -- none of them resulted

7   in a -- in an injury.

8        Q.   Okay.

9        A.   And this would be over --

10       Q.   Prior to --

11       A.   -- a five-year -- a five-year period prior to

12   the -- prior to her automobile accident.  I actually

13   believe that she may have -- I know she tripped over

14   something and -- one time that I have recall because she

15   called me.  And then she fell once in the parking lot of

16   her condominium that I -- I know about.

17       Q.   Did she to your knowledge before the verdict

18   came in have any issues with balance?

19       A.   Well, she's 91 years old and has -- has -- has

20   obviously had fallen at least a couple times before

21   that.  So, yes, she had some issues with balance.  If

22   you -- as -- as her orthopedist when she broke her hip

23   the first time, you know, observed that she was a

24   remarkably able 91-year-old for -- for being 91 years

25   old.

```
 1        Q.   Has your mother to your knowledge ever treated

 2   or been for any sort of psychiatric condition?

 3        A.   No.

 4        Q.   I think you told us she doesn't still drive

 5   anymore; is that correct?

 6        A.   Correct.

 7        Q.   You said that before the trial she resumed

 8   some tap dancing; is that correct?

 9        A.   Correct.

10        Q.   Did I understand that correct?  All right.

11             How often was she doing that?

12        A.   I'm not positive of that.  And I think that

13   it -- that all she was doing at that point might have

14   been at-home exercises.  She had been -- she had been

15   part of a -- of a dance troupe called the Sassy Tappers

16   that was -- you know, was a el- -- elderly group of --

17   of women in the Neptune and Atlantic Beach area.  My

18   mother was the most elder -- elderly person still in the

19   troupe.

20             That shut down because of COVID.  And so it

21   was kind of in a hiatus.  But they -- I -- I think that

22   there was some interest to trying to get it back.  And

23   she may have gone -- there's a -- this -- this is put on

24   at the senior center in -- in Neptune Beach in -- in

25   association with a little dance studio, and she may have
```

R, MIL, 403



1    actually gone to -- to the dance studio once or twice in

2    the postaccident, prelawsuit time period.

3        Q.   So you said that, I believe, she had to stay

4    in -- in an in-care sort of facility for approximately

5    five months fallen -- following the fall --

6        A.   Yeah.  And --

7        Q.   -- after the trial?

8        A.   -- in -- in -- in fairness she probably had to

9    stay there for about three months.  And then we were

10   making some rearrangements to her condominium so she

11   could live on the first floor.  And so that process

12   probably required an extra month or two of that process

13   that -- that was not really medical.

14       Q.   Got it.

15            Other than the surgery and -- I guess did she

16   have to have any sort of physical therapy I assume after

17   the --

18       A.   Yeah.

19       Q.   -- surgery?

20       A.   Yeah.

21       Q.   Other than the surgery and physical therapy,

22   what other treatment did she receive for the hip, for

23   the fall?

24       A.   So they -- they did a -- a hip replacement,

25   which is part of the miracle of -- of both modern

```
 1   medicine and -- and a lucky way in which her break
 2   occurred.  You know, normally, when a 91-year-old person
 3   breaks a hip, that's kind of the game's over because
 4   the -- us- -- usually you don't recover from that.  But
 5   she broke it in just the way that the accepted procedure
 6   is just replace the hip.
 7           So that, you know, hip replacement is a much
 8   more streamlined recovery process.  And so once the hip
 9   was replaced, it really is a re- -- a rehabilitation
10   exercise.  And so with- -- within two or three weeks
11   of -- of the hip replacement, you know, you're -- you're
12   actually into exercising and doing stuff that you've got
13   to do.
14           Is that responsive to your question?
15           THE REPORTER:  You're -- you're frozen.
16           THE WITNESS:  Is she -- oh.  I thought she
17       just quit.
18           MS. KIDD:  Man.  That was a long one.  Sorry.
19       I heard the two to three weeks of, and then it
20       froze.  So sorry, Mr. Court Reporter, if you can --
21           THE REPORTER:  That's okay.
22           MS. KIDD:  -- read that back.  Unless he --
23       unless he stopped.  Then just tell me.
24           THE WITNESS:  Well, I went to sleep, so I
25       don't know.
```

```
 1              THE REPORTER:  What was the last thing you
 2        heard?
 3              MS. KIDD:  Within two to three weeks.  That
 4        was the last I heard.
 5              THE REPORTER:  There was a little bit more to
 6        it.
 7         (The record was played by the reporter as
 8        requested.)
 9              MS. KIDD:  Just keep going.
10              THE REPORTER:  Okay.
11              MS. KIDD:  Streamline the recovery process.
12              THE REPORTER:  Okay.  I thought you --
13              MS. KIDD:  Yeah.
14              THE REPORTER:  -- froze again.  I'm sorry.
15              MS. KIDD:  Me too, but I think -- I think
16        we're okay.  We caught up.  So go ahead.  Hurry
17        before it --
18         (The record was played by the reporter as
19        requested.)
20        Q.   (BY MS. KIDD)  Okay.  Just a couple of words.
21   I'm so sorry.  Okay.
22              All right.  So exercising in the in-home
23   facility.  Nothing else to your understanding after that
24   for the hip?
25        A.   Well, I -- I don't want to minimize, you know,
```

what -- the -- the degree of recovery.  I've never had

one of my hips done, and having -- having seen the cut,

you know, it -- it's -- it's a -- it's a serious

surgery.  But, yeah, within -- yeah, so maybe she was in

the hospital for a couple of days and then is over at

a -- in a skilled nursing facility.  And she's in a

skilled nursing facility for maybe again two or three

weeks and then moves into assisted care -- I'd say

may- -- maybe a month and then moves into an assisted

care situation.

        So, you know, the -- the number of doctor

visits and, you know, wound care and all that kind of

stuff begins to taper off pretty quickly.  And you then

go into -- into rehabilitation and then, you know,

they've got all kind of different people helping you

with rehab.

    Q.    Okay.  Got it.  So in the documents that you

produced to us, we see several e-mail exchanges with Mr.

Butler and his firm since the bad faith lawsuit has been

filed in this case.  So I'm going to ask you some

questions about those communications.

        Based upon what I've seen in the documents

you've produced, it appears to me that you and Mr.

Butler and his office have had at least some phone calls

since the bad faith lawsuit had been filed.  Is that a

1  fair assessment?

2       A.   Yeah.  I guess it's a couple of calls anyway.

3       Q.   Okay.  What were discussed on the calls?

4       A.   Well, the -- I think the main topic of the

5  conversations were that Ms. Mills had filed a bad faith

6  claim against State Farm and they were pursuing it and

7  that at least I and possibly my mother were going to be

8  witnesses and would need to gather documents and be

9  ready for that to occur.  I don't recall much more in

10  the way of detail.  If I had -- I think we've -- I -- I

11  know we've had at least one such conversation, possibly

12  two.  I -- I don't think any more than that.

13      Q.   Okay.  There is an attachment to an e-mail to

14  you from Mr. Butler's firm in July of 2023, which is

15  obviously during the pendency of this lawsuit, that

16  appears to be some sort of -- and I'll -- I'll be happy

17  to share my screen for presentation, the being defense

18  firm hired by State Farm.  Do you see that?

19      A.   Mm-hmm.

20      Q.   Is that something that his office sent to you,

21  or is that something you prepared?

22      A.   It would've come from his office.  Or -- or --

23  or --

24      Q.   Okay.

25      A.   -- yeah.  I -- I don't know who prepared it,

1    but, no, I didn't prepare it.

2       Q.   Okay.  Did you review this at all in

3    preparation for the deposition today?

4       A.   No.

5       Q.   Did you and Mr. Butler have a conversation

6    about this presentation or these slides?

7       A.   Not that I'm recalling sitting here today.

8    It had -- there are more slides to this.  Is this the

9    only slide?

10       Q.   No.  There are more.  And I'll happy to go

11    through them.

12       A.   If you could just scroll --

13       Q.   This one --

14       A.   -- through them quickly, I'll see if anything

15    about it --

16       Q.   Sure.

17           That's the -- the last one because the next

18    one goes into the second amended complaint.

19       A.   That's the lawsuit.  It doesn't really ref- --

20    jog a -- a memory.  If I had to speculate in the fog of

21    what I can recall, I think this is in the context of Mr.

22    Butler having called me and he said, you know, they

23    filed a lawsuit.  I -- I should expect to be a witness

24    in it.  And maybe that he's going to send me the sort of

25    things that might be the subject of the deposition or

```
 1  shown to me at a deposition.  I -- I don't believe that
 2  we like opened up a slide show and walked through it
 3  together on the telephone or anything like that.
 4       Q.   All right.  Do you recall anything else with
 5  regard to your conversations with Mr. Butler about --
 6  did he express to you any theories of the case at all?
 7       A.   Not that I'm recalling.
 8       Q.   There were some e-mails in the file you sent
 9  to us in exchange with Mr. Butler's office with regard
10  to privileges.  I'll show that.
11       A.   Mm-hmm.  That actually -- yeah.  At least one
12  of the conversations was -- was on that topic sort of
13  initially.  It -- may- -- maybe he had asked me if I was
14  able to share, and I said, look, I don't know, you know.
15  And -- and he said, well, let me send you some cases and
16  you can look at it.
17            And so that -- that was in -- in at least of
18  the -- if we've had two conversations, one of them was
19  limited to, you know, can -- can I share anything about
20  the conversations I would've had with the defense
21  counsel.  And he said, you know, yeah, just, you know,
22  sit tight on that.  Let me send you some cases.  You can
23  look at it and let me know if you're comfortable.  And
24  so that -- that's what this would've been about.  And
25  I -- and I did --
```

H,
R

1    Q.   Your conversation --

2    A.   I did look at the cases and did conclude that

3    the -- yeah, there was -- yeah, for what -- whatever

4    privileges that -- that we had had been effectively

5    assigned to the -- to Ms. Mills for this case, so...

6    Q.   Okay.  And so by conversations with defense

7    counsel, you mean the Cole, Scott & Kissane attorneys --

8    A.   Cor- -- correct.

9    Q.   -- hired?

10   A.   Yeah.

11   Q.   Okay.  Got it.

12        Mr. Butler or his office didn't direct you how

13   to testify in any way; is that correct?

14   A.   Correct.

15   Q.   Do you recall talking with the Cole, Scott &

16   Kissane attorneys about the verdict itself and the

17   outcome?

18   A.   Oh, we -- we certainly met briefly after the

19   jury came back in with my mother.  And I won't say they

20   were ecstatic.  They were pleased.  They -- you know,

21   that -- that was a -- a good outcome.  Again, it was

22   better than the predicted range that they had advised

23   State Farm to be worried about.

24        And so they, you know, talked to this --

25   this -- yeah.  It's -- it's tough to have a -- you know,

1  to have a damages only case because, you know, you --
2  you start at the beginning with -- you're -- you're
3  losing from the start.  But within the context of that
4  case, I think they felt pretty good about it.
5      Q.   Okay.  And did the Cole, Scott & Kissane's
6  attorneys generally keep you and your mother informed to
7  what they were discovering as part of the lawsuit once
8  they were hired to defend your mother?
9           MR. BUTLER:  Form.
10          THE WITNESS:  Not especially.  Yeah.  I mean,
11          I -- we -- they -- they did share and I think they
12          were in the -- what I produced.  Yeah.  There were
13          one or two case assessments that they worked up,
14          and they shared those with us.
15          But not like in an ongoing -- the only -- the
16          only possible exception to that that I can think of
17          is it -- we were aware that the insurance company
18          had hired an investigator.  And so we knew that was
19          going to take place.  And I think maybe the --
20          yeah, that -- there was some discussion about that
21          around the time of the mediation.  That's about the
22          approximate time frame.
23          But that was a -- kind of an exception.  We
24          didn't -- so certainly no like regular briefings on
25          the progress of the case or anything like that.

1      Q.   (BY MS. KIDD)  Did you request that?

2      A.   No.

3           MS. KIDD:  All right.  I think I am almost

4      done with my cross.  If guys want, you know,

5      another a five-minute break, I'll go over my notes

6      and see if there's anything I need to follow up on.

7           THE WITNESS:  Okay.

8           MR. BUTLER:  Quick as you can.

9           THE VIDEOGRAPHER:  Going off the record at

10     6:20.

11      (Recess taken from 6:20 p.m. until 6:23 p.m.)

12           THE VIDEOGRAPHER:  We're going back on the

13     record at 6:23.

14     Q.   (BY MS. KIDD)  All right.  I just want to

15   follow up on one thing, Mr. Laseter.  We talked about,

16   you know, you -- your mother's policy limit selection,

17   and you, I believe, told us that you felt -- you had a

18   conversation with her that you thought $25,000 was an

19   appropriate limit for her financial circumstances.

20           What did you mean by that?

21     A.   Generally speaking, insurance limits are

22   calculated to protect someone from a loss of assets.

23   And because my mother was in -- was not at risk of

24   losing assets in my judgement, she didn't need to carry

25   significant limits.

1      Q.   But do -- but you then told us that there's a
2 huge process, though, of becoming judgment proof,
3 though.  So you understood, then, while she didn't have
4 assets, there was a risk that there could be a judgment
5 in excess of those $25,000 policy limits where she could
6 be liable for an accident?
7           MR. BUTLER:  Form.
8           THE WITNESS:  Sure.  And -- and, you know,
9      that there's a -- that -- that -- that extends --
10     you know, you could have a $10 million policy
11     limits and still face exce- -- excess judgment.  So
12     there's -- that -- that's a risk anyone would have.
13     But generally people who have higher limits are
14     doing it because they are in fact at -- at material
15     economic risk.
16     Q.   (BY MS. KIDD)  Do you know if she ever changed
17 those policy limits at any point in time, or was it
18 always $25,000 as far as you know?
19           MR. BUTLER:  Form.
20           THE WITNESS:  I -- I actually don't know
21     the -- you know, the answer to that historically,
22     and, of course, you know, $25,000 limits in 1965
23     would be a different thing than they are now, so --
24     and --
25           MS. KIDD:  Okay.  Okay.  I think that's all I

```
 1        have subject to whether or not Mr. Butler has any

 2        other redirect.

 3                    FURTHER EXAMINATION

 4   BY MR. BUTLER:

 5        Q.   You said that you discussed State Farm's

 6   stubborn position, quote, which made no sense, unquote,

 7   with defense counsel during the litigation process.  Did

 8   State Farm ever make Mary Laseter aware that at the same

 9   time you were expressing her concerns that State Farm's

10   claims handling practices were not being done in good

11   faith so as to protect Mary Laseter from personal

12   financial liability that State Farm and its agents were

13   engaged in legislation lobbying efforts seeking to

14   eliminate State Farm's potential financial

15   responsibility in this and other cases?

16        A.   Never heard of that.

17             MS. KIDD:  We're frozen.  I object to that

18        question, but I don't think he finished the

19        question.  That I heard --

20             MR. BUTLER:  Your objection is --

21             MS. KIDD:  Sorry.

22             MR. BUTLER:  -- is noted.

23             MS. KIDD:  You're back on so -- all right.  I

24        didn't -- don't know if you started answering, but

25        I think I heard the tail end of that question and I
```

```
 1        object.
 2             MR. BUTLER:  Your objection's noted.
 3             That's all I have.
 4             MS. KIDD:  Oh, no.  I think he's frozen again.
 5             MR. BUTLER:  That's all we have.
 6             MS. KIDD:  I -- I didn't get the answer.  I'm
 7        sorry.
 8             MR. BUTLER:  You want the court reporter to
 9        play it back?
10             MS. KIDD:  Please.
11             THE REPORTER:  You want the whole question?
12             MS. KIDD:  Yes, please.
13             THE REPORTER:  Okay.
14         (The record was played by the reporter as
15        requested.)
16             MS. KIDD:  Was the answer no?
17             MR. BUTLER:  Yeah.  The answer was no.
18             MS. KIDD:  Thank you.  All right.  Just a
19        couple of follow-ups, then, if that was all.
20                       FURTHER EXAMINATION
21     BY MS. KIDD:
22        Q.   Mr. Laseter, do you have any independent
23     knowledge as to any lobbying efforts for recent
24     legislation in Florida?
25        A.   No independent source.  The PowerPoint that
```

you showed earlier that I got obviously after this

lawsuit was filed was in reference to that.  But I -- I

had no independent knowledge of that.

    Q.   Okay.  Do you know of any State Farm agents or

lawyers to your knowledge that had any part of that

lobbying effort?

    A.   I did not at the time.  There is suggestion

that the -- the CKS firm is involved in that.  But I did

not know that at the time.

    Q.   Do you know if any lawyers that defended your

mother had any independent involvement in any sort of

lobbying efforts for change in legislation?

            MR. BUTLER:  Form.

            THE WITNESS:  I -- I do not know.  And it -- I

        suspect the answer is no, but I don't know.

            MS. KIDD:  That's all I have.

            MR. BUTLER:  We'll attach those slides that

        you showed, Amanda, as plaintiff's next composite.

        We're done.  Thank you.

         (Plaintiff's Composite Exhibit No. 18

        marked/identified.)

            THE VIDEOGRAPHER:  Stand by.

            This concludes the deposition of Scott

        Laseter.  At 6:30 we're off the record.

         (Deposition concluded at 6:30 p.m.)

DISCLOSURE

2    STATE OF GEORGIA

3    COUNTY OF FAYETTE

4        Pursuant to Article 10.B of the Rules and

5    Regulations of the Board of Court Reporting of the

6    Judicial Council of Georgia, I make the following

7    disclosure:

8        I am a Certified Court Reporter and an independent

9    contractor.

10       I was contacted to provide court reporting services

11   for this deposition by Janice S. Baker & Associates.  I

12   will not be taking this deposition under any contract

13   that is prohibited by the O.C.G.A. 15-14-37(a) and (b)

14   or Article 7.C of the Rules and Regulations of the

15   Board.  I have no contract and/or agreement to provide

16   court reporting services with any party to this case or

17   any counsel in this case.

18       I am not disqualified for interest, personal or

19   financial, under O.C.G.A.  9-11-28(c).

20       I will charge my usual and customary rates to all

21   parties in the case.

22       On this date of November 8, 2023.

23

24                          _____

25                          Eric A. Edwards, CCR
                            4520-6049-0760-1920

CERTIFICATE

2    STATE OF GEORGIA

3    COUNTY OF FAYETTE

4        I, Eric A. Edwards, Certified Court Reporter,

5    certify that the foregoing pages 1 through 183 of the

6    transcript are a true, correct, and complete record of

7    the testimony given by the deponent, Scott Laseter, who

8    was first duly sworn by me; that I am not a relative,

9    employee, attorney, or counsel of any of the parties nor

10   financially interested in the action; that the said

11   deponent and counsel in the presence of each other and

12   before me did not reserve the reading and signing of the

13   deposition transcript; and the original deposition under

14   seal shall be filed with the court by the attorney

15   taking the deposition.

16       This certificate is expressly withdrawn and denied

17   upon disassembly and/or photocopying of the foregoing

18   transcript or any portion thereof unless such

19   disassembly or photocopying is done by the undersigned

20   Certified Court Reporter and signature and seal are

21   attached hereto.

22       On this date of November 24, 2023.

23

24   _____

25                    Eric Allen Edwards, CCR
                     4520-6049-0760-1920